**EXHIBIT A**

FILED: NEW YORK COUNT  CLERK 07/18/2014

NYSCEF DOC. NO. 1

INDEX NO. 652201/2014

RECEIVED NYSCEF: 07/18/2014

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

| | |
|---|---|
| ARROWHEAD CAPITAL FINANCE, LTD., | Index No. _____ |
| Plaintiff, | SUMMONS |
| v | |
| SEVEN ARTS ENTERTAINMENT, INC., | Basis of venue: CPLR 503(a) |
| Defendant | :. THIS IS A RELATED CASE TO #601199/2010 IN IAS PART 54 |

TO THE ABOVE-NAMED DEFENDANT:

Seven Arts Entertainment Inc.
8721 Sunset Boulevard, Suite 209
Los Angeles, CA 90069

    YOU ARE HEREBY SUMMONED to answer the Complaint in this action,

within twenty (20) days after service of this Summons, exclusive of the day of service, or

within thirty (30) days after service if this Summons is not personally delivered to you

within the State of New York. In case of your failure to answer, judgment will be taken

against you by the default for the relief demanded in the Complaint.

Dated: Allentown, Pennsylvania
    July 17, 2014

BARRY L. GOLDIN, ESQ.
*Attorney for Plaintiff Arrowhead Capital Finance Ltd.*
3744 Barrington Drive
Allentown, PA 18104-1759
Tel: 610-336-6680
Fax: 610-336-6678
Email: barrygoldin@earthlink.net
        And
240 Madison Avenue, 3rd Floor, NY, NY 10016

ARR40710.1COMSAE

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

| | |
|---|---|
| ARROWHEAD CAPITAL FINANCE, LTD., | Index No. _____ |
| Plaintiff, | COMPLAINT |
| v. | |
| SEVEN ARTS ENTERTAINMENT, INC., | THIS IS A RELATED CASE TO #601199/2010 IN IAS PART 54 |
| Defendant | |

Plaintiff Arrowhead Capital Finance, Ltd. ("Plaintiff" or "Arrowhead"), a Bermuda incorporated company, by its duly appointed liquidator W. William Woods (the "Liquidator"), by way of complaint against defendant Seven Arts Entertainment, Inc. ("Defendant" or "SAE"), alleges as follows:

## NATURE OF ACTION AND REQUESTED RELIEF

1. This is an action by plaintiff judgment creditor Arrowhead to have Defendant SAE added as an additional judgment debtor to, and jointly and severally liable for, the October 2012 Judgment to Arrowhead of $2,496,159.50, plus accrued interest and other relief (the "October 2012 Judgment"), which was entered in accordance with the June 2012 Decision & Order (the "June 2012 Decision") against SAE's predecessors Seven Arts Pictures PLC ("PLC") and Seven Arts Filmed Entertainment Limited ("SAFE") in the action entitled *Arrowhead Capital Finance Ltd. v. Seven Arts Pictures PLC et al*, in the Supreme Court of the State of New York, County of New York, Index No. 601199/2010 (IAS PART 54) (the "Predecessor Action"). [That June 2012 Decision and the October 2012 Judgment are attached hereto as Exhibits 1 and 2, respectively.]

2. That June 2012 Decision and the October 2012 Judgment were previously rendered as a result of the default of (among others) SAE's predecessors PLC and SAFE

in payment of a December 2006 Secured Subordinated Term Loan Promissory Note to Arrowhead (the "Arrowhead Note") and related agreements. [A copy of that Arrowhead Note is attached as Exhibit 3 hereto.]

3. Plaintiff judgment creditor Arrowhead seeks to have successor defendant SAE found jointly and severally liable for the duties and obligations of and relief awarded against SAE's predecessors PLC and SAE as (among other things):

(i) that Arrowhead Note explicitly states each "successor" of PLC or of SAFE "shall be jointly and severally obligated" thereunder; SAE has admitted in writing that SAE is the "successor" of PLC and of SAFE; and the federal courts also have adjudicated that SAE is "successor" of, and liable for adjudications previously rendered against, PLC;

(ii) SAE has continued to conduct the same business formerly conducted by, under the same management, ultimate ownership, and control, and using the same Seven Arts logo, name, facilities, and personnel as its predecessors, PLC and SAFE; and

(iii) PLC and SAFE received insufficient (if any) realizable consideration for transfer of all their assets to their affiliate SAE; rather, as a result of their asset transfers to SAE were left without assets to pay their obligations to Arrowhead and other creditors; and their asset transfers to SAE constitute an inequitable, improper, and fraudulent device employing the same adjudicated misconduct of their controlling figure Peter Hoffman ("Hoffman") as he previously employed to frustrate other collection and enforcement by other creditors.

THE PARTIES.

2

4. Plaintiff judgment creditor Arrowhead is a mutual fund company existing under
Bermuda law; had its principal place of business at c/o Citco Fund Services (Bermuda)
Limited, Washington Mall West, Second Floor, 7 Reid Street, Hamilton HM 11,
Bermuda; and was placed into voluntary liquidation, and the Liquidator appointed.
Pursuant to the "Consent Judgment and Permanent Injunction" dated December 23, 2008
issued in the action entitled *Arrowhead Capital Finance Ltd. v. Metro II LLC, Arrowhead
Consulting Group LLC et al*, Supreme Court NY Co., Index No. 600136/2008 [copy
attached as Exhibit 6 hereto], Arrowhead has been assigned and is the holder of the
Arrowhead Note [copy attached as Exhibit 3 hereto] and related rights under a Master
Agreement dated as of December 22, 2006 among, Arrowhead, Cheyne Specialty
Finance Fund L.P. ("Cheyne"), and signatory affiliates of Peter Hoffman, including
(among others) PLC, SAFE, and Seven Arts Pictures, Inc. ("SAP") [copy of that Master
Agreement is attached as Exhibit 4 hereto].

5. Defendant SAE is a corporation incorporated under the laws of the State of
Nevada, currently having its principal address at 8721 Sunset Boulevard, Suite 209, Los
Angeles, CA 90069, which also has been and is an office address of its controlling person
Peter Hoffman ("Hoffman") and other Hoffman affiliates.

6. At all pertinent times, defendant SAE has been and is managed by Peter
Hoffman with the assistance of his daughter Kate (aka Katherine) Hoffman ("Kate
Hoffman").

7. On November 9, 2010, PLC announced that it had redomiciled in the United
States by transfer of all its assets to SAE, in a reorganization in which SAE continued
PLC's business [see the November 9, 2010 press release attached as Exhibit 7 hereto];

3

SAE became owner of and thereafter continued to conduct the business formerly conducted by PLC; SAE became and remains a registrant with and required to make public filings with the U.S. Securities and Exchange Commission (the "SEC"); and SAE's shares thereafter have been traded in the U.S. in the penny over-the-counter market.

8. In connection with PLC's asset transfer to SAE, PLC transferred all shares of PLC's wholly-owned subsidiary SAFE (a U.K. company), so that SAFE became a wholly-owned subsidiary of SAE.

9. In or about January 1, 2012, SAE caused all remaining assets of its then wholly-owned subsidiary SAFE to be transferred to SAE, thereby redomiciling SAFE's assets and business in the United States; SAE thereafter continued to conduct the entertainment-related business formerly conducted by SAFE; and, according to SAE's filings with the SEC, that transfer to SAE of SAFE's assets "had no impact on [SAE's] consolidated financial statements" [see SAE's Annual Report on Form 10-K/A for the year ended June 30, 2013 (Ex. 12 hereto at p. 5)].

10. SAE is thus the transferee of the assets and business of, the successor to, and continues to conduct the business of, its predecessors PLC and SAE, under continuing management and control of their same controlling figures, namely Peter Hoffman and his daughter Kate Hoffman.

### SAE's Affiliates PLC and SAFE.

11. PLC is a corporation organized under the laws of England. At all pertinent times PLC was managed and controlled by Peter Hoffman with the assistance of his daughter Kate Hoffman.

12. Peter and Kate Hoffman arranged transfer, completed in or about November 2010, of PLC's then remaining assets to SAE in the reorganization in which SAE continued PLC's business, but that business was re-domiciled through SAE in the United States [see the November 9, 2010 press release of PLC attached as Exhibit 7 hereto].

13. On or about November 8, 2011, PLC was placed in involuntary liquidation in the U.K. under English law. But, because all PLC assets already had been transferred from PLC prior to its being placed in involuntary liquidation, the U.K. liquidator has lacked resources to pay fees and costs of liquidator, attorneys, accountants, and others and so has made little or no effective effort to recover any of the assets which were transferred from PLC prior to its liquidation.

14. SAFE is a corporation organized under the laws of England; at all pertinent times has been managed and controlled by Peter Hoffman with the assistance of his daughter Kate Hoffman; and, under the direction and control of Peter and Kate Hoffman transferred its assets to SAE effective as of January 1, 2012, as a result of which SAFE was left with little or no realizable assets to pay SAFE's creditors, including the claims for approximately $2.5 million on the defaulted Arrowhead Note owing to Arrowhead as to which Arrowhead had filed its Complaint in 2010 and obtained the June 2012 Decision and October 2012 Judgment against (among others) SAFE in the Predecessor Action.

15. In or about April 2013, another SAFE creditor (namely Content Media Corporation Limited) initiated liquidation proceedings in the U.K. against SAFE, resulting in SAFE being placed in involuntary liquidation under English law.

16. SAFE's U.K. Liquidator filed a Statement of Affairs of judgment debtor SAFE, signed by Kate Hoffman and dated October 9, 2013 [copy attached as Exhibit 13

5

hereto], which shows that SAFE's only purported realizable assets consisted of approximately $2,000 of cash in bank, and that SAFE admitted debts of more than $15 million (before taking into account the October 2012 Judgment of approximately $2.5 million previously entered in favor of Arrowhead against SAFE in Arrowhead's Predecessor Action).

17.  Because SAFE's assets had been transferred to SAB effective as of January 2012, thereby stripping SAFE of realizable assets more than a year prior to judgment debtor SAFE's being placed in involuntary U.K. liquidation, SAFE's U.K. liquidator has lacked resources to pay fees and costs of liquidator, attorneys, accountants, and others and so has made little or no effective effort to recover any of the assets which were diverted or otherwise transferred from SAFE prior to its liquidation.

### The Arrowhead Note.

18.  This action arises from default of obligors (including PLC, SAFE, and SAP) and their successor SAE to pay the Arrowhead Note.  In Arrowhead's Predecessor Action, the New York Supreme Court already has rendered its June 2012 Decision and subsequent October 2012 Judgment holding Hoffman affiliates (including, among others, SAFE, PLC, and SAP) jointly and severally liable for the amounts due on the defaulted Arrowhead Note.   In the instant action, Arrowhead seeks adjudication that SAE (as admitted successor to PLC and SAFE and their business and as transferee of Collateral securing the Arrowhead Note) also is jointly and severally liable for the obligations of PLC and SAFE under the June 2012 Decision and October 2012 Judgment [Ex.s 1 & 2 hereto] and the underlying Arrowhead Note [Ex. 3 hereto], Master Agreement [Ex. 4 hereto], Loan and Security Agreements and Copyright Mortgages and Assignments

referenced in the Master Agreement [collectively the "Financing and Security Agreements"], and related Agreements.

19. The Arrowhead Note on which the October 2012 Judgment was based was signed by Hoffman for each borrower (including PLC, SAFE and SAP), each of which then was a Hoffman affiliate. The Arrowhead Note states, and each borrower therein agreed, the Arrowhead Note is governed by New York law; each signatory (so including PLC, SAFE and SAP) and their "successors ... shall be jointly and severally obligated" thereunder; and the signatories "and their successors" irrevocably consent and submit to the jurisdiction of the New York Court "and waive any objection based on forum non-conveniens". In the words of the Arrowhead Note [Ex. 3 hereto]:

> (i) [at p. 2] "THIS NOTE, AND ALL MATTERS RELATED HERETO AND/OR ARISING HEREFROM, SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, ... and shall be binding upon the Undersigned and the Undersigned's legal representatives or successors"

> (ii) [at pp. 2-3] "... the term 'Undersigned' as used herein shall mean all parties signing this Note, and each one of them, and all such parties, their respective legal representatives, successors and permitted assigns, shall be jointly and severally obligated hereunder."

> (iii) [at p. 3] 'To induce the Lender [Arrowhead] to make the loan evidenced by this Note, the Undersigned (i) irrevocably agrees that, subject to Lender's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS NOTE OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK, THE UNDERSIGNED HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY ... COURTS LOCATED WITHIN SAID CITY AND STATE; AND (II) WAIVES ANY OBJECTION BASED ON FORUM NON-CONVENIENS.

20. The Arrowhead Note further states that it is entitled to all the benefits and security of the Master Agreement. The Arrowhead Note so states [Ex. 3 hereto at p. 1]

This ... Note is the "Arrowhead Note" issued in connection with, further evidences the Undersigned's obligation ... under, and is delivered pursuant to that certain Master Agreement bearing even date herewith.... together with all exhibits thereto... (the 'Agreement') and is entitled to all of the benefits and security of the Agreement. All of the terms, covenants and conditions of the Agreement are hereby made a part of this Note and are deemed incorporated herein in full."

21. In the Master Agreement, the parties thereto (including SAE's predecessors PLC and SAFE) agreed that Agreement shall be governed by New York law and consented to jurisdiction of the New York courts located in Manhattan. In the words of Master Agreement §9.5.5 [see Ex. 4 hereto]:

"9.5.5. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. All of the parties hereto irrevocably submit to the jurisdiction of the state ... courts located in the Borough of Manhattan, The City of New York, in the State of New York, for the resolution of any and all disputes arising hereunder."

22. In the Arrowhead Note the obligors (including PLC and SAFE and their successors) further agreed that "all service of process shall be made as provided in the" Master Agreement [Ex. 3, p. 3 (penultimate paragraph)]. In turn, the Master Agreement permits service by (among other things) "any reputable overnight courier service" and states such service "shall be deemed received one (1) Business Day following delivery to such courier service" [Ex. 4, Master Agreement §9.1].

23. In the Master Agreement (and thus in the Arrowhead Note which incorporates the definitions of the Master Agreement):

(i) the term "Borrower" is defined to include the signatory Hoffman affiliates (including, among others, PLC, SAFE and SAP ) [Master Agreement first paragraph];

(ii) the term "Pictures" is defined to include the motion pictures *Deal*, *Noise*, and *Pool Hall Prophets* (aka *Shooting Gallery*] [Master Agreement §1.3]; and

(iii) the term "Collateral" is further defined as follows [Master Agreement §2.7]:

8

"2.7. ... the term Collateral is hereby amended to include all Collateral under the Deal Loan Documents and the Noise Loan Documents and all collateral granted to the Lenders [Arrowhead and Cheyne] pursuant to this paragraph. ... As additional security, ... each Borrower... hereby grants to [Arrowhead and Cheyne], a continuing first priority perfected security interest ... in, lien on, assignment of and right of set-off against, all of its respective right, title and interest in and to the following property and assets of such Borrower, whether now owned or existing or hereafter acquired or arising, regardless of where located:

2.7.1. Seven Arts right, title and interest in distribution fees payable in connection with the films *'Bao'*, *'Broken'*, and *'Mirror Wars'* (together with the Pictures [*Deal*, *Noise*, and *Shooting Gallery*], the 'Films';

...

2.7.3. all of such Borrower's right, title and interest (if any) in and to each and every Picture, the scenario, screenplay or script upon which such Picture is based, all of the properties thereof, tangible and intangible, and all domestic and foreign copyrights and all other rights therein and thereto, of every kind and character, whether now in existence or hereafter to be made or produced, and whether or not in possession of the Borrowers, including with respect to each and every one of the Pictures and without limiting the foregoing language, each and all of the following particular rights and properties (to the extent they are owned or hereafter created or acquired by the Borrowers); and

2.7.4. eight million, one hundred thousand (8, 100,000), shares of Seven Arts Pictures PLC owned by SAP, as evidenced by the Pledge Agreement ..."

24. In turn, under the Financing and Security Agreements for the respective

Pictures, the term "Collateral" was defined to include (among other things):

"(ii) all of Producer's right, title and interest in the Picture, including their right to possession thereof; (iii) all goods, accounts, contract rights, general intangibles, equipment, copyrights, trademarks, and any proceeds thereof or income therefrom, including all of Producer's right, title and interest (and the other co-producer's right, title and interest) in and to the distribution agreements and subsidies set forth in Schedule I hereto or otherwise; (iv) all film, tape and sound elements thereof in all forms and formats; (vi) a subordinate lien on all assets of Seven Arts Future Flows I LLC; and (vi) all of the ownership interests in the LLCs."

See, the definition of "Collateral" on page 25 of the *Deal* Financing and Security

Agreement and the *Noise* Financing and Security Agreement.

25. As set forth in the prior Financing and Security Agreements and in the Master Agreement, any proceeds of those Pictures were required to be held in trust for and delivered for the benefit of Arrowhead.  The Hoffman affiliates (including without limitation PLC, SAFE, and SAP) so agreed (as set forth in the Financing and Security agreements for both the Pictures *Deal* and *Noise*):

> "8.3. <u>Producer to Hold in Trust</u>.  ... upon receipt by it of any revenue, income, profits or other sums in which a security interest is granted by this Financing Agreement, payable pursuant to any agreement or otherwise, or of any check, draft, note, trade acceptance, or other instrument evidencing an obligation to pay such sum, to hold the same in trust for Financier [Arrowhead] , and to forthwith, without any notice or demand whatsoever (all notices, demands, or other actions on the part of Financier being expressly waived), endorse, transfer, and deliver any such sums or instruments, or both, to Financier to be applied to the repayment of Obligations." [emphasis added]

26. Pursuant to Master Agreement §5.1, Arrowhead and the other parties (including without limitation SAB's predecessors PLC and SAFE) further agreed that "all payments relating to or as proceeds from exploitation of any of the Pictures or other Collateral" shall be received and held "in trust for, and as the sole and exclusive property of" Cheyne [until the Cheyne Note was paid] and of Arrowhead, and, "immediately upon receipt", shall be remitted "to the Collection Account".  The last sentence of Master Agreement §5.1 states [Ex. 4]:

> If the Borrowers or any Affiliated Person or any shareholder, officer, director, employee or agent of the Borrowers or any Affiliated Person, or any **other Person acting for or in concert with the Borrowers** shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds from the exploitation of any of the Pictures or other Collateral, the Borrowers and each such Person **shall receive all such items in trust for, and as the sole and exclusive property of the Bank [Arrowhead and Cheyne] and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Collection Account."** [emphasis added]

27. In Master Agreement §5.1, the parties (including, among others, SAE's predecessors PLC and SAFE) acknowledged that Cheyne already "has established" a specifically identified collection account with "The Chase Manhattan Bank, New York" (the "New York Collection Account"); that "all proceeds of the Pictures [such as "*Deal*", "*Noise*", and *Pool Hall Prophets*"] paid or payable" "shall ... be deposited into the Collection Account"; that "any account debtor with respect to any of the Pictures" shall be directed to wire such funds "to the Collection Account"; that those monies "on deposit in the Collection Account" shall be applied to pay interest and principal on the Cheyne Note and then to pay interest and principal on the Arrowhead Note; and that a monthly statement shall be provided showing deposits into the Collection Account "and the application thereof to the Cheyne Note and the Arrowhead Note".

28. The Master Agreement was explicitly referenced in the "Assignment of Interest in Copyright Mortgage and Assignment' dated as of December 22, 2006 (as recorded in the United States Copyright Office on January 22, 2007 at Vol. 3548 Doc. No. 29), confirming the prior Copyright Mortgages and security interests granted by Hoffman's affiliates to Arrowhead in (among other things) the motion pictures and copyrights to *Deal* and *Noises*, and all accounts receivable, cash and non-cash proceeds and other Collateral related thereto or derived therefrom, and further confirming Arrowhead's continuing mortgage and security interest therein subordinate only to the then senior interest of Cheyne.  [Exhibit 5 hereto is that "Assignment of Interest in Copyright Mortgage and Assignment" as recorded with the Copyright Office.]

## JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this dispute and over defendant SAE, as this action arises out of or related to the Arrowhead Note and the Master Agreement and related documents which (i) by the terms thereof are explicitly governed by New York law; (ii) relate to an obligation exceeding one million dollars in the aggregate; and (iii) contain provisions whereby Defendant SAE (as "successor" to PLC and SAFE) has submitted to the jurisdiction of the courts of this State. See NY CLS Gen. Oblig. §5-1402; Arrowhead Note [Exhibit 3 hereto].

30. This Court also has jurisdiction over defendant SAE pursuant to:

(a) CPLR 302(a)(1) because SAE has been transacting business within the State of New York;

(b) CPLR 302(a)(2) because SAE has committed one or more tortious acts within the State causing injury to person or property within the State (including without limitation breaches of trust as to proceeds required by the Master Agreement and related documents to be held in trust and deposited into a Collection Account at The Chase Manhattan Bank, New York and then remitted from that New York Collection Account to Arrowhead and as to film elements and other Collateral required by the Master Agreement and related documents to be deposited in film laboratories as to which Arrowhead is required to, but has not been provided access and knowledge); and

(c) CPLR 302(a)(3) because SAE has committed one or more tortious acts without the State causing injury to person or property within the State (including without limitation diversion for itself and its affiliates proceeds which were required to be held in trust and deposited into a Collection Account at The Chase Manhattan Bank, New York and depositing film elements and other Collateral in film laboratories as to which

Arrowhead was and is required to, but has not been provided access and knowledge and otherwise refusing to provide Arrowhead documents and information as to which Arrowhead is entitled under the Master Agreement and related documents and the New York Supreme Court's June 2012 Decision and October 2012 Judgment.

### FACTUAL BACKGROUND.

Peter Hoffman's Previously Adjudicated History of Fraud, Fraudulent Transfers, Contempt, and Other Misconduct.

31.  Previously, Peter Hoffman previously was found by an arbitrator to have committed fraud against another creditor (Jonesfilm) by diverting for himself funds he had been required to hold in trust and deliver to that creditor; that arbitration award was confirmed, and he was further adjudicated to be the "alter ego" of his company and held personally liable for that misconduct, by the Los Angeles Superior Court; and that judgment against him was affirmed by May 4, 2006 decision of the California appellate court in *Lions Gate Films, Inc. v. Jonesfilm and NTTS Productions Ltd.*, Case No. BS 092529 (appellate decision B183198).

32. Peter Hoffman also has an adjudicated history, and *modus operandi*, of transferring assets from one of his affiliated corporate shells to another and then leaving transferor corporate shell inactive and without assets in order to avoid paying claims of creditors, as described in (among other things) arbitration awards, including an award dated June 22, 2006 obtained by a judgment creditor (Jonesfilm) against his affiliates (including among others PLC, SAFE and SAP) in IFTA Case No. 5-56 entitled *Jonesfilm v. Cinevisions, Seven Arts Pictures, Inc., Seven Arts Filmed Entertainment Limited, and Seven Arts Pictures PLC*; those arbitration awards were confirmed by June 19, 2007 Order and Judgment of the U.S. District Court for the Central District of California in the

action entitled *Seven Arts Pictures, Inc. et al v. Jonesfilm*, Case No. CV 05-1292 c/w CV 06-2387; and that judgment was affirmed by February 12, 2009 decision of the U.S. Court of Appeals for the Ninth Circuit, No. 07-56045.

33. Peter Hoffman and his affiliates PLC and SAFE also have been held in contempt by federal courts at least thrice for transfer of assets in disobedience of post-judgment garnishment and turnover orders, and for refusal to provide post-judgment discovery, including the following:

(i) Contempt adjudication dated February 26, 2008 of the U.S. District Court for the Central District of California, *Seven Arts Pictures, Inc. et al v. Jonesfilm*, Case No. CV 05-1292 c/w CV 06-2387; affirmed by February 12, 2009 decision of the U.S. Court of Appeals for the Ninth Circuit, No. 07-56045;

(ii) Contempt Order dated November 15, 2011 of the U.S. District Court for the Eastern District of Louisiana, *Seven Arts Pictures, Inc. et al v. Jonesfilm*, CV No. 09-4814 c/w 09-4815, affirmed by February 18, 2013 decision of the U.S. Court of Appeals for the Fifth Circuit, 512 Fed. Appx. 419, 2013 WL 599661; and

(iii) Contempt adjudication dated November 1, 2012 of the U.S. District Court for the Eastern District of Louisiana, *Seven Arts Pictures Inc. et al v. Jonesfilm*, CV No. 09-4814 c/w 09-4815 (2012 WL 5398439), affirmed by August 8, 2013 decision of the U.S. Court of Appeals for the Fifth Circuit, 538 Fed. Appx. 444, 2013 WL 4018659.

The New York Supreme Court's June 2012 Decision and October 2012 Granted Judgment Creditor Arrowhead Judgment for Approximately $2.5 million on the Defaulted Arrowhead Note, and "Execution Therefor".

34. The New York Supreme Court's June 2012 Decision in Arrowhead's Predecessor Action (Index No. 601199/201) granted plaintiff Arrowhead's motion for

partial summary judgment on the Arrowhead Note against Hoffman-affiliate signatories

to that Arrowhead Note, including (among others) "defendant-borrowers Seven Arts

Pictures PLC (Seven Arts), Seven Arts Filmed Entertainment, Ltd. (SAFE), ... [and]

Seven Arts Pictures, Inc. ("SAP") [Exhibit 1 hereto (see pp. 1 & 16-17 thereof)].

35. In the June 2012 Decision the Court found the promissory note to senior

creditor Cheyne (the Cheyne Note) had been satisfied by payment to Cheyne [at p. 12

"Cheyne's acceptance of payment ... constituted an accord and satisfaction of the Cheyne

Note]; the Arrowhead Note thus was no longer subordinate to that satisfied Cheyne Note;

and plaintiff Arrowhead "has established its right to foreclosure of the Collateral securing

the amounts due under the Arrowhead Note" [at p. 17]. That Decision [at p. 17] then

ordered Arrowhead's motion for summary judgment:

> "is granted on liability ... against defendants Seven Arts Pictures PLC, Seven Arts
> Filmed Entertainment Ltd., ... Seven Arts Pictures, Inc., ..."

36. Plaintiff Arrowhead then obtained entry of the October 2012 Judgment against

Hoffman affiliates (including, among others, SAFE and SAP), jointly and severally, in

the amount of $2,496,159.50 (consisting of the principal and then accrued interest on that

Arrowhead Note), and that Judgment further ordered "execution therefor" [Exhibit 2

hereto.]

37. That June 2012 decision and October 2012 Judgment were affirmed by

October 2013 decision of the First Appellate Department, and all other or further rights to

appeal of the defendants thereto (including without limitation PLC, SAFE, and SAP)

have expired.

38. No payment has been made to plaintiff judgment creditor Arrowhead of any

of the Arrowhead Note nor of that June 2012 Decision or the October 2012 Judgment.

15

39. Hoffman's affiliates have refused to provide Arrowhead any accountings, documents or information which they were required to provide Arrowhead as to (among other things) proceeds required to be held in trust and deposited into the New York Collection Account for the benefit of Arrowhead, and film rights, film materials, distribution agreements, and other Collateral under the Master Agreement and related agreements and documents.

SAE Is Admitted Successor to, and Liable for the Obligations of PLC, to Arrowhead

40. In SAE's press releases and filings with the SEC, SAE has repeatedly admitted that SAE is the "successor to Seven Arts Pictures PLC". For instance, attached to SAE's Form 8-K filing with the SEC, signed by Peter Hoffman and dated September 6, 2012, was an SAE press release dated August 31, 2012 which states "Seven Arts Entertainment Inc. is the successor to Seven Arts Pictures Plc". [A copy of that SEC filing and press release is attached as Exhibit 9 hereto.]

41. Subsequently, the Louisiana federal court's November 1, 2012 decision found SAE to be judgment debtor PLC's "successor"; thus bound by a judgment which a judgment creditor had obtained against PLC; and so jointly and severally liable with PLC under that judgment to the judgment creditor. See *Seven Arts Pictures, Inc. v. Jonesfilm,* 2012 WL 5398439 at *7. Later, that District Court holding was affirmed by the U.S. Court of Appeals for the Fifth Circuit as follows:

> "Appellants [including Hoffman and SAFE] contend that ... Seven Arts Entertainment Inc. is not a judgment debtor. We reject this argument. The California district court's judgment confirming the arbitration award in favor of Jonesfilm explicitly states that it is binding on the judgment debtors' successors. **We agree with the district court that Seven Arts Entertainment Inc. is the successor of the named judgment debtor Seven Arts Pictures PLC."** [emphasis added]

16

*Seven Arts Filmed Entertainment Limited v. Jonesfilm*, 538 Fed. Appx. 444, 447 at fn. 3 (5th Cir. August 8, 2013).

42. In further SAE filings with the SEC, SAE continued to admit SAE "is the continuation of the business of" PLC, and stated that PLC's business had been so re-domiciled during 2010 into SAE "with no change in the economic interests of our shareholders". As described by SAE [SAE's Amended Annual Report on Form 10-K/A as filed with the SEC on November 9, 2012 (Ex. 10 hereto as p. 4)]:

> "We [SAE] are the continuation of the business and the successor of the NASDAQ listing to PLC, whose predecessor Seven Arts Pictures, Inc. ('SAP') was founded in 2002 ...
>
> ... As of June 11, 2010, we entered into an Asset Transfer Agreement..., to transfer all of the assets with a cost basis from PLC to us ... The purpose of this transfer was to eliminate our status as a foreign private issuer and to assume compliance with all obligations of a domestic issuer under all applicable state and Federal securities laws. Our intention in executing this transaction was to redomicile our business with no change in the economic interests of our shareholders."

Likewise, SAE's Form 10-Q for the quarter ended December 31, 2012 as filed with the SEC [Ex. 11 hereto at p. 6] reiterated that:

> "Seven Arts Entertainment, Inc. (herein referred to as the 'Company', 'Seven Arts' or 'SAE'), a Nevada Corporation, is the continuation of the business of Seven Arts Pictures Plc ('PLC') ..."

43. PLC received no realizable consideration for transfer of all PLC's assets to SAE, as SAE paid no realizable consideration to PLC, and in any event, SAE did not have and did not proffer any additional assets to further secure PLC's obligations to Arrowhead and other creditors.

