**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

ARROWHEAD CAPITAL FINANCE, LTD.,
                Plaintiff,

     - against -

SEVEN ARTS ENTERTAINMENT, INC., and
SEVEN ARTS FILMED ENTERTAINMENT
LOUISIANA LLC,
                Defendants

                            :
                            :
                            :
                            :   Case No. 1:14-CV-06512-KPF
                            :   **Hon. Katherine Polk Failla**
                            :
                            :
                            :
                            :

-----------------------------------------------------------------------x

## MEMORANDUM OF LAW OF PLAINTIFF ARROWHEAD CAPITAL FINANCE, LTD. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS SEVEN ARTS ENTERTAINMENT, INC. AND SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA, LLC

BARRY L. GOLDIN  [BG-4637]
*Attorney for Plaintiff Arrowhead Capital Finance Ltd.*
3744 Barrington Drive, Allentown, PA 18104-1759
Tel:  (610) 336-6680 Fax: (610) 336-6678
     and
240 Madison Avenue, 3rd Fl., New York, New York 10016
Email: barrygoldin@earthlink.net

# TABLE OF CONTENTS

Page

I. STATEMENT OF FACTS ......................................................................... 2

    1. The Arrowhead Note, Master Agreement and Related Security Documents ......................................................................... 2

    2. The Collateral Securing the Arrowhead Note ................................. 3

    3. Assignment to Plaintiff Arrowhead by Consent Judgment of the Arrowhead Note ......................................................................... 4

    4. No Payment Has Been Made on the Arrowhead Note ..................... 4

    5. Arrowhead's May 10, 2010 Action against Borrowers in New York Supreme Court. ......................................................................... 4

    6. U.K. Borrower/Public Company PLC Is Re-domiciled into Its U.S. Successor SAE, All PLC Assets Being Transferred to, and All PLC Liabilities Assumed by, SAE ..................................................... 4

    7. PLC, Stripped of All Assets, Is Placed in 2011 in Insolvency Liquidation in the U.K ............................................................... 5

    8. All SAFE Assets Are Transferred to SAE, Leaving SAFE Unable to Pay Nearly $30 Million of Creditor Claims, and SAFE Is Then Placed in Insolvency Liquidation ............................................................. 6

    9. Continuing Refusal of Hoffman and His Affiliates in the Predecessor Action to Produce Subpoenaed Documents with respect to Collateral and Collateral Proceeds ............................................................. 7

    10.  Plaintiff Arrowhead's Instant Action against Defendants SAE and SAFELA ......................................................................... 7

    11. Defendants SAE and SAFELA Fail to Comply with Discovery Requests and Orders ............................................................... 9

    12. Hoffman's Conviction on 16 Felony Counts of Wire & Mail Fraud and Conspiracy ......................................................................... 9

II. DISCUSSION ......................................................................... 9

Page

1. As Set Forth in the Asset Transfer Agreement dated as of May 14, 2010 (for Re-domicile of U.K. Public Company PLC into U.S. Company SAE) and as Also Admitted in Other PLC and SAE Filings with the SEC, SAE Assumed the Arrowhead Note and Related Liabilities and Obligations to Arrowhead ............... 9

   A. SAE's Assumption of Liabilities in the May 2010 Asset Transfer Agreement ............... 10

      (i) The Film Agreements So Assumed by SAE Include the Arrowhead Note, Master Agreement, Financing and Security Agreements, and Related Agreements for Production and Exploitation of Pictures *Deal*, *Noise*, and *Pool Hall Prophets* ............... 10

      (ii) The Liabilities to Arrowhead under the Arrowhead Note Are Also Included as Seven Arts Liabilities in Their June 30 and December 31, 2009 Financial Statements Which They Filed with the SEC ............... 11

   B. The Re-Domicile Proxy Materials and Subsequent SEC Filings Confirm SAE's Assumption of All Liabilities, and Thus All Liabilities to Arrowhead ............... 12

   C. Previous Federal Court Adjudications, That SAE Is "Successor" to and Liable for Obligations of PLC, Are Binding on and Preclusive against Defendants ............... 14

2. In the Asset Transfer Agreement by Which SAE during 2012 Acquired All Assets of Its Then Wholly-Subsidiary SAFE, SAE Similarly Assumed Subsidiary SAFE's Liabilities and Obligations to Arrowhead ............... 15

3. Under Both the "Continuity" and "De Facto Merger" Doctrines, SAE and SAFELA Are Jointly and Severally Liable to Arrowhead for the Obligations of Their Predecessor Borrowers/Debtors ............... 17

   A. The Transfer of PLC Assets to, and Assumption of PLC Liabilities by, Surviving Public Company SAE ............... 18

      (i) Continuity of Ownership ............... 18

      (ii) Cessation of Ordinary Business and Dissolution of the Transferor Company ............... 19

(ii)

<u>Page</u>

(iii) Assumption by the Successor of Liabilities for
Uninterrupted Business   19

(iv) Continuity of Management, Personnel, Location, Assets
and Operations   19

B. The Transfer of Wholly-Owned Subsidiary SAFE's Assets to and
Assumption of SAFE's Liabilities by Its Parent, Public Company SAE   20

(i) Continuity of Ownership   20

(ii) Cessation of Ordinary Business and Dissolution of the
Transferor Company   20

(iii) Assumption by the Successor of Liabilities for
Uninterrupted Business   20

(iv) Continuity of Management, Personnel, Location, Assets
and Operations   21

C. The Transfer of SAE Assets to and Concurrent Assumption of
Liabilities by Its Subsidiary SAFELA   21

(i) Continuity of Ownership   23

(ii) Cessation of Ordinary Business and Dissolution of the
Transferor Company   24

(iii) Assumption by the Successor of Liabilities for
Uninterrupted Business   24

(iv) Continuity of Management, Personnel, Location, Assets
and Operations   24

III. CONCLUSION   25

# TABLE OF AUTHORITIES

Page

Cases

Action Ink, Inc. v. Anheuser-Busch, Inc.,
959 F.S2d 934, 942-943 (E.D. La. 2014),
affirmed 576 Fed. Appx. 321 (5th Cir. 2014) ..... 15

Allen Morris Commercial Real Estate Services Co. v. Numismatic Collectors
Guild, 1993 WL 183771 (SDNY 1993) ..... 18

Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,
775 F.2d 38 (2d Cir. 1985) ..... 14, 18

B&B Hardware, Inc. v. Hargis, Indus., Inc.,
83 USLW 4176, 135 S.Ct. 1293, 191 L.Ed.2d 222 (2015) ..... 14

Cargo Partner AG v. Albatrans, Inc.,
352 F.3d 41 (2d Cir. 2003) ..... 18

Del Prado v. B.N. Development Co., Inc.,
602 F.3d 660 (2d Cir. 2010) ..... 15

Hoche Productions, S.A. v. Jayark Films Corp.,
256 F.S. 291 (SDNY 1966) ..... 18

John Deere Shared Services, Inc. v. Success Apparel LLC,
2015 WL 6656932 (SDNY 2015) ..... 18

Lummus Co. v. Commonwealth Oil Refining Co., Inc.,
297 F.2d 80 (2d 1962) ..... 15

Miller v. Forge Mench Partnership Ltd.,
2005 WL 267551 (SDNY 2005) ..... 18

NYK Cool A.B. v. Pacific Intern. Services, Inc.,
2013 WL 1274561(SDNY 2013),
aff. 562 Fed. Appx. 45 (2d Cir. 2014) ..... 17

