UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
ARROWHEAD CAPITAL FINANCE, LTD.,
                 Plaintiff,                     :
                                               :

         - against -                    :
                                               :   Case No. 1:14-CV-06512-KPF
SEVEN ARTS ENTERTAINMENT, INC., and    :   **Hon. Katherine Polk Failla**
SEVEN ARTS FILMED ENTERTAINMENT      :
LOUISIANA LLC,                          :
              Defendants          :
                                               :
                                               :

-----------------------------------------------------------------------x

**MARCH 3, 2016 SUPPLEMENTAL AFFIDAVIT OF BARRY L. GOLDIN, ESQ.
AND EXHIBITS THERETO**

BARRY L. GOLDIN, ESQ. (BG-4637)
*Attorney for Plaintiff Arrowhead Capital Finance Ltd.*
3744 Barrington Drive
Allentown, PA  18104-1759
Tel:  610-336-6680
Fax: 610-336-6678
Email: barrygoldin@earthlink.net
        And
240 Madison Avenue, 3rd Floor, NY, NY 10016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
ARROWHEAD CAPITAL FINANCE, LTD.,

                    Plaintiff,          :
                                   :

          - against -        :   Case No. 1:14-CV-06512-KPF
                                   :   **Hon. Katherine Polk Failla**
SEVEN ARTS ENTERTAINMENT, INC., and  :
SEVEN ARTS FILMED ENTERTAINMENT      :   **MARCH 3, 2016**
LOUISIANA LLC,                       :   **SUPPLEMENTAL AFFIDAVIT**
                Defendants    :   **OF BARRY L. GOLDIN, ESQ.**
                                   :

                                   :


-----------------------------------------------------------------------x
STATE OF PENNSYLVANIA )
                     ) ss.:
COUNTY OF LEHIGH     )

      BARRY L. GOLDIN, being duly sworn, deposes and says:

      1. I make this Affidavit as attorney for plaintiff Arrowhead Capital Finance Ltd.

("Arrowhead") in support of Arrowhead's Opposition to the Motion of defendants Seven

Arts Entertainment, Inc. ("SAE") and Seven Arts Filmed Entertainment Louisiana LLC

("SAFELA") for Summary Judgment and/or Summary Adjudication.

      2. I am a member of the Bar of States of New York and Pennsylvania, the U.S.

District Courts for Southern District of New York and Eastern District of Pennsylvania,

the U.S. Courts of Appeals for the Second, Fifth, and Ninth Circuits, and U.S. Supreme

Court.  I graduated University of Chicago Law School in 1976 and practiced law ever

since (for approximately 40 years).  For the past nearly 30 years, nearly all my work has

involved companies involved in and matters relating to the motion picture industry.

      3. I make this Affidavit of my own personal knowledge, based on knowledge

previously obtained while serving as counsel for Jonesfilm; my subsequent engagement

and service as counsel for judgment creditor Arrowhead in investigating and pursuing claims and obtaining adjudications for Arrowhead against Peter Hoffman affiliates in *Arrowhead Capital Finance, Ltd. v. Seven Arts Pictures Plc et al*, Index No. 601199/2010 Sup. Ct. NY Co.) (the "Predecessor Action"); and my service, as plaintiff Arrowhead's counsel in the instant and related actions, investigating and pursuing claims and obtaining adjudications against Peter Hoffman affiliates, including defendant public company SAE, and SAE's subsidiary, Seven Arts Filmed Entertainment Louisiana LLC ("SAFELA").

4. This action arises out of plaintiff Arrowhead's efforts to enforce an October 2012 Judgment [R.Doc. 16-2] obtained from the New York Supreme Court in the Predecessor Action, which Arrowhead filed on May 10, 2010 against Peter Hoffman affiliates ("Borrowers") -- Seven Arts Pictures Plc ("PLC"), Seven Arts Pictures, Inc. ("SAP"), Seven Arts Filmed Entertainment Limited ("SAFE"), and related special purpose companies Rectifier Productions, LLC ("Rectifier"), Deal Investments, LLC, Deal Productions, LLC and Pool Hall Productions LLC [Woods Aff. Ex. 4, R.Doc. 97-4].

5. In support of plaintiff Arrowhead's Motion for Summary Judgment [R.Doc. 96 *et seq.*], Arrowhead on February 1, 2016 filed the January 29, 2016 Affidavit of its liquidator W. William Woods ["Woods Aff.", R.Doc. 96-3] and February 1, 2016 Affidavit of undersigned Barry Goldin ["Goldin Aff.", R.Doc. 96-4] and exhibits 1 through 64 thereto (which are also referred to by those Exhibit numbers in this Affidavit). To lessen risk of confusion, exhibits attached to this Supplemental Affidavit begin with Exhibit 65.

Seven Arts Entertainment, Inc. Was Not Incorporated until after Filing of the Predecessor Action; Its Business License Has Now Expired; and It Has Been Dissolved.

6. Exhibit 65 hereto is a printout I obtained from the website of the Secretary of State of Nevada confirming that defendant SAE was not incorporated until June 11, 2010 and thus not incorporated for more than a month after plaintiff Arrowhead's May 10, 2010 filing of Arrowhead's Complaint in the Predecessor Action [Woods Aff. Ex. 4, R.Doc. 97-4]. Accordingly, at the time Arrowhead filed the Predecessor Action, Arrowhead could not have named SAE as a defendant, as SAE had not been incorporated nor acquired assets of Borrower PLC, Borrower SAFE, or any other Borrower.

7. Exhibit 66 hereto also confirms that defendant SAE's Nevada business license expired on June 30, 2014 and that SAE has been dissolved. However, SAE has continued to make filings with the U.S. Securities and Exchange Commission (the "SEC"), and Peter and Kate Hoffman have continued to conduct business after June 30, 2014 under the name Seven Arts [Goldin Aff. Ex.s 42-49 & 61-63].