44. In light of (among other things) SAE's admissions against interest in its SEC and other filings and press releases that SAE is PLC's "successor" and the continuation of PLC's business, and in accordance with the adjudications previously had against SAE

(including the November 1, 2012 adjudication of the Louisiana federal court affirmed by the Fifth Circuit Court of Appeals that SAE is the "successor" of PLC and jointly and severally liable for PLC's obligations), SAE is jointly and severally liable for all obligations of its predecessor PLC to Arrowhead (whether under the Arrowhead Note, the Master Agreement, or related agreements, and also under the adjudications had against PLC, including the June 2012 Decision and October 2012 Judgment).

SAE Is Also Admitted Successor to PLC, and Liable for PLC's Obligations to Arrowhead.

45. Upon the November 2010 completion of transfer to SAE of all PLC assets (including without limitation PLC's ownership of SAFE), SAFE became and thereafter has been a wholly-owned subsidiary of SAE.

46. Subsequently, Peter Hoffman, his daughter Kate Hoffman and SAE utilized their control over SAE's wholly-owned subsidiary SAFE to have all SAFE assets transferred to SAE effective as of January 1, 2012.

47. SAFE received no realizable consideration for transfer of SAFE's assets to SAE, as SAE paid no consideration to SAFE; SAE was already liable for SAFE obligations; and in any event, SAE did not have nor provide any additional assets to further secure SAFE's multi-million dollar obligations to Arrowhead and other creditors.

48. As a result of the transfer of SAFE's assets to SAE effective as of January 1, 2012, SAFE was left with little or no assets and more than $15 million of debts (including obligations to Arrowhead under the Arrowhead Note, the Master Agreement, and other obligations which were the subject of Arrowhead's 2010 Predecessor Action against SAFE and other Hoffman affiliates, and which resulted in the July 2012 Decision and the October 2012 Judgment of approximately $2.5 million entered in Arrowhead's

favor against SAFE and other Hoffman affiliates).   That transfer of SAFE's assets to SAE, leaving SAFE without realizable assets to pay multi-million obligations to Arrowhead and other creditors, repeated Hoffman's prior scheme of transferring assets from one corporate affiliate to another and so leaving transferor affiliate an empty shell without assets to pay creditors, as previously described in the June 2006 California arbitration award (IFTA Case No. 5-56), confirmed by June 19, 2007 Order and Judgment of the federal district court in California [*Seven Arts Pictures, Inc. v. Jonesfilm*, Case No. CV 05-1292 c/w CV 06-2387], and affirmed by February 19, 2009 decision of the Ninth Circuit Court of Appeals against PLC, SAFE, and SAP.

49. After transfer of SAFE's assets to SAE, SAE continued to conduct SAFE's business without change under the same "Seven Arts" name, using the same "Seven Arts" logo, personnel, telephone number, equipment, and facilities, and under the same management, direction, and control of Peter Hoffman and his daughter Kate Hoffman, as previously conducted by Peter and Kate Hoffman through SAFE.

50.  In SAE's filings with the SEC, SAE states that SAE purports to own (as a result of transfers to SAE from its predecessors) copyrights to or distribution rights for motion pictures which constitute part of judgment creditor Arrowhead's Collateral, including (among others) the motion pictures entitled *Deal*, *Noise*, and *Shooting Gallery* aka *Pool Hall Prophets*, and also *Boo*, *Broken* aka *A Broken Life*, and *Mirror Wars* [see Exhibit 12 hereto, pp. 13-17 of the Annual Report on Form 10-K for the year ended June 30, 2013 as filed with the SEC in or about October 19, 2013].

51.  SAE issued an October 31, 2013 press release which describes "its partnership with Tony Lytle Media Sales "to manage Seven Arts film library", and, in that press

release, describes SAE's business in nearly identical terms to its prior description of the

business of SAE's predecessors PLC and SAFE (even backdating the purported founding

of SAE to the earlier founding of PLC, SAFE, and SAP), as follows:

> "About Seven Arts Entertainment Inc.:
> Seven Arts Entertainment Inc. was founded in 2002 as an independent motion
> picture production and distribution company engaged in the development,
> acquisition, financing, production and licensing of theatrical motion pictures for
> exhibition in domestic (i.e. the United States and Canada) and foreign theatrical
> markets and for subsequent worldwide release in other forms of media, including
> home video and pay and free television."

[A copy of that October 31, 2013 press release is attached as Exhibit 14 hereto.]

52. In subsequent materials posted by SAE under the name "Seven Arts Pictures"

on the Internet, SAE further backdated its purported founding to "1994"; states it was so

"founded in 1994 to produce and acquire feature films" (thereby further confirming it is

the successor to the prior business of Seven Arts Pictures, PLC, and SAFE); and further

states it "currently has a library of 33 films" including *"Deal"* (starring Burt Reynolds and

Shannon Elizabeth), *"Noise"* (starring Tim Robbins and William Hurt), and *"Shooting

Gallery"* (starring Freddie Prinze, Jr. and Ving Rhames) [see the Internet posting which is

Exhibit 15 hereto].

53. Those films *Deal, Noise* (aka *The Rectifier*), and *Shooting Gallery* (aka *Pool

Hall Prophets*) are the very films financed by plaintiff judgment creditor Arrowhead and

in which Arrowhead was granted and has perfected first priority Copyright Mortgages

filed not later than 2006 with the U.S. Copyright Office and security interests securing

the obligations to Arrowhead under the 2012 Judgment and the underlying Arrowhead

Note, the Master Agreement, and the related Financing and Security Agreements signed

by Hoffman affiliates PLC, SAFE, SAP, Deal Productions LLC, Deal Investments LLC, Rectifier Productions LLC, Pool Hall Productions LLC, *et al.* [see Exhibits 3-6 hereto]

54. In light of (among other things) SAE's admissions against interest in its SEC and other filings and press releases that SAE is the "successor" to PLC and SAFE and the continuation of their business, SAE is jointly and severally liable for all duties and obligations of its predecessors PLC and SAFE to Arrowhead (whether under the Arrowhead Note, the Master Agreement, related agreements, June 2012 Decision, October 2012 Judgment, or otherwise).

## FIRST CAUSE OF ACTION
### Declaratory Judgment
(Against Defendant SAE)

55. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 54 as set forth at length herein.

56. As adjudicated in the June 2010 Decision and the October 2012 Judgment, the Arrowhead Note became and is due and payable by (among others) PLC and SAFE to judgment creditor Arrowhead in the amount of $2,496,159.50, plus accrued interest and other relief.

57. SAE is the "successor" and continuation of the business of PLC and of SAFE; SAFE completed acquisition of the business of PLC in or about November 2010 and of SAFE effective as of January 1, 2012 without paying adequate, realizable consideration therefor, and so leaving PLC and SAFE unable to satisfy their obligations to Arrowhead under (among other things) the Arrowhead Note, the Master Agreement, and related Financing and Security Agreements, and the June 2012 Decision and the October 2012 Judgment.

WHEREFORE, plaintiff Arrowhead seeks declaratory judgment that defendant SAE (as among other things "successor" of PLC and of SAFE and continuation of their business) is jointly and severally liable to Arrowhead for all duties, liabilities and obligations of predecessors PLC and SAFE (whether under the Arrowhead Note, the Master Agreement, related Financing and Security Agreements, June 2012 Decision, October 2012 Judgment, or otherwise); Arrowhead has valid, first priority, and superior Copyright Mortgages and security interests in the Collateral; and Arrowhead is entitled to enforce against SAE all Arrowhead's rights and remedies with respect to the Collateral (whether under the Arrowhead Note, the Master Agreement, related Financing and Security Agreements, June 2012 Decision, October 2012 Judgment, or otherwise).

### SECOND CAUSE OF ACTION
### Breach of Contract
### (Against Defendant SAE)

58. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 57 as set forth at length herein.

59. By its terms, the Arrowhead Note was and is binding on the "Undersigned", which therein was defined therein to mean (among others) each of PLC and SAFE and their "respective ... successors ... jointly and severally" [Ex. 3 hereto at pp. 2-3].

60. SAE is, has admitted itself to be, and has been adjudicated, "successor" of PLC, and thus SAE has been and is bound by and obligated for all duties and obligations of PLC under the Arrowhead Note, the Master Agreement, and the related Financing and Security Agreements and also the June 2012 Decision and the October 2012 Judgment.

61. SAE is, and has admitted itself to be the "successor" to SAFE, and thus has been and is bound by and obligated for all duties and obligations of SAFE under the

Arrowhead Note, the Master Agreement, and the related Financing and Security Agreements and also the June 2012 Decision and the October 2012 Judgment.

62. SAE has defaulted under the Arrowhead Note and breached duties and obligations of its predecessors PLC and SAFE under the Master Agreement, and the related Financing and Security Agreements, and such defaults and breaches are continuing.

63. Arrowhead obtained the June 2012 Decision against PLC and also the June 2012 Decision and the October 2012 Judgment against SAFE, but neither PLC nor SAFE has complied with those adjudications, and Arrowhead has not been paid any of the October 2012 Judgment nor received delivery of any of the Collateral thereunder.

64. As a direct and proximate result of defendant SAE's continuing breach of and failure to comply with and satisfy its obligations to Arrowhead (whether under the June 2012 Decision, the October 2012 Judgment, the Arrowhead Note, the Master Agreement, the Financing and Security Agreements, related documents, the June 2012 Decision, the October 2012 Judgment, applicable law, or otherwise), plaintiff Arrowhead has suffered damages for which the defendant SAE is liable, jointly and severally, in an amount to be proven at trial but, in any event not less than the amount of $2,496,159.50 in the October 2012 Judgment and interest accrued thereon.

WHEREFORE, plaintiff Arrowhead demands judgment against defendant SAE for compensatory and consequential damages in an amount not less than the $2,496,159.50 awarded in the October 2012 Judgment, plus interest and costs of suit, attorneys' fees and such other relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
**Breach of Duty to Account**

23

(Against Defendant SAE)

65. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 64 as set forth at length herein.

66. Defendant SAE, successor to PLC and to SAFE, had, continues to have, and continues to breach duties and obligations to beneficiary Arrowhead under the Arrowhead Note, Master Agreement (including without limitation §5.1 thereof) and related Financing and Security Agreements, requiring that all proceeds of the Pictures and other Collateral be accounted, held in trust, and deposited into the New York Collection Account for the benefit of Arrowhead, and then be remitted to Arrowhead to pay obligations with respect to the Arrowhead Note.

67. Defendant SAE, successor to PLC and to SAFE, had, continues to have, and continues to breach, duties and obligations under the Master Agreement, the Financing and Security Agreements, related agreements, and applicable law, to provide Arrowhead statements and access to and turn over or otherwise deliver to Arrowhead film rights, film materials, laboratory access letters, distribution agreements, documents, information, and other Collateral.

WHEREFORE, plaintiff Arrowhead is entitled to, and demands, judgment ordering defendant SAE to promptly (but in any event within 10 days from the date of the order) deliver to plaintiff Arrowhead:

(a) a full, true, and complete accounting of all funds and other proceeds of the Pictures; a full, true and complete listing of all bank accounts (including the bank's full name, address, and other contact information) into which those funds and other proceeds were deposited and through which those funds and other proceeds were transferred and

24

all bank statements and other documents reflecting those deposits and transfers; and a full, true, and complete tracing of all proceeds and other property which were required to be paid to or for plaintiff Arrowhead and all rights and property in which those funds and Collateral may be traced;

(b) a full, true, and complete list of the names and addresses of all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located; and

(c) irrevocable Direction Letters from and duly signed by SAE in which SAE authorizes all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located, to provide Arrowhead, Arrowhead's successors and assigns, and their designees unrestricted and unencumbered access thereto.

## FOURTH CAUSE OF ACTION
### Breach of Trust
#### (Against Defendant SAE)

68. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 67 as set forth at length herein.

69. Defendant SAE, successor to PLC and SAFE, had, continues to have, and continues to breach duties and obligations to beneficiary Arrowhead:

(i) under the Master Agreement (including without limitation §5.1 thereof), the Financing and Security Agreements, and applicable law, to cause to be held in trust and deposited into the New York Collection Account for the benefit of Arrowhead all proceeds of the Pictures and other Collateral, so that those proceeds may be disbursed to Arrowhead to pay the Arrowhead Note; and

(ii) under the Master Agreement, the Financing and Security Agreements, and applicable law, to hold for the benefit of Arrowhead film rights, film materials, laboratory access letters, distribution agreements, proceeds, and other Collateral constituting security for payment of the Arrowhead Note.

70. Defendant SAE breached, violated, and continues to breach and violate, its respective trust and fiduciary obligations to Arrowhead by (among other things):

(i) not requiring proceeds of the Pictures and other Collateral be held in trust for and deposited into the New York Collection Account for the benefit of Arrowhead, and instead signing instructions and otherwise permitting proceeds of the Pictures and other Collateral to be deposited into other accounts for the benefit of Hoffman affiliates and their assignees;

(ii) agreeing to alter, and altering, payment instructions to licensees and other distributors of the Pictures, so that rather than requiring proceeds be held in trust and deposited for Arrowhead in the New York Collection Account, licensees and other distributors of the Pictures were instead directed to wire proceeds to other accounts; and

(iii) agreeing to alter, and altering, laboratory instructions governing access to the Pictures (which were required to be held in trust for and as Collateral to Arrowhead) so that the respective film laboratory would not or would no longer recognize beneficiary Arrowhead's rights and interests therein and so not grant Arrowhead access thereto.

71. SAE and its affiliates have failed and continue to fail to provide any accounting to Arrowhead as to, and instead have withheld and concealed documents and information as to, laboratory access letters, distribution agreements, proceeds of the Pictures and other Collateral required to be held in trust and deposited into the New York

Collection Account and Collateral required to be held for the benefit of Arrowhead (whether under the Master Agreement, Financing and Security Agreements, applicable law, or otherwise).

72. As a direct and proximate result of defendant SAE's continuing breach of and failure to so comply with and satisfy its trust and other fiduciary obligations (whether under the Master Agreement, the Pledge Agreements, the Financing and Security Agreements, related documents, applicable law, or otherwise), plaintiff Arrowhead has suffered damages for which defendant SAE is liable, jointly and severally, in an amount to be proven at trial but, in any event not less than the amount of $2,496,159.50 in the October 2012 Judgment and interest accrued thereon.

WHEREFORE, plaintiff Arrowhead demands judgment against defendant SAE:

(i) ordering defendant SAE to promptly (but in any event within 10 days from the date of the order) prepare and deliver:

(a) a full, true, and complete accounting of all funds and other proceeds of the Pictures; a full, true and complete listing of all bank accounts (including the bank's full name, address, and other contact information) into which those funds and other proceeds were deposited and through which those funds and other proceeds were transferred and all bank statements and other documents reflecting those deposits and transfers; and a full, true, and complete tracing of all proceeds and other property which were required to be held in trust for, plaintiff Arrowhead and all rights and property in which those funds and Collateral may be traced;

(b) a full, true, and complete list of the names and addresses of all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located; and

(c) irrevocable Directions Letters from and duly signed by SAE in which SAE authorizes all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located, to provide Arrowhead, Arrowhead's successors and assigns, and their designees unrestricted and unencumbered access thereto.

(ii) ordering defendant SAE to promptly (but in any event within 10 days from the date of the order) effectuate and complete turn over, surrender, delivery, and assignment to Arrowhead of all proceeds, stock certificates, film rights, film materials, laboratory access for the Pictures, distribution agreements, assignments, and other Collateral free and clear of all liens, encumbrances, and adverse charges (other than the copyright mortgages and other security interests held by plaintiff judgment creditor Arrowhead);

(iii) ordering imposition of a constructive trust and a constructive or equitable lien on all funds, rights and property in which diverted proceeds may be traced;

(iv) for judgment against defendant SAE for compensatory and consequential damages, in an amount to be proven at trial but, in any event not less than the amount of $2,496,159.50 in the October 2012 Judgment, plus interest and costs of suit; and

(v) for attorney's fees and such other relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
Conversion
(Against Defendant SAE)

73. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 72 as set forth at length herein.

74. Defendant SAE, successor to PLC and SAFE, had, continues to have, and continues to breach duties and obligations to Arrowhead:

(i) under the Master Agreement (including without limitation §5.1 thereof), the Financing and Security Agreements, and applicable law, including (without limitation) to cause to be held in trust and deposited into the New York Collection Account for the benefit of Arrowhead all proceeds of the Pictures and other Collateral, so that those proceeds may be disbursed to Arrowhead to pay the Arrowhead Note; and

(ii) under the Master Agreement, the Financing and Security Agreements, and applicable law, to hold for the benefit of Arrowhead film rights, film materials, proceeds, laboratory access letters, distribution agreements, and other Collateral constituting security for payment of the Arrowhead Note and other duties and obligations owing to Arrowhead.

75. Defendant SAE breached, violated, and continues to breach and violate, its respective duties and obligations to Arrowhead by (among other things) taking and continuing to take personal property, and the proceeds thereof that constitutes Collateral securing the Arrowhead Note, directing that such proceeds be deposited into accounts for SAE and its affiliates (rather than accounts for Arrowhead as required under the Master Agreement and related documents) and converting or participating in the conversion of such personal property and proceeds for the benefit of SAE and its affiliates (including without limitation Peter Hoffman and Kate Hoffman).

76. As a result of defendant SAE's conversion or participation in conversion of proceeds payable to Arrowhead and of Collateral in which Arrowhead has a security interest, plaintiff Arrowhead has suffered damages which are the natural, reasonable, and proximate result of the conversion.

WHEREFORE, plaintiff Arrowhead demands judgment against defendant SAE:

(i) ordering defendant SAE to promptly (but in any event within 10 days from the date of the order) prepare and deliver:

(a) a full, true, and complete accounting of all funds and other proceeds of the Pictures; a full, true and complete listing of all bank accounts (including the bank's full name, address, and other contact information) into which those funds and other proceeds were deposited and through which those funds and other proceeds were transferred and all bank statements and other documents reflecting those deposits and transfers; and a full, true, and complete tracing of all proceeds and other property which were converted from, plaintiff Arrowhead and all rights and property in which those converted funds and Collateral may be traced;

(b) a full, true, and complete list of the names and addresses of all warehouses, film laboratories, film vaults, an other locations at which elements and other materials for the Pictures or other Collateral may be located; and

(c) irrevocable Directions Letters from and duly signed by SAE in which SAE authorizes all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located, to provide Arrowhead, Arrowhead's successors and assigns, and their designees unrestricted and unencumbered access thereto.

(ii) imposing a constructive trust and a constructive or equitable lien on all funds, rights and property in which those converted funds and other property may be traced;

(iii) for judgment against defendant SAE for compensatory and consequential damages, in an amount to be proven at trial but, in any event not less than the amount of $2,496,159.50 in the October 2012 Judgment, plus interest and costs of suit; and

(iv) for attorney's fees and such other relief as the Court deems just and proper.

### SIXTH CAUSE OF ACTION
### Replevin
### (Against Defendant SAE)

77. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 76 as set forth at length herein.

78. SAE is bound and jointly and severally obligated by duties and obligations of its predecessors PLC and SAFE under the Arrowhead Note and the Master Agreement, and the related Financing and Security Agreements and Copyright Mortgages, wherein Arrowhead was granted and received Copyright Mortgages on and pledges of and security interests in the Collateral to secure duties and obligations owing to Arrowhead.

79. The obligors of the Arrowhead Note and the Master Agreement (including without limitation defendant SAE's predecessors PLC and SAFE) were adjudicated in the June 2012 Decision and the October 2012 Judgment to have defaulted in their duties and obligations to plaintiff Arrowhead under the Arrowhead Note and the Master Agreement, and plaintiff Arrowhead has been granted leave in that June 2012 Decision and the October 2012 Judgment to execute thereon and foreclose on the Collateral thereunder.

80. Among rights and remedies to which plaintiff judgment creditor Arrowhead is entitled, upon breach or other default of the Arrowhead Note and the Master Agreement,

are surrender and delivery to Arrowhead of all Collateral, wherever located, in recognition of plaintiff Arrowhead's rights as a secured party under the Arrowhead Note, the Master Agreement, the Financing and Security Agreements, the Copyright Mortgages, and applicable law.

81. Plaintiff Arrowhead's rights also include, without limitation, taking possession of, selling, or otherwise disposing of or dealing with the Collateral.

82. Plaintiff Arrowhead has previously demanded surrender of the Collateral to Arrowhead, and the executives and managers (including Peter Hoffman and his daughter Kate Hoffman) of SAE and SAE's predecessors (including, without limitation PLC and SAFE) have been and are aware of those demands.

83. Defendant SAE not only has failed to deliver any Collateral to Arrowhead, but rather has continued to license, distribute, exhibit, and otherwise use and exploit the Collateral for the benefit of SAE and SAE's affiliates, and has continued to divert to and for SAE and its affiliates and their assigns all proceeds therefrom.

84. Defendant SAE wrongfully holds and continues to hold Collateral of plaintiff Arrowhead, subject to plaintiff Arrowhead's valid, first priority, and superior Copyright Mortgages and Arrowhead's security interests, rights and remedies with respect to the Collateral.

85. To the extent that plaintiff Arrowhead does not already have possession, plaintiff Arrowhead is entitled to immediate surrender to Arrowhead and turn over and possession of all Collateral.

WHEREFORE, plaintiff Arrowhead demands judgment against defendant SAE:

(i) confirming that plaintiff Arrowhead has a valid, first priority, and superior Copyright Mortgage and security interest in the Collateral;

(i) ordering defendant SAE to promptly (but in any event within 10 days from the date of the order) prepare and deliver:

(a) a full, true, and complete accounting of all funds and other proceeds of the Pictures; a full, true and complete listing of all bank accounts (including the bank's full name, address, and other contact information) into which those funds and other proceeds were deposited and through which those funds and other proceeds were transferred and all bank statements and other documents reflecting those deposits and transfers; and a full, true, and complete tracing of all proceeds and other property which were converted from, plaintiff Arrowhead and all rights and property in which those converted funds and Collateral may be traced;

(b) a full, true, and complete list of the names and addresses of all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located;

(c) irrevocable Directions Letters from and duly signed by SAE in which SAE authorizes all warehouses, film laboratories, film vaults, and other locations at which elements and other materials for the Pictures or other Collateral may be located, to provide Arrowhead, Arrowhead's successors and assigns, and their designees unrestricted and unencumbered access thereto.

(iii) further ordering SAE to promptly (but in any event within 10 days of the date of that order) marshal and effectuate surrender and delivery to Arrowhead of all Collateral;

33

(iv) further ordering entry of an Order authorizing issuance of writ of replevin and/or other orders of seizure directing the Sheriff of New York County and such other officers, persons or entities as may be applicable to levy upon, attach, garnish, take possession of, seize, and otherwise execute upon any or all of the Collateral and proceeds and any other property in which SAE has an interest and deliver same to or for plaintiff Arrowhead for application to the judgments due Arrowhead until such judgments have been paid in full.

## SEVENTH CAUSE OF ACTION
### Turn Over, Sale, and Foreclosure of, and Other Dealing with Collateral
(Against Defendant SAE)

86. Plaintiff Arrowhead repeats and realleges each and every allegation contained in paragraphs 1 through 85 as set forth at length herein.

87. Plaintiff Arrowhead has valid, first priority, and superior Copyright Mortgages on and security interests in Collateral securing duties and obligations owing to Arrowhead.

88. SAE is bound and jointly and severally obligated by duties and obligations of its predecessors PLC and SAFE under the Arrowhead Note, Master Agreement, and related Financing and Security Agreements and Copyright Mortgages, wherein Arrowhead was granted, received, and holds such Copyright Mortgages on and pledges and security interests in Collateral to secure duties and obligations owing to Arrowhead.

89. Obligors under the Arrowhead Note (including without limitation SAE's predecessors PLC and SAFE) were adjudicated in the June 2012 Decision and October 2012 Judgment to have defaulted in their obligations to plaintiff Arrowhead under the Arrowhead Note and the Master Agreement, and Arrowhead has been granted in that

June 2012 Decision and the October 2012 Judgment leave to foreclose on and otherwise execute Arrowhead's rights and remedies with respect to the Collateral thereunder.

90.   Defendant SAE and its predecessors (including PLC and SAFE) have continued to fail and refuse to cure their defaults in their duties and obligations owed to plaintiff Arrowhead under (among other things) the Arrowhead Note, the Master Agreement, the Financing and Security Agreements, the Copyright Mortgages, the June 2012 Decision and the October 2012 Judgment and applicable law.

91.   As a result of such failure to cure such defaults, defendant SAE has been and continues to be in breach of the Arrowhead Note, the Master Agreement, the Financing and Security Agreements, the Copyright Mortgages, and other duties and obligations to plaintiff judgment creditor Arrowhead.

WHEREFORE, plaintiff judgment creditor Arrowhead demands judgment:

(i) granting Arrowhead full and immediate access to and possession of the Collateral; authorizing Arrowhead to obtain turn over, sell, foreclose upon and/or otherwise deal with, execute, and exercise any and all of Arrowhead's rights and remedies against or otherwise with respect to Collateral (whether at private or public sale or otherwise to the fullest extent permitted in the Arrowhead Note, Master Agreement, Copyright Mortgages, Financing and Security Agreements, or applicable law); and authorizing and permitting Arrowhead to bid on, tender, acquire, deal with, and pay for Collateral with any or all amounts due or other obligations owed to Arrowhead rather than and in lieu of Arrowhead having to deposit, bid, or otherwise provide cash, bond, or other security or consideration;

(ii) determining any deficiency in the Arrowhead Note, the Master Agreement, the Financing and Security Agreements, the October 2012 Judgment, or otherwise that may be due and owing to plaintiff judgment creditor Arrowhead; and

(iii) awarding plaintiffs Arrowhead costs of suit, attorneys' fees and such other and further relief as the Court deems just and proper.

Dated: Allentown, Pennsylvania
July 17, 2014

BARRY L. GOLDIN, ESQ.
*Attorney for Plaintiff Arrowhead Capital Finance Ltd.*
3744 Barrington Drive
Allentown, PA 18104-1759
Tel: 610-336-6680
Fax: 610-336-6678
Email: barrygoldin@earthlink.net
And
240 Madison Avenue, 3rd Floor, NY, NY 10016

ARR40710.2COMSAE

36

EXHIBITS TO COMPLAINT

| Ex. | Document |
|---|---|
| 1. | June 2012 Decision and Order of the New York Supreme Court for New York County in the case entitled *Arrowhead Capital Finance Ltd. v. Seven Arts Pictures PLC et al*, Index No. 601199/2010 (the "Predecessor Arrowhead Action") |
| 2. | Judgment & Order filed, docketed and entered October 2012 in the Predecessor Action |
| 3. | Secured Subordinated Term Loan Promissory Note dated December 2006 payable to Arrowhead in the then principal amount of $1 million (the "Arrowhead Note") by Hoffman affiliates, including (among others) Seven Arts Pictures, PLC ("PLC"), Seven Arts Filmed Entertainment Limited ("SAFE") and Seven Arts Pictures Inc. ("SAP") |
| 4. | Master Agreement dated as of December 22, 2006 among Arrowhead, Cheyne Specialty Finance Fund L.P. ("Cheyne"), and Hoffman affiliates (including, among others, PLC, SAFE, and SAP) |
| 5. | Assignment of Interest in Copyright Mortgage and Assignment dated as of December 22, 2006 as recorded in the U.S. Copyright Office on January 22, 2007 at Vol. 3548, Doc. No. 29. |
| 6. | Consent Judgment and Permanent Injunction dated December 23, 2008 of the New York Supreme Court, NY County, in *Arrowhead Capital Finance Ltd. v. Metro II LLC, Arrowhead Consulting Group LLC. et al*, Index No 600136/2008 |
| 7. | Press Release of Seven Arts Pictures PLC dated November 9, 2010 entitled "Re-Domicile and Appointment of Board Member" |
| 8. | Press Release of Seven Arts Pictures PLC dated May 2, 2011 entitled "Seven Arts Pictures PLC Announces Change of Accounting Firm" |
| 9. | Pages of Form 8-K of Seven Arts Entertainment Inc. ("SAE") dated September 6, 2012 and accompanying press release of SAE dated August 31, 2012, as filed with the U.S. Securities and Exchange Commission (the "SEC") |
| 10. | Pages of Annual Report on Form 10-K/A (Amendment No. 1) of Seven Arts Entertainment Inc. ("SAE") for the year ended June 30, 2012 as filed with the SEC |
| 11. | Pages of Quarterly Report on Form 10-Q for the quarter ended December 31, 2012 as filed with the SEC in February 2013 |

12.   Pages of Annual Report on Form 10-K for the year ended June 30, 2013 of SAE as filed with the SEC

13.   Statement of Liquidator of SAFE dated October 14, 2013 and accompanying Statement of Affairs of SAFE signed by Kate Hoffman dated October 9, 2013

14.   Press Release of SAE dated October 31, 2013 (entitled "Seven Arts Announces Sales at MIPCOM and Neuromancer Previsualization Teaser")

15.   Material posted on Tony Lytle Media Sales website with respect to distribution of Seven Arts Pictures purported library of films, including *"Deal"*, *"Noise"*, and *"Shooting Gallery"* aka *"Pool Hall Prophets"*, which are the subject of Arrowhead's first priority copyright mortgages and security interests [see the Master Agreement and Copyright Mortgages (Ex.s 4 & 5 hereto)]

# EXHIBIT 1

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: **JUSTICE SHIRLEY WERNER KORNREICH**        PART 54
_____
*Justice*

Index Number : 601199/2010

**ARROWHEAD CAPITAL**

vs.