Seven Arts Filmed Entertainment Limited v. Jonesfilm,
538 Fed. Appx. 444 (5th Cir. 2013) ..... 15

Seven Arts Pictures, Inc. v. Jonesfilm,
2012 WL 5398439 (E.D. La. 2012) ..... 15

Time Warner Cable, Inc. v. The Networks Group, LLC,
2010 WL 356311 (SDNY 2010) ..... 17, 18

<u>Page</u>

*Vigilotti v. Vigolotti*,
518 B.R. 191 (Bktry D. Conn. 2014)                                          15


<u>Statutes and Rules</u>
New York Civil Practice Law and Rules:
      Article 52                                                    18
      Rule 5222                                                      7

Plaintiff Arrowhead Capital Finance, Ltd. ("Arrowhead") submits this Memorandum of Law in support of its Motion for Summary Judgment against defendants Seven Arts Pictures, Inc. ("SAE") and Seven Arts Filmed Entertainment Louisiana, LLC ("SAFELA"). As contemplated by the first paragraph of plaintiff's First Amended Complaint (the "FAC"), plaintiff Arrowhead's motion seeks adjudications:

(a) adding each defendant SAE and SAFELA as an additional judgment debtor to, and jointly and severally liable for, the October 2012 Judgment in favor of Arrowhead of $2,496,159.50 plus accrued interest and other relief (the "October 2012 Judgment), which was entered pursuant to June 2012 Decision (the "June 2012 Decision") on the Arrowhead Note dated December 2006 of defendants' predecessors Seven Arts Pictures, Inc. ("SAP"), Seven Arts Pictures PLC ("PLC"), and Seven Arts Filmed Entertainment Limited ("SAFE") in *Arrowhead Capital Finance Ltd. v. Seven Arts Pictures PLC et al*, Supreme Court, New York Co., Index No. 601199/2010 (the "Predecessor Action"); and

(b) permitting judgment creditor Arrowhead to foreclose upon and enforce against SAE and SAFELA, jointly and severally, Arrowhead's rights and remedies with respect to its Collateral, including (without limitation) "foreclosure of the Collateral securing the amounts due under the Arrowhead Note" (as set forth in the June 2012 Decision at p. 17), and underlying agreements (Master Agreement, Financing and Security Agreements, Pledge Agreement, and related documents) and trace misappropriated trust funds.

As described below, defendants SAE and SAFELA are liable to Arrowhead for obligations of their predecessors on multiple grounds, including (among others):

(1) SAE's explicit assumption (in the Asset Transfer Agreements by which SAE acquired all assets of its predecessors PLC and SAFE) of (i) "all the obligations,

responsibilities and liabilities pursuant to the Film Agreements" [which include

the Arrowhead Note and security documents for obligations to Arrowhead] and

(ii) indebtedness [including indebtedness to Arrowhead] related to the Pictures;

(2) SAE's admissions against interest in notices, filings with the U.S. Securities

and Exchange Commission (the "SEC"), and otherwise of SAE's assumption of

"all" PLC's liabilities (and thus of "all" PLC's liabilities to Arrowhead);

(3) prior federal court adjudications against SAE, that SAE is "successor",

jointly and severally liable for obligations, of predecessor PLC, those

adjudications being preclusive and collateral estoppel against SAE; and

(4) application of the "continuity of interest" and related "de facto merger"

doctrines to SAE and also to SAFELA.

## I. <u>STATEMENT OF FACTS.</u>

1. The Arrowhead Note, Master Agreement and Related Security Documents.

    Peter Hoffman has been principal shareholder, chief executive officer and

controlling person (directly and indirectly) of a series of companies in the motion picture

business, conducting business under and using the shared Seven Arts name, logo,

letterhead, office and email address, with the same personnel and the same management

(Peter and his daughter Kate Hoffman).[1]

    In December 2006, Hoffman affiliates entered into a $7.5 million loan refinancing

with Cheyne Specialty Finance Fund Ltd. ("Cheyne") and Arrowhead Consulting Group,

Inc. ("ACG").  "Borrowers" were Hoffman affiliates Seven Arts Pictures Plc ("PLC" a

U.K. public company), Seven Arts Pictures, Inc. ("SAP" a U.S. company owning a

---

[1] Goldin Aff. Ex. 29 (p. 53 description of Peter and Kate Hoffman), Ex. 10, Tr. 10:9-18:22, 62:8-63:8; Ex. 10, Tr. 40:23-45:1, 68:16-75:10, 192:1-193:1; Ex. 37 at*13].

controlling interest in PLC), Seven Arts Filmed Entertainment Limited ("SAFE" then a wholly-owned subsidiary of PLC), and special purpose affiliates Deal Investments, LLC, Deal Productions, LLC, Rectifier Productions, LLC, and Pool Hall Productions, LLC [R. Doc. 16-1; Woods Aff. Ex.s 1-3; Goldin Aff. Ex. 8 (Tr. 19:24-24:2)].

As part of that refinancing, Borrowers signed a Secured Senior Promissory Note to Cheyne for $6.5 million (the "Cheyne Note"), "Secured Subordinated Promissory Note" to ACG for $1 million (the "Arrowhead Note"), Master Agreement dated as of December 22, 2006 incorporated by reference in those Promissory Notes, and exhibits to and documents referenced in the Master Agreement (generally relating to those lenders' security interests in Collateral for the Promissory Notes) [Woods Aff. Ex.s 1-3].

During 2008, the Cheyne Note was paid, whereupon the Arrowhead Note became senior, and entitled to enforce all rights, with respect to Collateral [R.Doc. 16-1].

2. The Collateral Securing the Arrowhead Note.

As described in the Master Agreement [Woods Aff. Ex. 2], the Collateral securing the Arrowhead Note includes (among other things):

> (i) mortgages on copyrights, distribution agreements for, and other rights with respect to three films produced by those Hoffman affiliates (*Deal*, *Noise* aka *The Rectifier*, and *Pool Hall Prophets* aka *Shooting Gallery* aka *Backspin*) and tax credits and refunds from their production [Master Agreement §§1, 2.7 & 6; R.Doc.s 30-1, 30-2 & 30-3, re-filed by defendants as 33-1, 33-2 & 33-3];

> (ii) fees from distribution of other films distributed by Seven Arts companies (*Boo*, *Broken* aka *A Broken Life*, and *Mirror Wars*) [Master Agreement §2.7.1];

> (iii) 8.1 million shares of PLC then owned by SAP, all other PLC shares acquired by SAP, and any resulting securities [Master Agreement §2.7.4 and Pledge Agreement (also known as "Charge Over Shares") §§1 & 2]; and

> (iv) film collections, tax refunds, and other Collateral proceeds, all required to be deposited in a designated lock-box account at Chase Manhattan Bank, New York, and held in trust for and remitted to Arrowhead [Master Agreement §5.1].

3. Assignment to Plaintiff Arrowhead by Consent Judgment of the Arrowhead Note.

During December 2008, the NY court entered a Consent Judgment assigning the Arrowhead Note and related rights from ACG to Arrowhead [R.Doc. 16-6].

4. No Payment Has Been Made on the Arrowhead Note.

Arrowhead has not received any payment on the Arrowhead Note; no Collateral proceeds (no film collections, tax refunds, share sale proceeds, nor other monies) have been deposited for Arrowhead in the lock-box account; Borrowers and their successors refuse to deliver to Arrowhead any film, share, or other Collateral; and they failed to account for receipts or disbursements of Collateral proceeds [Woods Aff. ¶'s 17-18].