Background Information as to Seven Arts Filmed Entertainment Louisiana LLC, Which Is Not in Good Standing in Louisiana and Has No Physical Office in Louisiana; Peter Hoffman Has Admitted in Writing Being Its Chief Executive Officer; and Its Only Physical Office Is Shared with Defendant SAE in Peter Hoffman's House.

8. Exhibit 67 hereto is a printout I obtained from the website of the Secretary of State of Louisiana confirming SAFELA last filed a report with the Louisiana Secretary of State on September 4, 2013, and that SAFELA has ceased to be in good standing for failure to file subsequent Annual Reports with the Louisiana Secretary of State.

9. In Kate Hoffman's Affidavit [R.Doc. 102 ¶1],[1] she falsely states that her father, Peter Hoffman "was never an officer or director of SAFELA". However, that statement

---

[1] Kate Hoffman's February 1, 2016 Affidavit is improper, and should be disregarded and stricken, insofar as not based on her personal knowledge. Rather, she is engaged in a self-serving cover-up as to of millions of dollars of Collateral proceeds required by Master Agreement §5.1 to be deposited in a New York lockbox account, and held in trust for and

3

is belied by the "Guaranty and Personal Undertaking by Peter Hoffman" dated August 5,

2014 signed by Peter Hoffman in which he represents that:

> "1. I [Peter Hoffman] am currently the CEO of Seven Arts Filmed Entertainment Louisiana LLC ('SAFELA') and Seven Arts Entertainment Inc. ('SAE')."

[Goldin Aff. Ex. 49].  During Kate Hoffman's November 9, 2015 testimony, she

authenticated Peter Hoffman's signature on that "Guaranty and Personal Undertaking by

Peter Hoffman" [Ex. 8, Tr. 201:23-202:15], and then testified as follows [202:16-:203:14]

> "Q. ... turning to the first page, the item 1 says:
> "I [Peter Hoffman] am currently the CEO of Seven Arts Filmed Entertainment Louisiana LLC ('SAFELA') and Seven Arts Entertainment, Inc. ('SAE').
>
> A [Kate Hoffman]. Yes.
>
> Q. And was that your understanding in August 5, 2014, the date of this document, that Peter Hoffman was the CEO of Seven Arts Filmed Entertainment Louisiana, LLC and Seven Arts Entertainment, Inc.?
>
> A. I have no idea.
>
> Q. Do you have any reason to doubt that?
>
> A. I -- I honestly just don't know; I don't know why Peter would put it in there if it wasn't true, but I don't know.
>
> Q. So since it's in there and Peter Hoffman signed this document, you would assume it is true; is that correct?
> ...
> A.  I mean, I -- yes, I could assume it's true."

---

remitted to Arrowhead, but not deposited in that account nor paid to Arrowhead. Meanwhile, she, her father Peter Hoffman, and their Seven Arts affiliates fail to provide court-ordered discovery of bank statements, participation statements, accountings, and other documents, as to the collections; they now purport to be unable to account for or trace those millions of dollars of collections; and now she also has been charged by U.K. tax authorities with tax fraud involving millions of British pounds in another motion pictures scheme [Goldin Aff. Ex. 64].

10. Peter Hoffman's August 5, 2014 written admission of his continuing title as "CEO" of SAFELA and of SAE [Goldin Aff. Ex. 49] was signed by him months *after* he had been indicted by the federal grand jury in New Orleans [see Exhibit 76 hereto, the docket sheet confirming that action was filed against Peter Hoffman on February 6, 2014 and the ensuing May 14, 2014 Second Superseding Indictment of Peter Hoffman], and thus belies his December 15, 2015 testimony to this Court that "when I got indicted, I resigned". He so falsely testified to the Court [Ex. 10, Tr. 62:8-10)]:

Q [The Court]. ... What is your role in SAE, the Nevada company?

A [Peter Hoffman]. Well, I was the CEO. When I got indicted, I resigned, and then I was just acting as counsel...."

11. Likewise, many months after his indictment, Peter Hoffman also signed for both SAE and SAFELA the July 18, 2014 Convertible Promissory Note payable to himself in the amount of $1,900,000 [Goldin Aff. Ex. 43]; Peter Hoffman signed for SAE the Membership Certificates dated August 29, 2014 for SAE membership interests in SAFELA [Ex 46]; Peter Hoffman signed for both SAE and SAFELA the Convertible Promissory Note dated August 22, 2014 payable to Kate Hoffman in the amount of $172,890 [Ex. 47]; and Kate Hoffman signed for SAE the August 2014 Pledge Agreement in favor of Peter Hoffman securing that Promissory Note with SAE's 60% membership interests in SAFELA [Ex. 44];

12. Kate Hoffman's Affidavit misrepresents that SAFELA has a principal place of business in New Orleans, Louisiana [R.Doc. 102 ¶1]. Her statement is belied by her emails, which she sent as "Chief Executive Officer - Seven Arts Entertainment" listing only a Los Angeles (not New Orleans) address [see Goldin Aff. Ex. 52 (her Dec. 3, 2014

email) and Ex. 54 (her April 28, 2015 email)]. Her statement is further belied by her own

November 9, 2015 testimony [Goldin Aff. Ex. 8, Tr. 302:22-24]:

> "Q. SAFELA doesn't have a -- a physical office in New Orleans, does it?
>
> A [Kate Hoffman]. Not any longer, ..."

She then reiterated that SAFELA has no physical office in New Orleans, and further

testified that SAFELA's sole physical office is merely space shared with Seven Arts

Entertainment in the Los Angeles house of her father, Peter Hoffman [at 303:12-21]:

> "A. There's no physical office in New Orleans for SAFELA, no.
>
> Q. Okay. And to the extent that there's a physical office anywhere, it's the same office that's used by Seven Arts Entertainment, is that correct?
>
> A. Which is Peter's house. So assuming that there's a physical office, anywhere, it's in Peter's house.
>
> Q. And that Peter's house is 1643 Queens Road in Los Angeles; is that correct?
>
> A. Correct."[2]

Arrowhead's August 22, 2011 Summary Judgment Motion in the Predecessor Action Was Granted in 2012 and That Decision Was Affirmed by October 17, 2013.