**SEVEN ARTS PICTURES PLC,**

SEQUENCE NUMBER : 001

DISMISS ACTION

INDEX NO. _____

MOTION DATE 1/23/12

MOTION SEQ. NO. _____

...tion to/for _____        E-FILED

_____        No(s). 11-25 ,

_____        No(s). 27-71,78

_____        No(s). _____

Upon the foregoing papers, it is ordered that this motion is

**MOTION IS DECIDED IN ACCORDANCE WITH ACCOMPANYING MEMORANDUM DECISION AND ORDER.**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: 6/20/12

☒ CROSS-MOTION

_____        J.S.C.

1. CHECK ONE: ............................................... ☐ CASE DISPOSED ☒ NON-FINAL DISPOSITIO

2. CHECK AS APPROPRIATE: ....................MOTION IS: ☐ GRANTED ☐ DENIED ☒ GRANTED IN PART ☐ OTHE

3. CHECK IF APPROPRIATE: ............................... ☐ SETTLE ORDER ☐ SUBMIT ORDER

☐ DO NOT POST ☐ FIDUCIARY APPOINTMENT ☒ REFEREN

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 54
--------------------------------------------------------------------x
ARROWHEAD CAPITAL FINANCE, LTD.,

                       Plaintiffs,

          -against-

SEVEN ARTS PICTURES PLC, SEVEN ARTS FILMED
ENTERTAINMENT, LTD., DEAL INVESTMENTS, LLC,
DEAL PRODUCTIONS, LLC, SEVEN ARTS
PICTURES, INC., SEVEN ARTS FUTURE FLOWS I,
RECTIFIER PRODUCTIONS, and POOL HALL
PRODUCTIONS, LLC,

                    Defendants.
--------------------------------------------------------------------x

Index No.: 601199/2010

**DECISION & ORDER**

KORNREICH, SHIRLEY WERNER, J.:

    Plaintiff, Arrowhead Capital Finance, Ltd. (Arrowhead or plaintiff), brought this action to recover principal, interest, attorneys' fees and costs, allegedly due under a subordinated note (Arrowhead Note), collateral pledged as security for the Arrowhead Note, and damages for conversion.  Defendant-borrowers Seven Arts Pictures PLC (Seven Arts), Seven Arts Filmed Entertainment, Ltd. (SAFE), Deal Investments, LLC (Deal Investments), Deal Productions, LLC (Deal Productions), Seven Arts Pictures, Inc. (SAP), Rectifier Productions, LLC (Rectifier) and Pool Hall Productions, LLC (Pool Hall, and collectively with Seven Arts, SAFE, Deal Investments, Deal Productions, SAP and Rectifier, Borrowers), and defendant Seven Arts Future Flows I (FFI, and collectively with Borrower, defendants) move, pursuant to CPLR 3212, for an order granting summary judgment dismissing the complaint.  Plaintiff cross-moves for summary judgment.

    The complaint contains five causes of action, numbered here as they are in the complaint: 1) judgment for the unpaid principal balance and interest due under the Arrowhead Note, 2) an

order of replevin directing delivery to plaintiff of Collateral (as defined by this opinion below)

securing the Arrowhead Note, 3) foreclosure of all of plaintiff's security interests in the

Collateral, 4) attorneys' fees and costs due under the Arrowhead Note, and 5) damages for

conversion.

       For the reasons that follow, defendants' motion is denied, and plaintiff's cross-motion is

granted on liability as to the first and fourth causes of action against the Borrowers and on

liability as to the third cause of action against all defendants.  The cross-motion is denied as to

the second and fifth causes of action.

*Background*

       On December 3, 2004, defendant Pool Hall and non-party Mercantile National Bank

(Mercantile) entered into a Loan and Security Agreement for the purpose of financing the

production of a motion picture entitled *Pool Hall Prophets* (Pool Hall Loan Agreement).

Hoffman Affidavit, Doc 12 (Hoffman Aff), Ex C.  On May 4, 2006, defendants Deal

Investments, Deal Productions, SAP and FFI entered into a Financing and Security Agreement

with Arrowhead Consulting Group, LLC (ACG), plaintiff's predecessor in interest, for the

purpose of financing the production of a motion picture entitled *Deal* (Deal Loan Agreement).

Hoffman Aff, Ex D.  On May 16, 2006, defendants Rectifier, SAP and FFI entered into a

Financing and Security Agreement with Arrowhead Target Fund Ltd (Arrowhead Target) for the

purpose of financing the production of a motion picture entitled *Noise* (Noise Loan Agreement,

and together with Pool Hall Loan Agreement and Deal Loan Agreement, Loan Agreements).

Hoffman Aff, Ex E.  *Pool Hall Prophets*, *Deal* and *Noise* are hereinafter referred to as the

Financed Pictures.  The Pool Hall Loan Agreement defines "Loan Documents" to mean "the Pool

Hall Loan Agreement, the Note and each and every document, instrument and agreement required to be delivered hereunder or thereunder or contemplated hereby or thereby." Pool Hall Loan Agreement, §1.27. However, other than the Pool Hall Loan Agreement, the other documents and instruments required to be delivered or contemplated, are not in the record.

On December 22, 2006, defendants, non-party Cheyne Specialty Finance Fund L.P. (Cheyne), and ACG, executed a Master Agreement, which was an amendment to the Pool Hall Loan Agreement. Affidavit of William F. Dahill in Opposition to Defendants' Motion for Summary Judgment, (Dahill Opp Aff), Ex. 4, p 1. Pursuant to the Master Agreement, Cheyne and ACG agreed to loan the Borrowers $7,500,000, defined as the "Additional Loan". Master Agreement, §1.4. Specifically, Cheyne advanced $6,500,000 in exchange for a senior promissory note, defined in the Master Agreement as the "Cheyne Note" or "Senior Note", and ACG advanced $1,000,000 in exchange for a subordinated promissory note, referred to in the Master Agreement as the "Arrowhead Note" or the "Subordinated Note", and collectively as the "Additional Notes". Id., §3. The Master Agreement requires defendants to reimburse ACG for any "reasonable out-of-pocket expenses of ACG (including, without limitation, fees and disbursements of external counsel) incurred in connection with the enforcement of any of its rights and remedies arising hereunder . . . promptly after demand." Id., §8. The Master Agreement says that all references to the "Note" in the Pool Hall Loan Agreement were deemed to refer to the Additional Notes. Id., §1.30.[1] The proceeds of the Additional Loan were to be used to pay the notes executed in connection with the Deal and Noise Loan Agreements, after

---

[1]The Arrowhead and Cheyne Notes appear in the record, respectively, as Dahill Opp Aff Exs 3 & 6.

3

which the Deal Loan Documents and Noise Loan Documents were terminated. Master Agreement, §2.4. Hence, the only remaining Loan Documents are the Pool Hall Loan Documents, of which only one, the Pool Hall Loan Agreement is in the record.

The Master Agreement provides that its terms trump the Pool Hall Loan Documents in the event of any inconsistency. *Id.*, §2. In addition, undefined, capitalized terms in the Master Agreement have the meaning ascribed to them in the "Pool Hall Loan Agreements". *Id.* Although the plural "Agreements" is used, only one Agreement is in the record. The Cheyne Note incorporates all of the terms and conditions of the Master Agreement and also provides that undefined, capitalized terms have the meaning ascribed to them by the Master Agreement.

As security for the monies advanced to the Borrowers' under the Loan Agreements, Cheyne and ACG were assigned collateral (Original Collateral). Hoffman Aff, Ex C, §§ 1.21, 4.1 & 4.2; Ex D, §8.1 and Schedule II; and Ex E, §8.1 and Schedule II. The Master Agreement amends the definition of "Collateral" under the Pool Hall Loan Agreement to include the additional collateral under the Master Agreement, the Deal Loan Documents and the Noise Loan Documents. Master Agreement, §§ 2.7.1 through 2.7.4. The Senior Note and the Subordinated Note were secured by the Collateral, which by definition includes the Original Collateral under the Pool, Deal and Noise Loan Documents, and new collateral, including revenue from two other motion pictures produced by defendants, a security interest in defendants' film library subordinated to Arrowhead Target's interest, and 8,100,000 shares of Seven Arts stock belonging to SAP. The court will use the term "Collateral" in this opinion to mean the Original Collateral and the additional collateral granted to Cheyne and ACG under the Master Agreement.

4

The subordination clause in the Master Agreement contains the following definitions applicable to paragraph 4, entitled "Subordination":

> 4.1.1 "Senior Debt" means all of Cheyne's rights to repayment of the Indebtedness pursuant to the Cheyne Note.
> 4.1.2 "Senior Liens" means all liens, security interests and assignments with respect to the Collateral securing payment or performance of the Borrowers' obligations to Cheyne for Senior Debt.
> 4.1.3 "Subordinated Debt" means all of Arrowhead's rights to repayment of the Indebtedness pursuant to the Arrowhead Note.
> 4.1.4 "Subordinated Liens" means all liens, security interests and assignments with respect to the Collateral securing payment or performance of the Borrowers' obligations to Arrowhead for Subordinated Debt.

The Master Agreement provides that Cheyne's consent is required to enforce the Arrowhead Note *prior to full payment* of the Indebtedness under the Cheyne Note:

> Unless and until all of the Senior Debt has been fully paid and satisfied, [ACG] will not (i) ask, demand, sue for, take or receive, or retain, from the Borrowers . . . payment of all or any part of the Subordinated Debt, or (ii) declare the Subordinated Debt due and payable by reason of default or for any other reason . . . .

*Id.*, §4.3. As previously noted, "Senior Debt" means "all of Cheyne's rights to repayment of the Indebtedness pursuant to the Cheyne Note". *Id.*, 4.1.1. Indebtedness is not a defined term in the Master Agreement or the Cheyne Note, which means that the definition in the Pool Hall Loan Agreements govern. The Pool Hall Loan Agreement defines "Indebtedness" as:

> all of Borrower's monetary obligations to the Bank [Mercantile] hereunder under the Note and under the other documents, instruments and agreements to be executed by Borrower pursuant hereto....

Pool Hall Loan Agreement, Hoffman Aff, Ex C, §1.21. The Pool Hall Loan Agreement provides that "The Note shall be marked 'canceled' and returned to Borrower when Borrower has indefeasibly paid the Indebtedness in full." *Id.*, §2.6.3. No amendment to that provision appears in the Master Agreement.

5

The Master Agreement amended the definition of Bank to mean Cheyne and ACG, with the proviso that, so long as any amount remained "due and owing" under the Cheyne Note, the term "Bank" would mean "the Senior Lender acting for itself and as agent for the Subordinated Lender," and all rights of the Bank under the Pool Hall Loan Documents, would "inure solely to the Senior Lender until the Senior Debt as defined herein has been repaid in full, subject to the Subordinated Lender's continuing lien thereon and rights described therein." Master Agreement, §2.2.

The Cheyne Note says at the top "Amount: $6,5000,000". Dahill Opp Aff, Ex 6.  It further provides that:

> This Secured Term Loan Promissory Note ("Note") is the "Cheyne Note" issued in connection with, [sic] further evidences the Undersigned's obligation to repay that certain Additional Loan created under,... and is delivered pursuant to that certain Agreement bearing even date herewith,[2] among Lender [Cheyne] and the Undersigned

*Id.* The Undersigned includes all of the defendants, except FFI. *Id.* Although the Cheyne Note also gives Cheyne all of the benefits and security of the Master Agreement,[3] it does not reflect monetary obligations other than the $6,500,000 loan.  Once the Cheyne Note is paid in full, The Pool Hall Loan Agreement, as amended by the Master Agreement, does not reflect further monetary obligations or "Indebtedness" to Cheyne.

---

[2]The copy of the Cheyne Note in the record is dated December 2006, without a day, but it clearly refers to the $6,500,000 loan from Cheyne pursuant to the Master Agreement.

[3]For example, while the Cheyne Note remains unpaid, Cheyne has the right to receive payments made to distributors and sub-distributors for distribution of the Financed Pictures and other films.

6

The Master Agreement provides that Cheyne had certain obligations to protect plaintiff's interests. It states that "[u]pon payment in full of the Senior Debt held by Cheyne, Cheyne shall provide Arrowhead [ACG] all the benefits of a secured party with respect to the Collateral." *Id.*, §4.7. Cheyne had no right to amend or modify the terms of the Cheyne Note or the Senior Liens without ACG's prior written consent. *Id.*, § 4.2. The Master Agreement provides that so long as any balance remained due on the Senior Note, Cheyne would act not only for itself, but also as agent for ACG. *Id.*, §2.2.

With respect to plaintiff's right to enforce its Subordinate Liens on Collateral, the Master Agreement requires Cheyne's consent to enforce them, but not to institute an action for equitable or injunctive relief :

> [ACG] *will not take any action to enforce* the Subordinate Liens *without Cheyne's prior written consent*, provided that *nothing in this Agreement shall at any time prevent Arrowhead* [ACG], solely in its capacity as a secured creditor subordinated to Cheyne, *from initiating legal proceedings against the Borrowers to enforce the provisions of the Subordinated Note and related security agreements by injunction or other equitable relief* or in the context of any bankruptcy, reorganization or insolvency proceedings. All amounts . . . recovered with respect to any property of the Borrowers which is subject to the Subordinate Liens by the enforcement of the Subordinate Liens shall be paid over and delivered to Cheyne immediately upon [ACG]'s receipt thereof . . . .

*Id.*, §4.4 (emphasis added).

Both the Cheyne Note and the Arrowhead Note were due for repayment on June 30, 2007. Defendants exercised their right to seek a three-month extension of the maturity date through September 30, 2007. As a result, the interest rate on the Arrowhead Note increased from 19% per annum to 23% per annum. Master Agreement, §2.9. It is undisputed that defendants failed to honor the extended maturity date, which constituted an "Event of Default" under the Master Agreement.

On April 22, 2008, Cheyne entered into an Assignment Agreement (2008 Assignment Agreement) with defendants and Peter Hoffman, pursuant to which Cheyne, as Seller, purported to assign to defendant SAFE, as Purchaser, all of Cheyne's rights, title and interest in the "Loan Documents" referred to in the "Assignment Agreements" dated as of December 26, 2006 (2006 Assignment Agreements). The 2008 Assignment Agreement recites that:

> A. Pursuant to the Assignment Agreements dated as of December 26, 2006 ("Assignment Agreements") relating to the financing of the pre-production and production of these certain motion pictures currently entitled *Noise*, *Pool Hall Prophets* and *Deal* ("Pictures"), Seller has acquired certain "Loan Document Rights" relating to the Pictures as defined in the Assignment Agreements.
>
> B. The Purchaser wishes to Purchase from the Seller and the Seller desires to sell to the Purchaser all of the Seller's right, title and interest in, to and under the "Loan Documents" as referred [sic] in the Assignment Agreements upon and subject to the terms set forth herein.

Dahill Opp Aff, Ex 9, Recitals A and B. In return for the 2008 Assignment Agreement, SAFE paid Cheyne $6,458,272.47. *Id.*, §1.3. The 2008 Assignment Agreement was executed on behalf of all defendants by Seven Arts' CEO, Peter Hoffman (Mr. Hoffman). Dahill Opp Aff, Ex 8 (Hoffman Dep.) at 68. Mr. Hoffman acted as both attorney and principal. *Id.*

The 2008 Assignment Agreement provides that:

> Pursuant to this Agreement, all obligations owed to the Seller under the Loan Documents will be deemed paid in full and this Agreement is without prejudice to any other party under the Loan Documents.

*Id.*, §1.6. Cheyne nor did not obtain ACG's prior written consent to the 2008 Assignment Agreement. Hoffman Dep. at 81. As previously noted, the Master Agreement requires ACG's prior written consent to any change in the Senior Debt or Senior Liens. Master Agreement, § 4.2.

On October 22, 2008, ACG made a demand for repayment of the Arrowhead Note. Hoffman Aff, Ex F (Demand Letter). Defendants refused to pay.

Defendants did not put the 2006 Assignment Agreements in this record, leaving their definition of the "Loan Documents" assigned to them shrouded in mystery. Nevertheless, defendants oppose summary judgment relying on the meaning of "Loan Documents" as defined in the missing 2006 Assignment Agreements. Defendants contend that because the amount they paid pursuant to the 2008 Assignment Agreement was less than the full amount owed to Cheyne under the Master Agreement, Cheyne's rights to the Collateral under the Master Agreement, excluding the Original Collateral,[4] are still enforceable by Cheyne, whose rights are senior to Arrowhead's.

However, Mr. Hoffman testified at his deposition that Seven Arts, his shorthand for the related defendant entities, does not owe Cheyne any money. Hoffman Dep. at 62. When asked what the 2008 Assignment Agreement meant when it said that all of defendants' obligations to Cheyne under the "Loan Documents will be deemed repaid in full," he explained that:

> since they knew they weren't being fully paid and satisfied that they were taking a substantial haircut on the loan, *they nevertheless agreed by this clause that they couldn't come back and sue us on the senior note*.

*Id.* at 69 (emphasis added). He elaborated:

> It says shall be deemed repaid in full. And the word "deemed" usually means that's because they weren't really paid in full but they're treated as having no further liabilities.

*Id.* at 70. He also agreed with this statement:

---

[4]Defendants admit that the Original Collateral now belongs to SAFE. Defendants' Memorandum of Law in Support at 7.

9

Cheyne has no right to sue any of the Seven Arts entities for any amount of haircut that they took.

*Id.* at 72.

Other evidence in the record supports the conclusion that Cheyne accepted $6,458,272.47, the amount it received pursuant to the 2008 Assignment Agreement, in full settlement of the Cheyne Note and then assigned to SAFE all of the Collateral securing it. For example, on page 20 of Seven Arts' recent Form-6K SEC filing,[5] there is a list of all "Film and production loans." The outstanding obligation to ACG in the amount of $1,879,877 is listed.[6] The one to Cheyne, which defendants claim still exists, is not. Dahill Opp Aff, Ex 20, p 23.

Although Mr. Hoffman's affidavit tries to draw a distinction between the Loan Documents assigned by the 2008 Assignment Agreement and Cheyne's rights under the Master Agreement, the SEC filing states that Cheyne's $6,500,000 loan was assigned to SAFE. *Id.* at Note 10. Further, in a letter to plaintiff's counsel, Mr. Hoffman stated that SAFE, as assignee under the 2008 Assignment Agreement, "is entitled to all of the benefits of the Master Agreement including, without limitation, the provisions regarding subordination in Paragraph 4 of the Master Agreement." Dahill Opp Aff, Ex 18. Also, in response to interrogatory 55, defendants swore that "SAFE as assignee has all the rights of Cheyne pursuant to the Master Agreement, including all subordination rights in the Master Agreement." Dahill Opp Aff, Ex 19. Mr. Hoffman verified defendants' interrogatory responses. *Id.*

---

[5] The same form also includes a statement by Seven Arts that the Subordinated Note "debt will never be paid due to its subordination to the [Senior Note]." Dahill Opp Aff, Ex 20.

[6] This amount represents $1 million in principal, plus interest through December 31, 2010.

10

On January 30, 2008, ACG assigned its interest under the Master Agreement to plaintiff Arrowhead pursuant to a Consent Order entered by Justice Herman Cahn of this court, confirmed by a subsequent Consent Judgment and Permanent Injunction entered by Justice Cahn on December 23, 2008. *See* Dahill Opp Aff, Exs. 15 and 16.

On January 13, 2009, Arrowhead went into liquidation and Windsor William Ashburnham Woods was appointed as Arrowhead's sole liquidator (Mr. Woods). Affidavit of William Woods, Doc 39 & EBT of William Woods (Woods Dep.) at 8. Mr. Woods commenced this action on behalf of Arrowhead on May 10, 2010, without obtaining Cheyne's written consent. Woods Dep. at 42-44. The court notes that the parties sought neither to join Cheyne in this litigation nor to seek discovery from it. Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 10.

*Discussion*

To prevail on a motion for summary judgment pursuant to CPLR 3212, the moving party must "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case." *Winegard v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 (1985). Failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers. *Id.* The court must view the evidence in the light most favorable to the party opposing the motion, and must give that party the benefit of every favorable inference. *Myers v Fir Cab Corp.*, 64 NY2d 805 (1985). Once this showing has been made, the burden shifts to the party opposing the motion to demonstrate by admissible evidence the existence of a factual issue requiring a trial, or an acceptable excuse for failing to do so. *GTF Marketing, Inc., v Colonial Aluminum Sales, Ins.*, 66 NY2d 965, 968

11

(1986); *Zuckerman v City of New York*, 49 NY2d 557, 562 (1980).  A party cannot defeat summary judgment with bald conclusory allegations, even if they are believable, that create only a shadowy semblance of an issue.  *Polanco v City of New York*, 244 AD2d 322 (2d Dept 1997), *citing S.J. Capelin v Globe*, 34 NY2d 338 (1974).

Plaintiff had the right to demand and sue for repayment of the Arrowhead Note, without Cheyne's consent, once the Senior Debt was paid in full.  Section 4.3 of the Master Agreement provides that plaintiff cannot sue for payment of the Subordinated Debt "unless and until all of the Senior Debt has been fully paid."  In section 4.1.1 of the Master Agreement, Senior Debt is defined as "all Cheyne's rights to repayment of the Indebtedness pursuant to the Cheyne Note." Defendants have admitted that Cheyne cannot sue defendants under the Cheyne Note.

Thus, plaintiff has established a prima facie right to recovery by submitting proof of the promissory note sued upon and defendant's failure to make payment by September 30, 2007. *Silver v Silver*, 17 AD3d 281 (1st Dept 2005); *Boland v Indah Kiat Fin. (IV) Mauritius Ltd.*, 291 AD2d 342, 343 (1st Dept 2002).  Cheyne's acceptance of payment pursuant to the 2008 Assignment Agreement constituted an accord and satisfaction of the Cheyne Note.  *Merill Lynch Realty/Carll Burr, Inc. v Skinner*, 63 NY2d 590, 596 (1984) ("[A]cceptance of a check in full settlement of a disputed or unliquidated claim operates as an accord and satisfaction . . . . when the person receiving the check has been clearly informed that acceptance of the amount offered will settle or discharge a legitimately disputed unliquidated claim."); *Photos v Arverne Houses, Inc.*, 269 AD2d 377 (2d Dept 2000).  The record demonstrates that Cheyne agreed not to pursue further recovery on the Cheyne Note after receipt of payment under the 2008 Assignment Agreement, which states that Cheyne is deemed paid in full.

12

Defendants failed to present evidence that raises an issue of fact as to any Indebtedness due under the Cheyne Note and offered no excuse for their failure to do so. They did not come forward with admissible evidence that Cheyne has further rights to enforce the Loan Documents referred to in the 2006 Assignment Agreements, documents in their control, which they chose not to put before the court. Nor have they demonstrated that there is outstanding "Indebtedness" to Cheyne, as defined in the Pool Hall Loan Agreements or in "other documents, instruments and agreements". No document in the record supports Mr. Hoffman's conclusory statement that Cheyne remains unpaid or has additional rights, and there is no excuse offered for the failure to produce documents that are clearly within defendants' control. Having failed to come forward with these documents, upon which defendants' arguments are premised, the court is permitted to draw the inference that they would have supported plaintiff. *Noce v Kaufman*, 2 NY2d 347, 353 (1957)("where an adversary withholds evidence in his possession or control that would be likely to support his version of the case, the strongest inferences may be drawn against him which the opposing evidence in the record permits").

In addition, Mr. Hoffman's affidavit contradicts his prior statements and contains inadmissible hearsay. His deposition testimony, his letter to plaintiff's counsel and his interrogatory response state that Cheyne agreed not to sue defendants, and SAFE received an assignment of all of Cheyne's rights under the Master Agreement. Thus, the affidavit is insufficient to raise an issue of fact. *Joe v Orbit Indus.*, 269 AD2d 121, 122 (1st Dept 2000) ("plaintiff's] self-serving affidavit opposing the motion [for summary judgment] cannot be relied upon to contradict her prior testimony"), *citing Kistoo v City of New York*, 195 AD2d 403, 404

13

[1st Dept 1993]. To the extent that Mr. Hoffman's affidavit states what Cheyne insisted upon entering into the 2008 Assignment Agreement, it is hearsay.

Turning to the third cause of action to foreclose security interests in the Collateral, section 4.4 of the Master Agreement required Cheyne's consent to enforce the Collateral, but not to initiate legal proceedings against defendants. Defendants urge that Cheyne's consent is excused only with respect to insolvency, reorganization or bankruptcy proceedings. This is a misreading of the Master Agreement. It says that nothing prevents ACG from initiating legal proceedings to enforce its rights to the Collateral "by injunction or other equitable relief *or* in the context of any bankruptcy, reorganization or insolvency proceedings." Defendants' construction ignores the disjunctive pronoun. Therefore, while plaintiff may have needed Cheyne's consent, it was consent to enforcement of the Collateral and did not limit plaintiff's right to initiate this action.

While defendants now claim that, pursuant to the 2008 Assignment Agreement, Cheyne assigned only the Original Collateral and not the additional collateral under the Master Agreement, they have failed to present the 2006 Assignment Agreement that contains the definition of the assigned "Loan Documents". Again, the court will draw an adverse inference from defendants' failure to produce documents over which they have control and upon which they rely. As previously noted, various admissions establish that the 2008 Assignment Agreement gave SAFE the same rights as Cheyne under the Master Agreement.

Furthermore, Cheyne's consent is not required before plaintiff enforces its rights to the Collateral because requesting consent would be futile. The reality here is that SAFE is the assignee of Cheyne's rights, including its right to consent. Once it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts,

14

such as conditions precedent. *J. Petrocelli Constr., Inc. v Realm Elec. Contrs., Inc.*, 15 AD3d 444, 446 (2d Dept 2005). Here, defendants orchestrated the assignment to SAFE of Cheyne's rights, have steadfastly denied that their obligation to Cheyne is satisfied, and, as a result, SAFE clearly would not consent to plaintiff's enforcement of its rights against the Collateral. Hence, requesting consent would be futile.

Importantly, Cheyne only could invade the Collateral if it is owed money, and it is not. The Master Agreement provides that until the Cheyne Note is paid in full, the term Bank means Cheyne acting for itself and as agent for ACG and that any rights that inure to the Bank, inure to Cheyne, subject to ACG's continuing lien and rights. Master Agreement, §2.2. It follows that once money is no longer owed under the Cheyne Note, the benefits should inure to ACG. In addition, now that the Cheyne Note is paid, SAFE, as Cheyne's assignee, must provide plaintiff, as ACG's assignee, "all the benefits of a secured party with respect to the Collateral." Master Agreement, §4.7.

Lastly, in violation of the Master Agreement, defendants did not obtain ACG's written consent to the substitution of SAFE for Cheyne as the lender, allegedly giving SAFE the right to collect the Original Collateral while Arrowhead gets nothing. A court of law cannot sanction such a result. Deeply rooted in our jurisprudence, and equally applicable to cases in law and equity, is the truism that a wrongdoer should not profit from his wrong. *General Stencils, Inc. v Chiappa*, 18 NY2d 125, 127 (1966); *Kytel Intl. Group, Inc. v Total-Tel Carrier Servs., Inc.*, 47 AD3d 448 (1st Dept 2008)(basic tenet of our jurisprudence is that no man may take advantage of his own wrong). In effect, SAFE as assignee is asserting the right to prevent the collection of money allegedly owed to Cheyne, after Cheyne accepted a settlement of the Cheyne Note and

15

transferred its rights to SAFE, one of the Borrowers.  It would offend notions of fairness and justice to allow a debtor to step into the shoes of a senior lender to which it owed money and use that position to indefinitely refuse to pay monies owed to a junior lender.  While this seems to be an issue of first impression under these circumstances, there are the bankruptcy cases that support the court's conclusion by analogy.  *In re Robbins Int'l Inc.*, 275 BR 456, 471 (SDNY 2002), *aff'd*, 2003 US App LEXIS 2502, 55 Fed Appx 71 (2d Cir 2003) (nor) ("It is well established that one who makes a payment that is the primary obligation of the payor, as distinguished from a payment of the debt of another, is not entitled to subrogation."); *In re GREENWALD*, 114 BR 410, 413 (Bankr. SDNY. 1990)(one cannot seek subrogation for paying one's own debts); *In re Innovative Communication Corp.*, 2010 Bankr. LEXIS 1141, at *29 (Bankr. DVI April 27, 2010), 53 Bankr. Ct. Dec. 52 (nor) ("Only when the payment is made by one who is not already obligated will there be an assignment rather than satisfaction of the debt.").

Here, SAFE is not seeking to assert its rights to a fund in bankruptcy.  However, it pretends to protect Cheyne's rights to collect security for a debt Cheyne cannot enforce, while preventing plaintiff from obtaining the Collateral that was intended to secure the Arrowhead Note once Cheyne was paid.  Defendants wrongly obtained the 2008 Assignment Agreement without notice to ACG, in breach of the Master Agreement.  While defendants claim that no change was made to the Master Agreement terms, the effect was to put the fox in charge of the hen house.

In sum, plaintiff's cross-motion for summary judgment is granted on liability against defendants other than FFI as to the first and fourth causes of action, which seek recovery of the principal and interest under the Arrowhead Note, and attorneys' fees and costs incurred in

16

enforcing plaintiff's rights.  Plaintiff also has established its right to foreclosure of the Collateral securing the amounts due under the Arrowhead Note, as prayed for in the third cause of action. The court refers to a Special Referee the issues of the amount of principal and interest due under the Arrowhead Note, the amount of reasonable attorneys' fees and costs plaintiff incurred in enforcing its rights under the Master Agreement, the nature and whereabouts of the Collateral subject to foreclosure pursuant to the Master Agreement, and the relative priority of the rights of plaintiff and Arrowhead Target to Collateral.

The motion and cross-motion are denied with respect to the second and fifth causes of action, respectively, replevin and conversion.  Neither party has addressed them in their moving papers.

The remaining contentions of the parties have been considered by the court and have been found either unnecessary to the decision or lacking in merit.  Accordingly, it is

ORDERED that defendants' motion for summary judgment dismissing the complaint is denied; and it is further

ORDERED that cross-motion for summary judgment of plaintiff Arrowhead Capital Finance, Ltd., is granted on liability on the first and fourth cause of action against defendants Seven Arts Pictures PLC, Seven Arts Filmed Entertainment, Ltd., Deal Investments, LLC, Deal Productions, LLC, Seven Arts Pictures, Inc., Rectifier Productions, LLC and Pool Hall Productions, LLC, and is granted on liability third cause of action against said defendants and Seven Arts Future Flows I; and is denied as to second and fifth causes of action; and it is further

ORDERED that the court refers to a Special Referee to hear and report, or if the parties consent, to hear and determine, the issues of the amount of principal and interest due plaintiff

17

under the Arrowhead Note, the amount of reasonable attorneys' fees and costs plaintiff incurred in enforcing its rights under the Master Agreement, the nature and whereabouts of the Collateral (as defined in this opinion) subject to foreclosure pursuant to the Master Agreement, and the relative priority of the rights of plaintiff and Arrowhead Target to Collateral; and it is further

ORDERED that counsel for plaintiff Arrowhead Capital Finance, Ltd., shall within 30 days from the date of this order, serve a copy of this order with notice of entry, together with a completed Information Sheet,[7] upon the Special Referee Clerk in the Motion Support Office (Room 119M), who is directed to place this matter on the calendar of the Special Referee's Part for the earliest convenient date.

Dated: June 20, 2012

ENTER:

_____
J.S.C.

---

[7]Copes are available in Rm. 119M at 60 Centre Street and on the court's website at www.nycourts.gov/supctmanh under the "References" section of the "Courthouse Procedures" link.

EXHIBIT 2

At a Supreme New York State
Supreme Court, held in and for
the County of New York, on the
___12___day of September, 2012

PRESENT:  HON. SHIRLEY WERNER KORNREICH, J.S.C.