5. Arrowhead's May 10, 2010 Action against Borrowers in New York Supreme Court.

On May 10, 2010, Arrowhead commenced an action, by filing a Summons and Complaint against PLC and the other Borrowers, Index No. 601199/2010 (Arrowhead's "Predecessor Action") in New York Supreme Court, seeking money judgment for the unpaid Arrowhead Note and enforcement of rights in the Collateral [Woods Aff. Ex. 4].

In that action, Arrowhead obtained a June 2012 decision that the Cheyne Note had been repaid; Arrowhead's rights had thus ceased to be subordinated to rights of Cheyne; and Arrowhead was and is entitled to enforce its rights in the Collateral. The New York court then filed and entered an October 2012 Judgment for Arrowhead for $2,496,159.50 (principal of $1 million plus accrued interest) then owing on the Arrowhead Note against SAFE, SAP, and other Borrowers. That June 2012 Decision was affirmed by October 2013 decision of the First Appellate Department. [R.Doc.s 16-1, 16-2; Woods Aff. Ex. 7]

6. U.K. Borrower/Public Company PLC Is Re-domiciled into Its U.S. Successor SAE, All PLC Assets Being Transferred to, and All PLC Liabilities Assumed by, SAE.

Hoffman arranged for his U.K. public company PLC to enter into an Asset Transfer Agreement dated as of May 14, 2010 (*only four days* after Arrowhead filed the May 2010 Action against PLC and the other Borrowers) for transfer of all PLC assets to and assumption of all PLC liabilities by newly-formed Nevada company SAE. [Goldin Aff. Ex. 12 (filed by PLC with the SEC as Ex. 2.1 to PLC's Sept. 27, 2010 filing)].

Hoffman then arranged for a Notice dated May 25, 2010 to be sent to PLC share-holders for an extraordinary shareholder meeting for approval of a resolution to so re-domicile PLC into SAE [Goldin Aff. Ex. 13]. That May 25, 2010 Notice stated PLC:

> "shall transfer all of its assets to [SAE], a newly formed Nevada corporation, **in exchange for an assumption of all of its liabilities**..." [emphasis added]

The PLC shareholder meeting was held on June 11, 2010, at which that shareholder resolution was approved, as certified by Kate Hoffman (Peter Hoffman's daughter) [Goldin Aff. Ex.s 14 & 8 (Kate Hoffman Depo Tr. at 52:20-54:4)].

Subsequently, Hoffman and Seven Arts' outside securities counsel (the Baker & Hostetler law firm) delivered letters during February and May 2011 to the SEC, reiterating and so again admitting that SAE had acquired "all assets" and assumed "all liabilities" of PLC [Goldin Aff. Ex.s 18-19; Ex. 10, Peter Hoffman Tr. 153:4-157:2)].

PLC and SAE also issued press releases, and other securities filings, admitting SAE was the company formerly known as PLC; SAE acquired all assets and assumed all liabilities of PLC; and re-domicile had not effected any change (other than to re-domicile the public company from the U.K. to the U.S.).[2]

7. PLC, Stripped of All Assets, Is Placed in 2011 in Insolvency Liquidation in the U.K.

---

[2] SAE/PLC's Form 20-F/A filed with the SEC in June 2012 explicitly so admits "all the assets and liabilities of Seven Arts Pictures plc... have been transferred to SAE" [Goldin Aff. Ex. 26 p. 21; *see also* Ex. 15 (pp. 44, F17, F53-54); Ex.s 27-29].

PLC's transfer of all assets to SAE, left PLC unable to pay creditors.  Thus, during 2011, involuntary insolvency proceedings were begun in U.K. court against PLC; a U.K. liquidator was appointed, who filed Chapter 15 proceedings in 2012 in bankruptcy court in Louisiana; the liquidator ultimately found PLC's remaining assets were claims against Hoffman and Hoffman affiliates which the liquidator, having no assets, lacked resources to pursue; the liquidator thus requested and the bankruptcy court ordered closure of the Chapter 15 bankruptcy case; and the liquidator effectively terminated the liquidation, having collected nothing for creditors [Goldin Aff. Ex.s 20-25; R.Doc.s 82-83].

Meanwhile, PLC's liquidator stated (contrary to Hoffman assertions) that the liquidator received no bank statements of PLC bank accounts (whether at Coutts Bank, Barclays Bank, or otherwise) [Goldin Aff. Ex. 23 (Response of Adam Jordan)].

8. <u>All SAFE Assets Are Transferred to SAE, Leaving SAFE Unable to Pay Nearly $30 Million of Creditor Claims, and SAFE Is Then Placed in Insolvency Liquidation.</u>

PLC's asset transfer to SAFE included all shares of PLC wholly-owned subsidiary SAFE (through which Seven Arts film business was conducted), so that SAFE became a wholly-owned subsidiary of SAE [Goldin Aff. Ex.s 12-19 & Ex. 26 (p. 21)].

During 2012, Hoffman arranged an Asset Transfer Agreement between SAE and its then wholly-owned subsidiary SAFE, by which SAE received transfer of "all" SAFE assets, including the Completed Pictures which are part of Arrowhead's Collateral.  SAFE was so stripped of all assets; but SAFE received no consideration for its asset transfer to parent SAE, other than SAE's assumption of SAFE liabilities [Goldin Aff. Ex. 30 §2.5].

By 2013 involuntary liquidation proceedings were brought in the U.K. against SAFE; a liquidator was appointed; the liquidator's report found SAFE had assets of less than 2,000, but liabilities of approximately 19.2 million, pounds U.K. (a deficit of nearly

$30 million U.S.); and thus the SAFE liquidator had no funds or other assets with which to pursue claims against Hoffman or others.  The SAFE liquidator (like the PLC liquidator) has not achieved any recovery for creditors. [Goldin Aff. fn.6; Ex.s 31-33]

9. Continuing Refusal of Hoffman and His Affiliates in the Predecessor Action to Produce Subpoenaed Documents with respect to Collateral and Collateral Proceeds.

Prior to the Predecessor Action's October 2012 Judgment, Hoffman and the Borrowers refused to provide Arrowhead discovery as to Collateral or Collateral proceeds, as they argued Arrowhead was not entitled to such discovery until liability of the Borrowers had been decided [Woods Aff. ¶14, Ex. 5 (Borrowers' Response to Interrog. No.s 51-54); Ex. 6 (Borrowers' Response to Prod. Req. No.s 23-27 & 31-32)].

During May 2014 (after the appellate decision affirming the adjudications against Borrowers), Arrowhead began proceedings to serve Rule 5222 subpoenas on Borrower judgment debtors for documents to enforce Arrowhead's rights to its Collateral and Collateral proceeds; Hoffman and his affiliates refused to produce documents on grounds the documents had been transferred to and could only be obtained from SAE.[3]

10.  Plaintiff Arrowhead's Instant Action against Defendants SAE and SAFELA.

On July 18, 2014, plaintiff filed the instant action in New York Supreme Court against defendant SAE for (among other things) declaratory judgment that SAE is liable for its predecessors' obligations to Arrowhead under the October 2012 Judgment and related documents, and to enforce Arrowhead's security interest in and other rights with respect to Collateral and Collateral proceeds.  Hoffman arranged removal by SAE to this federal court on grounds of diversity.  [R.Doc. 1 *et seq.*]

---

[3] Goldin Aff. ¶58; Ex. 63, Tr. 37:9-39:19, 58:24-63:21, 102:3-15, 129:7-132:10].