13.  Exhibit 75 hereto is Arrowhead's August 22, 2011 Notice in the Predecessor

Action of Arrowhead's Cross-Motion for Summary Judgment, seeking summary

judgment on the causes of action in Arrowhead's May 10, 2010 Complaint against the

respective Borrowers. That Arrowhead Summary Judgment Motion was granted by June

2012 Decision of Justice Kornreich of the New York Supreme Court [R.Doc. 16-1];

Justice Kornreich then entered October 2012 Judgment in Arrowhead's favor against

Borrowers SAFE, SAP, Rectifier and other Borrowers, jointly and severally, for

---

[2] Kate Hoffman agreed during her testimony that all references to Peter were to her father Peter Hoffman [Goldin Aff. Ex. 8, Tr. 18:15-21].

$2,496,159.50 [R.Doc. 16-2]; and Justice Kornreich's June 2012 Decision was affirmed

by the First Appellate Department's October 17, 2013 Decision [Woods Aff. Ex. 7].

The Arrowhead Note and Master Agreement.

14. Kate Hoffman's February 1, 2016 Affidavit [R.Doc. 102 ¶4] admits the 2012

Judgment in Arrowhead's favor was based on the Arrowhead Note (the Promissory Note

of the Borrowers dated as of December 2006) and related Master Agreement attached as

Exhibits 3 and 4 to Arrowhead's Complaint [R.Doc.s 16-3 & 16-4]); her Affidavit defines

the term "Transaction Documents" to mean the Arrowhead Note, Master Agreement, and

Pool Hall Loan Documents, Deal Loan Documents and Noise Loan Documents [R.Doc.s

33-1 through 33-4].  However, her Affidavit [R.Doc. 102 ¶6] falsely denies that those

documents were negotiated in New York and further falsely denies that New York was a

focal point or center of activities in connection with those documents.

15. Contrary to Kate Hoffman's Affidavit, Borrower Rectifier Productions LLC

("Rectifier") was and is a New York company controlled by Peter Hoffman.  Attached as

Exhibit 67 hereto is Rectifier's Articles of Incorporation as certified on March 7, 2006 by

the New York Secretary of State (listing Peter Hoffman as Rectifier's agent for service);

Exhibit 68 hereto is Rectifier's "Limited Liability Company Operating Agreement", dated

as of March 29, 2006 signed by Peter Hoffman for both Rectifier and its Managing

Member SAP; and Exhibit 69 hereto is a printout of the New York State Department of

State, Division of Corporations, stating Rectifier continues to be an active company in

New York and that Rectifier's address for service remains the address of Peter Hoffman.

16. Contrary to Kate Hoffman's Affidavit, the June 2006 financing for Rectifier

production in New York of the film *Noise* was arranged at the 500 Fifth Avenue, New

York, New York law offices of Max Drake, Esq. of Wollmuth Maher & Deutsch counsel

for Arrowhead's predecessor.  That financing was evidenced by (among other things):

(i) the *Noise* Financing and Security Agreement, signed by both Rectifier and

SAP, which they explicitly agreed is "governed by the laws of the State of New

York without reference or deference to principles of New York conflicts law"

[R.Doc. 30-4 §§9.5] and in which they further submit to jurisdiction and venue of

the state and federal courts in New York, including the following [§9.9]:

"Producer [SAP and Rectifier collectively] hereby irrevocably submits itself to ...
the jurisdiction of the state courts of the State of New York and to the jurisdiction
of the United States District Court for the Southern District of New York, for the
purpose of any suit, action or other proceeding arising out of or based upon this
Financing Agreement or any of the Collateral Security Documents or the subject
matter hereof or thereof brought by Financier or its successors or assigns ..."

(ii) the Secured Promissory Note signed by both Rectifier and SAP which they

again explicitly agree is governed by New York law and in which they again

to jurisdiction and venue in New York, New York, and waive any objection of

forum non-conveniens [R.Doc. 30-4 at pp. 31-32]; and

(iii) the Copyright Mortgage and Assignment for *Noise*, which was also signed by

both Rectifier and SAP and then filed and recorded in the U.S. Copyright Office

by the New York office of Arrowhead counsel, the Wollmuth Maher & Deutsch

law firm [R.Doc. 70].

That *Noise* "Financing and Security Agreement" and "Copyright Mortgage and

Assignment" were assigned to Arrowhead in the December 2006 refinancing as described

in §1.3 (and secure Collateral under §2.7) of the Master Agreement [Woods Aff. Ex. 2].

17.  The December 2006 Arrowhead Note and Master Agreement [Woods Aff.

Ex.s 1 & 2] were negotiated in New York for Arrowhead's predecessor (Arrowhead

Consulting Group, Inc.) by Max Drake, Esq. of the New York offices of the Wollmuth

Maher & Deutsch law firm, and for senior creditor Cheyne by Cheyne's then U.S.

counsel, the Brown & Rudnick law firm, through its partner Boris Ziser, Esq., whose

offices were located at Seven Times Square in New York, New York.  [Exhibit 72 hereto

is a December 28, 2006 email to Peter Hoffman from Cheyne attorney Ziser, showing

that New York address of attorney Ziser at the Brown Rudnick law firm; that New York

address is repeated in Master Agreement §9.1 as Cheyne's U.S. address for notices.]

18. The Arrowhead Note was signed by Peter Hoffman for New York company

Rectifier and for PLC, SAFE, SAP and each of the other Borrowers, and then forwarded

on December 21, 2006 to the New York address of Arrowhead attorney Max Drake for

closing of the refinancing contemplated by the Master Agreement.  [Exhibit 71 hereto is a

copy of Peter Hoffman's December 21, 2006 letter and accompanying Arrowhead Note

signed by Peter Hoffman for Rectifier, PLC, SAFE, SAP and the other Borrowers,

addressed and delivered to the 500 Fifth Avenue, New York offices of Arrowhead's then

attorney Max Drake].