------------------------------------------------------------x

ARROWHEAD CAPITAL FINANCE, LTD.,

                        Plaintiffs,

             -against-

SEVEN ARTS PICTURES PLC, SEVEN ARTS FILMED
ENTERTAINMENT, LTD., DEAL INVESTMENTS, LLC,
DEAL PRODUCTIONS, LLC, SEVEN ARTS
PICTURES, INC., SEVEN ARTS FUTURE FLOWS I,
RECTIFIER PRODUCTIONS, and POOL HALL
PRODUCTIONS, LLC,

                        Defendants.

------------------------------------------------------------x

Index No.: 601199/2010

**JUDGMENT & ORDER**

      Defendants Seven Arts Pictures PLC, Seven Arts Filmed Entertainment, Ltd., Deal

Investments, LLC, Deal Productions, LLC, Seven Arts Pictures, Inc., Rectifier Productions, LLC,

Pool Hall Productions, LLC and Seven Arts Future Flows I having moved for an order granting

summary judgment dismissing the complaint, and plaintiff Arrowhead Capital Finance, Ltd.,

having cross-moved for summary judgment,

      And upon reading and filing e-filed documents numbered 11 through 25, 27 through 71

and 78 in support of and in opposition to said motion and cross-motion, and counsel for the

parties having appeared for oral argument on January 10, 2012, and due deliberation having been

had thereon, and the court having rendered its written decision dated June 20, 2012 and entered

on June 22, 2012, denying defendants motion, granting plaintiff's cross-motion for summary

1

judgment on liability on the first and fourth causes of action against Seven Arts Pictures PLC,

Seven Arts Filmed Entertainment, Ltd., Deal Investments, LLC, Deal Productions, LLC, Seven

Arts Pictures, Inc., Rectifier Productions, LLC, and Pool Hall Productions, LLC, and against said

defendants and Seven Arts Future Flows I on the third cause of action, and denying the cross-

motion with respect to the second and fifth causes of action, and referring certain issues relating

to the first, third and fourth causes of action to a Special Referee; and the court having been

notified on August 10, 2012 that a bankruptcy stay is in effect with respect to defendant Seven

Arts Pictures PLC, and the court having issued its additional order dated September 5, 2012 (e-

filed document 98), and the parties having submitted proposed judgments and letters regarding

the same (e-filed documents 91 through 97 and 99 through 102), and plaintiff having waived its

fourth cause of action for attorneys' fees and costs,

Now, on motion of William F. Dahill, Esq., attorney for Plaintiff, it is hereby

ORDERED and ADJUDGED that plaintiff Arrowhead Capital Finance, Ltd., with an

address c/o W. William Woods, plaintiff's duly appointed liquidator, 175 Bloor Street East, Suite

807, Toronto, Ontario, M4W 3R8, Canada, shall recover on plaintiff's first cause of action, the

sum of $1,157,273.42, plus interest at the rate of 23% from October 1, 2007 to the entry of

judgment in the sum of $ _1,338,886.08_  to be taxed by the Clerk, for a total sum of

$_2,496,159.50_ , from defendants (i) Seven Arts Filmed Entertainment, Ltd., with its

principal place of business at 6121 W. Sunset Boulevard, Suite 512, Los Angeles, CA 90028, (ii)

Deal Investments, LLC, with its principal place of business at 6121 W. Sunset Boulevard, Suite

512, Los Angeles, CA 90028, (iii) Deal Productions, LLC, with its principal place of business at

6121 W. Sunset Boulevard, Suite 512, Los Angeles, CA 90028, (iv) Seven Arts Pictures, Inc.,

2

with its principal place of business at 6121 W. Sunset Boulevard, Suite 512, Los Angeles, CA 90028, (v) Rectifier Productions, LLC, with its principal place of business at 6121 W. Sunset Boulevard, Suite 512, Los Angeles, CA 90028, and (vi) Pool Hall Productions, LLC, with its principal place of business at 6121 W. Sunset Boulevard, Suite 512, Los Angeles, CA 90028, jointly and severally, and plaintiff shall have execution therefor; and it is further

ORDERED that the fourth cause of action for attorneys' fees and costs is hereby dismissed based upon plaintiff's waiver; and it is further

ORDERED that the first cause of action against Seven Arts Pictures PLC, and the second, third and fifth causes of action against all defendants are severed and shall continue as a separate action, and plaintiff shall serve a copy of this order with notice of entry on the Clerks of the Court and the Trial Support Office, who shall note the severance in their respective records; and it is further

ORDERED that the third decretal paragraph of the court's June 20, 2012 decision and order is amended to vacate the reference to a Special Referee of the issues of the principal and interest due plaintiff under the Arrowhead Note and the amount of reasonable attorneys' fees and costs plaintiff incurred in enforcing its rights under the Master Agreement.

ENTER:

SHIRLEY WERNER KORNREICH
SHIRLEY WERNER KORNREICH, J.S.C.

FILED

OCT 10 2012

COUNTY CLERK'S OFFICE
NEW YORK

3                CLERK

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARROWHEAD CAPITAL FINANCE, LTD.,

Plaintiff,

-against-

SEVEN ARTS PICTURES PLC, SEVEN ARTS
FILMED ENTERTAINMENT, LTD., DEAL
INVESTMENTS, LLC, DEAL PRODUCTIONS, LLC,
SEVEN ARTS PICTURES, INC., SEVEN ARTS
FUTURE FLOWS I, RECTIFIER PRODUCTIONS,
and POOL HALL PRODUCTIONS, LLC,

Defendants.

Judgment

Wolhmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Attorneys for Plaintiff Arrowhead Capital Finance, Ltd.*

1 - 6

FILED AND
DOCKETED
OCT 1 0 2012  1:17 P M
AT
N.Y., CO. CLK'S OFFICE


DOCKETED BY

EXHIBIT 4

## MASTER AGREEMENT

This Amendment (the "Agreement") to that certain Loan and Security Agreement dated as of December 3, 2004 by and between Pool Hall Productions, LLC and Mercantile National Bank is dated as of December 22, 2006 and is entered into by and between Seven Arts Pictures PLC ("Seven Arts"), Seven Arts Filmed Entertainment, Ltd., ("SAFE"), Deal Investments, LLC ("Deal Investments"), Deal Productions, LLC ("Deal Productions"), Seven Arts Pictures, Inc. ("SAP"), Seven Arts Future Flows I ("FFI"), Rectifier Productions, LLC ("Rectifier"), Pool Hall Productions, LLC ("Pool Hall") (Seven Arts, SAFE, Deal Investments, Deal Productions, SAP, Rectifier, and Pool Hall are each a "Borrower" and collectively, the "Borrowers") on the one hand, and Cheyne Specialty Finance Fund L.P. ("Cheyne" or "Senior Lender") and Arrowhead Consulting Group LLC ("Arrowhead" or "Subordinated Lender" and, together with Cheyne, the "Lenders") on the other hand. FFI, an affiliate of certain of the Borrowers, will benefit from the refinancing contemplated by this Agreement. For the avoidance of doubt, FFI is not a Borrower hereunder and has no obligation with respect to any of the loans described hereunder, including without limitation the Additional Loan.

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree to amend the Pool Hall Loan Agreement and otherwise as follows:

1.   **FACTUAL BACKGROUND.**

1.1.     Pool Hall and Mercantile National Bank ("Mercantile") entered into that certain Loan and Security Agreement dated as of December 3, 2004 (as amended to date, the "Pool Hall Loan Agreement") and other agreements relating to the financing of that certain motion picture currently entitled *Pool Hall Prophets*. Pursuant to that certain Loan Assignment Agreement dated as of the date hereof (the "Pool Hall Loan Assignment"), Mercantile sold, transferred, granted, and assigned to Lenders the Pool Hall Loan Agreement and the other Loan Documents (as defined in the Pool Hall Loan Assignment) (the "Pool Hall Loan Documents").

1.2.     Deal Investments, Deal Productions, SAP and FFI, on the one hand, and Arrowhead on the other hand, entered into that certain Financing and Security Agreement dated as of May 4, 2006 (as amended to date, the "Deal Loan Agreement") and other agreements relating to the financing of the pre-production and production of that certain motion picture currently entitled *Deal*. Pursuant to that certain Loan Assignment Agreement dated as of the date hereof (the "Deal Loan Assignment"), Arrowhead sold, transferred, granted, and assigned to Lenders the Deal Loan Agreement and the other Loan Documents (as defined in the Deal Loan Assignment) (the "Deal Loan Documents").

1.3.     Rectifier, SAP, and FFI on the one hand, and Arrowhead Target Fund Ltd ("Arrowhead Target") on the other hand, entered into that certain Financing and Security Agreement dated as of May 16, 2006 (as amended to date, the "Noise Loan Agreement") and other agreements relating to the financing of the pre-production and production of that certain motion picture currently entitled *Noise*. The Deal Loan Agreement and the Noise Loan Agreement are collectively referred to herein as the "Arrowhead Loan Agreements." Pursuant to that certain Loan Assignment Agreement dated as of the date hereof, (the Noise Loan Assignment") Arrowhead Target sold, transferred, granted, and assigned to Lenders the Noise Loan Agreement and the other Loan Documents (as defined in the Noise Loan Assignment) (the "Noise Loan Documents"). The Pool Hall Loan Assignment, the Noise Loan Assignment and the Deal Loan Assignment are collectively referred to herein as the "Loan Assignments." The Pool Hall Loan Agreement, the Noise Loan Agreement and the Deal Loan Agreement are referred to

herein as the "Loan Agreements." The Pool Hall Loan Documents, the Deal Loan Documents and the Noise Loan Documents are collectively referred to herein as the "Loan Documents." *Pool Hall Prophets, Deal, and Noise* are each referred to herein as a "Picture" and together as the "Pictures."

        1.4.    The Borrowers have requested that the Lenders, as assignees under the Pool Hall Loan Agreements, increase the Commitment Amount (after giving effect to the repayments of the Existing Loans as specified herein) to Seven Million Five Hundred Thousand Dollars ($7,500,000.00) and make an Advance in such amount. The Lenders are willing to do so (such Advance referred to as the "Additional Loan") upon the terms and conditions set forth herein and in the Pool Hall Loan Documents (as amended hereby) and in consideration of the Borrowers' agreements, representations and warranties contained herein.

        1.5.    As a condition of making the Additional Loan, the Lenders require a subordinated lien on FFI's film library to allow such additional encumbrance thereon. FFI is willing to grant such lien, provided that such lien is subordinated and may not be exercised or foreclosed upon prior to the payment in full of the existing indebtedness of FFI and that such lien be automatically extinguished in the event the holder of such indebtedness transfers such indebtedness at or above par. The Lenders hereby consent to the foregoing terms.

        **2.**    **AMENDMENTS TO POOL HALL, DEAL AND NOISE LOAN DOCUMENTS; ADDITIONAL TERMS AND PROVISIONS.** It is the intention of the parties hereto, subject to the terms hereof, including without limitation the provisions regarding the subordination of the rights of the Subordinated Lender to the rights of the Senior Lender, that the Lenders, as assignees of Mercantile, be substituted into the Pool Hall Loan Documents in the place of the original financier or lender thereunder, with all the rights of such financier or lender. In addition to the terms and provisions set forth in the Pool Hall Loan Documents, the parties to this Agreement have agreed to the terms and provisions set forth in this paragraph 2. To the extent that any of the terms or provisions of any of the Pool Hall Loan Documents are inconsistent with any of the terms and provisions set forth in this section 2, the Pool Hall Loan Documents are each hereby deemed amended to conform to the terms and provisions set forth herein. Capitalized terms used herein without definition shall have the respective meanings set forth therefor in the Pool Hall Loan Agreements.

In consideration for the undertakings contained herein, the parties hereto agree as follows:

        2.1.    The Borrowers shall be the Borrowers under the Pool Hall Loan Agreements.

        2.2.    The term "Bank" under the Pool Hall Loan Agreements shall mean Cheyne Specialty Finance Fund L.P. and Arrowhead Consulting Group LLC; provided, however, that so long as any amounts remain due and owing under the Cheyne Note, the term "Bank" shall mean the Senior Lender acting for itself and as agent for the Subordinated Lender, and any and all rights that inure to the Bank under the Pool Hall Loan Documents shall, subject to the subordination provisions hereof, inure solely to the Senior Lender until the Senior Debt (as defined herein) has been repaid in full, subject to the Subordinated Lender's continuing lien thereon and rights described herein.

        2.3.    Subject to the terms and conditions contained herein, the Lenders hereby agree severally and not jointly, subject to the terms and conditions hereof and in the respective amounts agreed to hereunder, to make an Advance to the Borrowers under the Additional Loan in an aggregate principal amount of Seven Million Five Hundred Thousand Dollars ($7,500,000.00). Subordinated Lender's

funding of One Million Dollars ($1,000,000) in exchange for the Arrowhead Note shall be netted out of the proceeds payable to Arrowhead hereunder in repayment and purchase of the Deal Loan Documents and shall be remitted by Cheyne as contemplated by Schedule 1 hereto.

2.4.     The Borrowers shall use the proceeds of the Additional Loan solely as follows (as further specified on Schedule 1 hereto): (i) to repay all amounts due and owing under the existing promissory notes executed in connection with the Loan Agreements (such existing promissory notes are collectively referred to herein as the "Existing Notes"), and concurrently with the receipt of such funds the Deal Loan Documents and the Noise Loan Documents shall be terminated, (ii) to fund the remaining costs of production of *Noise* and *Deal*, (iii) to fund the Seven Hundred Fifty Thousand Dollars ($750,000.00) deposit into the Interest Reserve (as defined below), (iv) to pay attorney's fees and costs of the Borrowers and Lenders incurred in connection with this Agreement and other closing costs and (v) the remaining balance of the Additional Loan shall be used to repay Seven Arts for amounts it has invested to date to fund the cost of production of *Noise* and *Deal*. In furtherance of the foregoing, the Borrowers hereby irrevocably instruct Cheyne to disburse the proceeds of the Additional Loan on the Closing Date in the manner set forth on Schedule 1 hereto. Any failure by the Borrowers to use the proceeds of the Additional Loan as set forth hereinabove shall constitute an Event of Default under the Loan Agreements for which no cure period shall apply.

2.5.     Principal and interest on the Notes (as defined below) shall be due and payable in full on June 30, 2007, subject to one three (3) month extension to September 30, 2007 if the Borrowers, with the Lenders' consent, pay to each of the Lenders a fee in an amount equal to one percent (1%) of the outstanding principal balance of their respective portion of the Additional Loan as of such date (the "Maturity Date"). In connection with the foregoing, all references in the Pool Hall Loan Documents to the "Maturity Date" shall now be deemed to refer to the Maturity Date as defined herein.

2.6.     The term "Interest Rate" is hereby amended to mean (a) with respect to the Cheyne Note (as defined below) the rate of eighteen percent (18%) per annum thereon and (b) with respect to the Arrowhead Note (as defined below) the rate of nineteen percent (19%) per annum thereon. The Borrowers shall make monthly payments of interest on the Additional Loan at the Interest Rate. Notwithstanding anything to the contrary contained herein, the Lenders shall not be obligated to advance under the Additional Loan, and will hold back as a reserve against the Additional Commitment Amount, the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "Interest Reserve") for the payment of accrued interest hereunder with the Borrowers hereby acknowledging their respective receipt of same. Interest payable hereunder shall be payable monthly in arrears on the last date of each calendar month or, if any such date shall not be a Business Day, on the next succeeding Business Day to occur after such date, and shall be paid out of the Interest Reserve.

2.7.     As a condition precedent to the Lenders making the Advance, the term Collateral is hereby amended to include all Collateral under the Deal Loan Documents and the Noise Loan Documents and all collateral granted to the Lenders pursuant to this paragraph. All representations, warranties, covenants with respect to the Collateral shall be deemed to refer to the Collateral, as such term is amended hereby. The Borrowers hereby confirm the continuing first priority perfected security interest in favor of the Bank (subject to Arrowhead's subordination agreement set forth below) in the Collateral (as amended as set forth above). As additional security for the Borrowers' obligations under the Pool Hall Loan Agreement, as amended hereby, each Borrower (and FFI, with respect to the collateral specified in Section 2.7.2) hereby grants to the Bank (subject to Arrowhead's subordination agreement set forth below), a continuing first priority perfected security interest (but with respect to any FFI assets, a

second priority and subordinated security interest) in, lien on, assignment of and right of set-off against, all of its respective right, title and interest in and to the following property and assets of such Borrower, whether now owned or existing or hereafter acquired or arising, regardless of where located:

        2.7.1.  Seven Arts right, title and interest in distribution fees payable in connection with the films *"Boo"*, *"Broken"* and *"Mirror Wars"* (together with the Pictures, the "Films";

        2.7.2.  A junior and subordinate security interest in FFI's film library, subject and subordinate to the existing lien thereon in favor of Arrowhead Target, it being understood that such lien shall automatically be extinguished in the event Arrowhead Target transfers the senior note with respect to such indebtedness for a price equal to or more than the outstanding principal amount plus accrued and unpaid interest thereon and Cheyne fails to exercise its right of first refusal as more fully set forth in the Right of First Refusal Agreement of even date herewith between Cheyne and Arrowhead Target;

        2.7.3.  all of such Borrower's right, title and interest (if any) in and to each and every Picture, the scenario, screenplay or script upon which such Picture is based, all of the properties thereof, tangible and intangible, and all domestic and foreign copyrights and all other rights therein and thereto, of every kind and character, whether now in existence or hereafter to be made or produced, and whether or not in possession of the Borrowers, including with respect to each and every one of the Pictures and without limiting the foregoing language, each and all of the following particular rights and properties (to the extent they are owned or hereafter created or acquired by the Borrowers); and

        2.7.4.  eight million, one hundred thousand (8,100,000) shares of Seven Arts owned by SAP, as evidenced by the Pledge Agreement attached as Exhibit A hereto, which Pledge Agreement contains provisions providing benefits to Arrowhead as subordinated lender and Cheyne's agreement to act as collateral agent therefor.

        2.8.  Upon the Lenders' request, the Borrowers shall purchase currency exchange rate protection.

        2.9.  Upon the occurrence of an Event of Default, the Borrowers shall pay interest at a default rate equal to twenty-two percent (22%) per annum (twenty-three percent (23%) on the Arrowhead Note) on the unpaid principal balance of the Additional Loan.

        2.10.  Conditions Precedent and Restatement of Representations, Warranties and Covenants.  Each Borrower hereby restates in their entirety, and incorporates by reference herein, all representations, warranties and covenants of the Borrower in the Pool Hall Loan Agreement as if set forth herein in their entirety; provided, however, that to the extent any such representations, warranties or covenants relate to individual items of Collateral specific to any Borrower or to specific Pictures, such representations, warranties and covenants are hereby amended accordingly.  The Borrowers represent that the conditions precedent set forth in Section 6 of the Pool Hall Loan Agreement were satisfied prior to the first advance thereunder.  In addition to satisfaction of the conditions precedent set forth in Section 6 hereof, the Lenders shall not be obligated to make the Advance unless all of the conditions precedent set forth in the Pool Hall Loan Agreement (as amended hereby to take into account the amended definitions

of "Borrower", "Collateral", and "Bank" among others) have been satisfied at the time of the Advance, without giving effect to any prior satisfaction of such conditions precedent in connection with any prior Advance under the Pool Hall Loan Agreement.

      2.11.   Except as expressly set forth herein, all other terms, covenants and conditions of the Loan Documents shall remain in full force and effect.

## 3.    <u>EXECUTION OF ADDITIONAL PROMISSORY NOTES.</u>

      In connection with the Additional Loan, concurrently herewith, the Borrowers shall execute a senior promissory note in favor of Cheyne, in the principal amount of Six Million Five Hundred Thousand Dollars ($6,500,000.00) (the "Cheyne Note") and a subordinated promissory note in favor of Arrowhead, in the principal amount of One Million Dollars ($1,000,000.00) (the "Arrowhead Note"), each in the form attached hereto.  Until all obligations under the Senior Note have been paid in full, no amounts shall be due and payable under the Subordinated Note except for the periodic payment of monthly interest and the payment at closing of transaction expenses due hereunder.  All references in the Pool Hall Loan Documents to the "Note" shall be deemed to refer to the Additional Notes.

## 4.    SUBORDINATION.

      4.1.   As used in this paragraph 4, the following capitalized terms shall have the meanings set forth below:

            4.1.1.   "Senior Debt" means all of Cheyne's rights to repayment of the Indebtedness pursuant to the Cheyne Note.

            4.1.2.   "Senior Liens" means all liens, security interests and assignments with respect to the Collateral securing payment or performance of the Borrowers' obligations to Cheyne for Senior Debt.

            4.1.3.   "Subordinated Debt" means all of Arrowhead's rights to repayment of the Indebtedness pursuant to the Arrowhead Note.

            4.1.4.   "Subordinate Liens" means all liens, security interests and assignments with respect to the Collateral securing payment or performance of the Borrowers' obligations to Arrowhead for Subordinated Debt.

      4.2.   Arrowhead hereby subordinates and makes second, junior and inferior any and all liens, rights, powers, titles and interests of Arrowhead under, pursuant to or by virtue of the Subordinate Liens to all of Cheyne's liens, rights, titles and interests under, pursuant to or by virtue of the Senior Liens, provided that Arrowhead's loans and liens shall in no event be subordinated to any, and shall rank in all respects senior to all, existing and future secured or unsecured indebtedness of the Borrowers other than the Senior Liens.  Subject to the foregoing, the Senior Liens shall be unconditionally first, prior and superior to any and all of Arrowhead's liens, rights, powers, titles and interests under, pursuant to or by virtue of the Subordinate Liens.  The Senior Lender shall not amend, modify or extend the terms of the Senior Debt or the Senior Liens without the prior written consent of the Subordinated Lender, such consent not to be unreasonably withheld, conditioned or delayed, it being

understood that it shall not be unreasonable for the Subordinated Lender to withhold its consent to any increase in the principal amount or interest rate of the Senior Debt.

4.3.    Unless and until all of the Senior Debt has been fully paid and satisfied, Arrowhead will not (i) ask, demand, sue for, take or receive, or retain, from the Borrowers, by setoff or in any other manner, payment of all or any part of the Subordinated Debt, or (ii) declare the Subordinated Debt due and payable by reason of any default or for any other reason, or bring or join with any creditor other than the Senior Lender (solely to enforce its claims as a subordinated secured creditor)in bringing any proceeding against the Borrowers under any bankruptcy, reorganization, readjustment or arrangement of debt, suspension of payments, receivership, liquidation or insolvency or similar law or statute now or hereafter in effect.

4.4.    Arrowhead will not take any action to enforce the Subordinate Liens without Cheyne's prior written consent, provided that nothing in this Agreement shall at any time prevent Arrowhead, solely in its capacity as a secured creditor subordinated to Cheyne, from initiating legal proceedings against the Borrowers to enforce the provisions of the Subordinated Note and related security agreements by injunction or other equitable relief or in the context of any bankruptcy, reorganization or insolvency proceedings. All amounts, whether in the form of cash, proceeds, checks, drafts, orders or other instruments for the payment of money, recovered with respect to any property of any of the Borrowers which is subject to the Subordinate Liens by the enforcement of the Subordinate Liens shall be paid over and delivered to Cheyne immediately upon Arrowhead's receipt thereof, in the form received by Arrowhead, but with any necessary endorsements or instruments required for payment to Arrowhead, and, until so delivered shall not be commingled with any other funds or property but shall be held by Arrowhead upon an express trust for the benefit of Cheyne.

4.5.    The Senior Lender shall promptly give Arrowhead a copy of any written notice to the Borrowers of (a) the occurrence of any event of default or default (as defined in the applicable loan agreements) (including any demand for payment of the Senior Debt), (b) the acceleration of all or any portion of the Senior Debt and (c) the assignment of all or any portion of the Senior Debt (together with the name and address of the assignee).

4.6.    The Senior Lender hereby subordinates and makes second, junior and inferior any and all liens, rights, powers, titles and interests of Senior Lender under, pursuant to or by virtue of the second lien in the FFI library, including without limitation by virtue of any lien granted in the FFI library or FFI's assets pursuant to the Deal Loan Documents and/or the Noise Loan Documents (the "Cheyne Subordinated FFI Lien") to all of Arrowhead Target's liens, rights, titles and interests under, pursuant to or by virtue of the existing secured debt and liens on FFI held by Arrowhead Target pursuant to that certain Note Purchase and Security Agreement dated as of February 15, 2006 among Arrowhead Target, FFI, SAFE and SAP (the "FFI Senior Debt"), provided that the Senior Lender's loans and liens shall in no event be subordinated to any, and shall rank in all respects senior to all, existing and future secured or unsecured indebtedness of FFI other than the Cheyne Subordinated FFI Lien. Unless and until all of the FFI Senior Debt has been fully paid and satisfied, Cheyne will not (i) ask, demand, sue for, take or receive, or retain, from FFI, by setoff or in any other manner, payment of all or any part of the debt secured by the Cheyne Subordinated FFI Lien (the "Cheyne Subordinated FFI Debt"), or (ii) declare the Cheyne Subordinated FFI Debt due and payable by reason of any default or for any other reason, or bring or join with any creditor (other than with Arrowhead Target solely to enforce Cheyne's claims as a subordinated secured creditor) in bringing any proceeding against FFI under any bankruptcy, reorganization, readjustment or arrangement of debt, suspension of payments, receivership, liquidation or

insolvency or similar law or statute now or hereafter in effect, provided that nothing in this Agreement shall at any time prevent Cheyne, solely in its capacity as a secured creditor subordinated to Arrowhead Target, from initiating legal proceedings against the Borrowers to enforce the provisions of the Cheyne Note and related security agreements by injunction or other equitable relief or in the context of any bankruptcy, reorganization or insolvency proceedings.  In no event shall the Senior Lender accept payment of any monies from FFI prior to repayment in full of the FFI Senior Debt, and the Senior Lender shall promptly deliver and pay over to Arrowhead immediately upon the Senior Lender's receipt thereof, in the form received by the Senior Lender, but with any necessary endorsements or instruments required for payment to Arrowhead, and, until so delivered shall not be commingled with any other funds or property but shall be held by the Senior Lender upon an express trust for the benefit of Arrowhead.  The Cheyne Subordinated FFI Lien shall automatically and without further action be terminated and extinguished in the event Arrowhead Target, at any time following March 31, 2007, transfers the FFI Senior Debt to a third party for an amount equal to at least the unpaid principal and interest on such loan and Cheyne fails to exercise its rights pursuant to the ROFR.  The Senior Lender hereby irrevocably appoints Arrowhead Target as its attorney in fact for purposes of filing any termination statements with respect to the Cheyne Subordinated FFI Lien and authorizes the filing thereof, such appointment being coupled with an interest.  Arrowhead Target is an intended third party beneficiary of this Agreement and shall be entitled to enforce the terms hereof.

4.7.     Upon payment in full of the Senior Debt held by Cheyne, Cheyne shall provide Arrowhead all the benefits of a secured party with respect to the Collateral underlying the Additional Loan, including without limitation the Pledge Agreement and the Collection Account.

## 5.     COLLECTION ACOUNT; INTEREST RESERVE.

5.1.     The Collection Account.  Cheyne has established an account with The Chase Manhattan Bank, New York, as follows: BIC code CHASUS33, ABA 021000021, A/C Morgan Stanley & Co Intl Ltd A/C 400 333139, MS Fund Code: 04F106514, (the "Collection Account").  Earnings on amounts on deposit in the Collection Account shall inure to the benefit of the Borrowers.  The Borrowers shall cause all proceeds of the Pictures paid or payable to the Borrowers or any of them to be deposited into the Collection Account and shall direct any account debtor with respect to any of the Pictures wishing to send a wire transfer as payment to send any funds to the Collection Account.  On the first business day of each month (each such date, a "Payment Date"), Cheyne shall apply the amounts on deposit in the Collection Account as follows:

(a) first, to interest due on the Cheyne Note in respect of such month;

(b) second, to the extent of funds available in the Collection Account after payment of the amount specified in (a) above, to the unpaid principal balance of the Cheyne Note;

(c) third, to the extent of funds available in the Collection Account after payment of the amounts specified in (a) and (b) above, to interest due on the Arrowhead Note; and

(d) last, to the extent of funds available in the Collection Account after payment of the amounts specified in (a), (b) and (c) above, to the unpaid principal balance of the Arrowhead Note.

Cheyne shall provide Seven Arts with a statement within 10 days after each Payment Date showing the deposits into the Collection Account in the previous month and the application thereof to the Cheyne

Note and the Arrowhead Note. At such time as the Cheyne Note has been repaid, Cheyne shall remit all funds therein to Arrowhead in payment of interest due, first, and then the unpaid principal balance of, the Arrowhead Note, and if the Arrowhead Note has been repaid, to Seven Arts. The Lenders shall not use the Collection Account for any other purpose. If the Borrowers or any Affiliated Person or any shareholder, officer, director, employee or agent of the Borrowers or any Affiliated Person, or any other Person acting for or in concert with the Borrowers shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds from the exploitation of any of the Pictures or other Collateral, the Borrowers and each such Person shall receive all such items in trust for, and as the sole and exclusive property of, the Bank and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Collection Account.

 . 5.2    The Interest Reserve.   Cheyne shall deposit the Interest Reserve into the Collection Account. Provided that (i) there is no Event of Default then in effect and (ii) amounts then due on the Cheyne Note have been paid, on each Payment Date, Cheyne shall cause current interest to be paid on the Arrowhead Note out of the Interest Reserve, and the Borrowers hereby consents to such payments. In the event interest due on the Cheyne Note on any Payment Date has not been timely paid, either by the Borrowers directly or the application of deposits in the Collection Account (other than the Interest Reserve), Cheyne shall first apply the Interest Reserve to such overdue interest payment.

   6.    CONDITIONS PRECEDENT TO AVAILABILITY OF ADDITIONAL COMMITMENT AMOUNT.

This Agreement shall be effective upon the occurrence of the following:

          6.1.    execution of this Agreement by all parties;

          6.2.    perfection of the security interests of the Bank in the Collateral (as such term is amended hereby);

          6.3.    the Borrowers' execution of the Additional Notes; and

          6.4.    delivery to the Lenders of opinions of counsel regarding the due organization and authority of the Borrowers, the enforceability of this Agreement and the perfection of the Lenders' security interests.