Plaintiff discovered from Seven Arts press releases and SEC filings that SAE had transferred film Collateral rights to its at least 60% owned subsidiary SAFELA, pursuant to a purported Multi-Film Distribution Agreement (drafted and signed in June 2014 but back-dated by Hoffman to October 2013); this Court granted Arrowhead leave to amend its Complaint to include SAFELA as a defendant and reflect newly-discovered evidence; and Arrowhead on October 7, 2014 so filed its First Amended Complaint (the "FAC") against SAE & SAFELA [R. Doc. 16].

The initial paragraphs of Arrowhead's FAC [R.Doc. 16] state:

"1. This is an action by plaintiff judgment creditor Arrowhead to have two Seven Arts companies, namely defendants SAE and SAFELA (collectively 'Defendants'), each added as an additional judgment debtor to, and jointly severally liable for, the October 2012 Judgment to Arrowhead of $2,496,159.50, plus accrued interest and other relief ...

3. Plaintiff judgment creditor Arrowhead seeks to have successor Seven Arts companies, Defendants SAE and SAFELA, found jointly and severally liable for the duties and obligations of and relief against their predecessor Seven Arts companies SAP, PLC and SAFE, ..."

In the FAC, Arrowhead asserts eight causes of actions, consisting of the following:

1. Declaratory Judgment that defendant SAE is jointly and severally liable to Arrowhead for all obligations of its Seven Arts predecessors and so liable for all obligations to Arrowhead under the June 2012 Decision, October 2012 Judgment and underlying Arrowhead Note, Master Agreement and related agreements, and that Arrowhead may enforce its rights and remedies with respect to the Collateral.

2. Declaratory Judgment that defendant SAFELA is jointly and severally liable to Arrowhead for all obligations of its Seven Arts predecessors and so liable for all obligations to Arrowhead under the June 2012 Decision, October 2012 Judgment and underlying Arrowhead Note, Master Agreement and related agreements, and that Arrowhead may enforce its rights and remedies with respect to the Collateral.

3. Against SAE and SAFELA for breach of contractual obligations under the Arrowhead Note, Master Agreement and related agreements.

4. Against SAE and SAFELA for breach of duty to account with respect to Collateral and Collateral proceeds (including, among others, proceeds required to be held in trust for the benefit of Arrowhead).

5. Against SAE and SAFELA for breach of trust and fiduciary obligations.

6. Against SAE and SAFELA for conversion of proceeds payable to Arrowhead and of Collateral in which Arrowhead has a security interest.

7. Against SAE and SAFELA for replevin.

8. For turn over, sale, foreclosure of, and other dealing with Collateral.

11. Defendants SAE and SAFELA Fail to Comply with Discovery Requests and Orders.

At a December 15, 2015 contempt hearing, this Court questioned Peter Hoffman for hours and heard his evasive testimony as to the Seven Arts defendants' failure to locate and produce documents in possession, custody, and control of themselves and their agents; their disregard of discovery obligations; and their disobedience of the Court's discovery orders [R.Doc. 62; Goldin Aff. Ex. 10].

12. Hoffman's Conviction on 16 Felony Counts of Wire & Mail Fraud and Conspiracy.

Meanwhile, Hoffman and his wife Susan Hoffman were indicted and convicted in federal court in Louisiana, on multiple counts of wire fraud, mail fraud, and conspiracy. Judge Feldman's December 9, 2015 decision denied Peter Hoffman's motion for acquittal on 16 of those wire fraud, mail fraud, and other counts and likewise denied the acquittal motion of Hoffman's wife, Susan Hoffman [R.Doc. 84].[4]

## II. **DISCUSSION**.

1. As Set Forth in the Asset Transfer Agreement dated as of May 14, 2010 (for Re-domicile of U.K. Public Company PLC into U.S. Company SAE) and as Also Admitted

---

[4] During January 2016, Hoffman's daughter Kate Hoffman (chief operating office of Hoffman's Seven Arts companies, including defendants SAE and SAFELA) was charged by U.K. revenue authorities with tax fraud involving more than 10 million pounds sterling in another scheme involving film rights [Goldin Aff. Ex. 64].

in Other PLC and SAE Filings with the SEC, SAE Assumed the Arrowhead Note and Related Liabilities and Obligations to Arrowhead.

A. SAE's Assumption of Liabilities in the May 2010 Asset Transfer Agreement.

On May 10, 2010, Arrowhead filed its suit (the "Predecessor Action") in New York state court against Hoffman's then public company PLC and the other Borrowers for payment of the Arrowhead Note and related obligations [Woods Aff. Ex. 4].

Almost immediately, Hoffman arranged for PLC to enter into an Asset Transfer Agreement dated as of May 14, 2010 with SAE (the "May 2010 Transfer Agreement"), and caused that Agreement to be filed with the SEC.[5]  In that Agreement:

(a) PLC assigned SAE "all" PLC's "rights, title and interest in and to All Assets"; use of the "Seven Arts" name and logo; and all PLC offices, facilities, equipment, employees, and Peter Hoffman's employment agreement [§§2.1-2.4]; and

(b) under the caption "Assumption" [§2.2], SAE took that assignment subject to:

"(i) all of the obligations, responsibilities and liabilities of [PLC] pursuant to the terms of the Film Agreements ... and (ii) the obligations and liabilities of SAE reflected in the pro forma balance sheet dated as of December 31, 2009, attached as Exhibit "D".[6]

(i) The Film Agreements So Assumed by SAE Include the Arrowhead Note, Master Agreement, Financing and Security Agreements, and Related Agreements for Production and Exploitation of Pictures Deal, Noise, and Pool Hall Prophets.

In §1.1(c) of that May 2010 Transfer Agreement, "Film Agreements" are defined to include "all agreements entered into with respect to production or exploitation of any New or Completed Picture".  PLC and SAE filings with the SEC, identify "Completed

---

[5] Goldin Aff. Ex. 12 (Ex. 2.1 to PLC  Form F-1 Reg. Statement Amend. No. 4 filed with the SEC on Sept. 27, 2010) obtained from the SEC's EDGAR on-line retrieval system.
[6] That May 10, 2010 Agreement filed with the SEC lacks attachment of exhibit "D" (pro forma balance sheet as of December 31, 2009); but $1,100,000 liability on the Arrowhead Note is included in the public company June 30, 2009 audited and December 31, 2009 unaudited financial statements in the SEC filing [Goldin Aff. Ex. 15, F-53-54 & F-17].

Pictures" to include all six film which are Arrowhead film Collateral (*Boo*, *Broken Life*, *Deal*, *Noise*, *Mirror Wars* and *Pool Hall Prophets*) [Goldin Aff. Ex. 26 pp. 38 & F22].

As described in the 2006 Master Agreement Ex. 2 [§§1 & 2.4], the financing was to fund, and the Master Agreement, Financing and Security Agreements and related documents were to secure repayment of that financing, for "production and exploitation of Pictures" [e.g., *Deal*, *Noise*, and *Pool Hall Prophets*].  Thus, those Agreements are "Film Agreements" defined in §1.1(c), and PLC's obligations thereunder to Arrowhead were assumed by SAE pursuant to §2.2(i), of the May 2010 Transfer Agreement.

> (ii) <u>The Liabilities to Arrowhead under the Arrowhead Note Are Also Included as Seven Arts Liabilities in Their June 30 and December 31, 2009 Financial Statements Which They Filed with the SEC.</u>

Pursuant to the May 2010 Transfer Agreement [Goldin Aff. Ex. 12, §2.2(ii)], the liabilities assumed by SAE include liabilities in the "December 31, 2009 balance sheet".