19. The Arrowhead Note explicitly states in the last paragraph on page two

thereof in capital letters and bold print that the Note and all related matters are construed

by the internal laws of the State of New York.  The Arrowhead Note so states:

> **"THIS NOTE, AND ALL MATTERS RELATED HERETO AND/OR ARISING HEREFROM, SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES**, and shall be binding upon the Undersigned and the Undersigned's legal representatives or successors."

20. The Arrowhead Note's third page also includes irrevocable agreement to jurisdiction in the state and federal courts for New York, New York, and waives any objection of forum non-conveniens. The Arrowhead Note so states:

> "To induce the Lender [Arrowhead][3] to make the loan evidenced by this Note, the Undersigned (i) irrevocably agrees that, subject to Lender's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS NOTE OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS **WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK**, THE UNDERSIGNED HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE AND (ii) WAIVES ANY OBJECTION BASED ON FORUM NON-CONVENIENS." [emphasis added]

21. Similarly, the Master Agreement is explicitly governed by the laws of New York and includes irrevocable submission to jurisdiction of the state and federal courts located in Manhattan, New York.  The Master Agreement so states:

> §9.5.5 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.  All of the parties hereto hereby irrevocably submit to the jurisdiction of the state and federal courts located in the Borough of Manhattan, the City of New York, in the State of New York, for the resolution of any and all disputes arising hereunder."

22. Master Agreement §5.1 further requires that all collections with respect to film and other Collateral be paid into a designated "account with The Chase Manhattan Bank" in New York (therein defined as the "Collection Account"), and that:

> "If the Borrowers or any Affiliated Person or any shareholder, officer, director, employee or agent of the Borrowers or any Affiliated Person, or any other Person acting for or in concert with the Borrowers shall receive any monies, checks, notes, drafts or other payments relating to or as proceeds from the exploitation of any of the Pictures or other Collateral, the Borrowers and each such Person shall receive all such items in trust

---

[3] The Arrowhead Note's first paragraph defines "Lender" as Arrowhead Consulting Group, LLC "together with any holder hereof" [plaintiff Arrowhead being such a holder by the New York Court's December 23, 2008 Consent Judgment  [R.Doc. 16-6].

for, and as the sole and exclusive property of, the Bank [Arrowhead][4] and immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Collection Account."

Indeed, Kate Hoffman's Affidavit [R.Doc. 102 ¶11 (1st sentence)] admits the transaction documents "assumed SAFE would deposit monies in a collection account".

23. In the Master Agreement, the parties agreed that additional funds provided thereunder would be used by Rectifier and the other Borrowers to complete production of the film *Noise*, then being produced in New York.  Master Agreement §2.4 so states:

"The Borrowhers shall use the proceeds of the [refinancing] solely as follows: ... (ii) to fund the remaining costs of production of *Noise* ..."

24. As set forth in Master Agreement (§§1.3 & 2.7), the obligations to Arrowhead under the Arrowhead Note were secured through the *Noise* Financing and Security Agreement [R.Doc. 30-4] and the *Noise* Copyright Mortgage and Assignment [Ex. 70 hereto], the underlying security being (among other things) the film *Noise* being produced in New York and all New York tax refunds from its production.  Moreover, pursuant to Master Agreement §5.1, the tax refunds payable by New York with respect to production of *Noise* were Collateral proceeds required to be deposited in the §5.1 New York Collection Account and held in trust for and remitted to Arrowhead.

25. Borrower Rectifier did so apply to the State of New York for motion picture production tax refunds for production of *Noise* in New York [Exhibit 73 hereto, Rectifier tax return signed by Peter Hoffman seeking New York tax refunds]; the State of New York did deliver a June 2, 2008 tax refund check payable to Rectifier in the amount of $160,815.50 [Exhibit 74 hereto] which, as Peter Hoffman testified, was the first of two comparable installments deposited in Rectifier's New York bank account [Ex. 10, Tr. at

---

[4] In Master Agreement §2.2, the term "Bank" is defined to mean Arrowhead.

195:1-198:11]; but none of those funds was paid into the designated New York lockbox

Collection Account for Arrowhead's benefit as required by Master Agreement §5.1 [Ex.

10, Tr. at 95:1-5].

SAE's Receipt of All PLC Assets in the Re-Domicile Transaction in which SAE
Assumed All PLC Liabilities.

26. Kate Hoffman's Affidavit [R.Doc. 102 ¶13] further misrepresents that "PLC ...

retained substantial assets, including a claim for copyright infringement against Content

Film and receivables with a full value, potentially totaling together in excess of

$10,000,000".   To the contrary, in the re-domicile transactions re-domiciling U.K. public

company PLC into Nevada company SAE, PLC retained no such assets.  Rather:

(i) Kate Hoffman's reference to a claim against Content Film is disingenuous as

the federal district court on October 3, 2011 dismissed that claim "with prejudice"

because barred by a three-year statute of limitations; that decision was affirmed in

*Seven Arts Filmed Entertainment Limited v. Content Media Corp. PLC*, 733 F.3d

1251 (9th Cir. 2013) (which confirmed that statute of limitations expired three

years after 2005 notice of repudiation, and so had expired by 2008); and thus

those purported SAFE claims were already valueless prior to any November 2009

transfer of PLC's assets to SAE or any 2012 transfer of SAFE's assets to SAE;

(ii) PLC's November 9, 2010 press release announced completion of the transfer

of "all" (not merely some) of its assets to SAE [Goldin Aff. Ex. 16]:

> "PLC announced today that it has **completed the transfer of all of its
> assets** to [SAE] in exchange for common stock of SAE on a basis of one
> share of SAE for each ordinary share of [PLC].
> The primary purpose of this transaction was to move the domicile of
> Seven Arts from the United Kingdom to the United States. ..." [emphasis
> added]

(iii) Peter Hoffman prepared, signed and delivered to the SEC his November 19, 2010 letter on Seven Arts letterhead confirming approval of re-domicile by PLC's shareholders and representing that "**Seven Arts is the successor to all assets and liabilities of PLC**" [emphasis added] [Goldin Aff. Ex. 17];

(iv) The February 25, 2011 letter to the SEC from Seven Arts' counsel (Randall Katz of the Baker & Hostetler law firm), represented to the SEC [Ex. 18 p. 1, authenticated by Peter Hoffman, Ex. 10, Tr. 153:4-155:9]:

"By way of background, **PLC transferred all of its assets to NEV (its wholly-owned subsidiary), which also assumed all of PLC's liabilities** (the 'Transaction').  The result of the Transaction was to place all of PLC's operations in NEV (a Nevada-domiciled company), a first-tier subsidiary of PLC, rather than to maintain them directly in PLC (an England and Wales domiciled company)." [emphasis added]

(v) The May 9, 2011 letter to the SEC from Seven Arts' counsel (Randall Katz) reiterated to the SEC that [Ex. 19 pp. 2-3 authenticated by Peter Hoffman, Ex. 10, Tr. at 155:24-157:2]:

"2. ... <u>Response</u>. In PLC's first response in its February 25, 2011, comment response letter, PLC provided Staff with some background information that should help to put this response in context. '...**PLC transferred all of its assets to NEV (its wholly-owned subsidiary), which also assumed all of PLC's liabilities** (the 'Transaction').  The result of the Transaction was to place all of PLC's operations in NEV (a Nevada-domiciled company), a first-tier subsidiary of PLC, rather than to maintain them directly in PLC (an England and Wales domiciled company)." [emphasis added].

(vi) The SAE/PLC Form 20-F/A, filed with the SEC in June 2012, again admitted "all the assets and liabilities of" PLC have been transferred to SAE [Goldin Aff. Ex. 26 p. 21]:

"On June 11, 2010, our shareholders approved the transfer of all of our assets ... to ... SAE...  We do not believe that this redomiciling will have any material effect on the Group's business or operations, ... **all the assets and liabilities of [PLC] (including ownership of certain subsidiaries) have been transferred to SAE**"

13

[emphasis added];

(vii) PLC's liquidator affirmed in filings with the U.S. Bankruptcy Court and to PLC creditors that PLC has no realizable assets and so has closed the PLC estate with no distribution to creditors [Goldin Aff. Ex.s 22-25].

Parent Company SAE's 2012 Receipt of All Arrowhead Film Collateral and Other Assets Held by Its Then Wholly-Owned Subsidiary SAFE, in Consideration for Which SAE Assumed All Obligations of SAFE to Arrowhead under the Arrowhead Note, Master Agreement, and Related Obligations.

27.  Kate Hoffman's Affidavit [R.Doc. 102 ¶9] admits that the Asset Transfer Agreement by which SAFE (then a wholly-owned subsidiary of SAE), transferred SAFE assets to SAE, was dated January 2012; but her Affidavit then misrepresents [R.Doc. 102 ¶13] that "SAFE ... retained substantial assets, including a claim for copyright infringement against ContentFilm and receivables with a full value, potentially totaling together in excess of $10,000,000".  However, SAFE retained no such assets:

(i) as described in the preceding paragraph, the purported claim against Content Media was barred by the statute of limitation as the federal district court had already found in its October 3, 2011 decision, affirmed by the Ninth Circuit Court of Appeals *Seven Arts Filmed Entertainment Limited v. Content Media Corp. PLC*, 733 F.3d 1251 (9th Cir. 2013);

(ii) in connection with the subsequent SAFE liquidation, Kate Hoffman signed and presented documents then admitting SAFE has no assets, but approximately $30 million of liabilities [Goldin Aff. Ex.s 31-33]; and

(iii)  SAE's Annual Report on Form 10-K for the fiscal year ended June 30, 2013 states [Goldin Aff. Ex. 29 p. 3 & repeated at p. F8]:

"On January 1, 2012 Seven Arts Filmed Entertainment Limited ('SAFE') **sold all of its film assets** to SAE for assumption of indebtedness." [emphasis added]

28. Kate Hoffman's Affidavit [R.Doc. 102 ¶9] also falsely denies SAE assumption of liabilities under that January 2012 Asset Transfer Agreement. However, in that 2012 Agreement [Goldin Aff. Ex. 30 §§1.1, 2.2 & 2.5], the term "Film Agreements" is defined to include all agreements with respect to production or exploitation of the Films (and so includes the Arrowhead Note, Master Agreement, and related obligations signed or assumed by SAFE for production and exploitation of the then Completed Films constituting Arrowhead's Film Collateral); the only consideration for transfer to SAE of SAFE's films  (including Arrowhead Film Collateral) and Film Agreements (such as the Arrowhead Note and Master Agreement and related obligations) was SAE's assumption of liabilities with respect thereto (and thus assumption of SAFE's liabilities under the Arrowhead Note and Master Agreement and related obligations); and SAE so assumed all SAFE liabilities to Arrowhead under the Arrowhead Note, Master Agreement, and related obligations.

29. SAE's Annual Report on Form 10-K for the fiscal year ended June 30, 2013 further admits [Goldin Aff. Ex. 29 p. 3 & repeated at p. F8]:

"On January 1, 2012 Seven Arts Filmed Entertainment Limited ('SAFE') sold all of its film assets to SAE for assumption of indebtedness.  SAFE ceased operations on May 31, 2013 on closing of its office in London, England. ... The asset transfer agreement had no impact on the Company's consolidated financial statements."