   7.    REPRESENTATIONS AND WARRANTIES.

          In order to induce Lenders to enter into this Agreement, each Borrower represents and warrants to the Lenders that:

          7.1.    no event has occurred or is continuing which constitutes an Event of Default or potential Event of Default under the Pool Hall Loan Agreement;

          7.2.    the Borrowers' representations and warranties contained in the Pool Hall Loan Agreement (as amended hereby to apply to each Borrower) are true, correct and complete on and as of the date hereof to the same extent as though made on and as of the date hereof; and

7.3.    the Borrowers' execution, delivery and performance of this Agreement is within their corporate power and has been duly authorized by all necessary corporate action and this Amendment constitutes a valid and binding agreement of the Borrowers, enforceable against the Borrowers in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally.

8.    **REIMBURSEMENTS.**  Seven Arts agrees to reimburse Cheyne Capital Management Limited ("CCM") and Arrowhead for (i) any out-of-pocket expenses incurred by it in connection with the transaction contemplated hereunder, including, without limitation, all reasonable fees and disbursements of CCM's and Arrowhead's external counsel in connection with documentation and due diligence, whether or not the transaction documents are executed or the transaction contemplated hereby is consummated and (ii) reasonable out-of-pocket costs and expenses of CCM and Arrowhead (including, without limitation, fees and disbursements of external counsel) incurred in connection with the enforcement of any of its rights and remedies arising hereunder, in either case, promptly after demand.

9.    **MISCELLANEOUS.**

9.1.    Notices.  All notices, requests, demands, and other communications required or permitted to be given under this Agreement shall be given in writing (at the addresses set forth below) by any of the following means: (i) personal service; (ii) facsimile transmission (if confirmed by sending a copy by any other method specified herein); (iii) delivery by any reputable overnight courier service; or (iv) registered or certified mail, postage prepaid, return receipt requested. Any notice, demand or request sent pursuant to either (i) or (ii) hereof shall be deemed received upon such personal service or upon dispatch by facsimile and if sent pursuant to (iii) hereof shall be deemed received one (1) Business Day following delivery to such courier service and if sent pursuant to (iv) hereof shall be deemed received upon actual receipt thereof.

| To Borrower: | If to Cheyne: |
|---|---|
| At the addresses set forth in the Loan Agreements | Cheyne Capital Management Ltd. Stornoway House 13 Cleveland Row London  SW1A 1DH United Kingdom Tel: +44 (0) 20 7031 7450 Fax: +44 (0) 20 7031 7614 |
| With a copy to: | |
| Gipson Hoffman & Pancione 1901 Avenue of the Stars, Suite 1100 Los Angeles, California  90067 Attn: Lawrence R. Barnett Facsimile No.  310-556-8945 Telephone No. 310-556-4660 | With a copy to: Brown Rudnick Berlack Israels LLP Seven Times Square New York, NY  10036 Telephone No. 212-209-4850 Telecopier No. 212-938-2803 Attention: Boris Žiser |
| | If to Arrowhead |

|  | 601 Carlson Parkway<br>Suite 1250<br>Minnetonka, MN 55305<br><br>With a Copy to:<br><br>Wollmuth Maher & Deutsch LLP<br>401 N. Michigan Avenue, Suite 3200<br>Chicago, IL 60611<br>Telephone No. 312.222.5118<br>Telecopier No. 312.604.7863<br>Attention: Mason H. Drake |
| --- | --- |

Such addresses may be changed by notice to the other parties given in the same manner as provided above. For used herein, the term "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

9.2.   Further Instruments. Each party will, whenever and as often as it shall be requested so to do by the other, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be necessary or proper, in the reasonable opinion of the requesting party, in order to carry out the intent and purpose of this Agreement. In furtherance of the foregoing, the Borrowers shall deliver letters of direction to the Distributors, advising them of the transactions contemplated by this Agreement and directing them to remit future payments to the lock-boxes.

9.3.   Confidentiality. The parties hereto agree to keep secret and confidential the transactions contemplated by this Agreement, except to the extent disclosure thereof is required by applicable law. Notwithstanding the foregoing, Seven Arts may issue a press release announcing the closing of the financing contemplated herein, so long as such press release does not identify the Lenders.

9.4.   Restricted Payments. Until such time as all amounts with respect to the Additional Loan have been paid in full, each of the Borrowers covenants and agrees that it shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to any owner of an interest in such Borrower, or otherwise with respect to any ownership or equity interest or security in or of such Borrower, (ii) redeem, purchase, retire or otherwise acquire for value any ownership or equity interest or security in or of such Borrower or (iii) set aside or otherwise segregate any amounts for any such purpose.

9.5.   Matters of Construction.

9.5.1.   Incorporation of Exhibits. All exhibits attached and referred to in this Agreement are hereby incorporated herein as though fully set forth in (and shall be deemed to be a part of) this Agreement.

9.5.2.   Entire Agreement. This Agreement, together with the Loan Documents, contains the entire agreement between the parties respecting the matters

herein set forth and supersedes all prior agreements between the parties hereto respecting such matters.

9.5.3. <u>Severability</u>. If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

9.5.4. <u>Captions</u>. Section headings shall not be used in construing this Agreement.

9.5.5. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. All of the parties hereto hereby irrevocably submit to the jurisdiction of the state and federal courts located in the Borough of Manhattan, The City of New York, in the State of New York, for the resolution of any and all disputes arising hereunder.

9.5.6. <u>Third-Party Beneficiaries</u>. Except as expressly set forth herein, nothing in this Agreement, expressed or implied, is intended to confer any rights or remedies upon any person, other than the parties hereto and, subject to the restrictions on assignment herein contained, their respective successors and assigns.

9.5.7. <u>Amendments</u>. This Agreement may be amended only by a writing executed by all parties, but not otherwise.

<u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other documents contemplated hereby. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or such other documents, this Agreement or such other document shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement or any other transaction document.

10.     <u>EFFECTIVE AMENDMENT</u>.

It is hereby agreed that, except as specifically provided or contemplated herein, this Agreement does not in any way affect or impair the terms and conditions of the Pool Hall Loan Agreement, and all terms and conditions of the Pool Hall Loan Agreement are to remain in full force and effect unless otherwise specifically amended, waived or changed pursuant to the terms and conditions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date indicated below.

Dated:  December 22, 2006

Seven Arts Pictures PLC

By: _____
    Peter Hoffman
Its: _____

Dated:  December 22, 2006

Seven Arts Filmed Entertainment, Ltd.

By: _____
    Peter Hoffman
Its: _____

Dated:  December 22, 2006
as grantor of a limited and subordinated lien

Seven Arts Future Flows I, LLC, solely in its capacity

By: _____
    Peter Hoffman
Its: _____

Dated:  December 22, 2006

jDeal Investments, LLC

By: _____
Its: _____

Dated:  December 22, 2006

Deal Productions, LLC

By: _____
Its: _____

Dated:  December 22, 2006

Seven Arts Pictures, Inc.

By: _____

504-587-9043      p.4
P.04

Dated: December 2?, 2006

Its: _____

Rectifier Productions LLC

By: Seven Arts Pictures, Inc.

Its: Managing Member

By: _____

Peter Hoffman, President

Dated: December 2?, 2006

Pool Hall Productions, LLC

By: _____

Its: _____

[Signature Page to Master Agreement, continued]

Dated:  December __, 2006           Cheyne Specialty Finance Fund L.P.

By:_____

Its:_____

Dated:  December __, 2006           Arrowhead Consulting Group LLC (as Lender)

By:_____

Its:_____

[Signature Page to Master Agreement, continued]

Dated:  December __, 2006                    Cheyne Specialty Finance Fund L.P.

                                             By:_____

                                             Its:_____

Dated:  December 22, 2006                    Arrowhead Consulting Group LLC (as Lender)

                                             By:_____

                                             Its: Chief Manager

EXHIBIT 5



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

| DATE OF RECORDATION |
|---|
| 22Jan07 |

| VOLUME | DOC. NO. |
|---|---|
| 3548 | 29 |

| VOLUME | DOC. NO. |
|---|---|

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services

c-762 · JANUARY 2004 — 4,000

# Document Cover Sheet
## UNITED STATES COPYRIGHT OFFICE

Copyright Office fees are subject to change.
For current fees check the Copyright Office website at
www.copyright.gov, write to the Copyright Office
or call (202) 707-3000.

**RECEIVED**



159167911

FEB 5 2007

**DOCUMENT SECTION**

DO NOT WRITE ABOVE THIS LINE · SEE INSTRUCTIONS ON REVERSE

**For Recordation of Documents**

Volume ___3548___    Document ___029___

Volume _____    Document _____

Date of recordation   M ___JAN 2 2 2007___ D
(ASSIGNED BY THE COPYRIGHT OFFICE)

Funds received ___$95 14w___

90

To the Register of Copyrights: Please record the accompanying original document or properly certified copy thereof.

**1** First party name given in the document   Deal Investments, LLC

**2** First title given in the document   DEAL
(IMPORTANT: Please read instruction for this and other spaces.)

**3** Total number of titles in the document   1

**4** Amount of fee calculated   $95.00

**5** Fee enclosed
☐ Check   ☐ Money order
☑ Fee authorized to be charged to Copyright Office deposit account

Deposit account number   DA92941

Deposit account name   Brown Rudnick Berlack Israels LLP

**6** Completeness of document   ☑ Document is complete by its own terms   ☐ Document is not complete. Record "as is."

IMPORTANT NOTE: A request to record a document "as is" under 37 CFR §201.4(c)(2) is an assertion that: (a) the attachment is completely unavailable for recordation; (b) the attachment is not essential to the identification of the subject matter of the document; and (c) it would be impossible or wholly impracticable to have the parties to the document sign or initial a deletion of the reference to the attachment.

**7** Certification of Photocopied Document   Complete this certification if a photocopy of the original signed document is substituted for a document bearing the actual original signature.

NOTE: This space may not be used for documents that require an official certification.

I declare under penalty of perjury that the accompanying document is a true and correct copy of the original document. Executed on _____.
DATE

Signature _____

Duly authorized agent of _____

**8** Return to:   Name   Mark S. Leonardo, Esq., Brown Rudnick Berlack Israels LLP

Number/street   One Financial Center   Apt/suite _____

City   Boston   State   MA   Zip   02111

Phone number   617-856-8145   Fax number   617-856-8201

Email   ip@brownrudnick.com

SEND TO: Library of Congress, Copyright Office, Documents Recordation Section, 101 Independence Avenue SE, Washington, DC 20559-6000
INCLUDE ALL THESE TOGETHER: (1) Two copies of this form; (2) payment from a deposit account or by check/money order payable to Register of Copyrights; and (3) your document.

DOCUMENT COVER SHEET   REV: 07/2006   PRINT: 07/2006 — xx,000   Printed on recycled paper                U.S. Government Printing Office: 2006-310-xxx/60,xxx

## ASSIGNMENT OF INTEREST IN
## COPYRIGHT MORTGAGE AND ASSIGNMENT

Reference is hereby made to that certain Copyright Mortgage and Assignment executed as of May 4, 2006 (the "Mortgage") between Deal Investment, LLC, Seven Arts Pictures, Inc. and Deal Productions, LLC (collectively, "Mortgagor") and Arrowhead Consulting Group, LLC ("Mortgagee") which was recorded in the United States Copyright Office on June 20, 2006 in Volume 3539, Page 717 and pursuant to which Mortgagor mortgaged, assigned, granted, conveyed and transferred for security to Mortgagee, all of Mortgagor's right, title and interest of every kind and nature, without limitation, in and to all copyrights and rights and interests of every kind or nature in copyrights and works protectable by copyright, whether now owned or hereafter created or acquired; and all renewals and extensions thereof, and all accounts receivable related thereto and all other cash and non-cash proceeds therefrom, and all of the collateral related thereto or derived therefrom, in and to that certain screenplay and the motion picture based upon and derived from said screenplay, currently entitled *Deal* together with the proceeds thereof (collectively, the "Work"), as such collateral is more fully set forth in the Mortgage.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mortgagee hereby irrevocably grants, assigns, transfers, sets over and conveys by quitclaim to Cheyne Specialty Finance Fund L.P. ("Cheyne"), without recourse, representation or warranty a senior interest in Mortgagee's right, title and interest in the Mortgage and the Work, subject to Mortgagee's continuing subordinated interest therein as set forth in that certain Master Agreement dated as of December 22, 2006 by and among Seven Arts Pictures PLC, Seven Arts Filmed Entertainment, Ltd., Deal Investments, LLC, Deal Productions, LLC, Seven Arts Pictures, Inc., Seven Arts Future Flows I, Rectifier Productions, LLC, Pool Hall Productions, LLC, on the one hand, and Cheyne and Mortgagee, on the other hand.

IN WITNESS WHEREOF, the undersigned has executed this Assignment of Copyright Mortgage and Assignment as of December 22, 2006.

ARROWHEAD CONSULTING GROUP, LLC

By: 
Its: *Chief Manager*

V3548 D029

STATE OF _Minnesota_  )

                                    ) ss.

COUNTY OF _Hennepin_  )

On _December 22, 2006_ before me, _Lynette S. Schultz_ a Notary Public, personally appeared _James N. Fry_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) (is/are) subscribed to the within instrument, and acknowledged to me that (he/she/they) executed the same in (his/her/their) authorized capacit(-y/-ies), and that by (his/her/their) signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

      WITNESS my hand and official seal.

 (Seal)

Notary Public



V3539 D717 PAGE 3

EXECUTED

## COPYRIGHT MORTGAGE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS that for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned, Deal Investments, LLC, a Louisiana limited liability company, Deal Productions, LLC, a Louisiana limited liability company, Seven Arts Pictures, Inc., a Nevada corporation (collectively, "Mortgagor"), do hereby mortgage, assign, grant, convey and transfer for security to Arrowhead Consulting Group, LLC ("Mortgagee") and its successors, licensees and assigns, throughout the universe in perpetuity, all right, title and interest of every kind and nature, without limitation, in and to all copyrights and rights and interests of every kind or nature in copyrights and works protectable by copyright, whether now owned or hereafter created or acquired, all renewals and extensions thereof, and all accounts receivable related thereto and all other cash and non-cash proceeds therefrom, and all of the collateral related thereto or derived therefrom described in Exhibit "A" hereto (collectively the "Collateral"), in and to that certain screenplay (the "Screenplay"), and the motion picture based upon and derived from the Screenplay (the "Picture"), currently entitled *Deal* and in and to the copyright and all rights and interests of every kind or nature, without limitation, in and to all works based upon, incorporated in, derived from, incorporating or relating to the Screenplay or the Picture or from which the Screenplay or the Picture are derived. The Screenplay and the Picture are collectively referred to herein as the "Work."

Mortgagor agrees that if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes copyright infringement with respect to the Work or constitutes plagiarism, or violates or infringes any of Mortgagor's or Mortgagee's rights with respect to the Work, or any part thereof, or if any person, firm or corporation does or performs any acts which, in Mortgagee's opinion, constitutes an unauthorized or unlawful distribution, exhibition or use of the Work, or any part thereof, then, in such event, Mortgagee may, and shall have the right to, take such steps and institute such suits or proceedings as Mortgagee may deem reasonable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable, necessary or proper for the full protection of the parties' rights. Mortgagee may take such steps or institute such suits or proceedings in its own name, in Mortgagor's name or in the names of the parties jointly.

Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its lawful attorney-in-fact to do all acts and things permitted or contemplated by the terms hereof and pursuant to the Loan and Security Agreement referred to below. Without limiting the generality of the foregoing, the conveyance and assignment contained herein includes all prior choses-in-action, at law, in equity and otherwise, the right to recover all damages and other sums, and the right to other relief allowed or awarded at law, in equity, by statute or otherwise.

I:\WPDOCS\108\RJHS\Deal Copyright Mortgage .wpd

V3539 D717

V3539 D717  Page 2

Mortgagor and Mortgagee have entered into that certain Financing and Security Agreement dated as of May 4, 2006 (the "Loan Agreement") relating to the mortgage and assignment for security in and to the rights referred to herein, and this Copyright Mortgage and Assignment hereby incorporates the terms and provisions of the Loan Agreement, as the same may, from time to time, be amended, amended and restated, modified, supplemented, renewed or replaced.  Capitalized terms not defined herein shall have the meaning set forth in the Loan Agreement.

V3548 D029  Page 4

IN WITNESS WHEREOF, Mortgagor has executed this Copyright Mortgage and Assignment as of the day and year set forth below.



DEAL INVESTMENTS, LLC
("Borrower")

By: _____

Its: _____
      (Authorized Signatory)

DEAL PRODUCTIONS, LLC
("Borrower")

By: _____

Its: _____
      (Authorized Signatory)

SEVEN ARTS PICTURES, INC.
("Borrower")

By: _____

Its: _____
      (Authorized Signatory)

Executed in Los Angeles, California
on May ___4___, 2006

V3548 D029  Page 5

V3548 D029  Page 6

## EXHIBIT "A"

## COLLATERAL DESCRIPTION

The "Collateral" means all of Mortgagor's right, title and interest, whether now owned or hereafter acquired, made produced or created by Mortgagor, in and to the Work, including, without limitation, the following:

1.      <u>Work Collateral and Copyright</u>. The Work and all rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Work" includes the Work (as defined in the main portion of this Copyright Mortgage and Assignment), all of the rights referred to above and the rights set forth in paragraphs 1.1 through 1.13, below), including, without limitation:

1.1.     all rights of every kind and nature (including, without limitation, copyrights) in and to the literary material upon which, in whole or in part, the Work is or may be based, or which may be or has been used or included in the Work, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion, and all drafts, versions and variations thereof (collectively the "Literary Property");

1.2.     all physical properties of every kind or nature of or relating to the Work and all versions thereof, including, without limitation, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including, without limitation, interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Work in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each of the foregoing (collectively the "Physical Property");

1.3.     all rights to perform, copy, record, re-record, produce, reproduce and synchronize any or all music and musical compositions created for, used in or to be used in connection with the Work, and all other rights of every kind and nature in and to any and all of the music and musical compositions created for, used in or to be used in connection with the Work, including, without limitation, all copyrights therein, as well as all other rights to exploit such music, including, without limitation, record, soundtrack recording and music publishing rights;

1.4.     all collateral, allied, ancillary and subsidiary rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Work or the Literary Property, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series

production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Work, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of, connected with or inspired by the Work or the Literary Property; the title or titles of the Work, the characters appearing in the Work or the Literary Property and the names and characteristics of such characters; and any and all commercial exploitation in connection with or related to the Work, and all remakes of or sequels to the Work and the Literary Property;

1.5.   all rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Work, including, without limitation, all agreements for personal services (including, without limitation, the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative, artistic and technical staff) and agreements for the use of studio space, equipment, facilities, animation services, special effects services and laboratory contracts;

1.6.   all insurance and insurance policies obtained in connection with the Work, the insurable properties thereof or any person or persons engaged in the development, production, completion, delivery or exploitation of the Work, and the proceeds of all of the foregoing;

1.7.   all copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Work or the Literary Property or any part thereof, and the right (but not the obligation) to publish the same for copyright purposes, to register claim under copyright, to renew and extend such copyrights and the right (but not the obligation) to sue in the name of Mortgagor or Mortgagee (or both) for past, present or future infringements of copyright;

1.8.   all rights to produce, release, sell, distribute, lease, market, license, exhibit, broadcast, reproduce, publicize or otherwise exploit the Work, the Literary Property and any and all rights therein, in perpetuity, without limitation, in any manner and in any media whatsoever, throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

1.9.   all right, title and interest in and to the Distribution Agreements, the Sales Agency Agreement, and all other agreements licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Work or rights therein, including, without limitation, any and all rights relating to merchandising, publishing, music and phonorecords derived from or connected with the Work, and the proceeds of all of said agreements;

1.10.   all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing,

-2-

licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Work and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, copyright infringement, breach of contract or infringement of any other rights, or derived therefrom in any manner whatsoever;

    1.11.  any and all accounts (including, without limitation, the Collection Account), accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including, without limitation, inventory (as those terms are defined in the California Commercial Code), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Work or any element thereof;

    1.12.  any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Work or any element thereof; and

    1.13.  all cash and non-cash proceeds, products, additions and accessions (including, without limitation, insurance proceeds) of the Work, as defined and referred to in paragraphs 1.1 through 1.12, above;

    2.  <u>Personal Property</u>. The following personal property, whether now owned or hereafter acquired, and the proceeds thereof: (i) all of Mortgagor's rights in and to the title of the Work and the exclusive use thereof including, without limitation, any and all rights protected pursuant to trademark, service mark, unfair competition or other laws, rules or principles of law or equity and (ii) all rights in and to any and all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, relating to the Work, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or patents, and the right (but not the obligation) to sue in the name of Mortgagor or Mortgagee (or both) for past, present or future infringement of trademark or patent.

    3.  <u>Cash</u>. All of Mortgagor's cash and cash equivalents derived from or relating to the Work and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings relating to the Work which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which, in the ordinary course of business, is transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired.

    4.  <u>Equipment</u>. All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description now owned or hereafter acquired by Mortgagor and used in connection with the Work (including without limitation, all wardrobe, props, mikes, scenery, sound stages,

movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery), and all goods of like kind or type hereafter acquired by Mortgagor in substitution or replacement thereof, and all additions and accessions thereto (collectively the "Equipment") and all rents, proceeds and products of the Equipment, including, without limitation, the rights to insurance covering the Equipment.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

V3548 D029 Page 9

H:\WPDOCS\10\NUHS\Deal Copyright Mortgage.wpd

-4-

# EXHIBIT 6

At IAS Part 49 of the Supreme Court
of the State of New York, held in and for
the County of New York, at the County
Court House at 60 Centre Street, New
York, New York, on the 23 day of
December ,2008

PRESENT: **HERMAN CAHN**
**J.S.C.**

HON. _____
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

|  |  |
|---|---|
| ARROWHEAD CAPITAL FINANCE, LTD., | Index No. 08/600136 |
| Plaintiff, | |
| v. | **CONSENT JUDGMENT AND** |
| METRO II LLC, ARROWHEAD CONSULTING GROUP LLC, NORTHPOINT AERO WARBIRD CLASSICS LLC, NORTHPOINT AERO LLC, NPA HOLDINGS LLC, and JAMES N. FRY, | <u>PERMANENT INJUNCTION</u> |
| Defendants. | |

---

THIS MATTER, having come before the Court by the commencement of an action by

the filing of a complaint dated January 16, 2008 by plaintiff Arrowhead Capital Finance, Ltd.

(the "Fund" or "Plaintiff") against defendants Metro II LLC ("Metro II"), Arrowhead Consulting

Group LLC ("ACG"), Northpoint Aero Warbird Classics LLC ("Northpoint I"), Northpoint Aero

LLC ("Northpoint II"), NPA Holdings LLC ("NPA") (Metro II, ACG, Northpoint I, Northpoint

II and NPA are collectively referred to herein as the "Corporate Defendants") and James N. Fry

("Fry" or the "Individual Defendant") (the Corporate Defendants together with the Individual

{NY036928;1}

A 000461

Defendant are sometimes collectively referred to herein as the "Defendants") asserting causes of action for breach of contract, replevin, foreclosure of security interests, injunctive relief, and attorneys' fees and costs, and the parties having consented to the entry of this consent judgment and permanant injunction; and after due deliberation and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED, that:

1.   Judgment is hereby entered against Defendants Metro II, Northpoint I, Northpoint II and NPA in the principal amount of $52,974,052, plus accrued interest of $ 15,029,210.27 additional accrued interest from August 18, 2008, interest accruing thereafter and costs of suit, attorneys' fees and such other relief as the Court deems just and proper

2.   Defendants shall not transfer, dissipate, convey, secrete, encumber or dispose of the Collateral (as defined herein) or knowingly or willfully impair or cause to be impaired the Collateral's value in any way pending disposition of the Collateral in accordance with this Consent Judgment in the appropriate jurisdictions, shall maintain, protect, and keep safe the Collateral for a period of six (6) months from the date of entry of this Consent Judgment (the "Maintenance Period") and shall not take any actions in contravention of the Fund's security interest in, and rights to such Collateral.  For purposes of this paragraph and Order, Collateral shall mean one or all of:

    i.   Plane
- a.   North American, Model T-6G-NT, FAA Registration No. N4996H, Serial No. 49-3320A; and
- b.   North American, Model SNJ-5, FAA Registration No. N913D, Serial No. 51686;

    ii.   Project
- a.   Lockheed, Model P38F-5, Serial No. 42-12652;
- b.   Republic Aviation, Model P47D-2, Serial No. 42-8089;
- c.   Chance Vought, Model F4U-4HP, FAA Registration No. N68HP, Serial No. 97302;

A 000462

  d.  Chance Vought, Model F4U-4CAV, FAA Registration No. N712RD, Serial No. 97280;

  e.  Grumman, Model F7F, Serial No. 80375;

  f.  Navy, Model N3N, FAA Registration No. N45269, Serial No. 20736; and

  g.  Grumman, Model F6F;

iii. Parts

  a.  North American, Model T-6G-NT;

  b.  Chance Vought, Model F4U;

  c.  Engine Inventory, Model Allison;

  d.  Lockheed, Model P38F-5;

  e.  Grumman, Model F6F;

  f.  Republic, Model P47D-2; and

  g.  Grumman, Model F7F;

iv. Securities

  a.  $100,000.00 Promissory Note from Madison Financial I, bearing a 15% interest rate, dated July 2, 2003, and due July 1, 2004;

  b.  $100,000.00 Promissory Note from Madison Financial II, bearing a 15% interest rate, dated December 5, 2003, and due December 5, 2004;

  c.  $100,000.00 Convertible, Subordinated, Unsecured Promissory Note from Dermatrends, bearing an 8% interest rate, and dated May 17, 2002;

  d.  $454,500.00 Convertible, Subordinated, Unsecured Promissory Note from Dermatrends, bearing an 8% interest rate, and dated February 21, 2003;

  e.  $500,000.00 Convertible Promissory Note from VisualGold, bearing a 10% interest rate, dated August 1, 2002, and due February 1, 2003;

  f.  $37,500.00 Promissory Note from VisualGold, bearing a 0% interest rate, dated August 15, 2003, and due February 15, 2004;

  g.  $250,000.00 Subscription from CI4NET, dated February 14, 2000;

  h.  $432,900.00 invested in 50,000 Common Shares of Isologen (ILE-NYSE) made on December 23, 2003;

  i.  $342,732.64 Promissory Note from HSP, bearing a 22% interest rate, dated November 3, 2006, and due May 2, 2007;and

  j.  $1,000,000.00 Subordinated Promissory Note from Seven Arts – "Cheyne," bearing a 19% interest rate, dated December 22, 2006, and due June 30, 2007 with a three month extension option;

v. Secured promissory notes (the "Collateral Notes"):

  a.  Number: 20060523-B1040, Amount: $2,400,000.00, Date: May 23, 2006;

  b.  Number: 20060531-B1041, Amount: $1,900,000.00, Date: May 31, 2006;

3

c. Number: 20060608-B1042, Amount: $3,050,000.00, Date: June 8. 2006;

d. Number: 20060613-B1043, Amount: $1,850,000.00, Date: June 13, 2006;

e. Number: 20060630-B1044, Amount: $2,405,000.00, Date: June 30, 2006;

f. Number: 20060712-B1045, Amount: $1,140,000.00, Date: July 13, 2006;

g. Number: 20060503-C00007, Amount: $2,479,990.00, Date: May 3, 2006;

h. Number: 20060504-C00009, Amount: $807,230.00, Date: May 4, 2006;

i. Number: 20060615-C00010, Amount: $365,150.00, Date: June 15, 2006;

j. Number: 20060526-DFZ00017, Amount: $2,550,000.00, Date: May 26, 2006;

k. Number: 20060526-DFZ00018, Amount: $2,450,000.00, Date: May 26, 2006;

l. Number: 20040223-D00004, Amount: $4,000,000.00, Date: February 23, 2004;

m. Number: 20040301-D00005, Amount $6,000,000.00, Date: March 1, 2004;

n. Number: 20040304-D00006, Amount: $7,000,000.00, Date: March 4, 2004;

o. Number: 20040413-D00007, Amount: £3,000,000.00, Date: April 13, 2004; and

p. Number: 20040419-D00008, Amount: £2,000,000.00, Date: April 19, 2004.

Notwithstanding the foregoing, neither this paragraph nor paragraph 3 shall require the expenditure of any sum by the Defendants beyond maintaining the insurance currently in place on the Collateral described in subparagraph 2.i. and paying storage, utilities and similar costs at the hangar and warehouse locations at which the Collateral described in subparagraphs 2.i. through iii. are maintained (or, to the extent such locations are owned directly or indirectly by one or more Defendants, permitting uncompensated use of such locations), in each case during the Maintenance Period.

3.   Defendants shall surrender, deliver and grant to the Fund peaceful possession of all of Collateral, wherever located (as provided in paragraph 14 with respect to access to third

4

party locations). This surrender is made to the Fund in recognition of the Fund's rights as a secured party under the UCC and other applicable federal and state law.

4.      During the Maintenance Period, no disposition of any Collateral shall be made other than pursuant to the Fund's instructions, and any of the Collateral in the custody or control of any Defendant shall be so held as the Fund's agent and subject to the Fund's sole instruction and made available to the Fund at a place to be designated by the Fund that is reasonably convenient to both the Fund and Defendants.  For purposes of this paragraph, the Defendants' and/or their affiliates' facilities in Colorado Springs, Colorado shall be deemed reasonably convenient.  Should the Fund request that the Collateral be moved, Defendants will assist the Fund in coordinating said move, but the costs associated with said request shall be borne solely by the Fund, provided, however, that such costs shall be reimburseable from the proceeds of any liquidation of the Collateral as provided for in the Forbearance Agreement.  At the conclusion of the Maintenance Period, if the Fund has not provided the Defendants with instructions for the disposition of the Collateral, the Defendants may place the Collateral described in subparagraphs 2.i. through iii. in any commercially reasonable location at the Fund's sole expense and/or maintain such Collateral in locations owned directly or indirectly by one or more Defendants, in which case such Defendants shall be entitled to reasonable compensation therefore from the Fund, provided, however, that such costs shall be reimburseable from the proceeds of any liquidation of the Collateral as provided for in the Forbearance Agreement.

5.      The Defendants hereby waive any rights Defendants may have to notice and hearing before a court of competent jurisdiction with reference to possession, and consent to the Fund's possession, sale, transfer and other disposition of the Collateral.