The public company's September 27, 2010 SEC filing includes balance sheets of the Seven Arts companies as of June 30, 2009 (audited) and December 31, 2009 (unaudited).    That June 30, 2009 balance sheet includes in "liabilities" (as "Production Loans") the $1 million principal amount of and interest accrued on the Arrowhead Note; see the Notes to the June 30, 2009 financial statements [Goldin Aff. Ex. 15 pp. F53-54]:

> "An original loan of $7,500,000 taken out from Cheyne Specialty Finance Fund LLP was acquired by the Group for payment of $6,500,000 ..., leaving a balance of $1,000,000 due to Arrowhead Consulting Group ... The $1,000,000 balance of the loan is secured with ... three films (*Deal*, *Noise* and *Pool Hall Prophets*) as well as ... a first security interest in 1,607,000 shares of the Company owned by Seven Arts Pictures, Inc. **This loan, together with accrued interest is included in Productions loans above**." [emphasis added]

The Notes to those audited Financial Statements reiterate (at p. F54) that Production and Corporate Loans include $1.1 million to Arrowhead (mis-identified as Cheyne).

11

The December 31, 2009 balance sheet Notes [F-17] repeat that entire paragraph from page F53, concluding with the sentence that the Arrowhead $1 million "loan, together with accrued interest is included in the Productions loans above".

Accordingly, obligations assumed by SAE in the May 2010 Asset Transfer Agreement include the $1 million Arrowhead note plus accrued interest, so shown as liabilities in the June 30 and December 31, 2009 balance sheets.

B. The Re-Domicile Proxy Materials and Subsequent SEC Filings Confirm SAE's Assumption of All Liabilities, and Thus All Liabilities to Arrowhead.

Consistent with the May 2010 Transfer Agreement, Hoffman (as PLC "Director") sent a May 25, 2010 Notice of Extraordinary General Meeting to PLC shareholders, for the stated purpose of transferring the public company's situs from the U.K. to the U.S. That PLC Notice sought shareholder approval of a resolution [Goldin Aff. Ex. 13] that:

> "1. [PLC] shall transfer all of its assets to Seven Arts Entertainment, Inc., a newly formed Nevada corporation, **in exchange for an assumption of all of its liabilities** and the issuance of 7,077,300 shares of common stock of Seven Arts Entertainment, Inc." [emphasis added]

The May 25, 2010 PLC cover letter to shareholders explained PLC would transfer all of its assets to SAE (defined as "the US Parent") and that PLC then would be liquidated:

> "... **The US Parent will assume all of the obligations of the Company** [PLC]. **After completion of the transfer of the assets... and assumption of [PLC] liabilities, the Directors will liquidate [PLC] in due course**... and all of its assets will be distributed to shareholders. The consideration for the transfer of the assets of [PLC] and assumption of liabilities of [PLC] to [SAE] is the issuance of 7,077,300 shares of common stock of [SAE] which will be distributed to each shareholder of [PLC] on a basis of one new common share of [SAE] for one ordinary share of [PLC]." [emphasis added]

PLC "Director" Kate Hoffman certified shareholder approval at the June 2010 shareholder meeting of the following resolutions for re-domiciling the public company by transfer of assets to, and assumption of all liabilities by, SAE [Goldin Aff. Ex. 14]:

"1. [PLC] shall transfer all of its assets to Seven Arts Entertainment Inc., a newly formed Nevada corporation, in exchange for **an assumption of all of its liabilities** and the issuance of 7,077,300 shares of common stock of Seven Arts Entertainment Inc.

2. Promptly upon approval of the shareholders of such transfer, the shares of common stock of Seven Arts Entertainment Inc. received by [PLC] will be distributed to each of its shareholders on the basis of one share of common stock of Seven Arts Entertainment Inc. for one ordinary share of [PLC].   **The Directors will liquidate [PLC] in due course** ...." [emphasis added]

PLC's November 9, 2010 press release announced completion of that asset

transfer from PLC to SAE [Goldin Aff. Ex. 16]:

"PLC announced today that it has completed the transfer of all of its assets to [SAE] in exchange for common stock of SAE on a basis of one share of SAE for each ordinary share of [PLC].
The primary purpose of this transaction was to move the domicile of Seven Arts from the United Kingdom to the United States. ..."

Peter Hoffman then prepared, signed and delivered to the SEC a November 19,

2010 letter on Seven Arts letterhead confirming June 2010 approval of re-domicile by

PLC's shareholders and representing to the SEC that "**Seven Arts is the successor to all**

**assets and liabilities of PLC**" [emphasis added] [Goldin Aff. Ex. 17].

Seven Arts' securities counsel (Randall Katz of Baker & Hostetler) delivered to

the SEC a February 25, 2011 letter explicitly stating [Goldin Aff. Ex. 18 p. 1]:

"By way of background, PLC transferred all of its assets to NEV (a wholly-owned subsidiary), **which also assumed all of PLC's liabilities** (the "Transaction"). The result of the Transaction was to place all of PLC's operations in NEV (a Nevada-domiciled company), ..." [emphasis added]

Seven Arts' securities counsel also subsequently delivered to the SEC a May 9, 2011

letter, reiterating that PLC had transferred all assets to SAE "which also assumed all of

PLC's liabilities" [Goldin Aff. Ex. 19 p. 2]:

"PLC transferred all of its assets to NEV (a wholly-owned subsidiary), **which also assumed all of PLC's liabilities** (the "Transaction").  The result of the

13

Transaction was to place all of PLC's operations in NEV (a Nevada-domiciled company), " [emphasis added][7]

The SAE/PLC Form 20-F/A, filed with the SEC in June 2012, again admits that "all the assets and liabilities of" PLC have been transferred to SAE [Goldin Aff. Ex. 26 p. 21]:

> "On June 11, 2010, our shareholders approved the transfer of all of our assets ... to ... SAE... We do not believe that this redomiciling will have any material effect on the Group's business or operations, ... **all the assets and liabilities of [PLC] (including ownership of certain subsidiaries) have been transferred to SAE**"

Defendant Seven Arts companies are bound by, and barred from contravening, those admissions against interest to the SEC (made through their ceo Hoffman on their letterhead  and their counsel and in their Form 20-F/A), as to SAE's assumption of "all" PLC's liabilities. *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.*, 775 F.2d 38, 43 (2d Cir. 1985) (affirms summary judgment that defendant assumed predecessor's liabilities, as defendant's SEC filings admitted assumption of the liabilities, and holding that officer's later contrary assertions did **not** show genuine factual dispute).[8]

> C. Previous Federal Court Adjudications, That SAE Is "Successor" to and Liable for Obligations of PLC, Are Binding on and Preclusive against Defendants.

In *B&B Hardware, Inc. v. Hargis, Indus., Inc.*,135 S.Ct. 1293, 1298-99 (2015), the U.S. Supreme Court approved broad application of issue preclusion, stating:

---

[7] At the December 15, 2015 contempt hearing, Hoffman authenticated his November 19, 2010 and securities counsel's February 25 and May 9, 2011 letters to the SEC that all PLC liabilities (and thus all PLC liabilities to Arrowhead) were assumed by SAE, and admitted those letters to the SEC were "accurate" [Goldin Aff. Ex. 10, Tr. 153:4-157:19].
[8] Hoffman wrongfully arranged for a subsequent purported Asset Transfer Agreement between PLC and SAE dated "as of June 11, 2010" to be filed in this Court [R.Doc. 30-5 pp. 2-6], which differs from the May 2010 Transfer Agreement [Ex. 12] actually filed with the SEC, and is contrary to his representations to the SEC, shareholders and creditors that "all" PLC liabilities were being assumed by SAE.  That later Hoffman version "as of June 11, 2010" is *not* the Agreement filed with the SEC; constitutes an "after-the-fact" attempt to defraud Arrowhead and other creditors; but is consistent with Hoffman's practice of self-serving, false filings for which he has been convicted of wire fraud, mail fraud, and conspiracy felony counts in federal court in Louisiana [R.Doc. 84].