SAE's admission in its SEC filing that the Asset Transfer Agreement "had no impact on the Company's [SAE's] consolidated financial statements" further confirms that SAE assumed all obligations of Borrower/judgment debtor SAFE (and thus all SAFE obligations under the Arrowhead Note, Master Agreement and related obligations).  For,

15

if the obligations of Borrower/judgment debtor SAFE had not been assumed by SAE,

then transfer of assets to SAE without assumption by SAE of SAFE's several million

dollars of liabilities to Arrowhead would have resulted in a significant betterment in

SAE's consolidated financial statements -- particularly as the Kate Hoffman signed

documents confirm that after January 2012 transfer of SAFE's assets to SAE, SAFE had

no assets to pay its admitted approximately $30 million of indebtedness to Arrowhead

and other creditors [Goldin Aff. Ex.s 31-33].

<u>Kate Hoffman's Misrepresentations as to Termination of Elaine New's Employment.</u>

    30. Kate Hoffman's Affidavit [R.Doc. 102 ¶12] disingenuously states that Elaine

New's employment was terminated "shortly after the SAFE Asset Transfer Agreement

was completed", and thus shortly after the January 2012 transfer of SAFE assets to SAE

[Goldin Aff. Ex.s 29 (p. 3) & 30].   To the contrary, SAE's Form 10-K for the year ended

June 30, 2013, filed with the SEC in October 2013, states [Goldin Aff. Ex. 29 p. 53]:

> "Elaine New has been an executive director since January 2007 and was our Chief
> Financial Officer from January 2007 until July 31, 2009 and from August 1, 2010
> until July 15, 2013 and remains an executive director."

Moreover, SAE's filings with the Secretary of State of Nevada continued to list, and thus

the Nevada Secretary of State's website continues to list, Elaine New as a director of SAE

[see Exhibit 65 hereto].

<u>Kate Hoffman's Affidavit Ignores SAE's Participation in Proceedings of, and
Misrepresents the Adjudications Rendered against SAE by, the Federal District Court in
Louisiana and the Fifth Circuit Court of Appeals.</u>

    31. Kate Hoffman's Affidavit also falsely states [R.Doc. 102 ¶16) that SAE was

not a defendant in the proceedings in the U.S. District Court for the Eastern District of

Louisiana  and further misrepresents that SAE took no part in those proceedings.  Those

misrepresentations are not based on her "personal knowledge" as she was not a party or

participant in those proceedings.  In any event, her misrepresentations are belied by the

District Court's November 1, 2012 adjudication, 2012 WL 5398439, which explicitly

held SAE to be "successor" of, and so liable for the judgment and contempt sanctions

against, its predecessor PLC as follows [Goldin Aff. Ex. 37 at *6] :

> "There is strong merit ... to ... assertions ... that SAE legally must be considered a
> judgment debtor as the successor of Judgment Debtor PLC because of the original
> California judgment and **SAE's own SEC filings asserting its status as**
> **successor to PLC**.  **Accordingly, the Court hereby amends its Order to**
> **specifically rule that SAE is a judgment debtor** ..." [emphasis added]

That decision describes sharing of management, "personnel, operations, monies, logo,

letterhead, and other materials without demarcation" among Seven Arts companies [*13]:

> "SAE represents in its SEC filings that it is a party to a 'related company
> agreement' with SAP. ... Pursuant to this agreement, SAP provides services for
> SAE at no fee other than Peter Hoffman's salary and the direct third party costs of
> the Los Angeles office. ... The services provided by SAP are at the requests of the
> management of SAE and include '[a]ccounting services, audits of distribution
> statements, collection of accounts receivable, supervision of production of motion
> pictures and similar day-to-day aspects of [SAE's business]. ...
>
> In addition to these services, SAE also shares with SAP all personnel, operations,
> monies, logo, letterhead and other materials without any line of demarcation. ...
> Through common officers, shared offices, logo, letterhead, email addresses and
> bank accounts SAE and the other Seven Arts companies are part of the larger
> Seven Arts group ... .  Hoffman has also testified that the cash flow between the
> Seven Arts companies is various and something that is unable to be characterized.
> ... the same counsel represents PLC, SAP and SAE in these proceedings."

32.  That November 2012 decision was appealed by Peter Hoffman, SAE, and

their affiliates, but was affirmed in *Seven Arts Filmed Entertainment Limited v.*

*Jonesfilm*, 538 Fed. Appx. 444 (5th Cir. 2013).  The Fifth Circuit's affirming decision

observed [Ex. 38 at Fn. 3], that the November 2012 district court decision had named:

> "Seven Arts Entertainment Inc." and "Seven Arts Filmed Entertainment Limited"
> as separate judgment debtors.  Appellants [SAE, Hoffman and their affiliates]

contend that the district court had no authority to make this revision because Seven Arts Entertainment, Inc. is not a judgment debtor.  We reject this argument. The California district court's judgment confirming the arbitration award in favor of [judgment creditor] Jonesfilm explicitly states that it is binding on the judgment debtors' successors.  **We agree with the district court that Seven Arts Entertainment, Inc. is the successor of the named judgment debtor Seven Arts Pictures PLC**." [emphasis added]

The PLC Bankruptcy Was Closed by the U.S. Bankruptcy Court's November 23, 2015 Order, as to Which This Court Has Already Taken Judicial Notice.

33.  Attached as Exhibit 79 hereto is my December 9, 2015 letter to the Court requesting judicial notice, and enclosing a copy of, the November 23, 2015 Order [entitled "Order Closing Case Pursuant to Bankruptcy Rule 5009(c)"] issued by the U.S. Bankruptcy Court for the Eastern District of Louisiana in the PLC Chapter 15 bankruptcy case and the related "Certificate of Service"  [The letter and attachments were previously filed by the undersigned with this Court as R.Doc. 82.]