5

A 000465

6.     The Fund may, at any time, remove any and all of the Collateral from the premises where the same are located and take such action as it may deem appropriate, and the Fund may at any time exercise its rights to dispose of such Collateral as provided for under any and all loan and/or financing documents and agreements, including but not limited to the Forbearance Agreement, and applicable provisions of law, without prejudice to all of the Fund's other rights.

7.     The Defendants shall not at any time hereafter contend that the Fund has accepted the Collateral in full satisfaction of the Obligations unless otherwise agreed to in writing.

8.     The Corporate Defendants waive the right to contend and are hereby forever barred from contending that the Fund has acted in any respect in a commercially unreasonable or improper manner in the disposition of the Collateral.

9.     The Defendants represent and warrant that the Collateral is subject to no liens, claims or security interests prior in right to the liens of the Fund.

10.     The Defendants shall execute and deliver at the Fund's request all documents reasonably necessary or appropriate to effectuate the peaceful possession of the Collateral by the Fund or by the Fund's designee.

11.     Nothing contained herein shall be deemed to be a release or waiver of the Fund's rights, including, without limitation, but only to the extent permissible under any and all loan and/or financing documents and agreements, including but not limited to the Forbearance Agreement, the Fund's right to recover any deficiency from the Corporate Defendants or any other person or entity that may be liable to Fund with respect thereto.  Moreover, nothing contained herein shall be deemed to be a release or waiver of the Fund's rights under the Senior Notes or to the Collateral Notes securing such Senior Notes.

6

A 000466

12.     The Defendants will account for in writing and provide the Fund with the specific location and status of all Collateral and the status of any insurance on the Collateral within two (2) business days of the date hereof.

13.     The Corporate Defendants shall pay any and all reasonable attorneys' fees and expenses incurred by the Fund in connection with the enforcement of this judgment and any and all loan and/or financing documents and agreements, including but not limited to the Forbearance Agreement, which are not less than $ _323,046.02_ from the proceeds of the disposition of the Collateral.

14.     The Corporate Defendants shall use reasonable efforts to allow the Fund sufficient access to the facilities where the Collateral is presently located to effectuate the purposes of this Consent Judgment.

15.     The Fund is not precluded from bringing any ancillary actions for judgment on the Senior Notes, seeking to take possession of, replevy and/or foreclose upon the Collateral or the Collateral Notes, and the Corporate Defendants expressly consent to jurisdiction in such actions.

**[Remainder of page deliberately left blank]**

7

A 000467

The undersigned consent to the form,
substance and entry of this order:

WOLLMUTH MAHER & DEUTSCH LLP
*Attorneys for Plaintiff Arrowhead Capital Finance, Ltd.*

By: _____                    Dated: August 18, 2008
      William F. Dahill
      James N. Lawlor

AKERMAN SENTERFITT LLP
*Attorneys for Defendants Metro II LLC, Arrowhead
Consulting Group LLC, Northpoint Aero Warbird
Classics LLC, Northpoint Aero LLC, NPA Holdings LLC,
and James N. Fry*

By: _____                    Dated: August 18, 2008
      Kenneth G. Alberstadt

ENTER:
12-23-08

_____ ,J.S.C.

HERMAN CAHN
J.S.C.

Norman Goodman
Clerk

FILED

DEC 30 2008

COUNTY CLERKS OFFICE
NEW YORK

A 000468

EXHIBIT 7

Seven Arts Pictures Plc. - News - Re-domicile and appointment of new Board member          Page 1 of 1

Follow us on nasdaq.net (SAPX)          **INVESTOR RELATIONS**

**SEVEN ARTS PICTURES PLC.,**
an independent motion picture company

HOME     COMPANY PROFILE     FILMS     MARKETS & FESTIVALS     NEWS     CONTACT

Home > Investor Relations > Corporate News > Re-domicile and appointment of new Board member

**INVESTOR RELATIONS**

CORPORATE
GOVERNANCE

BOARD OF DIRECTORS

FINANCIAL REPORTS

SEC FILINGS

PRESENTATIONS

CORPORATE NEWS

CONTACT US

ESPLANADE PICTURES
LLC

## RE-DOMICILE AND APPOINTMENT OF NEW BOARD MEMBER

NOV 09, 2010

SEVEN ARTS PICTURES PLC DOMICILES IN UNITED STATES AND APPOINTS FILM
PRODUCER & FINANCIER DAN REARDON TO ITS BOARD OF DIRECTORS

HOLLYWOOD, CA--(Marketwire) - Seven Arts Pictures Plc (NASDAQ: SAPX) ("Seven Arts")
announced today that it has completed the transfer of all of its assets to Seven Arts Entertainment
Inc., a Nevada corporation ("SAE") in exchange for common stock of SAE and one share
of SAE for each ordinary share of Seven Arts. Trading of ordinary shares of Seven Arts Pictures
Plc will terminate on the effective date of a Registration Statement of SAE for issuance of shares
of SAE to existing shareholders of Seven Arts, expected to be received by December 31, 2010
and resume under the new corporate name Seven Arts Entertainment Inc. SAE will retain the
NASDAQ listing of Seven Arts. Each Seven Arts shareholder will be required to surrender his/her
existing share certificates for SAE share certificates to ensure that there is no short-seller or
market makers trading without share ownership. There will not be an exchange of any Seven Arts
shares for SAE shares based solely on electronic ownership.

The primary purpose of this transaction was to move the domicile of Seven Arts from the United
Kingdom to the United States. "We are pleased to report that Seven Arts Entertainment Inc. will be
recognized as a domestic issuer shortly," said CEO of Seven Arts, Peter Hoffman. "We are also
pleased to announce that Dan Reardon, a highly successful entrepreneur, film producer and
financial executive has joined our Board of Directors. Dan has been actively working with Seven
Arts on several financing transactions and has an impressive background that can help lead our
Company in our future endeavors."

Seven Arts also announces it has received a notice from NASDAQ that its bid price was below $1
for thirty consecutive business days. Seven Arts and SAE will have until May 2, 2011 to maintain a
closing bid price of at least $1 for ten consecutive trading days as will be required for continued
listing on the NASDAQ Stock Market. SAE expects to meet these standards and continue its
NASDAQ listing.

Currently, Mr. Reardon is an Executive Producer of "LUNATIC AT LARGE," an original story by
Stanley Kubrick that is starring Scarlett Johansson and Sam Rockwell, and is a producer on
THICKER starring Leslie Zemeckis, Peter Facinelli, Guy Pearce and Christopher Lloyd. He is the
former CFO of Concrete Film Ventures, which financed several independent, feature film projects,
raised venture capital through limited partnerships, and secured substantial lines of credit from
media banks including the feature films "LEGACY" starring David Hasselhoff, "MY BROTHER
THE PIG" starring Scarlet Johansson and Eva Mendes, "THE PAVILION" starring Richard
Chamberlain, and "CHANGING HEARTS" starring Faye Dunaway.

Mr. Reardon previously was a founding shareholder of four successful public companies including
the NASDAQ-listed North American Scientific, Inc., and is well versed in merger and acquisitions,
IPOs, and capital raises. He also is well respected in real estate tax incentive financing programs.
Mr. Reardon administers several hundred million of incentives annually through the Federal
Preservation Tax Incentive Program. He holds a BA from Syracuse University in Film and Drama,
and is a graduate of Brooks School, a private secondary school.

Julia Verdin and Michael Hamilton have resigned from the Board of Directors of the Company. Ms.
Verdin has been replaced by Mr. Reardon. Seven Arts expects Mr. Hamilton's near-term
replacement will be nominated at Seven Arts' next Board of Directors meeting.

**About Seven Arts:**
Seven Arts Pictures Plc was founded in 2002 as an independent motion picture production and
distribution company engaged in the development, acquisition, financing, production, and licensing
of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and
foreign theatrical markets, and for subsequent worldwide release in other forms of media,
including home video and pay and free television.

**Cautionary Information Regarding Forward-Looking Statements:**
Forward-looking statements contained in this press release are made under the Safe Harbor
Provision of the Private Securities Litigation Reform Act of 1995. Any such statements are subject
to risks and uncertainties that could cause actual results to differ materially from the anticipated

Seven Arts Pictures Plc US contact:
Peter Hoffman
+1 323 372 3080
phoffman@7artspictures.com

Or:

Seven Arts Pictures Plc UK contact:
Kate Hoffman
+44 203 006 8223
khoffmann@7artspictures.com

**COMING SOON**



Radio Free Albemuth

**ABOUT US**          more >

We are an independent motion
picture production company
engaged in developing, financing,
producing and licensing theatrical
motion pictures with budgets in the
range of $2 million to $16 million for
exhibition in domestic (i.e. the
United States and Canada) and
foreign theatrical markets and for
subsequent post-theatrical
worldwide release in other forms of
media, including DVD, home video,
pay-per-view, and free television.

**CONTACT**

Seven Arts Pictures Plc. - A registered company of the United Kingdom          Designed by 6LAB

**United Kingdom**
38 Hertford Street - London W1J 7SG - United Kingdom
Phone : +44 20 3006 8222 - Fax : +44 20 3006 8220

**United States**
1801 Century Park East, Suite 1830 - Los Angeles, CA 90067 - United States
Phone : +1 323 372 3080 - Fax : +1 323 372 3088

EXHIBIT 8

Seven Arts Pictures PLC Announces Change of Accounting Firm - Yahoo! Finance    Page

Case 1:14-cv-06512-KPF   Document 1-1   Filed 08/14/14   Page 106 of 166

Upgrade to Safer IE9

 **YAHOO!** FINANCE

 

# Seven Arts Pictures PLC Announces Change of Accounting Firm

marketwire

Press Release Source: Seven Arts Pictures plc On Monday May 2, 2011, 5:09 pm EDT

HOLLYWOOD, CA--(Marketwire - 05/02/11) - Seven Arts Pictures plc (NASDAQ:SAPX - News) ("Seven Arts" or the "Company") announced today that it has retained Kabani & Company, Inc. of Los Angeles, California as its independent registered public accounting firm. Kabani has offices in both Los Angeles, California and London, England (through Reddy Siddiqui & Kabani) and will be available to audit the Company for SEC reporting purposes and for compliance by the Company and its principal operating subsidiary, Seven Arts Filmed Entertainment Limited, with the Companies Act in the United Kingdom. Kabani will replace RBSM LLP, which audited the Company's consolidated financial statements for the fiscal years ended March 31, 2008, June 30, 2009, and June 30, 2010, and the three month period ended June 30, 2008. Kabani will commence a review of the Company's recently reported financial statements for the six months ended December 31, 2010.

There were and are no material disputes between the Company and RBSM regarding the fiscal periods audited by RBSM.

Peter Hoffman, Chief Executive Officer of Seven Arts, stated, "We are pleased to welcome Kabani & Co. into the Seven Arts family. We thank RBSM for their services to us in past years."

The Company also announced the termination of all relationships between Erika Smith and the Company, both as President of Seven Arts Entertainment Inc., a subsidiary of the Company, and as a director, effective April 19, 2011.

**About Seven Arts:**
Seven Arts Pictures PLC was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production, and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television.

**Cautionary Information Regarding Forward-Looking Statements:**
Forward-looking statements contained in this press release are made under the Safe Harbor Provision of the Private Securities Litigation Reform Act of 1995. Any such statements are subject to risks and uncertainties that could cause actual results to differ materially from the anticipated.

**Contact:**

```
Seven Arts Pictures plc US contact:
Peter Hoffman
+1-323-372-3080
phoffman@7artspictures.com
Or;
Seven Arts Pictures plc UK contact:
Kate Hoffman
+44-203-006-8223
khoffman@7artspictures.com
```

**Follow Yahoo! Finance on   Twitter; become a fan on   Facebook.**

EXHIBIT 9

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 8-K

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): June 22, 2012**

# Seven Arts Entertainment Inc.

*(Exact name of registrant as specified in its charter)*

| Nevada | 001-34250 | 45-3138068 |
|:---:|:---:|:---:|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(I.R.S. Employer Identification No.)* |

**8439 Sunset Boulevard, 4th Floor, West Hollywood, CA 90069**
*(Address of principal executive offices) (Zip Code)*

Registrant's telephone number, including area code **323 372 3080**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

**Seven Arts Entertainment Inc.**

September 6, 2012

By: /s/ Peter Hoffman

Peter Hoffman
Chief Executive Officer

3

EXHIBIT 99.1



## SEVEN ARTS ENTERTAINMENT INC. ANNOUNCES A 1-FOR-70 REVERSE SPLIT

LOS ANGELES, CA--(Marketwire –August 31, 2012) - Seven Arts Entertainment Inc. (NASDAQ: SAPX - News) ("Company" or "Seven Arts") announced today a 1-for-70 reverse split of its common stock effective as of 4:01p.m. EDT (immediately after the close of the market today). The Company's new CUSIP number is 81783N 201. By virtue of the reverse split, every seventy shares of the Company's outstanding common stock will be combined and converted into one share of new common stock with resulting fractional shares rounded up to the next whole share. Seven Arts also announced that it will proportionately reduce the number of its authorized shares of common stock.

**About Seven Arts Entertainment Inc.:**

Seven Arts Entertainment Inc. is the successor to Seven Arts Pictures Plc, which was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television.

**Cautionary Information Regarding Forward-Looking Statements.**

Forward-looking statements contained in this press release are made under the Safe Harbor Provision of the Private Securities Litigation Reform Act of 1995. Any such statements are subject to risks and uncertainties that could cause actual results to differ materially from the anticipated. The information contained in this release is as of August 31, 2012. Seven Arts assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

Contact:

Seven Arts Entertainment Inc.
Peter Hoffman
323-372-3080
phoffman@7artspictures.com

**Seven Arts Entertainment Inc.**
8439 Sunset Blvd., Fourth Floor
West Hollywood, CA 90069
Tel: (323) 372-3080
Email: phoffman@7artspictures.com

# EXHIBIT 10

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K/A**
Amendment No. 1

☑  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended **June 30, 2012**

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: **001-34250**



**SEVEN ARTS ENTERTAINMENT, INC.**
**(Formerly Seven Arts Pictures, PLC)**
(Exact name of Registrant as specified in its charter)

| Nevada | 45-3138068 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

| 8439 Sunset Blvd., Suite 402 Los Angeles, California | 90069 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number: Phone: (323) 372-3080: Fax: (323) 389-0664

Securities registered pursuant to Section 12(b) of the Act:
**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock: $0.01 Par Value**
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by a check mark whether the Registrant is a large filer, an accredited filer, non-accredited filer, or a smaller reporting company. See the definitions of "large accredited filer", "accredited filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accredited filer | ☐ | Accredited filer | ☐ |
|---|---|---|---|
| Non-accredited filer | ☐ | Smaller reporting company | ☑ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐   No ☑

The aggregate market value of common stock, par value $0.01 per share, held by non-affiliates of the registrant, based on the average bid and asked prices of the common stock on June 30, 2012 (the last business day of the registrant's most recently completed fiscal year) was approximately $3,011,829.  For purposes of this computation, all officers, directors and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed an admission that such officers, directors or 10% beneficial owners are, in fact, affiliates of the registrant.

Number of common shares outstanding as of October 8, 2012 was 11,636,677.

**DOCUMENTS INCORPORATED BY REFERENCE**

Listed below are documents incorporated herein by reference and the part of this Report into which each such document is incorporated:

None

PART I

ITEM 1. BUSINESS

Corporate History and Current Corporate Structure

We are the continuation of the business and the successor of the NASDAQ listing to PLC whose predecessor Seven Arts Pictures Inc. ("SAP") was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production, and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television. The Company currently owns interests in 33 completed motion pictures, subject in certain instances to the prior financial interests of other parties. As discussed herein, in late February 2012, the Company launched Seven Arts Music and acquired 52 completed sound recordings with the rights to additional albums. On June 30, 2012, Seven Arts Filmed Entertainment, LLC ("SAFELA") was transferred to the Company.  SAFELA, which is 60% owned by the Company, has a 30 year lease to operate a film production and post-production facility at 807 Esplanade Avenue in New Orleans, Louisiana.  The post-production facility commenced operations on July 1, 2012.

On June 11, 2010, we were formed and became a wholly owned subsidiary of PLC. As of June 11, 2010, we entered into an Asset Transfer Agreement, as amended on January 27, 2011 and again on August 31, 2011, to transfer all of the assets with a cost basis from PLC to us, in exchange for our assumption of certain indebtedness and for one share of common stock of ours for each ordinary share of PLC which have been distributed to shareholders. Additionally, 28,571 shares of our common stock were issued to PLC in order to satisfy any remaining obligations. This transfer was approved by the PLC shareholders at an Extraordinary General Meeting on June 11, 2010. The purpose of this transfer was to eliminate our status as a foreign private issuer and to assume compliance with all obligations of a domestic issuer under all applicable state and Federal securities laws. Our intention in executing this transaction was to redomicile our business with no change in the economic interests of our shareholders.

On August 31, 2011, NASDAQ approved the substitution of one share of our common stock for PLC's NASDAQ listing, effective at the opening of trading on September 1, 2011. On that date, each of PLC's ordinary shares was exchanged for one share of our common stock and commenced trading on NASDAQ as the successor to PLC's NASDAQ listing. This transaction was approved by PLC's shareholders at its Extraordinary General Meeting on June 11, 2010.

On November 8, 2011, PLC, was placed into involuntary creditors liquidation under English law.  Certain indebtedness of PLC remained with PLC and will be subject to administration or payment in those administration proceedings. In accordance with the asset transfer agreement, PLC has been issued 28,571 shares of our common stock in order to satisfy these obligations.

In February 2012, the Company acquired the music assets of Mr. Michery and 100% of the stock of BJ M., As a result, the Company is now also an independent distributor and producer of sound recordings through Seven Arts Music Inc.

The material assets that were acquired comprise 52 completed sound recordings including two completed albums with DMX, up to two additional albums from DMX and up to five albums from Bone Thugs-N-Harmony. The commitments and liabilities assumed were a promissory note dated June 15, 2010 in the amount of $200,000, and outstanding recording costs of the performances of DMX in amounts to be approved by us but not to exceed $140,000.

In connection with the acquisition of the music assets of Mr Michery, the Company issued 50,000 shares of our Series B Preferred to Mr Michery and his assigns and issued an additional 50,000 shares of our Series B Preferred into an escrow in favor of Mr. Michery and his assigns if two DMX albums and two Bone Thugs-N-Harmony albums generate an aggregate of net earnings before interest and taxes of $5,000,000 during the next five fiscal years.  Mr. Michery is the Chief Executive Officer of SAM.

In February of 2012, the Company also acquired Big Jake Music Inc. ("BJM") and issued 10,000 shares of our Series B Preferred to Jake Shapiro and his assigns and issued an additional 70,000 shares of our Series B Preferred into an escrow in favor of Mr. Shapiro and his assigns if certain specific terms are met: 40,000 shares are subject to proving valuation aud usage of certain advertising credits and 30,000 shares are subject to an earn- out over a two-year period.

4

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Seven Arts Entertainment Inc.**

By:  /s/ _____

By: ____

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|-----------|-------|------|
|           |       |      |

72

# EXHIBIT 11

# U.S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended December 31, 2012

**OR**

☐ **TRANSITION REPORT UNDER SECTION 13 OF 15(d) OF THE EXCHANGE ACT OF 1934**

Commission File Number **001-34250**



# SEVEN ARTS ENTERTAINMENT, INC.
(Exact name of small business issuer as specified in its charter)

| Nevada | 45-3138068 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

**8439 Sunset Boulevard 4 th Floor**
**Los Angeles, CA 90069**
(Address of principal executive offices)

**(323) 372-3080**
(Issuer's telephone number)

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days: Yes ☑   No ☐

Indicate by check mark whether the Registrant is a large accredited filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accredited filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act:

| Large Accredited Filer | ☐ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-Accredited Filer | ☐ | Smaller Reporting Company | ☑ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

As of February 15, 2013 there were 67,631,925 shares of Common Stock of the issuer outstanding.

**Seven Arts Entertainment, Inc.**
**Notes to Consolidated Financial Statements**
**December 31, 2012**
**(Unaudited)**

## NOTE 1 – NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES

### Nature of Activities, History and Organization :

Seven Arts Entertainment, Inc. (herein referred to as "the Company", "Seven Arts" or "SAE,"), a Nevada Corporation, is the continuation of the business of Seven Arts Pictures Plc. ("PLC"), which was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production, and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television. The Company currently owns interests in 33 completed motion pictures, subject in certain instances to the prior financial interests of other parties.

As discussed herein, in late February 2012, the Company formed Seven Arts Music, Inc. ("SAM") and acquired 52 completed sound recordings of the recording artist DMX from David Michery ("Michery") with the rights to additional albums and acquired 100% of the stock of Big Jake Music ("BJM"). As a result, the Company is also in the business of producing and distributing recorded music.

On June 30, 2012 Seven Arts Filmed Entertainment LLC ("SAFELA") was transferred to the Company. SAFELA, which is now 60% owned by the Company, has a 30 year lease to operate a film production and post-production facility at 807 Esplanade in New Orleans, Louisiana. The post production facility commenced operations on July 1, 2012.

On June 11, 2010, SAE, was formed and became a wholly owned subsidiary of PLC. As of June 11, 2010, the Company entered into an Asset Transfer Agreement, as amended on January 27, 2011 and again on August 31, 2011, to transfer certain assets with a cost basis from PLC to SAE, in exchange for assumption by SAE of certain indebtedness and for one share of common stock of SAE for each ordinary share of PLC which have been distributed to shareholders. Additionally, 28,571 shares (2,000,000 shares as adjusted for the 1:70 reverse stock split discussed herein) of SAE were issued to PLC in order to satisfy any remaining obligations. This transfer was approved by the PLC shareholders at an Extraordinary General Meeting on June 11, 2010. The purpose of this transfer was to eliminate our status as a foreign private issuer and to assume compliance with all obligations of a domestic issuer under all applicable state and Federal securities laws. Our intention in executing this transaction was to redomicile our business with no change in the economic interests of our shareholders.

On August 31, 2011, NASDAQ approved the substitution of one share of SAE, Inc. stock for the Company's NASDAQ listing, effective at the opening of trading on September 1, 2011. On that date, each of the Company's ordinary shares were exchanged for one share of common stock of SAE, and commenced trading on NASDAQ as the successor to the Company's NASDAQ listing. This transaction was approved by the Company's shareholders at the Company's Extraordinary General Meeting on June 11, 2010. On August 31, 2012, the Company announced a 1:70 reverse stock split, which was effective immediately. All share references herein have been adjusted to reflect this split.

On November 8, 2011, the Company's listing predecessor, PLC, was placed into involuntary creditors liquidation under English law (See Note 10 – Commitments and Contingencies). Certain indebtedness of PLC remained with PLC and will be subject to administration or payment in those administration proceedings. In accordance with the asset transfer agreement, PLC has been issued 2 million (pre-split)/28,571 post- split shares of common stock of SAE in order to satisfy these obligations.

6

**EXHIBIT 31.1**

## CHIEF EXECUTIVE OFFICER CERTIFICATION

I, Peter Hoffman, certify that:

1. I have reviewed this report on Form 10-Q of SEVEN ARTS ENTERTAINMENT, INC.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

5. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      a. Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusion about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

      c. Disclosed in this report any change to the registrant's internal controls over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal controls over financial reporting; and

6. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

      a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: February __, 2013

By: */s/ Peter Hoffman*
              Peter Hoffman
              President and Chief Executive Officer

# EXHIBIT 12

Case 1:14-cv-06512-KPF    Document 1-1    Filed 08/14/14    Page 120 of 166

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

## FORM 10-K

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended **June 30, 2013**

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: **001-34250**



**SEVEN ARTS ENTERTAINMENT INC.**
**(Formerly Seven Arts Pictures, PLC)**
(Exact name of Registrant as specified in its charter)

| Nevada | 45-3138068 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

| **8439 Sunset Blvd., Suite 402** | |
| **Los Angeles, California** | **90069** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number: Phone: (323) 372-3080; Fax: (323) 389-0664

Securities registered pursuant to Section 12(b) of the Act:
**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock; $0.01 Par Value**
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐    No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑    No ☐

# PART I

**ITEM 1. BUSINESS**

**Corporate History and Current Corporate Structure**

<u>Nature of Activities, History and Organization :</u>

Seven Arts Entertainment, Inc. (herein referred to as "the Company", "Seven Arts", "SAE," or "We"), a Nevada Corporation, is the continuation of certain business of Seven Arts Pictures Plc. ("PLC"), which was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production, and licensing of theatrical motion pictures for exhibition in domestic ( *i . e* ., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television. The Company currently owns interests in 39 completed motion pictures, subject in certain instances to the prior financial interests of other parties.

Seven Arts Music Inc. ("SAM") became a wholly owned subsidiary of the Company on February 23, 2012, although transaction costs had been incurred as early as September 2011. The first of the DMX albums acquired from David Michery was released on September 11, 2012. The first of the Bones Thugs-N-Harmony albums is fully delivered to the Company as of June 30, 2013 and scheduled for release in November, 2013. Several other new artists are being considered by SAM. The agreements under which SAM acquired its music assets were effective as of September 29, 2011 (Big Jake Music) and December 19, 2011 (Michery Assets) publicly announced and commenced business activities commenced on those dates, but definitive agreements were not executed, nor control gained, until February 23, 2012.

On June 30, 2012 Seven Arts Filmed Entertainment Louisiana LLC ("SAFELA") was transferred to the Company. SAFELA, which is now 60% owned by the Company, has a 30 year lease to operate a film production and post-production facility at 807 Esplanade in New Orleans, Louisiana. The post production facility commenced operations on July 1, 2012.

On June 11, 2010, SAE, was formed and became a wholly owned subsidiary of PLC. As of June 11, 2010, the Company entered into an Asset Transfer Agreement, as amended on January 27, 2011 and again on August 31, 2011, to transfer assets (as now reflected on our balance sheet) from PLC to SAE, in exchange for assumption by SAE of all booked indebtedness (now reflected on our balance sheet) and for one share of common stock of SAE for each ordinary share of PLC which have been distributed to shareholders. Additionally, 571 shares (2,000,000 shares as adjusted for the 1:70 and 1:50 reverse stock splits discussed herein) of SAE were issued to PLC as additional consideration to PLC. This transfer was approved by the PLC shareholders at an Extraordinary General Meeting on June 11, 2010. The purpose of this transfer was to eliminate our status as a foreign private issuer and to assume compliance with all obligations of a domestic issuer under all applicable state and Federal securities laws.

On August 31, 2011, NASDAQ approved the substitution of one share of SAE, Inc. stock for the Company's NASDAQ listing, effective at the opening of trading on September 1, 2011. On that date, each of the Company's ordinary shares were exchanged for one share of common stock of SAE, and commenced trading on NASDAQ as the successor to the Company's NASDAQ listing. This transaction was approved by the Company's stockholders at the Company's Extraordinary General Meeting on June 11, 2010. On August 31, 2012, the Company announced a 1-for-70 reverse stock split, which was effective immediately. All share references herein have been adjusted to reflect this split.

On November 8, 2011, the Company's listing predecessor, PLC, was placed into involuntary creditors' liquidation under English law. Certain indebtedness of PLC remained with PLC and will be subject to administration or payment in those administration proceedings.

On January 1, 2012, Seven Arts Film Entertainment Limited ("SAFE") sold all of its film assets to SAE for assumption of indebtedness. SAFE ceased operations on May 31, 2013 on closing of its office in London, England. The Company plans to file for creditors voluntary liquidation of SAFE in England. The asset transfer agreement had no impact on the Company's consolidated financial statements.

In connection with the acquisition of the music assets of Michery, the Company issued 100 ,000 shares of our Series B convertible preferred stock, par value $100 convertible at approximately $1.10 per share) to Michery and his assigns. 50,000 of these shares of the Company's Series B convertible preferred stock were placed in escrow.

<u>Capital Structure</u> :

SAE's authorized capital is 250,000,000 shares of capital stock. SAE has authorized the following classes of stock:

- 249,000,000 of common stock, $.01 par value per share. As of June 30, 2013, there are 46,323,297 shares of common stock outstanding . Each outstanding share of common stock entitles the holder thereof to one vote per share on matters submitted to a vote of stockholders.

- 125,125 shares of Series A Preferred Stock with a $10.00 stated value per share.  All of such authorized shares were issued to one shareholder in November 2011. These shares have a conversion price to common stock of $10.50 per share.

- 200,000 shares Series B Preferred Stock with a $100.00 stated value per share.  As of June 30, 2013, there are 43,580 shares outstanding.  The per share conversion price for the Series B Preferred Stock is $1.10 per share.

SAE became a United States issuer and commenced regular quarterly reporting from the first quarter ended September 30, 2011.

**Production Activities of Our Predecessors**

No production activities were undertaken by us until January 1, 2005 and all the production activities prior to that date were engaged in by our predecessors, CineVisions, SAPLA and SAP. All our production activities after January 1, 2005 were under our direction or that of PLC. All the films discussed below were produced or co-produced by our predecessors and were distributed by our predecessors. <u>The Hustle</u>  and  <u>A Shot at Glory</u>  were only distributed by our predecessors and were not produced by our predecessors.

<u>Films Produced and Distributed from 1994-1998</u>

Between 1996 and 1998, our predecessor CineVisions produced and licensed the distribution rights for  <u>Johnny Mnemonic</u> , <u>Never Talk To Strangers</u> ,  <u>9 ½ Weeks II</u> , and  <u>Shattered Image</u> , which were assigned to us by SAP. CineVisions assigned all rights to distribute these films to SAP, which in turn all such rights to us. Subsequently, all rights to  <u>9 ½ Weeks II</u>  were assigned by court order to a third-party in final judgment. We own the copyright to the other motion pictures either directly or through grants of all rights in perpetuity, through an affiliate.

<u>Films Produced and Acquired by SAPL and Fireworks</u>

In 1998, SAPL entered into a joint venture agreement for the production and distribution of motion pictures with Fireworks. Fireworks is a subsidiary of CanWest Global Entertainment, Inc., a large diversified Canadian media company. Pursuant to that joint venture, Fireworks and SAPL produced, acquired and distributed 11 motion pictures (the "Fireworks Pictures"), one of which was returned to the owner and two of which are among the motion pictures now owned by us, <u>Shot at Glory</u>  and  <u>The Hustle</u> . All SAP's interest in the Fireworks Pictures were assigned to us in 2004 by SAP, which is the subject of the copyright infringement litigation as discussed in Management's Discussion And Analysis of Financial Condition and Results of Operations -- Legal Proceedings.