"Sometimes two different tribunals are asked to decide the same issue.  When that happens, the decision of the first tribunal usually must be followed by the second, at least if the issue is really the same. Allowing the same issue to be decided more more than once wastes litigant's resources and adjudicators' times, and it encourage parties who lose before one tribunal to shop around for another. The doctrine of collateral estoppel or issue preclusion is designed to prevent this ..."

In the case at hand, the federal district court in Louisiana rendered a decision in 2013, finding SAE to be successor of and so liable for debtor PLC's obligations to satisfy two earlier adjudications of federal courts in California.  *Seven Arts Pictures, Inc. v. Jonesfilm*, 2012 WL 5398439 at \*7 (E.D. La. 2012).[9]  The Fifth Circuit Court of Appeals (after reviewing SAE's appeal) affirmed that adjudication holding SAE is successor of and liable for PLC's obligations to PLC's creditor, *Seven Arts Filmed Entertainment Limited v. Jonesfilm*, 538 Fed. Appx. 444, fn. 3 (5th Cir. 2013).  SAE had full and fair opportunity to, and did, appear and argue in district court and on appeal; final judgment was affirmed on appeal against SAE; and the adjudications (that SAE is successor to and liable for obligations of PLC) are preclusive and binding on SAE.  *Del Prado v. B.N. Development Co., Inc*., 602 F.3d 660, 664 (2d Cir. 2010) (decision of other circuit court is preclusive and collateral estoppel); *Vigilotti v. Vigolotti*, 518 B.R. 191, 197-200 (Bktry D. Conn. 2014) (Louisiana district court decision preclusive against defendants).[10]

2. In the Asset Transfer Agreement by Which SAE during 2012 Acquired All Assets of Its Then Wholly-Subsidiary SAFE, SAE Similarly Assumed Subsidiary SAFE's Liabilities and Obligations to Arrowhead.

---

[9] The California federal court adjudications against PLC included (a) confirmation of arbitration awards for more than $500,000 against PLC, SAFE, and SAP, and (b) contempt sanctions of $14,300 against Hoffman, PLC, SAFE, and SAP for disobeying the Court's judgment and post-judgment discovery orders [Goldin Aff. Ex.s 34 & 35].

[10] *Lummus Co. v. Commonw'lth Oil Ref. Co., Inc*., 297 F.2d 80, 89-90 (2d 1962) (decision of other circuit court is collateral estoppel); *Action Ink, Inc. v. Anheuser-Busch, Inc*., 959 F.S2d 934, 942-943 (E.D. La. 2014) (preclusion/collateral estoppel bar re-litigation of fact or law issue previously decided), *aff.* 576 Fed. Appx. 321 (5th Cir. 2014).

As part of the 2010 transfer of all PLC assets to SAE, PLC's wholly-owned subsidiary, Borrower SAFE, was transferred to and became a wholly-owned subsidiary of SAE [Goldin Aff. Ex.s 12 & 26 (p. 31).

During 2012 (while the May 2010 Action was pending in New York Supreme Court), Hoffman arranged transfer of all assets of Borrower SAFE to its new parent SAE, effected by Agreement dated as of January 3, 2012 signed by Peter Hoffman as SAE's "ceo" and daughter Kate Hoffman as SAFE's "Director" [Goldin Aff. Ex. 30]. SAFE was thus stripped of assets, being left with cash and assets of less than 2,000, but liable for creditor claims exceeding 20 million, pounds U.K (nearly $30 million U.S.) [Ex.s 31-33]. In that Transfer Agreement by which SAE acquired SAFE's assets, SAE agreed [Ex. 30]:

> (a) "to take the [SAFE asset] assignment "subject to all of the obligations, responsibilities and liabilities of [SAFE] pursuant to the terms of the Film Agreements" [§2.2];[11] and

> (b) "In consideration of the transfer ... SAE takes on all of the indebtedness related to the Assets... [§2.5]

SAE so assumed all liabilities and indebtedness of Borrower SAFE to Arrowhead under the Arrowhead Note, Master Agreement and related documents signed by SAFE, (i) because those agreements constitute "Film Agreements" and (ii) also because that "indebtedness related to the Assets" (i.e. film Collateral) SAE received from SAFE.

Indeed, if SAE were not deemed to have so assumed Borrower SAFE's obligations, then parent SAE would have been permitted to transfer to itself all assets of

---

[11] "Film Agreements" [defined at §1.3(c)], include "all agreements entered into with respect to the production or exploitation of any ... Completed Pictures" [§1.1(c)]; "Completed Pictures" (defined in the Recital) consist of films listed on Exhibit B (*Deal*, *Noise*, and other films that are Arrowhead Collateral); and thus the Arrowhead Note, Master Agreement [Ex. 2 §1, 2.4 & 2.7], Financing & Security Agreements [Doc.s 33-1, 2 & 3], & Pledge Agreement [Ex. 3] so "entered into with respect to the production or exploitation of Completed Pictures" [*Deal*, *Noise*, etc.], constitute "Film Agreements".

its wholly-owned subsidiary (Borrower SAFE); liabilities of Borrower SAFE of nearly

$30 million were left behind in subsidiary SAFE; and Arrowhead and other creditors of

SAFE would have been left without any assets in SAFE to pay their claims.[12]

3. Under Both the "Continuity" and "De Facto Merger" Doctrines, SAE and SAFELA Are Jointly and Severally Liable to Arrowhead for the Obligations of Their Predecessor Borrowers/Debtors.

Both defendants SAE and its subsidiary SAFELA also assumed and are jointly

and severally liable for the obligations of their predecessors to Arrowhead under the

related "Continuity" and "De Facto Merger Doctrines".

Under the "continuity" doctrine, *NYK Cool A.B. v. Pacific Intern. Services, Inc.,*

2013 WL 1274561 *13 (SDNY 2013), *aff.* 562 Fed. Appx. 45 (2d Cir. 2014):

> "successor liability attaches when the plaintiff demonstrates 'the existence of a single corporation after the transfer of assets, with an identity of stock stockholders, and directors between the successor and predecessor corporations.' [citations omitted]. '[S]uccessor liability attaches to a corporation as a 'mere continuation' only when 'one corporation survives the transaction; the predecessor corporation must be extinguished' [citation omitted]. 'Courts have made exceptions to this rule ... when it appeared that ... the predecessor corporation continued only as a shell and conducted no business' [lengthy citations omitted].

The "de facto" merger doctrine is described in *Time Warner Cable, Inc. v. The*

*Networks Group, LLC,* 2010 WL 356311 at *10 (SDNY 2010) as follows:

> "Underlying this doctrine is the principle that a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased (*Fitzgerald v. Fahnestock & Co.*, 286 A.D. 2d 573 [1st Dept. 2001]).

> The four hallmark elements of a de facto merger are: (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of liabilities necessary for the uninterrupted continuation of the business of the acquired corporation; and (4)

---

[12] By 2013, insolvency proceedings were filed against Borrower SAFE; a liquidator appointed; and financial statements signed by Kate Hoffman show SAFE had assets of less than $2,000, but liabilities and deficit of nearly $30 million [Goldin Aff. Ex. 31-33].

continuity of management, personnel, physical location, assets and general business operations (*Fitzgerald*, 286 A.D. 2d at 574)."