34.  Attached as Exhibit 80 hereto is a copy of this Court's December 10, 2015 Order granting plaintiff Arrowhead's request to take judicial notice of that November 23, 2015 Bankruptcy Court Order so closing the PLC Chapter 15 Case pursuant to Bankruptcy Rule 5009(c) [R.Doc. 83].

Kate Hoffman's Belated Admissions of Post-June 30, 2008 Collections of More Than $2.8 Million with respect to the Arrowhead Film Collateral.

35. Attached to my February 1, 2016 Affidavit as Exhibit 59 & 60 were December 2015 emails of Seven Arts executive Kate Hoffman, belated produced by defendants on January 29, 2016, which admit post-June 30, 2008 collections through December 2015 of more than $2.8 million with respect to films which constitute Arrowhead's Film Collateral (including the films *Deal*, *Noise*, *Shooting Gallery* aka *Pool Hall Prophets*, *Boo*, *Broken* aka *A Broken Life*, and *Mirror Wars*).

36. Attached as Exhibit 77 hereto is a report belatedly produced by defendants on

January 29, 2016 [bearing Bates No. SEVEN ARTS 4043 & 4047] from an unidentified

foreign distributor (presumably Chinese) showing ongoing distribution of Film Collateral

and proceeds generated from that distribution (in an unidentified currency) from July

2014 through May 2015 with respect to five of the films that constitute Film Collateral

(namely *Deal*, *Noise*, *Shooting Gallery* aka *Pool Hall Prophets*, *Boo*, and *A Broken Life*).

37. Attached as Exhibit 78 hereto is Peter Hoffman's October 30, 2015 Email to

Steve Markoff of Palm Finance and Markoff/'Palm Finance counsel John Kurtz, Esq. (of

the Hawley Troxell law firm), "Subject: Seven Arts Library/My Home" (another

document not produced to plaintiff Arrowhead until January 29, 2016). In that email

Peter Hoffman writes with respect to the Seven Arts film library (including films which

constitute Arrowhead's Flm Collateral):

> "**The small revenues from the films** was unfortunately for now at least **my last
> source of income**. Of course we will cooperate in all ways if you wish to sell the
> films to realize on your investment. What is the status of your offer to Chase on
> my home?" [emphasis added]

This October 30, 2015 email is yet another Peter Hoffman admission of his ongoing

efforts to divert all income from film Collateral for himself as his "source of income" --

in contravention of the requirements of Master Agreement §5.1 that those film revenues

be deposited in the lockbox account, and held in trust for and remitted to Arrowhead.

Prejudice Suffered by Arrowhead from Defendants' Late Production or Non-Production
of Discovery They Were Required and Ordered to, But Did Not, Timely Produce.

38. Because I received and reviewed all document productions from defendants, I

am aware that defendants delayed production until January 29, 2016 of documents

attached as Exhibits 59-60 to my February 1, 2016 Affidavit and Exhibits 77 & 78 to this

Affidavit; so rendered plaintiff Arrowhead unable to question Kate Hoffman as to those documents at her November 9, 2015 deposition or Peter Hoffman as to any of those documents at the Court's December 15, 2015 contempt hearing; and thereby prejudice Arrowhead's ability to obtain discovery in these proceedings.

39. As Arrowhead's counsel, I am aware that defendants have engaged in ongoing failure to comply with their discovery obligations and disobedience of discovery orders, as they have continued to fail to produce (among other things) almost all responsive accounting and participation statements and most bank statements with respect to collection and deposit of Collateral proceeds, thereby denying Arrowhead documents necessary for tracing millions of dollars which were required to have been (but were not) deposited in the Master Agreement §5.1 lockbox for Arrowhead. For instance:

> (i) although Kate Hoffman now admits post-June 30, 2008 collections of more than $1.5 million with respect to *Deal* [Goldin Aff. Ex.s 59 & 60], defendants produced only two pages of accountings from a single unidentified *Deal* distributor [Exhibit 77 hereto], apparently reporting licensor proceeds in Chinese currency, which converts into less than $25,000 U.S.;
>
> (ii) although Kate Hoffman now admits post-June 30, 2008 collections of more than $1,217,000 with respect to *Noise* [Ex.s 59 & 60], defendants produced only a few accounting statements reporting less than $250,000; and
>
> (iii) Seven Arts distribution agreements provided post-June 30, 2008 collections of hundreds of thousands of dollars for *Shooting Gallery* aka *Pool Hall Prophets* [Ex.s 59 & 60], but accounting statements produced were for less than $150,000.

40.  As Arrowhead's counsel, I am aware that defendants' disobedience of discovery obligations and discovery orders, also includes their ongoing failure to produce (among other things) responsive accountings and participation statements with respect to amounts purportedly payable to principal owners/licensors of Film Collateral (*Boo*, *Broken* aka *A Broken Life*, and *Mirror Wars*) as to which Seven Arts has continued to collect revenues [Ex.s 59 & 60], and their failure to produce any documentary evidence of payment by Seven Arts for the past eight years to owners/licensors of those films.

41. Exhibit 82 hereto is my February 9, 2016 "meet and confer" letter to Raymond Markovich, Esq., counsel for defendants SAE and SAFELA, as to failure of defendants to comply with document requests set forth in my January 5, 2016 letter [Exhibit 81 hereto].

42. Attached as Exhibit 83 hereto is the February 17, 2016 response of defendants SAE and SAFELA and Peter Hoffman in which they continue to stonewall, ignore, disregard, and disobey their discovery obligations and this Court's discovery orders.

43. Ongoing failure of defendants and the Hoffman's to comply with discovery obligations and their disobedience of discovery orders has (among other things) substantially delayed and increased the cost of this litigation by plaintiff Arrowhead; prejudiced Arrowhead's ability to enforce its rights in and with respect to Collateral and proceeds of Collateral; and continues to interfere with Arrowhead's ability to locate, trace, and pursue Collateral and Collateral proceeds, including (without limitation) the proceeds which were required to be deposited in the New York collection account and held in trust for and remitted to Arrowhead.