Through SAPL, Mr. Hoffman produced and acquired Fireworks <u>Rules of Engagement</u> , <u>Onegin</u> ,  <u>The Believer</u> ,  <u>Who Is Cletis Tout</u>  and  <u>American Rhapsody</u> . These motion pictures are the subject of copyright infringement and contract claims that we, together with SAP and SAFE, have brought against Fireworks and Content Film. See Management's Discussion and Analysis of Financial Condition and Results of Operations – Legal Proceeding. In particular, in these proceedings, we now claim based on assignment from SAP ownership of the following:

a).  All copyright and distribution rights to  <u>American Rhapsody</u>  and  <u>Who Is Cletis Tout</u> .
b).  All international distribution rights to  <u>Onegin</u>  and  <u>The Believer</u> .
c).  All distribution rights outside the United States and Canada to  <u>Rules of Engagement</u> .

<u>Films Co-Financed by SAPL</u>

SAPL co-financed three motion pictures in conjunction with Fireworks and Paramount. Of these motion pictures, we claim that one of them,  <u>Rules of Engagement</u> , was transferred to us by SAP in 2004. As set out below, this motion picture is the

We have acquired certain distribution rights to the following motion pictures since January 1, 2005

| Title | Talent | | Delivery Date | 1st U.S. Release | Date Distribution Rights Terminate |
|---|---|---|---|---|---|
| **Back In The Day**<br><br>(All International Territories) | Writer:<br><br>Director:<br>Cast: | Michael Raffanello<br>James Hunter<br>Ving Rhames<br>Ja Rule | 03/05 | 05/05 | 11/11/2019 |
| **Boo (1)**<br><br>(All International Territories) | Writer/Director:<br><br>Cast: | Anthony C. Ferrante<br>Trish Cohen<br>Happy Mahaney | 03/05 | 10/05 | 5/14/2008 |
| **A Broken Life**<br><br>(All International Territories) | Writers:<br><br><br>Directors:<br>Cast: | Neil Coombs, Anna Lee & Grace Kosaka<br>Neil Coombs<br>Tom Sizemore<br>Ving Rhames<br>Grace Kosaka<br>Saul Rubinek | 06/08 | 09/08 | 10/26/2026 |
| **Cemetery Gates (1)**<br><br>(All International Territories) | Writer:<br><br>Director:<br>Cast: | Brian Patrick O'Tolle<br>Roy Knyrim<br>Reggie Bannister | 03/05 | 05/06 | 4/4/2020 |
| **Drunkboat**<br><br>(All Territories) | Writer:<br><br>Director:<br>Cast: | Bob Meyer & Randy Buescher<br>Bob Meyer<br>John Malkovich<br>John Goodman<br>Dana Delaney | 12/08 | 07/12 | 4/28/2016 |
| **Gettin' It**<br>(All Territories) | Writer/Director:<br>Cast: | Nick Gaitatjis<br>Jessica Canseco<br>Patrick Censoplano<br>Cheryl Dent<br>Sandra Staggs | 12/06 | 08/07 | 4/4/2017 |

8

**Finance**

We create a separate finance plan for each motion picture we produce. Accordingly, the sources of the funds for production of each motion picture vary according to each finance plan. We utilize financing based on state and foreign country tax credits ( *e . g* ., Louisiana, United Kingdom and Hungary) and direct subsidies), "mezzanine" or "gap" funds, which are senior to our equity, and senior secured financing with commercial banks or private lenders, together in certain cases with a limited investment from us, which is customarily less than 10% of the production budget. Since each finance plan is unique to each motion picture, we cannot generalize as to the amount we will utilize any of these sources of funds for a particular motion picture. We generally obtain some advances or guarantees prior to commitment to production of a motion picture project, but those amounts may not be substantial on smaller budgeted motion picture ( *e . g* ., under $10,000,000), and in certain cases we have committed to production with an insubstantial amount of advances and guarantees. Unless we can manage the risks of production through the use of these financing techniques, we will not likely commit to production of larger budget motion pictures ( *e . g* ., over $15,000,000), and we have never in the past committed to such productions, without substantial advances or guarantees from third-party distributors, or the equivalent in "non-recourse" financings.

**Motion Picture Library**

In total we and our predecessors have produced or acquired interests in the following motion pictures to date described below in the table. We own (directly or through grants of all rights in perpetuity of at least theatrical, video, and television rights) either (a) the copyright to each picture designated as "CR" in the table below, or (b) distribution rights in the markets in which we operate for territories outside the United States and Canada ( *i . e* ., "International Territory") or for the territories designated in the table, for no less than 15 years. Historically, in any financial period a small number of motion pictures have accounted for the vast majority of our revenues generated from our motion picture library.

We have lost the right to manage twelve motion pictures (designated "+" in the table below) as a result of the exercise by the Arrowhead Target Fund of its rights under the Arrowhead Loan described above at "Risk Factors". As a result, Arrowhead is collecting all sums receivable with respect to these motion pictures and all interest in and receivables from these motion pictures has been removed from our financial statements effective June 30, 2009, but Arrowhead has not foreclosed on the copyright and distribution rights of our affiliate in these twelve motion pictures.

For purposes of this table, "Delivery Date" refers to the date the applicable motion pictures is completed and available for delivery to distributors. The "1st US release" is the date on which the film is first released in any medium ( *e . g* ., theatrical, video, television) in the United States.

13

| Title | Talent | | Delivery Date | 1st U.S. Release | Date Distribution Rights Terminate |
|---|---|---|---|---|---|
| American Summer aka The Pool Boys (CR) (All Territories) | Director: Cast: | J.B. Rogers Matthew Lillard Effren Ramirez | 06/08 | 9/11 | n/a |
| +Asylum (CR) (All Territories) | Writer: Director: Cast: | Patrick Marber David MacKenzie Ian McKellan Natasha Richardson | 05/04 | 08/05 | n/a |
| Autopsy (CR) (All Territories) | Director: Cast: | Adam Gierasch Robert Patrick | 06/08 | 1/09 | n/a |
| Back In The Day (All International Territories) | Writer: Director: Cast: | Michael Raffanello James Hunter Ving Rhames Ja Rule | 03/05 | 05/05 | 11/11/2019 |
| Boo (I) (All International Territories) | Writer/Director: Cast: | Anthony C. Ferrante Trish Cohen Happy Mahaney | 03/05 | 10/05 | 5/14/2008 |
| A Broken Life (All International Territories) | Writers: Directors: Cast: | Neil Coombs, Anna Lee & Grace Kosaka Neil Coombs Tom Sizemore Ving Rhames Grace Kosaka Saul Rubinek | 06/08 | 09/08 | 10/26/2026 |
| Captivity (All International Territories) | Writer: Director: Cast: | Larry Cohen Roland Joffe Elisha Cuthbert | 03/06 | 07/07 | 5/10/2008 |
| Cemetery Gates (1) (All International Territories) | Writer: Director: Cast: | Brian Patrick O'Tolle Roy Knyrim Reggie Bannister | 03/05 | 05/06 | 4/4/2020 |

14

| | | | | | |
|---|---|---|---|---|---|
| **Deal (CR)**<br>(All Territories) | Writer: | Gil Cates, Jr.<br>& Marc<br>Weinstock | 03/07 | 04/08 | n/a |
| | Director:<br>Cast: | Gil Cates, Jr.<br>Burt Reynolds<br>Bret Harrison<br>Shannon Elizabeth<br>Jennifer Tilly | | | |
| **Drunkboat**<br><br>(All Territories) | Writer:<br><br>Director:<br>Cast: | Bob Meyer &<br>Randy Buescher<br>Bob Meyer<br>John Malkovich<br>John Goodman<br>Dana Delaney | 12/08 | 7/12 | 4/28/2016 |
| **Gettin' It**<br>(All Territories) | Writer/Director:<br>Cast: | Nick Gaitatjis<br>Jessica Canseco<br>Patrick<br>Censoplano<br>Cheryl Dent<br>Sandra Staggs | 12/06 | 08/07 | 4/4/2017 |
| **Hades aka**<br>**The Black Waters of Echo Pond**<br>(All International Territories) | Director:<br>Cast: | Gabriel Bologna<br>Robert Patrick<br>Danielle Harris | 5/09 | 04/10 | 10/26/2027 |
| **+ The Hustle**<br>**(CR)**<br><br>(All Territories except Germany and Canada) | Writers:<br><br>Director:<br><br>Cast: | David Howard<br>& Michael<br>Capellupo<br>Stuart Cooper<br><br>Bobbie Phillips<br>Robert Wagner | 10/02 | 12/02 | n/a |
| **+ I'll Sleep When**<br>**I'm Dead (CR) (1)**<br>(All International Territories) | Writer:<br>Director:<br>Cast: | Trevor Preston<br>Mike Hodges<br>Clive Owen<br>Malcolm<br>McDowell<br>Jonathan Rhys<br>Meyers | 06/04 | 06/04 | n/a |
| **+ Johnny Mnemonic**<br>**(CR)**<br>(All Territories) | Writer:<br>Director:<br>Cast: | William Gibson<br>Robert Longo<br>Keanu Reeves<br>Dolph Lundgren | 12/94 | 05/95 | n/a |

15

| Title | Talent | | Delivery Date | 1st U.S. Release | Date Distribution Rights Terminate |
|---|---|---|---|---|---|
| **Knife Edge** (All Territories) | Director: Cast: | Anthony Hickox Joan Plowright Natalie Press | 06/08 | 03/10 | 3/23/2031 |
| **Men Don't Lie** (All Territories) | Director: Cast: | Jane Spencer Michael Madsen Elle Travis | not yet scheduled | not yet scheduled | |
| **+ Never Talk To Strangers (CR) (1)** (All Territories) | Writers: Director: Cast: | Lewis A. Green & Jordan Rush Peter Hall Antonio Banderas Rebecca DeMornay | 09/95 | 10/95 | n/a |
| **Night of the Demons (CR)** (All Territories) | Director: Cast: | Adam Gierasch Shannon Elizabeth Edward Furlong Diora Baird | 06/09 | 10/10 | n/a |
| **Nine Miles Down (CR)** (All Territories) | Director: Cast: | Anthony Waller Adrian Paul Kate Nauta | 06/09 | 2/13 | n/a |
| **Noise aka The Rectifier (CR)** (All Territories) | Writer/Director: Cast: | Henry Bean Tim Robbins William Hurt Bridget Moynahan William Baldwin | 03/07 | 05/08 | n/a |
| **+ No Good Deed (CR)** (All Territories) | Writer: Director: Cast: | Christopher Canaan & Steve Barancik Bob Rafelson Samuel L. Jackson Milla Jovovich | 05/02 | 09/03 | n/a |

16

| Title | Talent | | Delivery Date | 1st U.S. Release | Date Distribution Rights Terminate |
|---|---|---|---|---|---|
| **Pool Hall Prophets aka Shooting Gallery** (CR) (All Territories) | Writer/Director: Cast: | Keoni Waxman<br><br>Freddie Prinze, Jr.<br>Ving Rhames | 09/05 | 12/05 | n/a |
| + **Popstar** (All International Territories) | Writer: Director: Cast: | Timothy Barton<br>Richard Gabai<br>Aaron Carter<br>Alana Austin | 03/05 | 11/05 | 10/19/2014 |
| + **Red Riding Hood** (All International Territories excl Indonesia, Israel, Japan, Latin American Satellite TV, Mexico, Middle East, Pan Asian Satellite TV, Portugal, Russia, Slovenia/Croatia, Thailand, Turkey) | Writer: Director:<br><br>Cast: | Timothy Dolan<br>Randall Kleiser<br><br>Lainie Kazan | 03/06 | 06/06 | 5/2/2015 |
| **Schism** (RR) (All territories) | Writer/ Director | Adam Gierasch<br>Callum Blue<br>Vinnie Jones | 10/13 | Scheduled Winter 2014 | n/a |
| + **Shattered Image** (CR) (1) (All Territories) | Writer: Director: Cast: | Duane Poole<br>Raul Ruiz<br>William Baldwin<br>Anne Parillaud | 06/98 | 12/98 | n/a |
| + **A Shot At Glory** (All International Territories) | Writer: Director: Cast: | Denis O'Neill<br>Michael Corrente<br>Robert Duvall<br>Michael Keaton | 01/02 | 05/02 | 9/30/2016 |
| + **Stander (CR)** (All Territories) | Writer: Director: Cast: | Bima Stagg<br>Bronwen Hughes<br>Thomas Jane<br>Deborah Unger | 10/03 | 08/04 | n/a |

17

The experience and qualifications of the directors and senior management for at a minimum the last five years are as follows:

**The Honorable Hubert Gibbs** has been our Chairman and one of our directors since April 9, 2010. After graduating from Oxford University in 1981, Mr. Gibbs started his career as an editor, reader and translator at Quartet Books UK. Subsequently he worked as a stock market analyst with Banque Bruxelles Lambert and then as an independent communications entrepreneur responsible for starting up various companies including Instlang.com which was sold to market leader SDL in 1999. Most recently Mr. Gibbs has been involved in financing and producing independent films, including As Good as Dead and The Killing Jar. Mr. Gibbs managed the family estate, Tyntesfield until it was taken over by the National Trust in 2002.

**Peter Hoffman** has been our Chief Executive Officer and one of our directors since September 2004 and is also our founder. Mr. Hoffman took over as Chairman on December 31, 2009 following the death of previous chairman Anthony Bryan but resigned that position on election of Hubert Gibbs as Chairman. Under Mr. Hoffman's direction, we and our predecessors have produced and or distributed over thirty features since our inception including: Johnny Mnemonic, Never Talk To Strangers, 9 ½ Weeks II and Shattered Image. As our CEO, his responsibilities include, among others, the selection and production of motion pictures, strategic planning, business development, operations, financial administration, accounting, and reporting to the Board of Directors. Mr. Hoffman was previously President and CEO of Carolco Pictures. He was directly involved at Carolco in the production of a large slate of independent motion pictures, including Terminator 2, Basic Instinct, Total Recall, and Rambo III. Mr. Hoffman is a graduate of the Yale Law School and has participated as a lawyer and executive in numerous financial and tax-preferred financings for more than twenty-five years. Mr. Hoffman is the father of Katrin Hoffman, our Chief Operating Officer and our Executive Director.

**Katrin Hoffman** has been our Chief Operating Officer and a director since February 2008. As our COO, her responsibilities include supervising the production of motion pictures and licensing and delivering our motion pictures to third parties. She began her career at the age of 17 as an intern for Hollywood casting directors, Mary Vernieu and Risa Gramon-Garcia. Ms. Hoffman then worked for film agent Mort Viner at International Creative Management until his retirement when she joined our predecessors in 1998. She has managed the development, production and delivery of films including The Believer, No Good Deed, Stander, and Asylum. In addition to her production responsibilities, Ms. Hoffman is responsible for international distribution, acquisitions and film financing. Ms. Hoffman is the daughter of Peter Hoffman, our Chief Executive Officer and a Director.

**Anthony Hickox** has been a director since October 2007. He is a film director, writer and producer. Mr. Hickox wrote and directed his first film, Waxworks at the age of 21. Mr. Hickox was involved in the production of or direction of Sundown, Warlock; Armageddon; Children of the Corn, Turn of the Screw; Carnival of Souls, and Hellraiser 3: Hell on Earth.

**Elaine New** has been an executive director since January 2007 and was our Chief Financial Officer from January 2007 until July 31, 2009 and from August 1, 2010 until July 15, 2013 and remains an executive director. She is Cambridge University educated and is a Price Waterhouse (London) qualified Chartered Accountant. Ms. New was also in the media industry for the ten years previous to her employment at the Company as Finance Director of Metrodome Group Plc., a UK film distributor. Ms. New was previously engaged as Financial Controller of Harrods International, helping to establish an airport retailing arm, and as Commercial Director of Outfit, a new division of Sears Womenswear Ltd that she helped to create in the latter part of the 1990s. Ms. New was on the Executive Committee of The Quoted Companies Alliance for almost three years helping represent small to mid-cap companies listed both on AIM and the main list of The London Stock Exchange.

53

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Seven Arts Entertainment Inc.**

By: /s/ _____

By: _____

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

**Signature** _____ **Title** _____ **Date** _____

67

**Seven Arts Entertainment, Inc.**
**(Formerly Seven Arts Pictures, Plc.)**
**Notes to Consolidated Financial Statements**
**June 30, 2013 and 2012**

## NOTE 1 – NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES

Nature of Activities, History and Organization:

Seven Arts Entertainment, Inc. (herein referred to as "the Company", "Seven Arts" or "SAE,"), a Nevada Corporation, is the continuation of the business of Seven Arts Pictures Plc. ("PLC"), which was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production, and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television. The Company currently owns interests in 33 completed motion pictures, subject in certain instances to the prior financial interests of other parties. As discussed herein, in late February 2012, the Company formed Seven Arts Music, Inc. ("SAM") and acquired 52 completed sound recordings of the recording artist DMX from David Michery ("Michery") with the rights to additional albums and acquired 100% of the stock of Big Jake Music ("BJM"). As a result, the Company is also in the business of producing and distributing recorded music. On June 30, 2012 Seven Arts Filmed Entertainment LLC ("SAFELA") was transferred to the Company. SAFELA, which is now 60% owned by the Company, has a 30 year lease to operate a film production and post-production facility at 807 Esplanade in New Orleans, Louisiana. The post production facility commenced operations on August 12, 2012. On Aug 14, 2012 Seven Arts Filmed Entertainment Louisiana LLC ("SAFELA"), commenced operation of Seven Arts Post at the Company's production facility located at 807 Esplanade Ave., New Orleans, Louisiana.

On June 11, 2010, SAE, was formed and became a wholly owned subsidiary of PLC.   As of June 11, 2010, the Company entered into an Asset Transfer Agreement, as amended on January 27, 2011 and again on August 31, 2011, to transfer certain assets with a cost basis from PLC to SAE, in exchange for assumption by SAE of certain indebtedness and for one share of common stock of SAE for each ordinary share of PLC which have been distributed to shareholders. Additionally, 571 shares (2,000,000 shares as adjusted for the 1:70 and 1:50 reverse stock splits discussed herein) of SAE were issued to PLC in order to satisfy any remaining obligations. This transfer was approved by the PLC shareholders at an Extraordinary General Meeting on June 11, 2010. The purpose of this transfer was to eliminate our status as a foreign private issuer and to assume compliance with all obligations of a domestic issuer under all applicable state and Federal securities laws. Our intention in executing this transaction was to redomicile our business with no change in the economic interests of our shareholders. Subsequent to the transfer SAE became is a United States issuer and commenced regular quarterly reporting from the first quarter ended September 30, 2011.

On August 31, 2011, NASDAQ approved the substitution of one share of SAE, Inc. stock for the Company's NASDAQ listing, effective at the opening of trading on September 1, 2011. On that date, each of the Company's ordinary shares were exchanged for one share of common stock of SAE, and commenced trading on NASDAQ as the successor to the Company's NASDAQ listing. This transaction was approved by the Company's shareholders at the Company's Extraordinary General Meeting on June 11, 2010.   On August 31, 2012, the Company announced a 1:70 reverse stock split, which was effective immediately.  All share references herein have been adjusted to reflect this split.

F- 7

On November 8, 2011, the Company's listing predecessor, PLC, was placed into involuntary creditors' liquidation under English law (See Note 13 – Commitments and Contingencies). Certain indebtedness of PLC remained with PLC and will be subject to administration or payment in those administration proceedings.   In accordance with the asset transfer agreement, PLC has been issued 571 shares of common stock of SAE in order to satisfy these obligations.

On February 23, 2012, the Company formed Seven Arts Music, Inc. ("SAM") and acquired 52 completed sound recordings of the recording artist DMX from David Michery ("Mr. Michery") with the rights to additional albums and acquired 100% of the stock of Big Jake Music ("BJM"). As a result, the Company is also in the business of producing and distributing recorded music.

In connection with the acquisition of the music assets of Michery, the Company issued 100 ,000 shares of our Series B convertible preferred stock, par value $100 convertible at approximately $1.10 per share) to Michery and his assigns . 50,000 shares of the Company's Series B convertible preferred stock were held in escrow and to be released to Michery and his assigns only if two DMX albums and two Bone Thugs-N-Harmony albums generate an aggregate of net earnings before interest and taxes of $5,000,000 during the next five fiscal years

During the quarter ended December 31, 2012, Mr. Michery converted and sold 38,000 of the 50,000 shares of Series B that he and his assigns held. The Company and Mr. Michery have agreed the remaining 50,000 shares of Series B in escrow will be disposed of by release of 20,000 shares of the Series B convertible preferred stock to Mr. Michery in full satisfaction of any claims he may have against the Company and the balance of the 30,000 shares of Series B will be cancelled. The release of the 20,000 shares has been recognized as services in the accompanying financial statements. As of June 30, 2013, Mr. Michery or his assigns hold 32,000 shares of Series B convertible preferred stock.

In connection with the acquisition of the stock of BJM, the Company issued 80 ,000 shares of the Company's Series B convertible preferred stock, par value $100 convertible at approximately $1.10 per share) to Jake Shapiro and his assigns with 70,000 of these shares held in escrow to be released to Shapiro and his assigns only if certain specific terms are met : 40,000 shares were subject to proving valuation and usage of  certain advertising credits and 30,000 shares were subject to an earnout over a two year period.

The Company entered into a settlement agreement with Mr. Shapiro on February 27, 2013 and all shares of Series B preferred stock held in escrow for him and persons associated with him have been cancelled, with Mr. Shapiro and his assigns still holding 10,000 shares of Series B convertible preferred stock as of March 31, 2013. The name and the website of Big Jake Music were also reassigned to Mr. Shapiro as part of the settlement agreement.

Seven Arts Pictures Louisiana LLC, ("SAPLA"), a related party of the Company, entered into a Credit Agreement with Advantage Capital Community Development Fund dated October 11, 2007, for the acquisition and improvement of the production and post-production facility located at 807 Esplanade Avenue in New Orleans, Louisiana ("807 Esplanade") for aggregate principal advances of up to $3,700,000. This agreement was guaranteed by the Company's predecessor. Approximately $3,700,000 plus interest has been drawn under the terms of this Credit Agreement, as of June 30, 2012. The Company has now assumed the liability for $1,000,000 of this amount plus a contingent sum of $750,000 (contingent on receipt of at least $5,000,000 in cash proceeds from the tax credits to be earned by SAPLA) due to an agreement with the now mortgagor Palm Finance. A construction loan of $1,850,000 previously guaranteed by the Company has now also been assumed by the Company. ,The Company through SAFELA, has a 30 year lease on the property 807 Esplanade to operate a film production and post-production facility.

On January 1, 2012, Seven Arts Film Entertainment Limited ("SAFE") sold all of its film assets to SAE for assumption of indebtedness. SAFE ceased operations on May 31, 2013 on closing of its office in London, England. The Company plans to file for creditors voluntary liquidation of SAFE in England. The asset transfer agreement had no impact on the Company's consolidated financial statements.

F- 8

EXHIBIT 13

Rule 4 34-CVL

Form 4 20

The Insolvency Act 1986

S.95/99

## Statement of Company's Affairs

Pursuant to Section 95/99 of the
Insolvency Act 1986

|  | For official use |  |  |
|---|---|---|---|
|  |  |  |  |

To the Registrar of Companies

Company Number

05160597

Name of Company

| SEVEN ARTS FILMED ENTERTAINMENT LIMITED |
|---|
|  |

I,     SURJIT KUMAR SINGLA

of     Singla & Company
       12 Devereux Court
       Strand
       London
       WC2R 3JL

the liquidator of the above named company attach a statement of the company's affairs as at 9 October
2013

Signed _____                    Date   14 October 2013

Presenter's name, address and reference (if any)

Singla & Co
12 Devereux Court
Strand
London WC2R 3JL

SKS/AL/2604

| For Official Use | |
|---|---|
| Liquidation Section | Post Room |

THURSDAY

A05         17/10/2013         #94
       COMPANIES HOUSE

Rule 4 34 – CVL – Revised 6 April 2010                                    Form 4 19

# Statement of Affairs

Statement as to Affairs of

## SEVEN ARTS FILMED ENTERTAINMENT LIMITED

On the 9TH OCTOBER 2013, the date of the resolution for winding up

## Statement of Truth

I believe that the facts stated in this Statement of Affairs are true

Full Name:         KATRIN MARTHE HOFFMAN

Signed:

Dated:             9 OCTOBER 2013

## A- Summary of Assets

| ASSETS | Book Value £ | Estimated to Realise £ |
|---|---|---|
| Cash at Bank | 1,613 | 1,613 |
| Claim against Content Media Corp   US$ 7 5 million | 4,687,500 | Uncertain |
| VAT Refund Claim | 409,000 | NIL |
| Estimated total Assets available for preferential creditors | 5,098,113 | 1,613 |

SIGNATURE

DATE   09 OCTOBER 2013

|  | Estimated to realise £ |
|---|---|
| Estimated total assets for preferential creditors (carried from page A) | 1,613 |
| **Liabilities** | |
| Preferential creditors | NIL |
| Estimated (~~deficiency~~)/surplus as regards preferential creditors | 1,613 |
| Estimated prescribed part of net property where applicable (to carry forward) | N/A |
| Estimated total assets available for floating charge holders | 1,613 |
| Debts secured by floating charge | N/A |
| Estimated (~~deficiency~~)/surplus of assets after floating charge | 1,613 |
| Estimated prescribed part of net property where applicable (brought down) | N/A |
| **Total assets available to unsecured creditors** | 1,613 |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | (13,795,297) |
| Estimated (deficiency)/~~surplus~~ as regards non-preferential creditors (excluding any shortfall to floating charge holders) | (13,793,684) |
| Shortfall to floating charge holders (brought down) | N/A |
| Estimated (deficiency)/~~surplus~~ as regards creditors | (13,793,684) |
| Share Premium Account | (5,396,875) |
| Issued and called up capital | (2) |
| Estimated total (deficiency)/~~surplus~~ as regards members | (19,190,561) |

SIGNATURE _____

DATE ___ 09 OCTOBER 2013 ___

# B - Company Creditors

NOTE: You must identify creditors under hire-purchase, chattel leasing or conditional sale agreements and customers claiming amounts paid in advance of the supply of goods or services and creditors claiming retention of title over property in the company's possession.

| Name of Creditor or Claimant | Address (with postcode) | Amount of Debt £ | Details of any Security held by Creditor | Date Security Given | Value of Security £ |
|---|---|---|---|---|---|
| American Express | c/o Brachers LLP, Somerfield House, 59 London Road, Maidstone, Kent ME16 9JH | 31,691.00 | | | |
| Arrowhead Target Fund Limited - (In Liquidation) | 2nd Floor, 36 Market Street, Camelia Court, Camana Bay, Grand Cayman, CAYMAN ISLANDS KY1-9006   (US$ 8.3 million) | 5,187,500.00 | | | |
| Clean Heart Services | 45 Samuel Jones Court, Southampton Way, London SE15 6FG | 977.00 | | | |
| Content Media Corporation Limited | c/o Olswang LLP, 90 High Holborn, London WC1V 6XX | 91,700.00 | | | |
| Green Acorn Limited | 136-144 New Kings Road, London SW6 4LZ | 1,500.00 | | | |
| HM Revenue & Customs | Enforcement & Insolvency, Durrington Bridge House, Barrington Road, Worthing, West Sussex BN12 4SE | 194,084.00 | | | |
| Palm Finance Corporation | 233 Wilshire Blvd , Suite 200, Santa Monica, California 90401-1227, USA  (US$ 13,240,601) | 8,275,375.00 | | | |
| Reddy Siddiqui & Kabani | Park View, 183-189 The Vale, London W3 7RW | 12,470.00 | | | |

TOTAL                13,795,297.00

SIGNATURE _____

DATE _09 OCTOBER 2013_

EXHIBIT 14



f (https://www.facebook.com/pages/PR-Newswire/26247320522)

(http://www.prnewswire.com/rss)

Member Sign In ⌄

For Journalists > (http://prnmedia.prnewswire.com)

For Bloggers > (/bloggers)

Global Sites ⌄

PR Newswire Services (http://advg (http://www.p (http://www.p (http://www.p (http://www.p (http://www.p (http:

See more news releases in
Entertainment (http://www.prnewswire.com/news-releases/entertainment-media-latest-news/entertainment-list/)
Film and Motion Picture (http://www.prnewswire.com/news-releases/entertainment-media-latest-news/film-
and-motion-picture-list/)
OTC, SmallCap (http://www.prnewswire.com/news-releases/financial-services-latest-news/otc-smallcap-list/)
Trade Show News (http://www.prnewswire.com/news-releases/general-business-latest-news/trade-show-news-
list/)

# Seven Arts Announces Sales at MIPCOM and Neuromancer Previsualization Teaser

 ()  

LOS ANGELES, Oct. 31, 2013 /PRNewswire/ -- Seven Arts Entertainment Inc.
(OTCQB: SAPX) ("Seven Arts" or the "Company") announced that its partnership with
Tony Lytle Media Sales ("Tony Lytle") to manage Seven Arts' film library, resulted in a
successful sales effort at MIPCOM, producing pending deals for the Seven Arts'
library in Eastern Europe, Scandinavia and Japan, as well as securing a deal with
MIG in Germany for four library motion pictures.

At the upcoming American Film Market, the Company will introduce a four-minute
teaser reel for its upcoming production "Neuromancer", created by the renowned
previsualization house The Third Floor, Inc. ("Third Floor").

CEO Kate Hoffman stated, "I am thrilled that Seven Arts' association with Tony Lytle
has got off to such a great start and have every confidence in continued success
going forward.  We are also very excited by the Third Floor previsualization which we
believe will progress the production of our film based on the legendary science fiction
novel "Neuromancer"."

Journalists and
Bloggers



Visit **PR Newswire for
Journalists**
(http://prnmedia.prnewswire...
for releases, photos,
ProfNet experts, and
customized feeds just
for Media.

**About Seven Arts Entertainment Inc.:**

Seven Arts Entertainment Inc. was founded in 2002 as an independent motion picture production and distribution company engaged in the development, acquisition, financing, production and licensing of theatrical motion pictures for exhibition in domestic (i.e., the United States and Canada) and foreign theatrical markets, and for subsequent worldwide release in other forms of media, including home video and pay and free television.

**About The Third Floor, Inc.:**

THE THIRD FLOOR, Inc. is the world's preeminent previsualization company. Since 2004, the studio has helped clients visualize and maximize creative content in industries such as motion pictures, television commercials and video games by producing computer-animated blueprints, known as "previsualizations". THE THIRD FLOOR's feature film credits include The Avengers, Battleship, Men in Black 3, Iron Man 2, Thor, Star Trek, Alice in Wonderland and Avatar.