*Time Warner, Id.* at *6 further confirms that, so long as there is "continuity of ownership", not all of the other elements are necessary to find a de facto merger.  Thus:

> "it is not necessary... that the predecessor entity be dissolved.  [citations omitted] So long as [transferor] is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made." *Fitzgerald v. Fahnestock & Co., Inc.*, [*supra*]."

See also *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.*, *supra* at 42, citing *Hoche Productions, S.A. v. Jayark Films Corp.*, 256 F.S. 291 (SDNY 1966); *Miller v. Forge Mench Partnership Ltd.*, 2005 WL 267551 (SDNY 2005) (judgment creditor granted summary judgment under continuity and de facto merger doctrines against judgment debtor's successor, and entitled, as secured creditor, to exercise CPLR Article 52 remedies to collect the judgment balance).[13]

The continuity and de facto merger doctrines are so similar they may be applied as one. *Time Warner*, *supra* at *6; *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n. 3 (2d Cir. 2003).

A. The Transfer of PLC Assets to, and Assumption of PLC Liabilities by, Surviving Public Company SAE.

(i) Continuity of Ownership.  As described in PLC's proxy material and SEC filings, shares of SAE were distributed on a share-for-share basis to the shareholders of

---

[13] *Allen Morris Commercial Real Estate Services Co. v. Numismatic Collectors Guild*, 1993 WL 183771 (SDNY 1993) (judgment creditor granted summary judgment under de facto merger doctrine against transferee of assets of judgment debtor company, where transferee has same major shareholders, directors and officers; transferee continued same business operations, work force, customer list, and business; transferee assumed liabilities of transferor necessary to continue the business; and debtor has no post-transfer employees and was contemplated to be dissolved and liquidated; *John Deere Shared Services, Inc. v. Success Apparel LLC*, 2015 WL 6656932 (SDNY 2015).

PLC so that there was no change in number of shares owned by each shareholder in the re-domiciled public company SAE [Goldin Aff. Ex.s 13-15, 17 & 19].

(ii) <u>Cessation of Ordinary Business and Dissolution of the Transferor Company.</u> The resolutions in PLC's proxy material and adopted at PLC's shareholders meeting contemplated PLC's liquidation, stating that, upon effectuation of the asset transfer from PLC to SAE, "the Directors will liquidate [PLC] in due course" [Goldin Aff. Ex. 13-14].

In fact, as a result of the PLC asset transfer to SAE (stripping PLC of all assets), PLC was rendered insolvent; involuntary liquidation proceedings were then brought against PLC, pursuant to which a liquidator was appointed; the liquidator reported PLC has no funds nor realizable assets, and so is unable to assert its claims against the Hoffman's; and the liquidation of PLC is effectively completed [Goldin Aff. Ex.s 20-25].

(iii) <u>Assumption by the Successor of Liabilities for Uninterrupted Business.</u>  In the Asset Transfer Agreement, assignee SAE explicitly assumed the Film Agreements and other obligations of assignor PLC for uninterrupted operation of the film business; it did so in order to continue distributing the same films, stored in the same locations, for exploitation by the same distributors, and secured by the same debt. [Goldin Aff. Ex. 12]

(iv) <u>Continuity of Management, Personnel, Location, Assets and Operations</u>.  As described in PLC's proxy materials seeking shareholder approval of re-domicile into successor public company SAE, there was intended to be no change in management, personnel, assets or location (other than redomicile of state of incorporation from U.K. to Nevada).  Indeed, the proxy statement so represented [Goldin Aff. Ex. 13]:

> "The proposed transaction will have no effect on the ongoing business and operations of the Company."

After the re-domicile was effected, the public company's management (the Board of Directors and officers, including Peter and Kate Hoffman) remained unchanged; operating personnel remained (including Linda Silverthorn and Stephanie Dillon); Peter and Kate Hoffman continued to be signatories on the bank accounts; and the film business continued to be operated for the same films, under the same Seven Arts International trade name, with the same Seven Arts letterhead, logo, telephone number, and email address, and from the same offices.[14]

All elements of the continuity and de facto merger doctrines having been satisfied, SAE thus assumed the obligations of its predecessor PLC.

B. The Transfer of Wholly-Owned Subsidiary SAFE's Assets to and Assumption of SAFE's Liabilities by Its Parent, Public Company SAE.

(i) Continuity of Ownership. At the time of SAFE's 2012 asset transfer to SAE, SAFE was a wholly-owned subsidiary of and controlled by SAE [Goldin Aff. Ex.s 29 & 30]; after that asset transfer to SAE, the assets remained under SAE control. The transfer from SAFE did not affect public company SAE's shareholders, whose interest in the assets (whether through SAE or wholly-owned subsidiary SAFE) remained unchanged.

(ii) Cessation of Ordinary Business and Dissolution of the Transferor Company. As a result of SAFE's asset transfer to SAE, SAFE was stripped of all assets but left with obligations of approximately $30 million; proceedings were brought in the U.K. to wind up SAFE; and a liquidator appointed (who made no recovery) [Goldin Aff. Ex.s 29-33].

(iii) Assumption by the Successor of Liabilities for Uninterrupted Business. In the Asset Transfer Agreement, assignee SAE explicitly assumed the Film Agreements

---

[14] *See* fn. 1 above; *see also* Goldin Aff. Ex's 15 (p. 61), 8 (Tr. 71:1-74:3, 112:15-120:11, 124:20-125:7, 192:2-193:1, 232:18-234:4, 293:20-294:15); Ex. 9 (Tr. 17:7-19:6); Ex. 10 (Tr. 8:14-19:2, 71:1-4, 161:6-18); Ex. 26 (p. 21).

and other obligations of PLC so as to continue operation of the film business - to continue distributing the same films, stored in the same locations, for exploitation by the same distributors, and secured by the same debt [Goldin Aff. Ex.s 29-30; see fn. 14 above].

(iv) <u>Continuity of Management, Personnel, Location, Assets and Operations.</u> After transfer of SAFE's assets to SAE, the management and bank account signatories (Peter and Kate Hoffman) remained unchanged; operating personnel remained (including Linda Silverthorn and Stephanie Dillon); and they continued to operate the film distribution business for the same films, under the same Seven Arts International trade name, with the same Seven Arts letterhead, logo, telephone number, and email address, and from the same offices [sees fn.s 1 & 14 above].

All elements of the continuity and de facto merger doctrines having been satisfied, SAE thus assumed the obligations of its wholly-owned subsidiary SAFE.

C. <u>The Transfer of SAE Assets to and Concurrent Assumption of Liabilities by Its Subsidiary SAFELA.</u>

By May 14, 2014, Arrowhead's counsel (attorney Goldin) had begun pursuing post-judgment discovery to enforce Arrowhead's affirmed Judgment against Borrowers [Goldin Aff. Ex. 41].

By May 2014, SAE owned 60% of the membership interests of SAFELA, the other 40% being owned by Palm Finance (which provided financing for Hoffman affiliates, including the company whose fraudulent tax credit applications led to their felony convictions) [R.Doc. 16-21 (p.3); R.Doc. 84; Goldin Aff. Ex. 8 (Tr. 188:17-190:1, 201:2-3); Ex. 10 (Tr. 64:8-10); Ex. 40].