BARRY L. GOLDIN

Sworn to before me in Lehigh County, Pennsylvania
this _3_ day of March, 2016.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Chrisann Loccarini, Notary Public
South Whitehall Twp., Lehigh County
My Commission Expires May 5. 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

ARR60215.3SGAFF

EXHIBITS TO MARCH 3, 2016 GOLDIN AFFIDAVIT

| Tab | Document |
| --- | --- |
| 65 | Printout from the Secretary of State of Nevada website with respect to defendant Seven Arts Entertainment, Inc. ("SAE") |
| 66. | Printout from the Secretary of State of Louisiana website with respect to defendant Seven Arts Filmed Entertainment Louisiana LLC ("SAFELA") |
| 67. | Articles of Incorporation of Rectifier Productions, LLC, a New York limited liability company ("Rectifier") as certified by the Secretary of State of New York on March 7  2006 |
| 68. | Rectifier Limited Liability Company Operating Agreement dated as of March 29, 2006 signed by Peter Hoffman for Rectifier and for its Managing Member Seven Arts Pictures, Inc. ("SAP") |
| 69. | Printout from the Secretary of State of New York website with respect to Rectifier showing Rectifier to be "Active" and listing its address as that of Peter Hoffman |
| 70. | Copyright Mortgage and Assignment dated May 16, 2006 in favor of Arrowhead's predecessor, as signed by Peter Hoffman for Borrowers Rectifier and SAP, recorded in the U.S. Copyright Office on June 20, 2006 at Vol. 3539, Doc. No. 716, filed for Arrowhead's predecessor by Max Drake, Esq. of the New York office of the Wollmuth Maher & Deutsch law firm |
| 71. | December 21, 2006 letter to Max Drake, Esq. at the New York offices of Wollmuth Maher & Deutsch (counsel for Arrowhead's predecessor) from Gipson Hoffman & Pencione, counsel for Rectifier and the other Borrowers, delivering the Arrowhead Note dated December 2006, signed by Peter Hoffman for Rectifier and the other Borrowers (including, without limitation, Seven Arts Pictures, Inc., Seven Arts Pictures Plc, and Seven Arts Filmed Entertainment Limited) |
| 72. | December 28, 2006 email to Peter Hoffman from Boris Ziser, Esq. of the New York offices of the Brown Rudnick law firm forwarding invoice for services rendered by Brown Rudnick in connection with transactions in New York contemplated by the Master Agreement (cc: Mikko Syrjanen of Cheyne) |
| 73. | March 10, 2008 email from Erik Smith of Seven Arts to Innes Harding of Cheyne and attached 2007 Rectifier tax returns, signed by Peter Hoffman, seeking tax refunds from the State and City of New York for production in New York of the film *Noise* |
| 74. | October 28, 2015 letter from Frank Nuara of the New York State Department of Taxation and Finance to Arrowhead attorney Goldin and accompanying copy of New York tax refund check dated June 2, 2008 payable to Rectifier in the amount of $160,815.50 |

75. Plaintiff Arrowhead's August 22, 2011 Notice of Cross-Motion for Summary Judgment in the Predecessor Action (*Arrowhead Capital Finance, Ltd. v. Seven Arts Pictures Plc et al*, Index No. 601199/2010, Supreme Court NY County)

76. Cover page of the docket sheet in the felony action entitled *United States of America v. Peter M. Hoffman, Michael P. Arata, Susan Hoffman*, USDC ED LA., 2:14-cr-00022 confirming that action was filed on February 6, 2014 and May 15, 2014 Second Superseding Indictment for Conspiracy, Wire Fraud, Mail Fraud and False Statements to a Federal Agent in that action

77. Distribution statement confirming continuing distribution from July 2014 through May 2015 of Film Collateral, consisting of *Deal*, *Shooting Gallery* (aka *Pool Hall Prophets*), *Noise*, *Boo* and *A Broken Life*, by an unidentified distributor in an unidentified foreign territory, results in an unidentified foreign currency (presumably Chinese), as first produced by defendants on January 29, 2016 [Bates-stamped SEVEN ARTS 0004043 & 4047].

78. October 30, 2015 Email from Peter Hoffman ("Subject: Seven Arts Library/My Home") to Steve Markoff (Palm Finance) and John Kurtz, Esq. as first produced to Arrowhead on January 29, 2016 [Bates-stamped SEVEN ARTS 004261], in which Peter Hoffman states:
    "The small revenues from the films was unfortunately for now at least **my** last source of income ..." [emphasis added]

79. December 9, 2015 letter to Judge Failla from Barry L. Goldin, Esq. (Arrowhead's counsel) and November 23, 2015 "Order Closing Case Pursuant to Bankruptcy Rule 5009(c)" of the U.S. Bankruptcy Court for E.D. Louisiana in the PLC Chapter 15 bankruptcy case and related "Certificate of Service" [R.Doc. 82].

80. Judge Failla's December 10, 2015 Order granting plaintiff Arrowhead's request to take judicial notice of that November 23, 2015 Bankruptcy Court Order so closing the PLC Chapter 15 Case pursuant to Bankruptcy Rule 5009(c) [R.Doc. 83].

81. January 5, 2016 letter of Barry L. Goldin, Esq. (Arrowhead counsel) to Raymond Markovich, Esq. (defendants' counsel) seeking documents from defendants SAE and SAFELA in accordance with Peter Hoffman testimony at December 15, 2016 contempt proceedings and the December 16, 2015 scheduling Order [R.Doc. 81].

82. February 9, 2016 "meet and confer" letter from attorney Goldin to defendant's counsel Markovich with respect to defendants' failure to comply with the document requests in attorney Goldin's January 5, 2016 letter [see Ex.81 above].

83. February 17, 2016 response (refusing to produce documents) of defendants SAE and SAFELA and Peter Hoffman to plaintiff Arrowhead attorney Goldin's February 9, 2016 "meet and confer" letter.