**About Tony Lytle Media Sales:**

Tony Lytle has over 25 years experience in licensing international feature film, television, and other rights worldwide.   He has worked for major British and American production and distribution companies such as ITC Entertainment, Sony, Fries International, New Line Cinema, and J&M Entertainment.

In addition to international feature film and program sales, he has been Instrumental in arranging television drama co-productions in Europe and the United States.

**Cautionary Information Regarding Forward-Looking Statements.**

Forward-looking statements contained in this press release are made under the Safe Harbor Provision of the Private Securities Litigation Reform Act of 1995.  Any such statements are subject to risks and uncertainties that could cause actual results to differ materially from the anticipated.  The information contained in this release is as of October 31, 2013.  Seven Arts assumes no obligation to update forward-looking statements contained in this release as the result of new information or future events or developments.

**Contact:**
Seven Arts Entertainment Inc.
Peter Hoffman
(323) 372-3080
phoffman@7artspictures.com (mailto:phoffman@7artspictures.com)

SOURCE Seven Arts Entertainment Inc.


RELATED LINKS

http://www.7artspictures.com (http://www.7artspictures.com)

## Custom Packages

Browse our custom packages or build your own to meet your unique communications needs.

Start today. (/promotional-pages/customized-communications-package.html)

## PR Newswire Membership

Fill out a PR Newswire membership form (https://account.prnewswire.com/OnlineMembershipFormStep1/) or contact us at (888) 776-0942.

## Learn about PR Newswire services

Request more information (/contact-us/Email-Us.html) about PR Newswire products and services or call us at (888) 776-0942.

About PR Newswire (http://prnewswire.mediaroom.com/index.php) | Contact PR Newswire (http://www.prnewswire.com/contact-us) | PR Newswire's Terms of Use Apply (http://www.prnewswire.com/terms-of-use-apply.html) | Careers (http://prncareerroom.drivetheweb.com/) | Privacy (http://prnewswire.mediaroom.com/index.php?s=62) | Site Map (http://www.prnewswire.com/sitemap/) | RSS Feeds (http://www.prnewswire.com/rss/) | Blog (http://blog.prnewswire.com/)
Copyright © 2014 PR Newswire Association LLC. All Rights Reserved.
A UBM plc (http://www.ubm.com) company.
Powered by Clickability (http://www.clickability.com).

7/9/2014 1:55 PM

Case 1:14-cv-06512-KPF   Document 1-1   Filed 08/14/14   Page 143 of 166

# EXHIBIT 15

# Tony Lytle media sales

Home

About us

Films

The Cassavetes Collection

Seven Arts Pictures

HandMade Films Libraries

Bristol Media Library

Cinema Seven Productions

Adelphi Films

The Grade Company

Peter Sellers Classics

Derek Jarman Films

Fighters Inc.

Documentaries

Consultancy

Associates

News

Contact

newsfl

TLMS has t
exclusiv(
representatic
the Seven /
Pictures lib
worldwid
excluding N
America
**more nev**

# Seven Arts Pictures

# SEVEN ARTS

Founded in 1994 to produce and acquire feature films, Seven Arts Pictures now has a library of 33 films, and is currently looking to acquire over one hundred additional films in the near future. Current feature film production projects a budgeted at up to $60 million each.

Seven Arts Pictures international distribution arm is run by C.O.O. Kate Hoffm from its London headquarters.

## Autopsy



Director: Adam Gierasch
Producer: Warren Zide
Starring: Robert Patrick, Jessica Lowndes, Ashl Schneider, Ross McCall
Year of Production: 2008

It's Mardi Gras, and Emily, her boyfriend Bobby and their friends Clare, Dmitri and Jude have h the time of their lives. On their way out of New Orleans, an accident leaves them hurt and stranded on a lonely Louisiana highway. When ambulance arrives, it whisks them to Mercy Hospital. With a minimal staff and many empty wings, the hospital is an eerie place... but that' only the beginning.

Dr. David Benway and his staff are using patien gruesome experiments. It's up to Emily to rescu her friends and escape... if she can.

## Back in the Day



Director: James Hunter
Starring: Ving Rhames, Ja Rule, Tatyana Ali and Pam Grier
Year of Production: 2005

Reggie Cooper has seen life from both sides of tracks... His lawyer father Terrence abandoned family when Reggie was a teenager, forcing Reg to learn how to survive in a violent inner city neighborhood. His friend and protector back in those days had been the local gangster Joseph Brown a.k.a. "J-Bone" Reggie had even taken bullet watching J-Bone's back and the wound s gives him blackouts.

As Reggie knows only too well; sometimes it's h

to tell your friends from your enemies...

## The Believer



Director: Henry Bean
Starring: Ryan Gosling, Garret Dillahunt, Billy Zane, Summer Phoenix
Year of Production: 2001

The Believer is a daring and courageous portray of a young Jewish man living an impossible contradiction as a neo-Nazi. Danny Balint (Ryan Gosling) is an intense young man whose fierce intelligence and inexhaustible curiosity once m him a star pupil at his local Yeshiva. Now, at age twenty-two, he focuses this intensity on altogether more sinister aims; as a rising star in local neo-fascist circles, Danny spends his days attacking synagogues and fomenting hate amon devoted band of followers. Yet while working tirelessly to realize the destruction of his own people, Danny finds himself inexplicably drawn back to Judaism.

## Boo!



Director: Anthony C. Ferrante
Starring: Trish Coren, M. Steven Felty and Dee Wallace Stone
Year of Production: 2005

Rumours about the ghosts that haunt Santa Mira hospital and the mysterious circumstances that have occurred in the past have made it a place teenage scare tactics for years.

When a group of five teenagers enter the abandoned hospital on Halloween night, they s discover that the rumours about the place bein haunted are very real. Meanwhile, a trainee co worried his sister may have gotten lost at the hospital, partners an ex-Blaxploitation actor turned cop, and together they become trapped the hospital with the teens. In order to escape they must work together against the ghostly sp who take over each person one by one, forcing them to question who is alive and who has beco a ghost....

## A Broken Life



Director: Neil Coombs
Starring: Tom Sizemore, Ving Rhames, Grace Kosaka, Salu Rubinek
Year of Production: 2008



Tortured by his own mediocrity, Max decides t
commit suicide and recruits his only friend Bud
struggling filmmaker, to record his last day on
earth.

Bent on exacting revenge, Max tracks down an
finally confronts his overbearing boss and his w
His rage builds until his last day is turned upsid
down by the kindness of a young woman in a
wheelchair. Just moments from his own end, M
fins hope but is too late to fix what is broken?

## Cemetery Gates



Director: Roy Knyrim
Starring: Reggie Bennister, Howard Bergerm Br
Carlson and Michelle Diamond
Year of Production: 2006

A story ripped straight from today's headlines,
Cemetery Gates tells the tale of a genetically
altered Tasmanian Devil who is stolen from a
research lab. The mutant eventually escapes it
liberators and makes a new home in a woodlan
cemetery, feasting on both the living and the
dead.

At the same time, a group of six collegians rent
out the cemetery from a shifty grave keeper to
make a student film. What happens next is an
exercise in suspense and fear as one by one the
young film makers fall victim to the ravenous
creature... except for one, who will soon find
he and the mutated Tasmanian Devil share a
startling connection from the past....

## Deal



Director: Gil Cates Jr.
Starring: Burt Reynolds, Bret Harrison,
Shannon Elizabeth, Jennifer Tilly
Year of Production: 2008

Set against the world of high stakes poker, "De
follows the story of Tommy Vinson, an ex-gamb
who quit the game of Texas Hold'em over 30 ye
ago after swearing to his wife, Helen, "never
again", and Alex Stillman, a cocky, hotshot car
playing senior at Yale University.

Tommy finds Alex and makes a pact with him: h
front Alex the high priced entry fees to all the
major tournaments if Alex plays the way that
Tommy wants him to. Tommy, who's now got th
appetite back for the game and a hunger to be
acknowledged as the best, enters the final

tournament of the poker season and ends up
facing his prote ge in the finals of the world se
of poker. And what happens there, even thoug
only one will be declared champion, leaves the
both winners.

## Drunkboat



Director: Bob Meyer
Producers: John Malkovich, Anthony J. Tomask
and Chase Bailey
Starring: John Malkovich, John Goodman,
Dana Delany
Year of Production: 2010

After twenty years of drunken bottles and emp
hallways, Mort Gleason witnesses his nephew M
being beaten while in a drunken stupor. The sh
contact with family brings Mort back to what ar
left of his senses and he returns to the last hon
he remembers in Chicago.

His sister, Eileen, lives in their family home nov
with her sixteen year old son, Abe. Her older s
Moo, the now missing nephew, helped spark Mc
return to his family. Three, four, five weeks pa
as Mort waits outside her home and makes a
tenuous re-entry into family life. Abe dreams c
sailboat and distant horizons. He saves money ;
sees an advertisement for the Kathy II. He and
friend calculate a way to buy the vessel from t\
unscrupulous rogues who make ends meet
wholesaling liquor and operating a sometime
boatyard.

Eileen, however, is unaware that her youngest
is planning his escape....

## Gettin' It



Director: Nick Gaitatjis
Starring: Patrick Censoplano, Cheryl Dent, San
Staggs and Jessica Canseco
Year of Production: 2006

Silver, a typical teenage boy with exploding
hormones, longs to have sex with his high schoc
sweetheart, Sheila. She's not ready to take tha
step and decides to dump him. Silver's devasta
and his friend, Arturo, comes to the rescue wit
plan for Silver to seek out older women who kn
what they want.

Soon Silver replaces Sheila with women who th
with their bodies and not their hearts. But still
Silver is not 'Gettin' It until a rumor gives him
larger than life reputation elevating his sexual

status to legendary proportions. He soon realis
he's gotten more than he wished for when wom
from around town chase him down to experienc
the legend. His amorous adventures bring him t
crossroads in his young life making him choose
between sex and true love.

## Knife Edge



Director: Anthony Hickox
Starring: Natalie Press, High Bonneville, Matthi
Boujenah, Joan Plowright
Year of Production: 2009

Blissfully happy in her new marriage to Henry,
Emma has agreed to give up a successful career
Wall Street to return to England and give her
6-year-old son, Thomas, a new life. Henry has
already chosen and purchased their dream hom
She is reunited with her sister Flora, her wayw
brother and the family solicitor, Clive Pollock,
all should be perfect, especially when she finds
she is pregnant again.

But Emma is beginning to feel increasingly
uneasy... Emma is progressively more and more
alarmed as a series of strange and terrifying
happenings begin to occur...

## Night of the Demons



Director: Adam Gierasch
Starring: Shannon Elizabeth, Edward Furlong,
Monica Keena, Diora Baird
Year of Production: 2009

Maddie Curtis and her friends Lily and Suzanne a
ready for a great Halloween night. They're going
a party at the notorious Broussard Mansion in Nev
Orleans. Over eighty years ago, six people
disappeared from the mansion without a trace - a
the owner, Evangeline Broussard, hung herself.

It turns out that the Broussard Mansion is home t
demons that need to possess seven vessels to bre
free of their ancient curse. One by one the guest
fall victim, transforming into hideous creatures. Only Maddie and two other
guests remain - but can they make it through the night and keep evil forces fr
spreading into the world?

## Nine Miles Down



Director: Anthony Waller
Starring: Adrian Paul, Kate Nauta
Year of Production: 2009



In the remotest reaches of the Sahara Desert, a sandstorm batters a deserted drilling station be used for scientific research. Three days earlier radio contact was lost, so security patrolman Ja is enlisted to investigate. Jack encounters a breathtakingly beautiful American geologist, Jo who claims to be the last remaining member of research team. She tells how the team successi breached the roof of a vast cavern at the unprecedented depth of nine miles. Following discovery, a series of mysterious sightings and hallucinations were experienced by the increasingly fearful drilling crew. Violence bro out, and the team fled the site, abandoning he with two scientists` corpses, which she keeps stored in a freezer. Although her explanation seems logical, Jack suspects she's hiding something more sinister.

## No Good Deed



Director: Bob Rafelson
Starring: Samuel L Jackson, Milla Jovovich, Ste Skarsgard
Year of Production: 2002

While doing a friend a favour for a friend and searching for a runaway teenager on Turk Stree police detective, Jack stumbles upon a bizarre band of criminals about to pull off a bank robbe Jack finds himself being held hostage while the criminals decide what to do with him, and the leaders beautiful girlfriend, Erin, is left alone t watch Jack.

Erin, who we discover is a master manipulator ( the men in the gang, reveals another side to Ja a melancholy romantic who could have been a classical cellist. She finds Jack's captivity an irresistible turn-on and he can't figure out if sh for real, or manipulating him, too. Before the g returns, Jack and Erin's connection intensifies who ends up with the money is anyone's guess.

## Noise



Director: Henry Bean
Starring: Tim Robbins, Bridget Moynahan, Willi; Hurt, William Baldwin
Year of Production: 2007

In long flashbacks, David Owen looks back to w he lived in Manhattan with his wife and baby. T unnecessary noises of the city interrupt his life the point that he takes a baseball bat to the windshield of cars whose alarms are blaring. Af



a few arrests, his wife kicks him out. On his ow
he learns to avoid arrest and leaves a calling ca
as "The Rectifier" when he breaks into an
offending car.

Gruska, an enterprising young reporter, tracks
down. He tells her his story, they become love
and she organizes a petition drive for a ballot
initiative to ban car alarms. The mayor become
the Rectifier's be te noire. Can David fight City
Hall and win?

## The Pool Boys



Director: J.B. Rogers
Producer: Warren Zide
Starring: Matthew Lillard, Efren Ramirez, Rach
Lefevre, Tom Arnold
Year of Production: 2011

From the makers of American Pie, a funny,
colorful, and surprisingly smart comedy, The Pc
Boys tells the story of Alex Sperling,
Harvard-bound valedictorian, who loses his
summer internship and heads to Los Angeles to
work for his charming and successful cousin Ro:
Unfortunately, Roger isn't quite the accomplis!
businessman he's made himself out to be-- he
actually dropped out of Harvard, and now work
a pool boy. A series of mishaps force Alex and
Roger to squat in the stunning mansion of one
Roger's clients, where they join forces with La
a local escort, to run a thriving business supply
ladies of negotiable affection. The company gr
like wildfire as Alex and Roger get caught in m
and more hilarious situations, from shotgun-
wielding celebrities to bar mitzvahs to sadistic
lesbian businesswomen, finally culminating in c
giant party... but when Alex's parents and thei
Harvard-alumni friends show up, they have to t
the bash into a Harvard event in order to save !
the business and Alex's future.

## Shooting Gallery



Director: Keoni Waxman
Starring: Freddie Prinze Jr., Ving Rhames, Dev
Sawa, Roselyn Sanchez
Year of Production: 2005

Jericho Hudson is a street kid with a gift for
shooting pool. But he finds himself in the midd
of a dangerous hustle when he's played as a pa
in a desperate contest of wits (and nine-ball)
between two old nemeses: Cue Ball Carl, Jerich
stake horse and mentor, and Timothy Mortense
corrupt vice cop with a secret past.

**GALLERY**

With the help of his rounder girlfriend, Jezebe
Jericho puts his own bold hustle into motion
revealing that he too is driven by unknown and
vengeful motivations. Pulling a "long frame" or
both Cue Ball and Timothy, Jericho secretly
manoeuvres these two dangerous men toward e
other, leading us to an explosive twist of a clim

## Silent Partner



Director: James D. Deck
Starring: Tara Reid and Nick Moran
Year of Production: 2003

A young CIA analyst, Gordon Patrick, is assigne
Russia after the mysterious death of a major
Russian political figure. His world quickly collic
with the beautiful Dina who holds secrets to th
dead man's past and to the corruption amongst
Russia's political elite. Patrick's determination
find the truth leads him down a spiral of
deception, murder, and greed. In the end, Gor
faces the brutal reality that those you trust the
most are the ones you should trust the least.

Silent Partner is a fast-paced action thriller tha
depicts the cutthroat savagery of organized cri
and its seamless connection to international
politics.

## The Wedding Chest



Director: Nurbek Egen
Starring: Natacha Regnier and Bolot Tentimysho
Year of Production: 2006

One fine day Aidar comes back from Paris to his
native village in Kirghizia with a charming Fren
girl, Isabelle. Aidar has changed, but everythin
home has remained the same.

Lake Issyk-Kul still sparkles silver and turquoise
the air is still so pure it tinkles... Isabelle doesi
understand why Aidar can't tell everyone that
is his fiancée; however secrets and lies from hi
past also remain unchanged...

It soon becomes apparent that something s from
the past can threaten the future.

© Tony Lytle 2012   |   tony@tonylytlemedia.com   |   site map   |   Contact   |   +44 (0) 7734 686 860   |

EXHIBIT 4

# Affidavit of Process Server

Supreme Court of the State of New York, County of New York

Arrowhead Capital Finance, LTD. vs Seven Arts Entertainment, Inc.   Case Number: 652201/2014

I **Bradford B. Weekes**, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundries of the state where service was effected, I was authorized by law to perform said service.

Party Served: **Seven Arts Entertainment, Inc.**
  BY SERVING: **Peter Hoffman - Agent for Service**

Documents Served: **Summons; Complaint; Notice of Commencement of Action Subject to Mandatory Electronic Filing**

Served at Place of Business: **8721 Sunset Boulevard, Suite 209, Los Angeles, CA 90069**

Date Served: **07/28/2014**        Time of Service: **01:45 pm**

**Manner of Service:**

[X] **PERSONAL SERVICE:** By personally delivering copies to the person being served.

[ ] **SUBSTITUTED SERVICE AT RESIDENCE:** By personally delivering copies to the dwelling house or usual place of abode of the person (or authorized person on behalf of an entity) being served. Person receiving documents must be at least 18 years of age and should be informed of the general nature of the papers.

[ ] **SUBSTITUTED SERVICE AT BUSINESS:** By leaving, during normal business hours, copies at the office of the person/entity being served with the person apparently in charge thereof.

[ ] **POSTING:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

[ ] **Non-Service:** After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

[ ] **Unknown at Address    Moved, Left no Forwarding    Service Cancelled by Litigant    Unable to serve in a Timely Fashion**
**Address Does Not Exist   Other:**

▶ _Bradford B Weekes_
                              SIGNATURE OF PROCESS SERVER

State of California

County of _LOS ANGELES_

Personally appeared before me on this _30TH_ day of _JULY_ , 20_14_ by _BRADFORD B WEEKES_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Signature _____   (Notary Seal)

MICHAEL KERN
COMM. # 2059000
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. FEB. 23, 2018

Order# ACS330576/NAPPS2010

EXHIBIT 3

**FedEx**
Express

*Package*
**US Airbill**

FedEx Tracking Number: 8044 8762 0075

MURG

Form ID No. **0215**

**1  From** *Please print and press hard.*

Date July 18, 2014    Sender's FedEx Account Number 1386-7991-8

Sender's Name BARRY GOLDIN    Phone (610) 336-6680

Company GOLDIN, BARRY L, ESQ

Address 3744 BARRINGTON DR

City ALLENTOWN    State PA    ZIP 18104-1759

**2  Your Internal Billing Reference**
*First 24 characters will appear on invoice.*

**3  To**

Recipient's Name Lawrence R. Barnett    Phone ( )

Company GIPSON HOFFMAN & PANCIONE

Address 1901 AVENUE OF THE STARS  Suite 1100
We cannot deliver to P.O. boxes or P.O. ZIP codes.    Dept/Floor/Suite/Room

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City Los Angeles    State CA    ZIP 90067

0113224957

HOLD Weekday
FedEx location address
REQUIRED NOT available for
FedEx First Overnight.

HOLD Saturday
FedEx location address
REQUIRED Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select locations.

**4  Express Package Service**    *To most locations.*
NOTE: Service order for chg of "flame-out requirement.

Packages up to 150 lbs.
For packages over 150 lbs, use the new FedEx Express Freight US Airbill.

[ ] FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[X] FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

[ ] FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

[ ] FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5  Packaging**    *Declared value limit $500.*

[ ] FedEx Envelope*    [X] FedEx Pak*    [ ] FedEx Box    [ ] FedEx Tube    [ ] Other

**6  Special Handling and Delivery Signature Options**

[ ] SATURDAY Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

[ ] No Signature Required
Package may be left without obtaining a signature for delivery.

[ ] Direct Signature
Someone at recipient's address may sign for delivery. *Fee applies.*

[ ] Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only. *Fee applies.*

**Does this shipment contain dangerous goods?**
One box must be checked.

[ ] No    [ ] Yes
As per attached Shipper's Declaration.    [ ] Yes
Shipper's Declaration not required.    [ ] Dry Ice
Dry Ice, 9, UN 1845 _____ kg

[ ] Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging or placed in a FedEx Express Drop Box.

**7  Payment** *Bill to:*

Enter FedEx Acct. No. or Credit Card No. below.

Sender
Acct No. in Section 1 will be billed.
FedEx Acct. No.
Credit Card No.

[ ] Recipient    [ ] Third Party    [ ] Credit Card    [ ] Cash/Check

Total Packages    Total Weight _____ lbs.    Total Declared Value† $ _____ .00

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this Airbill you agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide, including terms that limit our liability.

Rev. Date 2/12 • Part #163134 • ©1994–2012 FedEx • PRINTED IN U.S.A. SRS

611

Ship it. Track it. Pay for it. All online.
Go to fedex.com.



July 22, 2014

Dear Customer:

The following is the proof-of-delivery for tracking number **804487620075**.

## Delivery Information:

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered to:** | Receptionist/Front Desk |
| **Signed for by:** | G COLLINS | **Delivery location:** | CA |
| **Service type:** | FedEx Standard Overnight | **Delivery date:** | Jul 21, 2014 09:26 |
| **Special Handling:** | Deliver Weekday | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

## Shipping Information:

| | | | |
|---|---|---|---|
| **Tracking number:** | 804487620075 | **Ship date:** | Jul 18, 2014 |
| | | **Weight:** | 2.0 lbs/0.9 kg |

**Recipient:**
CA US

**Shipper:**
ALLENTOWN, PA US

Thank you for choosing FedEx.

EXHIBIT 2

MUR3

**FedEx** Express
*Package*
*US Airbill*

FedEx Tracking Number  **8044 8762 0535**

Form 0215

**From** *Please print and press hard.*

Date  July 18, 2014

Sender's FedEx Account Number  **1386-7991-8**

Sender's Name  BARRY GOLDIN   Phone ( 610 ) 336-6680

Company  GOLDIN, BARRY L, ESQ

Address  3744 BARRINGTON DR
Dept./Floor/Suite/Room

City  ALLENTOWN   State  PA   ZIP  18104-1759

**2  Your Internal Billing Reference**
First 24 characters will appear on invoice.

**3  To**
Recipient's Name   Phone ( )

Company  SEVEN ARTS ENTERTAINMENT, INC.

Address  8721 SUNSET BOULEVARD, Suite 209
We cannot deliver to P.O. boxes or P.O. ZIP codes.   Dept./Floor/Suite/Room

☐ HOLD Weekday
FedEx location address
REQUIRED. NOT available for
FedEx First Overnight.

☐ HOLD Saturday
FedEx location address
REQUIRED. Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select locations.

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City  LOS ANGELES   State  CA   ZIP  90069

0113224957

**4  Express Package Service**   *To most locations.*   *Packages up to 150 lbs.*
NOTE: Service order has changed. Please select carefully.   For packages over 150 lbs., see the box below. Use the FedEx Express freight US Airbill.

☐ FedEx First Overnight
Earliest next business morning delivery to select
locations. Friday shipments will be delivered on
Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be
delivered on Monday unless SATURDAY Delivery
is selected.

☒ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments
will be delivered on Monday unless SATURDAY
Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5  Packaging**   *Declared value limit $500.*

☒ FedEx Envelope*   ☐ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6  Special Handling and Delivery Signature Options**

☐ SATURDAY Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without
obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address
may sign for delivery. Fee applies.

☐ Indirect Signature
If no one is available at recipient's
address, someone at a neighboring
address may sign for delivery. For
residential deliveries only. Fee applies.

**Does this shipment contain dangerous goods?**
One box must be checked.

☐ No   ☐ Yes As per attached Shipper's Declaration   ☐ Yes Shipper's Declaration not required.   ☐ Dry Ice Dry Ice, 9, UN 1845   ___ kg

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging
or placed in a FedEx Express Drop Box.

☐ Cargo Aircraft Only

**7  Payment**  *Bill to:*

Enter FedEx Acct. No. or Credit Card No. below.

☒ Sender Acct. No. in Section 1 will be billed.   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

FedEx Acct. No.
Credit Card No.   Exp.

Total Packages   Total Weight   Total Declared Value†
___ lbs.   $ ___ .00

†Our liability is limited to USD100 unless you declare a higher value. See back for details. By using this Airbill you
agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide, including terms
that limit our liability.

Rev. Date 2/12 • Part #162134 • ©1994–2012 FedEx • PRINTED IN U.S.A. SRS

611

Learn to pack like a pro.
Go to fedex.com/packaging.



July 22, 2014

Dear Customer:

The following is the proof-of-delivery for tracking number **804487620535**.

### Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Receptionist/Front Desk |
| Signed for by: | D.DILLION | Delivery location: | CA |
| Service type: | FedEx Standard Overnight | Delivery date: | Jul 21, 2014 11:39 |
| Special Handling: | Deliver Weekday | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

### Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 804487620535 | Ship date: | Jul 18, 2014 |
| | | Weight: | 2.0 lbs/0.9 kg |

Recipient:
CA US

Shipper:
ALLENTOWN, PA US

Thank you for choosing FedEx.

EXHIBIT 1

*Telephone:*
*610-336-6680*
*Telecopier:*
*610-336-6678*
*Email:*
*barrygoldin@*
*earthlink.net*

*BARRY L. GOLDIN, ESQ.*
*3744 Barrington Drive*
*Allentown, PA 18104-1759*

*Admitted in*
*New York,*
*Ohio\**
*and Pennsylvania*

*\*Inactive in Ohio*

July 18, 2014

By Federal Express
Seven Arts Entertainment, Inc.
8721 Sunset Boulevard, Suite 209
Los Angeles, CA 90069

Re: *Arrowhead Capital Finance, Ltd. v. Seven Arts Entertainment, Inc.*
NY Supreme Court, New York County, Index No. 652201/2014

Dear Sir or Madam:

Enclosed please find the following being served upon Seven Arts Entertainment, Inc. in the above-referenced matter:

(i) the Summons and Complaint and the exhibits thereto (exhibits 1-15) which were filed electronically in the above-referenced matter on July 18, 2014 with the New York Supreme Court for New York County; and

(ii) "Notice of Commencement of Action Subject to Mandatory Electronic Filing" dated July 18, 2014.

Very truly yours,

Barry L. Goldin

cc w/encl:
Gipson Hoffman & Pancione
1901 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Attn: Lawrence R. Barnett

ARR40718.1LSAES

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------------x

ARROWHEAD CAPITAL FINANCE, LTD.,

                   Plaintiff,

              - against -

SEVEN ARTS ENTERTAINMENT, INC.

                   Defendant.

------------------------------------------------------------------x

Index No. 652201/2014

**AFFIRMATION OF SERVICE OF SUMMONS & COMPLAINT ON DEFENDANT SEVEN ARTS EMTERTAINMENT, INC.**

BARRY L. GOLDIN, ESQ.
Attorney for plaintiff
ARROWHEAD CAPITAL FINANCE, LTD.
3744 Barrington Drive
Allentown, PA 18104-1759
Tel:  610-336-6680
Fax: 610-336-6678
Email: barrygoldin@earthlink.net
          and
240 Madison Ave. 3rd Fl.,
New York, NY 10016

AFFIRMATION OF SERVICE

STATE OF PENNSYLVANIA        )
                             )SS.:
COUNTY OF LEHIGH             )

    BARRY L. GOLDIN, an attorney duly admitted to practice before the Courts of the State of New York under penalties made for perjury, hereby affirms as follows:

    1. I am not a party to this action, I am over the age of 18 and I reside in Lehigh County, Pennsylvania.

    2. Attached hereto is a true and correct copy of the following documents evidencing and confirming service of the Summons & Complaint during July 2018 on defendant Seven Arts Entertainment Inc. in *Arrowhead Capital Finance Ltd, v. Seven Arts Entertainment, Inc.*, Supreme Court NY County, Index No. 652201/2014:

    (i) Cover letter dated July 18, 2014 from Barry L. Goldin, Esq., attorney for plaintiff Arrowhead Capital Finance Ltd. serving the Summons and Complaint and the exhibits thereto and the "Notice of Commencement of Action Subject to Mandatory Electronic Filing" on defendant Seven Arts Entertainment, Inc. by Federal Express on the following addresses in accordance with the Master Agreement dated as of December 22, 2006 signed by Seven Arts Pictures PLC (Seven Arts Entertainment Inc. having been adjudicated the successor to and bound by the obligations of Seven Arts Pictures PLC):

> Seven Arts Entertainment Inc.
> 8721 Sunset Boulevard, Suite 209
> Los Angeles, CA 90069
>     and
> Gipson Hoffman & Pancione, Attn: Lawrence R. Barnett
> 1901 Avenue of the Stars, Suite 1100
> Los Angeles, CA 90067

Attached hereto is a true and correct copy of that July 18, 2014 letter from Barry L. Goldin, Esq. (Exhibit 1); proof of Federal Express delivery on July 21, 2014 to Seven Arts Entertainment Inc. (Exhibit 2); and proof of Federal Express delivery on July 21, 2014 to Gipson Hoffman & Pancione, Attn: Lawrence R. Barnett (Exhibit 3).

    (ii) Affidavit of Process Server Bradford B. Weekes of personal delivery on July 28, 2014 of the Summons, Complaint and Notice of Commencement of Action Subject to Mandatory Electronic Filing on Peter Hoffman-Agent for Service of defendant Seven Arts Entertainment, Inc. at 8721 Sunset Boulevard, Suite 209, Los Angeles, CA 90069 (Exhibit 4 hereto).

Dated: Allentown, Pennsylvania
      August 11, 2014

BARRY L. GOLDIN        [ARR40810.2AFSAE]

EXHIBITS TO AFFIRMATION

Ex.     Document

1.      July 18, 2014 letter from Barry L. Goldin to Seven Arts Entertainment, Inc.

2.      Proof of Federal Express delivery on July 21, 2014 to Seven Arts Entertainment Inc.

3.      Proof of Federal Express delivery on July 21, 2014 to Gipson Hoffman & Pancione

4.      Affidavit of Process Server Bradford B. Weekes of Personal Service on Seven Arts Entertainment Inc.