Peter Hoffman drafted and on July 2, 2014 sent to daughter Kate a "Multi-Film Distribution Agreement" between SAE and SAFLA, for transfer to SAFELA for a term

of up to 70 years of all SAE's film distribution rights (being rights SAE had acquired

from its predecessors PLC and SAFE, and including the films in which plaintiff judgment

creditor Arrowhead has Collateral interests) [Goldin Aff. Ex. 42; Ex. 8 (Tr. 193:2-

199:23); Ex.9 (Tr. 77:18-80:13].[15]   Peter Hoffman back-dated the first page of that draft

Agreement "as of October 1, 2013".  His cover email to Kate Hoffman stated [Ex. 42]:

> "Could you read this and let me know if it is OK?  If so please sign for SAE and
> return."

Later that day, Kate Hoffman emailed back to Peter Hoffman [Ex. 42] :

> "Can we talk about this? I think I understand why we're doing it but I'm
> uncomfortable with it for a couple of reasons that I want to talk through. ..."

The next day (July 3, 2014) Kate returned to Peter that attached distribution agreement

and her signature page, which she signed as SAE's "Chief Executive Officer" [Ex. 42];

Peter later signed that Agreement on behalf of SAFELA [R.Doc. 30-6 pp. 2-38].

That Distribution Agreement provides SAE no consideration for transfer of its

film distribution rights to SAFELA -- until after payment of SAFELA's fees and costs

(which include (among others) "any ... actual costs of any nature reasonably paid or

incurred by [SAFELA] in connection with the derivation of revenues from all Pictures in

all markets and media") [Goldin Aff. Ex. 42, p. 27, §IV(C)(7)].

Meanwhile, Peter Hoffman arranged the following scheme:

(a) he had a Convertible Promissory Note issued to himself "on July 18, 2014" in

the amount of $1,900,000 "representing assumption of the indebtedness of SAE to

"him for "debt for services and cash advances" [Goldin Aff. Ex. 43], thereby and

---

[15] By 2014 SAE's losses and deficits required SAE's SEC filings to report "substantial
doubt as to its ability to continue as a going concern" [R.Doc. 16-20 (p.4), 16-21 (p. 7)].

without consideration to SAFELA, causing SAFELA to assume its parent company SAE's purported $1.9 million debt to him;

(b) he had daughter Kate also sign for SAE, and counter-signed himself a Pledge Agreement dated August 2014, for pledge to himself of all SAE's membership interests in SAFELA (SAE's 60% membership interest in SAFELA) and all distributions thereon, as collateral security for that $1.9 million Convertible Promissory Note to himself [Ex. 44]; and

(c) he issued and signed for SAE its SAFELA Membership Unit Certificates dated August 29, 2014 (pledged to himself under the Pledge Agreement to secure his $1.9 million promissory note) and a Transfer Power to transfer those membership interests to himself [Ex.s 45-46; Ex. 9, Tr. 100:7-102:4].[16]

Because those Promissory Notes would be payable by SAFELA to the Hoffman's for more than $2 million ($1.9 million to Peter and $172,890 to Kate) before any distribution to SAFELA's parent SAE, the Hoffman's so had arranged that net proceeds from the films would be payable to themselves.  Likewise, Peter Hoffman purported to protect himself from sale or foreclosure of SAE's interest in SAFELA by having SAE so pledge to himself all SAE's membership interests in and distributions from SAFELA.

(i) Continuity of Ownership.  The transfer of film rights was from SAE to SAFELA, of which SAE owned 60% of the membership interests.  However, in  effect that transfer was merely from Hoffman-controlled entity SAE to another Hoffman-

---

[16] [Goldin Aff. Ex. 9, Tr. 86:14-88:6 & 100:70-102:4].  Peter Hoffman also arranged for SAFELA to issue on August 22, 2014 a similar Convertible Promissory Note payable to Kate Hoffman for $172,890 "representing assumption of indebtedness of SAE for services and cash advances" [Ex. 47; Ex. 8, Tr. 208:1-215:10].  SAFELA received no consideration for assumption of that indebtedness; but those Promissory Notes permit payee Hoffman's to divert for themselves net film proceeds collected through SAFELA.

controlled entity SAFELA, so net proceeds from the film rights would continue to be generated for and paid to the Hoffman's themselves.

(ii) <u>Cessation of Ordinary Business and Dissolution of the Transferor Company.</u> Peter Hoffman testified at the December 2015 contempt proceedings in this Court that SAE is "a dead company" and "doing nothing, has nothing" [Ex. 10 (Tr. 58:23-60:7)].

(iii) <u>Assumption by the Successor of Liabilities for Uninterrupted Business.</u>  In that Distribution Agreement by which SAFELA acquired SAE's film distribution business, SAFELA pays and has the right to deduct distribution and other fees and costs incurred for exploitation of film rights (so including fees and costs necessary for uninterrupted conduct of SAFELA's distribution business).  [Goldin Aff. Ex. 42 p. 27].

Meanwhile, Peter and Kate Hoffman arranged for SAFELA to issue to themselves Convertible Promissory Notes due September 30, 2015; thereby caused SAFELA to assume more than $2 million of SAE's purported indebtedness to themselves (although for no consideration to SAFELA); arranged for themselves to be paid all net film distribution proceeds generated from the films; and caused SAE to pledge, and deliver membership unit certificates, to Peter Hoffman for SAE's 60% (and thus controlling) membership interests in SAFELA [Goldin Aff. Ex.s 43-47].

(iv) <u>Continuity of Management, Personnel, Location, Assets and Operations.</u> After entry into to that Distribution Agreement and ensuing transfer of SAE's film business to SAFELA, Peter and Kate Hoffman continue to be the sole personnel, management and bank account signatories for that business; and continue to operate that business for the same films, under the same Seven Arts International trade name, with the same Seven Arts letterhead, logo, telephone number, and email address [fn.s 1 & 14

above; Goldin Aff. Ex. 8, Tr. 199:24-201:2, 231:17-21, 303:12-21].   Kate Hoffman was

unable to state any address where SAFELA could be contacted, other than her or Peter's

email address [Ex. 8, Tr. 300:9-302:10].   Peter Hoffman testified SAFELA observes

"zero" corporate formalities and has no financial statements [Ex. 10, Tr. 106:11-108:13].

The continuity and de facto merger doctrines being satisfied, SAFELA assumed

the obligations of its parent/transferor SAE and of SAE's predecessors PLC and SAFE.

On  January 29, 2016, defendants belatedly produced documents revealing Seven

Arts companies (including SAFE, SAE and SAFELA) continued through December 2015

to receive, with respect to Arrowhead film Collateral, millions of dollars required to be

(but which were not) deposited in the §5.1 lockbox trust account [Goldin Aff Ex.s 59-60].

### III. CONCLUSION.

Defendants SAE and SAFELA each assumed the obligations of predecessor

debtor Borrowers to Arrowhead; each should be added as additional judgment debtors to,

and jointly and severally liable for, the October 2012 Judgment in favor of Arrowhead

($2,496,159.50 plus accrued interest and other relief), and Arrowhead permitted to trace,

foreclose upon, and enforce against SAE and SAFELA, Arrowhead's rights and remedies

with respect to Collateral, including (without limitation) "foreclosure of the Collateral

securing the amounts due under the Arrowhead Note" (June 2012 Decision p. 17), and

rights and remedies under the Arrowhead Note and related documents.

Dated:  February 1, 2016,
Allentown, Pennsylvania

BARRY L. GOLDIN  [BG-4637]
*Attorney for Plaintiff Arrowhead Capital Finance Ltd.*
3744 Barrington Drive, Allentown, PA 18104-1759
Tel: (610) 336-6680 Fax: (610) 336-6678  &
240 Madison Avenue, 3rd Fl., New York, New York 10016
Email: barrygoldin@earthlink.net