UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

ARROWHEAD CAPITAL FINANCE, LTD.,

                           Plaintiff,

                    v.

SEVEN ARTS ENTERTAINMENT, INC., and
SEVEN ARTS FILMED ENTERTAINMENT
LOUISIANA LLC,

                       Defendants.

------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: September 16, 2016

14 Civ. 6512 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

     On July 18, 2014, Plaintiff initiated this action in New York State Supreme Court seeking, among other things, to hold Defendants Seven Arts Entertainment, Inc. and Seven Arts Filmed Entertainment Louisiana LLC liable for the debts of their alleged predecessors in interest. On August 14, 2014, Defendants removed the action to this Court. On February 1, 2016 — after a fractious discovery period — the parties filed cross-motions for summary judgment. Plaintiff then renewed an earlier application for the imposition of sanctions against Defendants for purported discovery violations. For the reasons set forth in the remainder of this Opinion, Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendants' cross-motion is denied in its entirety. In addition, the Court will impose sanctions on Defendants and their counsel as described herein for their egregious conduct during discovery.

## BACKGROUND[1]

### A.  Factual Background

### 1.  The Seven Arts Entities

Defendants are film companies managed by Peter Hoffman and his

daughter, Katrin ("Kate") Hoffman.  (*See generally* Goldin Decl., Ex. 10).  Over

the past 12 years, Mr. Hoffman has established a series of film-related

companies incorporating the name "Seven Arts."  (*See generally id.*).[2]  The first

---

[1]  The facts in this Opinion are drawn from the parties' submissions in connection with the motion for summary judgment, including Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1" (Dkt. #112)), Defendants' opposition to this statement ("Def. 56.1 Opp." (Dkt. #134)), Defendants' own Rule 56.1 Statement ("Def. 56.1" (Dkt. #100), and Plaintiff's opposition to this statement ("Pl. 56.1 Opp." (Dkt. #136)).  In addition, the Court has drawn on various declarations from attorneys and witnesses (cited using the convention "[Name] Decl.").

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Defendants pepper their Rule 56.1 opposition and motion papers with various evidentiary objections to the testimony and documents supporting Plaintiff's motion.  The vast majority of those objections are cursory and without merit.  Thus, whenever the Court cites Plaintiff's evidence without comment, it should be understood that the Court is overruling Defendants' correlative objections.

For convenience, the Court will refer to Plaintiff's brief in support of its motion for summary judgment as "Pl. Br." (Dkt. #111), Defendants' opposition brief as "Def. Opp." (Dkt. #132), and Plaintiff's reply as "Pl. Reply" (Dkt. #138).  Similarly, the Court will refer to Defendants' brief in support of their motion as "Def. Br." (Dkt. #99), Plaintiff's opposition brief as "Pl. Opp." (Dkt. #135), and Defendants' reply brief as "Def. Reply" (Dkt. #141).

[2]  The effect, if not the design, of this practice is to engender confusion between and among the various Seven Arts entities.  Precisely for this reason, the parties and the Court have selected abbreviations that avoid confusion for the reader.  In real life, the distinctions, semantic and otherwise, between and among the companies were considerably less obvious.

such company was Seven Arts Pictures, Inc. ("SAP"), which was formed in Nevada in 2002.  (*Id.* at 6).  Mr. Hoffman was the CEO and majority shareholder of SAP, and Ms. Hoffman served as his assistant.  (*Id.* at 10).

A few years later, Mr. Hoffman assumed control of a struggling jewelry business domiciled in the United Kingdom, and renamed that company Seven Arts Pictures PLC ("PLC").  (*See* Goldin Decl., Ex. 10 at 11).  PLC formed a subsidiary, named Seven Arts Filmed Entertainment Limited ("SAFE"), and this subsidiary purchased all the assets of SAP in 2004 in exchange for 70% of the stock in PLC.  (*Id.* at 11-12, 53).  Following the asset purchase, Mr. Hoffman assumed the role of CEO of PLC, and while he was not formally an officer or director of SAFE (*id.* at 13), "nothing much happened" at the subsidiary without Mr. Hoffman's knowledge (*id.* at 14).  Ms. Hoffman functioned as the managing director of SAFE.  (Def. 56.1 Opp. ¶ 13).

In approximately 2005, Mr. Hoffman established two more Seven Arts entities in Louisiana to launch a project called "The Film Studio": Seven Arts Pictures Louisiana LLC ("SAPLA") and Seven Arts Filmed Entertainment Louisiana ("SAFELA").  (*See* Goldin Decl., Ex. 10 at 15-16).  While SAPLA did not have any officers, Mr. Hoffman was "for all intents and purposes, ... one of the managing members of [the] company."  (*Id.* at 17).  Mr. Hoffman also had "management responsibility" at SAFELA, at least when that company was first formed.  (*Id.* at 17-18).

In 2010, PLC redomiciled from the United Kingdom to Nevada.  (*See* Goldin Decl., Ex. 10 at 51-52).  This redomicile was accomplished by means of

an Asset Transfer Agreement (the "First Transfer Agreement"), which
transferred all the assets of PLC to a Nevada Corporation called Seven Arts
Entertainment, Inc. ("SAE").  (*See id.*; Pl. 56.1 ¶¶ 27-28).  PLC shareholders
approved this agreement on June 11, 2010.  (Pl. 56.1 ¶¶ 31, 33).  In September
2010, PLC described the First Transfer Agreement to the United States
Securities and Exchange Commission (the "SEC") in the following terms:

> On June 11, 2010, our shareholders approved the sale
> of all our assets … to SAE, which will be the new holding
> company for all operations herein. … We do not believe
> the reincorporation will have any material effect on the
> Company's business or operations. … We do not believe
> there are any material changes in the articles or balance
> of SAE from those of [PLC] and our intention is that
> there are no such material changes.

(*Id.* at ¶¶ 32-33 (quoting Goldin Decl., Ex. 15 at 61)).  On November 9, 2010,
PLC issued a press release stating that it "ha[d] completed the transfer of all its
assets to [SAE]."  (*Id.* at ¶ 38 (quoting Goldin Decl., Ex. 16)).  Following the
transfer, Mr. Hoffman served as CEO of SAE; he later resigned from that
position in or about 2014, after being indicted in connection with his work on
The Film Studio, only to resume it during this litigation when the then-CEO
resigned.  (*See* Pl. 56.1 ¶ 12; Def. 56.1 Opp. ¶ 12; *see also* Goldin Decl., Ex. 10
at 62 ("When I got indicted, I resigned [as CEO of SAE], and then I was just
acting as counsel.  Then after the conviction, after the jury verdict, I then
resigned at everything."); *id.* at 63 ("I had to [resume the position of CEO] when
Rick Bjorklund resigned.  When he resigned, then there was nobody left.  So I

decided, you know, no matter what my problems, I had better, being the only officer around, and so I am the acting CEO [of SAE], at least as far as it goes.")).

Notably, the First Transfer Agreement gave SAE all of the shares of SAFE. (Goldin Decl., Ex. 12-19, 26).  In other words, the First Asset Transfer converted SAFE into wholly owned subsidiary of SAE.  (*See id.*).  In January 2012, Mr. Hoffman executed another Asset Transfer Agreement (the "Second Transfer Agreement" and, together with the First Transfer Agreement, the "Transfer Agreements"), which provided that SAFE would assign and convey all of its assets to SAE.  (Goldin Decl., Ex. 30).[3]  SAE also acquired at least 60 percent of SAFELA in or about June 2012.  (*See* Am. Compl., Ex. 20-21).

The Transfer Agreements left PLC and SAFE without any assets and unable to pay their respective creditors.  (*See* Pl. 56.1 ¶ 43).  Consequently, in 2011, involuntary insolvency proceedings were initiated in the U.K. against PLC.  (*Id.* at ¶ 44).  A U.K. liquidator was appointed, and the liquidator commenced Chapter 15 bankruptcy proceedings in the United States.  (*Id.*).  In 2012, a U.K. Deputy Official Receiver issued a report to the High Court of Justice, which showed that PLC had reported liabilities of £16,449,595.  (*Id.*).  The U.K. liquidator later filed a "Liquidator's Progress Report to the Creditors' Committee," which stated that the liquidator was unable able to collect any money on behalf of PLC's creditors, and that there was "no real prospect" that he would be able to collect any money in the future.  (*Id.* at 48).  The

---

[3]     Plaintiff suggests that the asset transfers were not in fact legitimate because SAFE and PLC did not receive adequate consideration.  (*See, e.g.*, Pl. Br. 6, 22-24).  The Court does not need to resolve this issue in order to resolve the instant motions.

liquidation and bankruptcy proceedings against PLC concluded in 2015, but the record does not contain any indication that the liquidator was able to satisfy any of PLC's debts.  (*Id.* at 49-50).

Similarly, in 2013, involuntary insolvency proceedings were initiated in the U.K. against SAFE, and a U.K liquidator was appointed.  (*See* Pl. 56.1 Opp. ¶ 15; Goldin Decl., Ex. 31-33).  The liquidator's report stated that SAFE now had assets of less than £2,000, but liabilities of approximately £19.2 million. (*See* Goldin Decl., Ex. 31-33).  The record does not contain any indication that the liquidator has been able to satisfy any of SAFE's debts.

### 2.    The Arrowhead Note

In December 2006, Mr. Hoffman signed a "Secured Subordinated Term Loan Promissory Note" (the "Arrowhead Note") on behalf of SAP, PLC, and SAFE.  (Goldin Decl., Ex. 1).  In this note, SAP, PLC, and SAFE each "jointly and severally promise[d] to pay to the order of ARROWHEAD CONSULTING GROUP, LLC … the principal sum of One Million Dollars[.]"  (*Id.*).  The principal was due on June 30, 2007, unless Arrowhead Consulting Group ("ACG") agreed to extend the deadline to September 30, 2007, in exchange for payment of an "extension fee equal to one percent (1%) of the original principal."  (*Id.*).

The Arrowhead Note "incorporated … in full" a "Master Agreement" (Goldin Decl., Ex. 1), which governed both the Arrowhead Note and a note held by senior lender Cheyne Specialty Finance Fund L.P. (the "Cheyne Note") (Woods Decl., Ex. 2).  The Master Agreement specified that the Arrowhead and Cheyne Notes were secured by various forms of collateral, including: (i) the

6

Seven Arts entities' "right, title[,] and interest in distribution fees payable in connection with the films '*Boo*,' '*Broken*' and '*Mirror Wars*'"; (ii) the proceeds from other films, which the Seven Arts entities promised to place in a designated "Collection Account" at Chase Manhattan Bank; and (iii) shares of PLC owned by SAP. (Woods Decl., Ex. 2). The Seven Arts entities defaulted on the Arrowhead Note, and remain in default. (*See* Woods Decl. ¶¶ 17-18).

### 3. Litigation Concerning the Default on the Arrowhead Note

On December 23, 2008, Justice Herman Cahn of the Supreme Court of the State of New York, County of New York, entered a consent judgment that assigned the Arrowhead note and related rights from ACG to the Plaintiff in this case, Arrowhead Capital Finance, Ltd. (*See* Am. Compl., Ex. 6). Over a year later, on May 10, 2010, Plaintiff commenced an action in state court against SAP, PLC, and SAFE (the "State Court Action"). (*See* Am. Compl., Ex. 1 (the "State Court Opinion") at 11). In this action, Plaintiff sought: (i) "judgment for the unpaid principal balance and interest due under the Arrowhead Note"; (ii) "an order of replevin directing delivery to [P]laintiff of [c]ollateral … securing the Arrowhead Note"; (iii) "foreclosure of all of plaintiff's security interests in the [c]ollateral"; (iv) "attorneys' fees and costs due under the Arrowhead Note"; and (v) "damages for conversion." (*Id.* at 1-2).

On June 20, 2012, Justice Shirley Werner Kornreich issued an opinion and order holding that Cheyne's note had been repaid in full. (*See* Am. Compl, Ex. 1). Consequently, the court concluded, Plaintiff was entitled to summary judgment on its claims for both the unpaid principal and interest under the

Arrowhead Note and attorneys' fees.  (*See id.*).  At the conclusion of its opinion, the court referred to a Special Referee "the issues of the amount of principal and interest due under the Arrowhead Note, the amount of reasonable attorneys' fees and costs [P]laintiff incurred in enforcing its rights under the Master Agreement, [and] the nature and whereabouts of the Collateral subject to foreclosure pursuant to the Master Agreement[.]" (*Id.* at 17).  However, Plaintiff later waived its claim for attorney's fees.  (Am. Compl., Ex. 2 at 2).

On October 10, 2012, the state court issued a final order and judgment (the "State Court Judgment") providing that SAP and SAFE were "jointly and severally" liable to Plaintiff "for a total sum of $2,496,159.50."  (Am. Compl., Ex. 2 at 2-3).  The Court further ordered that Plaintiff's "first cause of action against PLC [for liability under the Arrowhead Note], and the second, third[,] and fifth causes of action against all defendants [for replevin, foreclosure on collateral, and conversion], are severed and shall continue as a separate action." (*Id.* at 3).  This judgment was unanimously affirmed by the Appellate Division in October 2013.  *See Arrowhead Capital Fin., Ltd.* v. *Seven Arts Pictures PLC*, 972 N.Y.S.2d 899 (1st Dep't 2013).

Stated simply, Plaintiff found itself in 2013 with an incontestable judgment against SAP and SAFE that it had no practical way of enforcing.  As explained above, SAP had sold all of its assets to SAFE in 2004 (*see* Goldin Decl., Ex. 10 at 11-12, 53), and SAFE had sold its assets to SAE in 2012 (*see* Goldin Decl., Ex. 30).  Consequently, Plaintiff brought this case against SAE,

and later SAFELA, seeking to hold them liable as successors to SAP and SAFE. (*See* Dkt. #1, 16).

## B.    Procedural Background

On July 18, 2014, Plaintiff initiated this action in New York State Supreme Court, seeking, among other things, to enforce the State Court Judgment against SAE.  (Dkt. #1, Ex. A).  On August 14, 2014, SAE removed the action to this Court.  (*See* Dkt. #1).  Shortly thereafter, on September 23, 2014, this Court granted leave for Plaintiff to file an Amended Complaint.  (Dkt. #15).  The Amended Complaint alleged causes of action against SAE and its subsidiary SAFELA for: (i) declaratory judgment that SAE "is jointly and severally liable to Arrowhead for all duties, liabilities and obligations of predecessors SAP, PLC, and SAFE (whether under the Arrowhead Note, Master Agreement, … , [State Court Judgment], or otherwise)" and Arrowhead has the right to collect the collateral securing the Arrowhead Note from SAE; (ii) declaratory judgment that SAFELA "is jointly and severally liable to Arrowhead for all duties, liabilities[,] and obligations of predecessors SAP, PLC, and SAFE (whether under the Arrowhead Note, Master Agreement, … , [State Court Judgment], or otherwise)" and Arrowhead has the right to collect the collateral securing the Arrowhead Note from SAFELA; (iii) breach of contractual obligations under the Arrowhead Note, Master Agreement, and related agreements; (iv) breach of the duty to account with respect to the collateral securing the Arrowhead Note; (v) breach of trust and fiduciary obligations;

(vi) conversion; (vii) replevin; and (viii) turn over, sale, and foreclosure of the collateral securing the Arrowhead Note.  (*See generally* Am. Compl., Dkt. #16).

## 1.    The Motion to Dismiss

Defendants filed a motion to dismiss the Amended Complaint on October 23, 2014.  (Dkt. #31).  They argued that the Court lacked personal jurisdiction, and that this litigation should be automatically stayed in light of ongoing liquidation proceedings involving PLC.  (*See* Dkt. #31-34).  On June 24, 2015, the Court issued an oral decision denying the motion (the "June 24 Decision").  (*See* Dkt. #48).

## 2.    The Discovery Disputes and Contempt Proceedings

### a.    The Discovery Disputes

A case management plan, which included a schedule of discovery deadlines, was entered by the Court on July 6, 2015.  (Dkt. #47).  In a letter dated September 21, 2015, Plaintiff claimed that Defendants and their attorney had engaged in various forms of misconduct during discovery.  (*See* Dkt. #55 (the "September 21 Letter")).  More specifically, Plaintiff claimed that Defendants had (i) made untimely and improper objections to Plaintiff's discovery requests; and (ii) "[p]uff[ed] up" their document production with non-responsive documents, while simultaneously refusing to produce obviously responsive documents (including bank records for various Seven Arts entities). (*Id.* at 2).  In addition, according to Plaintiff, Defendants' interrogatory responses were incomplete in several respects.  (*Id.* at 3).  For example, Defendants refused to provide witnesses' last known addresses or places of

employment, as required by Local Rule 26.3, thereby depriving Plaintiff of the ability to contact those witnesses and arrange for interviews or depositions. (*Id.*).  At the same time, Defendants' interrogatory responses referenced exhibits that were not actually attached to the responses or otherwise produced to Plaintiff.  (*Id.*).  Furthermore, defense counsel had improperly stamped all produced documents as "confidential" — even documents that were press releases and publicly available SEC statements.  (*Id.*).  These problems with the document production were exacerbated, according to Plaintiff, by Defendants' concurrent refusal to make their officers available for depositions.  (*Id.*).  And during a September 3 telephone conference between the parties, defense counsel allegedly admitted that he had *not* been reviewing the discovery responses — even as he had personally signed several of them — and was merely forwarding what he had received from Mr. Hoffman.  (*Id.*).

In response to the September 21 Letter, the Court held a conference on October 6, 2015.  (*See generally* Dkt. #67).  At the conference, the Court found it "distressing" that Defendants had failed to produce bank statements and other documents that should have been within their possession or control.  (*Id.* at 26, 30-32).  After discussing document production with both parties' counsel, the Court concluded that it had "no confidence" that Defendants had "actually produced all of what they were supposed to produce."  (*Id.*).  The Court believed that the only way to determine whether "these productions have or have not been made is to bring [Mr. Hoffman] here, and put him under oath[,] and to query him [itself] about the production."  (*Id.* at 33).  But the

11

Court acknowledged that Mr. Hoffman might not want to testify, because he was in the process of appealing a federal criminal conviction for mail and wire fraud. (*See id.* at 13-15, 32-33). The Court would not require Mr. Hoffman to waive his Fifth Amendment privilege against self-incrimination; it cautioned the defense, however, that if Mr. Hoffman did decide to testify and his testimony was "unsatisfactory," the Court would impose sanctions. (*Id.* at 33-34).

Plaintiff asked to depose five witnesses before the Court examined Mr. Hoffman, and the Court granted that request. (*See* Dkt. #67 at 35-42). In addition, in an effort to streamline the discovery disputes between the parties, the Court asked Plaintiff's counsel to submit a list of documents that Plaintiff sought, but had not yet received. (*Id.* at 43-45). Plaintiff submitted the list on October 8, 2015 (Dkt. #61 (the "October 8 List")); the Court reviewed the October 8 List and endorsed it in its entirety, ordering Defendants to produce the documents on the List by October 16, 2015, so that Plaintiff's counsel could make effective use of the documents in connection with certain previously scheduled depositions (Dkt. #62).

On October 23, 2015, Plaintiff's counsel advised the Court that he had flown to California to depose five defense witnesses, three of whom were officers of Seven Arts entities. (Dkt. #64 (the "October 23 Letter")). However, after deposing his first witness, counsel learned that two of the officers had resigned and were unwilling to be deposed. (*Id.* at 2). And while the third officer (Ms. Hoffman) would be in Los Angeles at the appointed date and time, she would not appear for her scheduled deposition. (*Id.* at 2-3). Consequently, Plaintiff's

counsel could only take two of the scheduled depositions.  (*Id.* at 3).  According to counsel, these depositions confirmed counsel's fears that Defendants had not made diligent efforts to produce the documents on the October 8 List.  (*Id.*).

On November 12, 2015, the Court held a second conference to discuss Defendants' alleged violation of discovery orders.  (*See* Dkt. #89).  At the beginning of the conference, the Court noted several apparent violations by Defendants and their attorney of the Court's discovery orders.  (*See id.* at 1-5).  For example, at the October 5 conference, the Court had specifically directed Defendants to produce bank statements because Defendants "knew how to get them," but Defendants refused to produce the statements.  (*Id.* at 4).  Because Mr. Hoffman seemed to be directing defense counsel not to produce responsive documents, Plaintiff's counsel asked the Court to find Mr. Hoffman in contempt of court.  (*Id.* at 9).  For this reason, in addition to its pre-existing concerns about compliance with discovery orders, the Court scheduled a contempt hearing, so that the Court could examine Mr. Hoffman and determine whether he or the Seven Arts entities had violated Court orders.  (*Id.* at 9-11).

### b.    The Contempt Proceedings

The contempt hearing was held on December 15, 2015.  (*See* Goldin Decl., Ex. 10).  For approximately five hours, the Court (with the parties' consent) questioned Mr. Hoffman about the Seven Arts entities and their conduct during the discovery process.  Over the course of the proceedings, Mr. Hoffman offered explanations of varying plausibility for Defendants' failure to produce responsive documents.  (*See generally id.*).  He claimed that he was

unaware of the Court order directing Defendants to produce the documents on the October 8 List, even though Mr. Hoffman had prepared a memorandum articulating Defendants' potential grounds for not producing the items contained on the List. (*Id.* at 66; *see* Dkt. #77, Ex. 2 (November 4, 2015 memorandum from Mr. Hoffman to defense counsel Mr. Markovich)). Mr. Hoffman also claimed that he was unaware of any documents that had been given to the law firm Baker & Hostetler "to shield them"; he believed that he had waived any attorney-client privilege that may have stood in the way of document disclosure. (*See* Goldin Decl., Ex. 10 at 67-68). Mr. Hoffman then opined that some records for PLC and SAFE could not be obtained because they were in the custody of the liquidators for those entities. (*Id.* at 68-69). He later recalled that he had sent some documents to legal officials, without first making photocopies, so that he no longer had them. (*Id.* at 73-74).

Also significant for purposes of Plaintiff's sanctions application was Mr. Hoffman's testimony that the Seven Arts entities maintained "paperless office[s]," and that many of the requested documents had been stored on a server operated by an entity called Zed One. (Goldin Decl., Ex. 10 at 71-72). However, after the Seven Arts entities repeatedly failed to pay their bills — which failure, it bears noting, took place during this litigation, with Defendants' knowledge, and without the contemporaneous knowledge of the Court or Plaintiff's counsel — the Seven Arts entities were denied access to the Zed One server:

> So what we did was [Ms. Hoffman] ran and tried to
> download — and [another Seven Arts employee] tried to

14

> download everything they could [ ] off of the Zed One
> server before they cut us off and to get it onto the new
> cloud system that we have.  And they think we got most
> everything.  I mean, we may be missing some film
> related stuff not related to this case, but we think we got
> most of it.

(*Id.* at 72).  Upon hearing this and the other aforementioned explanations, the

Court asked Mr. Hoffman, "Are you saying then that there are certain PLC

documents that you simply do not have?"  (*Id.* at 74).  Mr. Hoffman responded,

"I just don't know."  (*Id.*).

Mr. Hoffman readily and reflexively blamed his staff for Defendants'

failure to produce documents.  (*See, e.g.*, Goldin Decl., Ex. 10 at 191-92). [4]

According to Mr. Hoffman, he relied on his staff to produce documents, and he

deliberately chose not to review some of the document productions "so there

wouldn't be any dispute as to whether or not [he] made the decision not to

produce a document."  (*Id.*).  Thus, Mr. Hoffman insisted, if his staff did not

produce certain documents, it was "either because of a judgment by them or

they made a mistake and [it can] all [be] easily corrected if there is a desire for

---

[4]     *See also, e.g.*, Goldin Decl., Ex. 10 at 172:

> THE COURT: Mr. Goldin, I don't think Mr. Hoffman disputes that
> these numbers needed some substantiation.  The real issue, of
> course, is where is that substantiation.  Your point, I believe, is it
> wasn't produced, and his counterpoint is he doesn't know why.
> Fair enough?

> [MR. HOFFMAN]: Yes. I'm in shock at hearing this man say
> something that's entirely inconsistent with what Stephanie [Dillon,
> Mr. Hoffman's administrative assistant] and Kate [Hoffman] told
> me, which is that we had delivered many accounting statements. I
> prefaced by saying I wasn't sure we had delivered all of them.  But
> the idea that we delivered none, like I say, I never even looked at
> them, but the people I love and trust told me that is just complete
> nonsense.

it to be corrected." (*Id.*).  The Court asked Mr. Hoffman what "judgment[s]" his

employees were making, and Mr. Hoffman responded:

> Well, you know, I don't know. I mean, it may be like, for
> example, the first time around, which actually got us
> into the mess, was Stephanie [Dillon] read when it said
> "bank statements," she thought that just meant the
> description of the accounts. So she just sent the
> information regarding the accounts and actually hadn't
> sent the bank statement.
>
> Then when I said, "Stephanie, that's crazy. You
> obviously have to send the statements." … [She said,]
> "I didn't understand."  So there may be cases where she
> misunderstood.  Also, unfortunately in this, we're
> dealing with a human level.  Stephanie is an emotional
> young woman.  She has the same feeling that all the
> people in the company do about [Plaintiff's counsel].  It's
> hard for me to constantly remind her that we can't, you
> know, just use our rage at him to not try and do our
> best.  And so, you know, since she was in tears when
> she had her deposition taken, it is just hard to get her
> to actually focus on dealing with the business of
> actually getting this done.

(*Id.* at 192).  When the Court remarked, "I have to say, that's something I'm not

buying in the least," Mr. Hoffman attempted to clarify:

> I don't mean to say that's what her feelings [are].  She
> understands she needs to comply.  She has been told
> she needs to comply.  Sometimes the emotion,
> particularly with Stephanie, I think that in my case,
> other than trying to make sure that I don't do something
> that [Plaintiff's counsel] can attack, I think that she
> actually was trying her best.  And if she made mistakes,
> it was out of good faith more than because she was like
> just trying to sabotage something for a person she can't
> stand.

(*Id.* at 194).

Ultimately, the Court reserved decision on the propriety of imposing

sanctions on Defendants or their attorney.  (*See* Goldin Decl., Ex. 10 at 211).

The next day, December 16, 2015, the Court ordered that (i) Plaintiff identify, by January 8, 2016, the additional discovery from Defendants to which Plaintiff believed it was entitled; and (ii) Defendants produce the discovery materials that Plaintiff requested by January 29, 2016, or explain with specificity the efforts made to locate the materials and the reasons why the materials were not produced.  (Dkt. #91).

On February 20, 2016, Plaintiff advised the Court that, despite its compliance with the December 16 Order, Defendants had failed to turn over responsive discovery.  (Dkt. #129).  After summarizing the history of Plaintiff's (and the Court's) efforts to effect compliance with the discovery orders, Plaintiff listed materials that Defendants still had failed to produce.  (*See, e.g.*, *id.* ("Thus, almost all responsive accounting and participation statements and most bank statements have not been produced, and Arrowhead is denied documents as to collection or tracing of millions of dollars required to have been deposited in the Master Agreement §5.1 lockbox, held in trust for, and remitted to Arrowhead.")).  Accordingly, Plaintiff renewed its request for this Court to sanction Defendants based on their continued refusal to produce evidence.  (*Id.*).[5]

---

[5]     Defendants suggested in a February 23, 2016 response that Plaintiff's request did not comply with this Court's individual rules of practice and should be summarily dismissed.  (Dkt. #131).  This position, however, disregards the fact that there was a pending motion for sanctions for which the December 15, 2015 hearing had been convened.  (*See* Dkt. #89 at 9).  In this regard, the Court was dismayed to learn from Plaintiff that, months after the December 15 hearing and in spite of numerous Court orders — not to mention personal promises to the Court — Mr. Hoffman and Defendants still failed to produce responsive documents to Plaintiff.  (*See* Dkt. #129).  However, the bases for the Court's imposition of sanctions later in this Opinion are Defendants' conduct before and at the December 15 hearing.

### 3.    The Instant Motions

On February 1, 2016, Plaintiff filed a partial motion for summary judgment, seeking a declaratory judgment that Defendants were liable for the State Court Judgment.  (Dkt. #101-28).  That same day, Defendants filed their cross-motion for summary judgment.  (Dkt. #98-100).  The parties filed their opposition papers on March 4, 2016 (Dkt. #132-37), and submitted their reply papers on March 18, 2016 (Dkt. #138-42).

### DISCUSSION

### A.    Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *accord Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on

18

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (quoting *In Re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (internal quotation marks omitted))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, "[i]n considering what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party "the

benefit of unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)) (internal quotation mark omitted).

## B.   Analysis

### 1.   Plaintiff's Motion for Summary Judgment Is Granted in Part

As noted, Plaintiff seeks to hold Defendants liable for the debts of Defendants' ostensible predecessors in interest.  Under New York law, when one corporation purchases another corporation's assets, the purchasing corporation does not "ordinarily become liable for the [selling corporation's] debts." *Cargo Partner AG* v. *Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003). Nevertheless, this general rule is inapplicable when: (i) the purchasing corporation "formally assumes [the] seller's debts"; (ii) the sale is "undertaken to defraud creditors"; (iii) the purchasing corporation "de facto merge[s] with a seller"; and (iv) the purchasing corporation "is a mere continuation of [the] seller."  *See Cargo*, 352 F.3d at 45 (citing *Schumacher* v. *Richards Shear Co.*, 59 N.Y.2d 239, 245 (1983)); *see also Arnold Graphics Indus.* v. *Indep. Agent Ctr., Inc.*, 775 F.2d 38 (2d Cir.1985) (applying this principle to a contract debt). Reasoning from these principles, Arrowhead argues that SAE and its subsidiary, SAFELA, can be held liable on the Arrowhead Note.  The Court will consider the liability of each entity in turn.

### a.   Liability of SAE

#### i.   Liability Based on the Transfer of Assets from PLC to SAE

##### A.   Collateral Estoppel

Plaintiff argues first that SAE is liable for all the debts of PLC —
including the debt on the Arrowhead note — and SAE should be collaterally
estopped from arguing otherwise. (Pl. Br. 14-15). The doctrine of collateral
estoppel provides that, when an issue of fact or law has been "actually litigated
and decided" by a court, and that issue of fact or law was "essential" to a valid
judgment, the issue cannot be re-litigated by the same parties. *See B & B
Hardware, Inc.* v. *Hargis Indus., Inc.*, — U.S. —, —, 135 S. Ct. 1293, 1303
(2015) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27, p. 250 (1980)). Here,
Plaintiff argues, the Fifth Circuit has already determined that SAE is the
"successor" to PLC, and that determination was essential to the Fifth Circuit's
judgment. (*See* Pl. Br. 15 (citing *Seven Arts Filmed Entm't Ltd.* v. *Jonesfilm*,
538 F. App'x 444, 447 n.3 (5th Cir. 2013) (per curiam)). Thus, Plaintiff
concludes, SAE cannot dispute that it is the legal successor of PLC. (*See id.*).

The Court cannot accept this argument. Crucially, when the Fifth
Circuit held that SAE was the "successor" to PLC, it was interpreting a contract
that is not at issue in this case. *Jonesfilm*, 538 F. App'x at 447 n.3. And in the
course of interpreting that contract, the Fifth Circuit had no opportunity to
consider the question presented here, *viz.*, whether SAE can be held liable for
the debts of PLC under New York law. Consequently, this Court is not bound
by the Fifth Circuit's judgment. *See B & B Hardware, Inc.*, 135 S. Ct. at 1306

("[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." (quoting 18 Charles A. Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE § 4417, p. 449 (2d ed. 2002))).

## B.     De Facto Merger

Plaintiff separately argues that SAE is liable on the Arrowhead Note because PLC was a signatory to the Note, and PLC de facto merged with SAE. (Pl. Br. 17-25).  Under New York law, "[a] de facto merger occurs when a transaction, although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'"  *Cargo*, 352 F.3d at 45 (quoting *Schumacher*, 59 N.Y.2d at 245).  The hallmarks of a de facto merger are: (i) a predecessor corporation owned by the same individuals or entities as a successor corporation; (ii) dissolution of the predecessor corporation or cessation of the predecessor's ordinary business; (iii) an assumption of the predecessor's liabilities to the extent necessary to continue the predecessor's business, and (iv) continuity of the predecessor's management, personnel, physical location, assets, and general business operations.  *See Cargo,* 352 F.3d at 46; *see also Nettis* v. *Levitt,* 241 F.3d 186, 193-94 (2d Cir. 2001) (per curiam), *overruled on other grounds by Slayton* v. *Am. Express Co.,* 460 F.3d 215 (2d Cir. 2006).

"These factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, 'it was the intent of [the successor] to absorb and continue the operation of [the predecessor].'"  *Nettis,* 241 F.3d at 194 (alteration in original) (quoting *Woodrick* v. *Jack J. Burke Real*

*Estate, Inc.*, 703 A.2d 306, 314 (N.J. Super. Ct. App. Div. 1997)).  Thus, if there is continuity of ownership between a predecessor and the successor, it is not always necessary to demonstrate that the other formal requirements for a de facto merger have been satisfied.  *See Cargo*, 352 F.3d at 47 ("[C]ontinuity of ownership is the essence of a merger."); *Time Warner Cable, Inc.* v. *Networks Grp., LLC*, No. 09 Civ. 10059 (DLC), 2010 WL 3563111, at *6 (S.D.N.Y. Sept. 9, 2010) (explaining that not all of the requirements are "necessary to find a de facto merger" (quoting *Fitzgerald* v. *Fahnestock & Co., Inc.,* 730 N.Y.S.2d 70, 71 (1st Dep't 2001))).  For example, a plaintiff does not always need to demonstrate that the predecessor company has been dissolved.  *Time Warner Cable*, 2010 WL 3563111, at *6 (citing *Fitzgerald,* 730 N.Y.S.2d at 71).  "So long as the [predecessor] corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made."  *Fitzgerald,* 730 N.Y.S.2d at 72; *see also Societe Anonyme Dauphitex* v. *Schoenfelder Corp.,* No. 07 Civ. 489 (RWS), 2007 WL 3253592, at *4 (S.D.N.Y. Nov. 2, 2007); *Holme* v. *Glob. Minerals & Metals Corp.,* 879 N.Y.S.2d 453, 454 (1st Dep't 2009); *AT & S Transp., LLC* v. *Odyssey Logistics & Tech. Corp.*, 803 N.Y.S.2d 118, 121 (2d Dep't 2005).

The transfer of assets from PLC to SAE bears the requisite hallmarks of a de facto merger.  First, the owners of PLC common stock were all given shares of SAE common stock (on a share-for-share basis).  (*See* Goldin Decl., Ex. 14; Pl. 56.1 ¶ 51).  As a result, there was continuity of ownership between PLC and SAE.  *See Cargo*, 352 F.3d at 47.

23

Second, PLC was "shorn of its assets." *Fitzgerald,* 730 N.Y.S.2d at 72. More specifically, all of PLC's assets were transferred to SAE. (*See* Goldin Decl., Ex. 14, 19, 26). In addition, PLC's directors expressed a clear intent that PLC would be liquidated (*see* Goldin Decl., Ex. 14), and the company eventually underwent liquidation proceedings (Pl. 56.1 ¶¶ 44, 57). It is true that PLC transferred its assets to SAE in 2010, and the involuntary liquidation proceedings against PLC were not initiated until 2011. (Pl. 56.1 ¶¶ 44, 57). But this brief delay in liquidating PLC is not dispositive. *See Arnold Graphics Indus., Inc.* v. *Indep. Agent Ctr., Inc.,* 775 F.2d 38, 42 (2d Cir. 1985) (explaining that because "there is no requirement that all of the events that are necessary to a finding of *de facto* merger occur at the same time," it was possible to find a de facto merger where a "selling corporation was not dissolved until eighteen months after the sale and possessed valuable assets during the interim"); *AT & S Transp., LLC,* 803 N.Y.S.2d at 121 (explaining that a selling corporation's decision not to "immediately liquidate" is "not dispositive" in a de facto merger analysis). Nor does the Court believe that Defendants can avoid liability under a de facto merger theory simply because PLC waited for involuntary liquidation proceedings to be initiated, rather than initiating liquidation proceedings on its own. *See Nettis,* 241 F.3d at 194 (explaining that the de facto merger analysis is "flexible," and must be applied in a manner that prevents injustice).

Third, SAE assumed enough of PLC's liabilities to continue PLC's business. *See Cargo,* 352 F.3d at 46; *Nettis,* 241 F.3d at 193-94. SAE and PLC collectively represented to the SEC that SAE had assumed at least some of

PLC's debts.  (*See* Goldin Decl. Ex. 19, 26).  More importantly, PLC and SAE told the SEC that the agreement between PLC and SAE was deliberately designed to have no "material effect on [PLC's] business or operations."  (Pl. 56.1 ¶¶ 33, 51).  Thus, any reasonable jury would have to conclude that SAE assumed enough liability to continue the operations of PLC.

Finally, PLC had the same management, assets, and general business operations as SAE.  *See Cargo,* 352 F.3d at 46; *Nettis,* 241 F.3d at 194.  The record suggests that Mr. Hoffman was closely involved in the management of both PLC and SAE.  (*See generally* Goldin Decl., Ex. 10).[6]  Furthermore, as noted above, PLC transferred all of its assets to SAE.  (*See* Goldin Decl., Ex. 14, 19, 26).  And SAE conducted the same type of business after the transfer.  (*See* Pl. 56.1 ¶ 33).  In fact, in SAE's Amendment No. 1 to its Form 10-K/A, filed with the SEC for the fiscal year that ended on June 30, 2012, SAE expressly acknowledged: "We are the continuation of the business and the successor of the NASDAQ listing to PLC[.]"  (*See id.* at ¶ 56).  Similarly, some of SAE's Forms 10-Q state that "[SAE] … is the continuation of the business of [PLC]."  (*Id.* at ¶¶ 71, 73).

It is true that PLC and SAE did not share a "location," or precisely the same "personnel."  *Cargo,* 352 F.3d at 46.  In fact, the point of the First Transfer Agreement was to move PLC from the United Kingdom to the United

---

[6]    Defendants argue that there was a difference between the individuals managing PLC in 2010, and the individuals managing SAE in 2012.  (*See* Def. Opp. 13 & n.15).  But the fact that SAE changed some management personnel in the two-year period following the merger does not detract from the conclusion that such a merger occurred.

States (*see* Goldin Decl., Ex. 10 at 51-52), and this move surely meant there would be at least minor personnel changes.  But the fact that PLC redomiciled its business does not preclude the possibility that PLC de facto merged into SAE.  *See Nettis,* 241 F.3d at 194 (suggesting that a de facto merger should be found whenever the successor corporation intends to "absorb and continue the operation of [its] predecessor" (quoting *Woodrick*, 703 A.2d at 314) (internal quotation mark omitted)).  And for all the reasons given above, the Court finds that a de facto merger occurred here.

Defendants urge the Court to reject Plaintiff's de facto merger arguments because Defendants believe those arguments rest on hearsay statements made to the SEC.  (*See generally* Def. Opp. 13-15, 22).  However, as Plaintiff notes in its reply brief, Mr. Hoffman authenticated the disputed SEC documents in his sworn testimony, and he testified that the statements contained in the documents were accurate.  (*See* Pl. Reply 1-2 (citing Goldin Decl., Ex. 10 at 153-55)).  Moreover, regardless of Mr. Hoffman's testimony, the statements that SAE made to the SEC are admissible as statements of a party opponent.  *See* Fed. R. Evid. 801(d)(2).[7]  Thus, the Court believes that it can consider the statements to the SEC for their truth.  Considered in this manner, the statements to the SEC conclusively show that PLC de facto merged with SAE.

---

[7]     The Court notes that the statements made by SAE are themselves sufficient to establish as a matter of law that a de facto merger occurred.  (*See* Pl. 56.1 ¶¶ 51, 56-57).  *See also Arnold Graphics Indus., Inc.* v. *Indep. Agent Ctr., Inc.*, 775 F.2d 38, 43 (2d Cir. 1985) (holding that an asset-purchasing company's statements to the SEC established the existence of a de facto merger as a matter of law, even though the SEC statements were later contradicted by an affidavit from the company's president).

Defendants also contend that Plaintiff should not be permitted to make de facto merger arguments because Plaintiff did not plead a de facto merger in the Amended Complaint.  (*See, e.g.*, Def. Opp. 20-21).  However, the Amended Complaint specifically alleges that, in 2010, PLC redomiciled its business to the United States, and the redomicile was accomplished by shifting PLC's assets to SAE.  (*See* Am. Compl. ¶ 12).  In addition, the Amended Complaint quotes representations made by the Seven Arts entities to the SEC, to the effect that PLC and SAPLA were operating the same business.  (*See id.*).  Finally, the Amended Complaint alleges that, after PLC transferred its business to SAE, PLC underwent liquidation proceedings.  (*See id.* at ¶ 14).  Thus, the Amended Complaint adequately pleads a claim that PLC de facto merged with SAE.  And, as explained above, Plaintiff has now proven that this de facto merger occurred.

Because Plaintiff has proven a de facto merger between SAE and PLC, Plaintiff is entitled to a declaration that SAE assumed PLC's obligations under the Arrowhead Note.[8]  *See Aguas Lenders Recovery Grp. LLC* v. *Suez, S.A.*, 585 F.3d 696, 700-01 (2d Cir. 2009) (suggesting that, when an asset transfer agreement is really a de facto merger, the asset-purchasing corporation is bound by the selling corporation's contractual agreements with third parties); *accord AT & S Transp., LLC*, 803 N.Y.S.2d at 121; *Ladenburg Thalmann & Co.* v. *Tim's Amusements, Inc.*, 712 N.Y.S.2d 526, 530-31 (1st Dep't 2000).  However, the Court is mindful that PLC is not yet a debtor on the State Court Judgment.

---

[8]    Because the Court has concluded that SAE assumed all of PLC's debts through a de facto merger, the Court need not reach Plaintiff's alternative argument that SAE contractually assumed PLC's debts.  (Pl. Br. 9-17).

(Am. Compl., Ex. 2 at 2-3).[9]  Thus, the relationship between PLC and SAE

cannot (yet) serve as a basis for finding that SAE is a debtor on the State Court

Judgment.

> ### ii.     Liability Based on the Transfer of Assets From SAE to SAE

Plaintiff also argues that SAE is liable on the Arrowhead Note because

SAFE was a signatory to the note, and SAFE de facto merged with SAE.  (Pl.

Br. 17-25).  As noted above, the Second Transfer Agreement conveyed all of

SAFE's assets to SAE.  From this and related evidence, Plaintiff contends that

the Second Transfer Agreement created a de facto merger between SAFE and

SAE.  The Court agrees.

Turning to the first prong of the de facto merger analysis, the Court notes

that there was a continuity of ownership between SAFE and SAE.  *See Cargo,*

352 F.3d at 46-47.  Before the Second Transfer Agreement was executed, SAFE

was the wholly owned subsidiary of SAE.  (*See* Pl. 56.1 ¶ 51; Goldin Decl.,

Ex. 12-19, 26).  In other words, SAFE was owned indirectly by SAE's

shareholders.  After the transfer agreement was executed, SAFE was owned

directly by SAE's shareholders, but the identity of those shareholders did not

change.

---

[9]     A review of the state court docket suggests that the state court has not yet entered
judgment against PLC because PLC has been involved in liquidation proceedings.  *See
Arrowhead Capital Fin. Ltd.* v. *Seven Arts Pictures PLC*, Index No. 601199/10 (Sup. Ct.
N.Y. County).  However, the logic of the State Court Opinion suggests that all
signatories to the Arrowhead Note — including PLC — are liable to Plaintiff.  (*See* Am.
Compl., Ex. 1).

Second, shortly after SAFE transferred its assets to SAE, SAFE ceased its operations and began liquidation proceedings.  *See Cargo,* 352 F.3d at 46; *Fitzgerald,* 730 N.Y.S.2d at 72.  As Defendant SAE explained to the SEC, "SAFE ceased operations on May 31, 2013 on closing of its office in London, England. SAE plans to file for creditors voluntary liquidation of SAFE in England." (Pl. 56.1 ¶ 57).  Liquidation proceedings against SAFE were in fact initiated in 2013. (*See* Goldin Decl., Ex. 31-33).  Here, as above, the Court does not believe that it is dispositive that SAFE signed the relevant asset transfer agreement roughly 17 months before it stopped operating.  (Pl. 56.1 ¶ 57 (noting that the Second Transfer Agreement was signed on January 1, 2012, but SAFE did not stop operating until May 31, 2013); *see supra* at 24 (citing *Arnold Graphics* for the proposition that it is permissible to find a de facto merger where "the selling corporation [is] not dissolved until eighteen months after the [asset] sale and possess[es] valuable assets during the interim").  The key point is that, following the sale of its assets to SAE, SAFE went out of business.

Third, SAE assumed enough of SAFE's liabilities to continue SAFE's business. *See Cargo,* 352 F.3d at 46; *Nettis,* 241 F.3d at 193-94.  The Second Transfer Agreement expressly provided that SAE would assume "all of the obligations, responsibilities and liabilities of [SAFE] pursuant to the terms of the Film Agreements." (Goldin Decl., Ex. 30).  Assuming these liabilities allowed SAE to reap the benefits of SAFE's film library.  (*See* Goldin Decl.,

Ex. 10 at 20 (agreeing with the Court that holding a film library was SAFE's "reason for being")).

Finally, there is abundant evidence that SAFE transferred its assets and general business operations to SAE.  As noted above, SAFE transferred its film library — its "reason for being" — to SAE.  (Pl. 56.1 ¶ 57).  In addition, Mr. Hoffman assured the SEC that the decision to fold SAFE into its parent company, SAE, would have "no impact on the [parent's] consolidated financial statements."  (*Id.*).  In other words, the total amount of business accomplished by SAFE and SAE would remain the same.

It is true that, when SAE absorbed SAFE, some Seven Arts operations were moved from the United Kingdom to the United States.  (Pl. 56.1 ¶¶ 40-41, 57).  And that move may have involved some change in personnel.  Once again, however, Mr. Hoffman's intention to move a piece of Seven Arts' business from the United Kingdom to the United States does not undermine the other evidence that a de facto merger occurred.  (*See supra* at 24).  Here, Mr. Hoffman's statements to the SEC paint an unmistakable picture of a subsidiary (SAFE) undergoing a de facto merger with its parent.  *See Nettis*, 241 F.3d at 194; *Woodrick*, 703 A.2d at 314.

Again Defendants argue that Plaintiff's arguments are infirm because they rely on hearsay statements made to the SEC.  (*See generally* Def. Opp. 13-15, 22).  However, the statements that establish SAE's merger with SAFE are statements made by SAE itself; consequently, these statements are admissible as statements of a party opponent.  *See* Fed. R. Evid. 801(d)(2).

In addition, Defendants argue that the Amended Complaint did not adequately plead that SAFE de facto merged with SAE.  (*See, e.g.*, Def. Opp. 1-3).  But the Court disagrees.  The Amended Complaint alleges that SAFE is one of the "predecessors" of SAE.  (Am. Compl. ¶ 63).  In addition, it alleges that SAE

> continued … [the] motion picture distribution business previously conducted by its predecessors SAP, PLC *and SAFE* without change in ownership and under the same management and control of Peter and Kate Hoffman, using the same "Seven Arts" name and logo, personnel, facilities, equipment, and telephone number, previously used by SAP, PLC *and SAFE*.

(*Id.* (emphases added)).  These allegations were sufficient to put Defendants on notice of Plaintiff's contention that SAE de facto merged with SAFE.

In light of this de facto merger, SAE and SAFE are one and the same company, and as a result, they have one and the same liabilities.  *See AT & S Transp., LLC*, 803 N.Y.S.2d at 121.[10]  Thus, Plaintiff is entitled to a declaratory judgment that SAE is liable on the Arrowhead Note to the same extent as signatory SAFE.  Similarly, Plaintiff is entitled to a declaration that SAE is liable on the State Court Judgment to the same extent as judgment debtor SAFE.

---

[10]   Because the Court has concluded that SAE assumed all of SAFE's debts through a de facto merger, the Court need not reach Plaintiff's alternative argument that SAE contractually assumed SAFE's debt on the Arrowhead Note.  (Pl. Br. 9-17).

### b.   Liability of SAFELA

In a variation on the theme of this litigation, Plaintiff also alleges that SAE de facto merged with SAFELA.  Plaintiff explains that in 2014, SAE transferred its film distribution rights to its subsidiary, SAFELA.  (*See* Pl. 56.1 ¶¶ 80-84).  According to Plaintiff, this asset transfer was simply a merger by a different name.  (*See* Pl. Br. 21-25).

Ultimately, however, the Court cannot make this finding as a matter of law with respect to SAFELA.  Simply put, the Court does not believe that Plaintiff has introduced enough evidence to show that SAE deliberately shifted all of its business to SAFELA, and then stopped conducting business itself. *See Cargo*, 352 F.3d at 45-46.  When the existing evidence is construed in the light most favorable to Defendants, it is equally consistent with the suggestions that: (i) SAE merged with SAFELA; and (ii) SAE shifted one portion of its business to SAFELA, after which both SAE and SAFELA have been on shaky financial footing.  (*See* Pl. 56.1 ¶¶ 77-94).[11]  Thus, the Court cannot find, as a matter of law, that SAFELA is liable on the Arrowhead Note or the State Court Judgment.

---

[11]   Plaintiff also identifies several pieces of evidence suggesting that SAE's transfer of assets to SAFELA was fraudulent.  (*See* Pl. Br. 21-23).  However, Plaintiff does not affirmatively argue that SAE arranged a fraudulent transfer to shield assets from creditors.  Thus, the Court has not considered any fraudulent transfer arguments.  *See Jackson* v. *Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (explaining that, in the summary judgment context, a counseled litigant can waive an argument by failing to address it).

## 2.   Defendants' Motion for Summary Judgment Is Denied

### a.   The Doctrine of Res Judicata Does Not Bar Plaintiff's Claims

Seeking to make affirmative use of Plaintiff's factual contentions, Defendants argue that, if they are truly the successors to PLC and SAFE, then the doctrine of res judicata bars all of Plaintiff's claims.  (Def. Br. 12-15).  As described in the remainder of this section, the effort fails.[12]

### i.   Plaintiff's Claims for Declaratory Relief Are Not Precluded

The doctrine of res judicata provides that, when a court resolves a case, the parties and their "privies" cannot relitigate "issues that were or could have been raised" in that case.  *St. Pierre* v. *Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (quoting *Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981)). Defendants contend that, if they are truly the successors to PLC and SAFE, then they are the "privies" of PLC and SAFE.  And Plaintiff "could have" brought its declaratory claims against these privies in the State Court Action: Before the State Court Action was resolved, Plaintiff either knew or should have known about the asset transfers underlying Plaintiff's de facto merger arguments.  Nevertheless, Plaintiff made no effort to raise its declaratory claims

---

[12]   Plaintiff argues that the Court resolved the res judicata argument at the conference held on November 12, 2015.  (Pl. Opp. 21).  However, the purpose of the November 12 conference was to discuss discovery issues and Defendants' anticipated motion for judgment on the pleadings; by identifying the problems with Defendants' anticipated motion — including the problems with Defendants' res judicata argument — the Court was simply identifying the hurdles that Defendants would need to overcome in any written motion.  (*See* Dkt. #89).  The Court did not finally resolve the res judicata issue at that time.

against Defendants in state court.  Thus, Defendants conclude, Plaintiff cannot bring its declaratory claims here.  (Def. Br. 12-15).

Defendants' argument is flawed in two respects.  First, the doctrine of res judicata only bars a plaintiff from bringing successive litigation against a defendant or its privies if the successive litigation arises out of the "same nucleus of operative fact" as the original litigation.  *Channer* v. *Dep't of Homeland Sec.*, 527 F.3d 275, 280-81 (2d Cir. 2008).  And in this case, Plaintiff's claims for declaratory relief do not share a "nucleus of operative fact" with the claims asserted in the State Court Action.  The State Court Action considered whether SAP, PLC, and SAFE were liable to Plaintiff under a particular contractual agreement (the Arrowhead Note).  (*See* Am. Compl., Ex. 1-2).  But Plaintiff's declaratory claims in this case raise a very different question: whether PLC and SAFE underwent a de facto merger when they signed *other* contractual agreements (the Transfer Agreements).  Thus, the doctrine of res judicata does not bar Plaintiff's claims for declaratory relief.

Second, and relatedly, Plaintiff's claims for declaratory relief can best be characterized as a request to enforce the State Court Judgment.  Plaintiff is essentially arguing that two of the debtors on the State Court Judgment — PLC and SAFE — have continued their business under different names; consequently, Plaintiff is seeking a declaration that, irrespective of any change in their corporate structures, PLC and SAFE are still liable on the State Court Judgment.  (*See generally* Am. Compl.).  And it is well-settled that the doctrine of res judicata does not bar a plaintiff's attempt to *enforce* the judgment in its

34

favor.  *See Am. Federated Title Corp.* v. *GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 523 (S.D.N.Y. 2014); RESTATEMENT (SECOND) OF JUDGMENTS §§ 17, 18 cmt. j.

Defendants contend that this case is analogous to *Russell* v. *SunAmerica Sec., Inc.*, 962 F.2d 1169 (5th Cir. 1992), where the Court found that the plaintiffs were doing more than simply bringing an action to enforce the judgment, *id.* at 1172-76.  In *Russell*, the plaintiffs settled a case against an entity called Southmark for $105,000.  *Id.* at 1171.  Thereafter, the plaintiffs tried to argue that Southmark's successor in interest (SunAmerica) owed them more than the $105,000 that the plaintiffs had already received.  *Id.*  The Fifth Circuit rejected this argument, holding that the settlement agreement prohibited additional litigation against Southmark or its successor.  *Id.* at 1176.

To describe the *Russell* case is to distinguish it:  Here, Plaintiff is not arguing that SAE or SAFELA owes anything more than the original defendants in the State Court Action.  (*See generally* Am. Compl.).  Rather, Plaintiff is simply trying to collect the money that those defendants owe under the State Court Judgment.  (*See generally id.*).

As presented, Defendants' arguments in support of summary judgment, including their preclusion arguments, are weak.  However, the strongest way to construe this particular argument is to say that Defendants believe they were "necessary parties" to the State Court Action.  As Defendants note, Plaintiff either knew or should have known about the consolidation of PLC and SAE a few weeks after it initiated the State Court Action.  Similarly, Plaintiff either

35

knew or should have known about the consolidation of other Seven Arts entities in early 2012, i.e., before the State Court issued its opinion.  Thus, Defendants suggest, Plaintiff had an obligation to amend its pleadings in the State Court Action to add SAE and SAFELA as parties.  (Def. Br. 2 n.2).

This suggestion is not supported by New York law.  Section 3002(a) of the New York Civil Practice Law and Rules expressly provides that, "[w]here causes of action exist against several persons, the commencement or maintenance of an action against one, or the recovery against one of a judgment which is unsatisfied, shall not be deemed an election of remedies which bars an action against the others."  N.Y. C.P.L.R. § 3002(a).  Similarly, section 3002(c) provides:

> Where causes of action exist against several persons for the conversion of property and upon express or implied contract, the commencement or maintenance of an action against one, or the recovery against one of a judgment which is unsatisfied, either for the conversion or upon the contract, shall not be deemed an election of remedies which bars an action against the others either for the conversion or upon the contract.

N.Y. C.P.L.R. § 3002(c).  Under these provisions, Plaintiff had a right to seek a judgment against some of the individuals who were liable on the Arrowhead Note, and then later initiate a second action against others liable on the same note.  *See, e.g.*, *Seaman* v. *Fichet-Bauche N. Am., Inc.*, 575 N.Y.S.2d 122, 124 (2d Dep't 1991).  Of course, the second action might be considerably shorter because the parties might be precluded from raising some of the *issues* that were actually litigated and decided in the prior action.  *See id.*  But, as

36

explained throughout this Opinion, the Court does not believe that Plaintiff is seeking to relitigate issues that were actually decided by the state court.

### ii. Plaintiff's Claims for Money Damages Are Not Precluded

Defendants also claim that res judicata bars Plaintiff's claims for money damages, i.e., the third through eighth claims in the Amended Complaint.  (*See* Def. Br. 12-13).  If any of the claims in the Amended Complaint covered misconduct that SAP, PLC, and SAFE allegedly committed before Plaintiff initiated the State Court Action, the Court would have to agree that these claims are barred by the doctrine of res judicata, because they would arise out of the same "nucleus of operative fact."  *Channer*, 527 F.3d at 280-81. Crucially, however, the Court construes the Amended Complaint to raise claims based on the misconduct of various Seven Arts entities after the State Court Judgment was entered.  Specifically, the Amended Complaint suggests that the State Court Judgment gave Plaintiff a right to begin collecting collateral from PLC and SAFE, but various Seven Arts entities engaged in misconduct to prevent Plaintiff from exercising this right.  (*See generally* Am. Compl.; Pl. Opp. 24-25 (confirming this interpretation of the Amended Complaint)).  So construed, the Amended Complaint raises claims that are beyond the (temporal) scope of the State Court Action; consequently, the Amended Complaint presents no res judicata problem.[13]

---

[13]   Similar logic compels denial of Defendants' claim that certain of Plaintiff's state-law claims are barred by the applicable statute of limitations.  (*See* Def. Br. 24-25).

### b.    The Automatic Bankruptcy Stay Does Not Bar This Litigation

Defendants also argue that it is impermissible for Plaintiff to bring this action because Plaintiff is asserting claims involving PLC, and such claims violate the automatic bankruptcy stay applicable to PLC.  (*See* Def. Br. 15-18). Defendants made precisely the same argument in their motion to dismiss, and the Court rejected that argument in the June 24 Decision.  (*See* Dkt. #44, 48). Specifically, the Court held:

> Because this suit is brought not against the bankruptcy debtor, PLC, but against nonbankrupt entities, and because there is no argument that's been presented to me that this lawsuit will have immediate adverse economic consequences for PLC's estate, I find the automatic stay to be inapplicable. Therefore, the motion to dismiss, insofar as it is premised on the automatic stay, is denied.

(Dkt. #48, at 6).  The Court's prior decision that the bankruptcy stay is inapplicable is "law of the case."  *Johnson* v. *Holder*, 564 F.3d 95, 99 (2d Cir. 2009).  Consequently, the Court must adhere to this decision "unless 'cogent and compelling reasons militate otherwise.'"  *Id.* (quoting *United States* v. *Quintieri,* 306 F.3d 1217, 1225 (2d Cir. 2002)).  Defendants have identified no cogent or compelling reasons for the Court to alter its decision about the application of the automatic stay.  Given the fact that Plaintiff already has a judgment against PLC, the Court does not believe that adding other entities to that judgment will harm the estate of PLC.  And, despite ample opportunity to

conduct discovery, Defendants have presented no evidence suggesting that PLC's estate would be harmed by this litigation.[14]

### c.     Defendants Forfeited Any Personal Jurisdiction Defense When They Failed to Comply with Discovery Orders

In the June 24 decision, the Court found that the allegations in the Amended Complaint were sufficient to support a *prima facie* case that the Court had personal jurisdiction over Defendants.  (*See generally* Dkt. #48). However, the Court left open the possibility that discovery might reveal insufficient evidence to support Plaintiff's jurisdictional allegations.  (*See id.* at 10 ("[T]o the extent that [D]efendants complain that [P]laintiff has failed to prove the jurisdictional elements, ... these arguments are premature. ... [I]t may be that later on this [case] will get dismissed on that basis, but at this sta[g]e that's not the standard I can use.")).  *See also, e.g.*, *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 570-71 (S.D.N.Y. 2012) (observing that a motion to dismiss for lack of personal jurisdiction could be renewed after discovery); *In re Sumitomo Copper Litig.*, 204 F.R.D. 58, 59 (S.D.N.Y. 2001) (same).  Now that the parties have had an opportunity to exchange discovery, Defendants have renewed their argument that the Court lacks personal jurisdiction.  (Def. Br. 18-22).

However, the Court need not reach the merits of Defendants' jurisdictional arguments because those arguments have been forfeited.  The

---

[14]     Because the Court has applied the law-of-the-case doctrine, it need not reach Plaintiff's alternative argument that, as of November 23, 2015, the bankruptcy case against PLC was closed.  (*See* Pl. Opp. 2-3; Dkt. #83).

Second Circuit has long recognized that a defendant can "forfeit[] its argument that personal jurisdiction is lacking." *Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V.* v. *Pemex-Exploración y Producción*, — F.3d —, No. 13-4022, 2016 WL 4087215, at *5 (2d Cir. Aug. 2, 2016); *see also, e.g.*, *City of New York* v. *Mickalis Pawn Shop, LLC*, 645 F.3d 114, 139 (2d Cir. 2011); *Hamilton* v. *Atlas Turner, Inc.*, 197 F.3d 58, 62 (2d Cir. 1999). One way to accomplish such a forfeiture is "noncompliance with discovery orders." *Robertson* v. *Dowbenko*, 443 F. App'x 659, 661-62 (2d Cir. 2011) (summary order). Here, the Court believes that Defendants' persistent violations of the Court's discovery orders prevented Plaintiff from obtaining evidence that could be used to prove its jurisdictional allegations. The Court will not allow these violations to go unredressed. As one of several sanctions for Defendants' misconduct, the Court now precludes Defendants from contesting the issue of personal jurisdiction. *See* Fed. R. Civ. P. 37(b)(2)(A) ("If a party or a party's officer, director, or managing agent … fails to obey an order to provide or permit discovery … the court where the action is pending may … prohibit[] the disobedient party from supporting or opposing designated claims or defenses[.]"); Fed. R. Civ. P. 37(d) (providing that a court may sanction a party for failure to attend depositions or answer interrogatories).

Several considerations inform the Court's decision to impose sanctions under Federal Rule of Civil Procedure 37, including: "[i] the willfulness of the [noncompliance] or the reason for noncompliance; [ii] the efficacy of lesser sanctions; [iii] the duration of the period of noncompliance[;] and [iv] whether

the [Defendants] ha[ve] been warned of the consequences of noncompliance."
*Agiwal* v. *Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (quoting
*Nieves* v. *City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)) (internal
quotation marks and ellipsis omitted).  Taken together, these considerations
confirm the propriety of precluding any argument by Defendants regarding
personal jurisdiction.

### i.    Willful Non-Compliance

Defendants' misconduct in this litigation is as deep as it is wide.[15]  To
begin, Defendants endeavored to hide the officers and employees of various
Seven Arts entities so that those individuals could not be deposed.  First,
Defendants refused to provide the addresses of their witnesses in their
interrogatory responses, as required by Local Rule 26.3, so those witnesses
were more difficult to pin down.  (*See* Dkt. #55).  In addition, when Plaintiff

---

[15]    Throughout these proceedings, Plaintiff has called the Court's attention to other cases
in which Mr. Hoffman and Mr. Markovich have been sanctioned.  And the Court's own
research confirms that there have been many such cases.  *See, e.g., Seven Arts Filmed
Entm't Ltd.* v. *Jonesfilm*, 538 F. App'x 444, 447 (5th Cir. 2013) (per curiam) (observing
that "disregard for the district court's order was but one installment in the continuing
tale of Appellants' contemptuous conduct" and affirming sanction imposed by district
court on, among others, SAP and Mr. Hoffman); *Seven Arts Pictures PLC* v. *Jonesfilm*,
311 F. App'x 962, 965 (9th Cir. 2009) (memorandum opinion) (upholding award of
sanctions against, among others, SAP and Mr. Hoffman for failure to comply with court
order enforcing an arbitration award), *as amended on denial of reh'g and reh'g en banc*
(Mar. 25, 2009); *Baiul* v. *NBC Sports*, No. 15 Civ. 9920 (KBF), 2016 WL 1587250, at *15
(S.D.N.Y. Apr. 19, 2016) (imposing sanctions on Mr. Markovich, observing: "If ever this
Court has witnessed attorney conduct more vexatious and harassing or deserving of
§ 1927 sanctions, the Court has difficulty in recalling that occasion."); *Too Easy Entm't,
LLC* v. *Seven Arts Pictures, Inc.*, No. 2006-CA-0015, 943 So.2d 1194, 1197 (La. Ct. App.
2006) (affirming award of sanctions on SAP and Mr. Hoffman for failure to appear at
debtors examination), *on reh'g* (Dec. 7, 2006), *aff'd on reh'g*, 2006-CA-0015, 954 So.2d
790 (La. Ct. App. 2007).  However, the Court believes that Defendants' conduct in this
case alone, and Mr. Markovich's conduct in this case alone, should form the basis for
any sanctions.

sought to depose the alleged CEO and CFO of SAE — Richard Bjorklund and Rachel Boulds — Defendants insisted that they had no obligation to produce these witnesses because the witnesses lacked "any information or knowledge related to the subject matter of this dispute." (Dkt. #56).  However, the Court could not — and still cannot — imagine that the CEO and CFO of SAE genuinely lacked "*any* information" about the finances of their company, or that they lacked "*any* information" about the relationship between their company and the other Seven Arts entities.  Consequently, the Court ordered that Mr. Bjorklund and Ms. Boulds be deposed in Los Angeles.  (*See* Dkt. #67 at 42).  Approximately one week before their scheduled depositions, Mr. Bjorklund and Ms. Boulds called Plaintiff's counsel and tried to persuade him that the depositions were unnecessary.  (*See* Dkt. #64).  A few days later, Mr. Bjorklund and Ms. Boulds abruptly resigned and then refused to travel to California.  (*See id.*).  Defense counsel confirmed that these officers resigned — at least in part — because they did not wish to be questioned in connection with this litigation.  (*See* Dkt. #63).

Similarly, after Plaintiff's counsel flew from Pennsylvania to California to take Ms. Hoffman's deposition, Defendants informed Plaintiff's counsel that Ms. Hoffman would be unavailable on the appointed deposition date.  (*See* Dkt. #64 at 2-3 (noting originally scheduled date of Saturday, October 24, 2015)).  Defendants explained that Ms. Hoffman could not attend her scheduled deposition because defense counsel had not yet prepared her to testify and, for religious reasons, defense counsel did not want to defend a deposition on a

Saturday.  (*See* Dkt. #63).  However, Defendants and their counsel provided no explanation for counsel's failure to prepare Ms. Hoffman at an earlier date, or for his failure to object to the Saturday deposition at any time before Plaintiff's counsel flew to Los Angeles to take it, despite Plaintiff's giving him many opportunities to do so.  (*See id.*; *see also* Dkt. #64).  Furthermore, after missing her deposition, Ms. Hoffman would not agree to be deposed on the East Coast, where Plaintiff's counsel is based, even though her travel plans required her to fly eastward from Los Angeles to her home in London.  (*See* Dkt. #64).

Finally, Defendants refused to produce Stephanie Dillon, claiming that she was "Mr. Hoffman's personal assistant/typist" and that Plaintiff had no "right to harass and annoy subordinate employees who ha[d] no knowledge or responsibility for the matters alleged in the [Amended Complaint]."  (Dkt. #56). But Mr. Hoffman later testified that Ms. Dillon was, at his direction, handling a portion of the discovery process for Defendants.  (*See* Goldin Decl., Ex. 10 at 191-94).  Ms. Dillon's role in the discovery process suggests that she was both aware of and able to access information relevant to these proceedings, despite Defendants' earlier assertions to the contrary.

Considering Defendants' entire course of conduct with respect to the depositions, the Court can only conclude that Defendants were deliberately making misrepresentations to the Court, cancelling depositions, and violating Court orders in an effort to prevent Plaintiff from gathering discoverable information.  Moreover, the Court believes that this conduct was coupled with willful attempts to withhold relevant documents.

43

Defendants have failed to articulate reasonable and credible explanations for their failure to produce the documents on Plaintiff's October 8 List.  Even if the Court credited the explanations that Mr. Hoffman offered at the December 15 hearing (and it does not credit several of them, for reasons discussed *infra*), the Court would have to conclude that Defendants were not making reasonable efforts to preserve information that might be relevant to this litigation.  Mr. Hoffman testified that, in the course of discovery in this case, Defendants were knowingly delinquent on their payments for use of the Zed One server.  (*See* Goldin Decl., Ex. 10 at 72).  Moreover, Defendants knew that if they could not find a way to pay for the Zed One server, they would be denied access to the documents on that server.  (*See id.* ("[T]hey would constantly cut us off[.]")).  Defendants also knew that the server was storing discoverable information.  (*See id.* ("[M]uch of the stuff that we've turned over we got off the Zed One server[.]")).  Nevertheless, Defendants delayed in making arrangements to download all of the documents on the Zed One server or to move all of the documents to Defendants' new cloud-based system; in so doing, they precipitated a situation where, if Mr. Hoffman is to be believed, they scrambled at the last minute to retrieve documents, but were unable to complete the task because they "no longer ha[d] access to the Zed One server."  (*See id.*; *see also id.* at 178).

Defendants' failure to make prompt arrangements to move or copy all of their documents from the Zed One server could be seen as reckless.  *See* Fed. R. Civ. P. 37(e) (noting that a party can be sanctioned if it does not take

44

reasonable steps to preserve discoverable electronic information).  But, on this record, the Court is convinced that Defendants' conduct transcended recklessness.  At the December 15 hearing, Mr. Hoffman offered a laundry list of excuses for the deficiencies in Defendants' document production.  (*See generally*, Goldin Decl., Ex. 10).  As this list grew longer, the excuses grew flimsier and Mr. Hoffman grew simultaneously angrier and less credible.  By the end of the hearing, and particularly after observing Mr. Hoffman's demeanor throughout that hearing, the Court was left with the distinct impression that Mr. Hoffman was making it up as he went along in order to conceal his true motive: shielding assets, and the information relating to those assets, from Defendants' creditors, including Plaintiff in this litigation.

### ii.    The Efficacy of Lesser Sanctions

The Court's efforts to effect compliance by Defendants with their discovery obligations are discussed in the Factual Background section, and are also evident from a review of the record in this case.  (*See, e.g.*, Dkt. #46, 54-56, 58-59, 61-67, 69, 71-74, 76-78, 80-81, 87, 91).  As many times as the Court intervened, Defendants still refused to comply with the Court's discovery orders.  In light of Defendants' willful efforts to derail the discovery process, the Court considered entering default judgment against Defendants on all counts in the Amended Complaint.  However, precluding Defendants from litigating the issue of personal jurisdiction — and giving a spoliation instruction, as appropriate, on any claims that are ultimately submitted to the jury — are

intermediate steps that will give Plaintiff a fair opportunity to present its case to the ultimate finder of fact.  This intermediate course of action is sufficient.

### iii.    The Duration of Noncompliance

The Court was first notified of Defendants' failure to comply with discovery obligations on September 21, 2015.  (Dkt. #55).  Since that time, Defendants continued to engage in misconduct.  Thus, more than enough time has elapsed for the Court to impose harsh sanctions.  *Agiwal*, 555 F.3d at 303 (holding that it was appropriate for the district court to default the defendant after he failed to comply with discovery orders for a "span of approximately six months").

### iv.    Warning

At the conference held on October 5, 2015, the Court explicitly warned defense counsel that if Mr. Hoffman chose to testify, but could not provide an adequate explanation for the deficiencies in Defendants' document production, the Court would impose sanctions.  (*See* Dkt. #67 at 33-35).  Because Defendants chose not to heed the Court's warning, the Court believes that sanctions are needed to deter future misconduct.  *Agiwal*, 555 F.3d at 302 (noting district court's repeated warnings of sanctions and explaining that sanctions under Rule 37 can be used to deter future violations of court orders).

### 3.    Additional Sanctions Are Warranted

In addition to precluding Defendants from litigating the issue of personal jurisdiction, the Court believes that additional sanctions are required to compensate Plaintiff for the expense of bringing Defendants' misconduct to the

Court's attention and to ensure that Defendants comply with their discovery obligations going forward.  In this regard, the Court has paid special attention to the words and actions of Mr. Hoffman.  At the December 15 hearing, Mr. Hoffman suggested that he had delegated the task of reviewing discovery materials to his staff so that he would not personally be held responsible for any failure to produce responsive materials.  (*See* Goldin Decl., Ex. 10 at 191-92 ("I did not review the amount produced.  I relied on my staff to do it and so there wouldn't be any dispute as to whether or not I made the decision not to produce a document.")).  The Court notes, as an initial matter, that Mr. Hoffman, the sun around whom all Seven Arts entities revolved, had the most knowledge about the existence and location of responsive documents, and would be involved in their production by necessity.  It thus beggars logic for Mr. Hoffman to claim that sitting on the sidelines of the document review process was a way to forestall later claims of willful non-production or spoliation.  If indeed Mr. Hoffman were not involved in the production, his absence would all but guarantee non-production or spoliation.

Moreover, contrary to his sworn testimony, Mr. Hoffman *was* involved in the process.  This is evidenced by Mr. Markovich's statement to Plaintiff's counsel that he (Mr. Markovich) was not reviewing discovery materials produced to Plaintiff, but was merely forwarding what he had received from Mr. Hoffman, which statement the Court has credited as consistent with its own observations in this litigation.  (Dkt. #55).  It is also evidenced by Mr. Hoffman's written communications with Mr. Markovich and Ms. Hoffman,

among others, which reveal him to be the principal architect of Defendants'

legal positions on Plaintiff's discovery requests.  (*See* Goldin Decl., Ex. 10 at 65

(discussing November 4, 2015 memorandum from Mr. Hoffman to Mr.

Markovich that outlined proposed bases for non-production of documents that

had been ordered by the Court); Dkt. #77, Ex. 2 (November 4, 2015

memorandum)).  Finally, it is evidenced by Mr. Hoffman's testimony at the

December 15 hearing, which clarified his critical role in deciding what

materials were searched and what items were considered "relevant."  (*See*

*generally* Goldin Decl., Ex. 10).

What is problematic is not the fact of Mr. Hoffman's involvement in the

discovery process, but the results: Even crediting Mr. Hoffman's testimony, he

gave strikingly imprecise directives to his staff to access certain materials, and

declined to pay Zed One for its document-management services without

advising the Court or Plaintiff about the non-payment of Zed One's invoices or

the consequences of such non-payment.  In so doing, Mr. Hoffman ensured

that Defendants' document productions would be incomplete.  (*See, e.g.*, Goldin

Decl., Ex. 10 at 66, 71-74, 191-92).

There are also reasons to discredit substantial portions of Mr. Hoffman's

testimony:  During the December 15 hearing, Mr. Hoffman was inconsistent to

the point of being incredible in his explanations for the non-production of

various categories of documents:

- Mr. Hoffman suggested that the onus was on Plaintiff's
  counsel to identify what materials had not been produced
  (*see, e.g.*, Goldin Decl., Ex. 10 at 123-24, 164);

48

- Relatedly, he argued a "no harm, no foul" position with respect to documents that Plaintiff's counsel had been able to obtain, sometimes fortuitously, from third parties (*see, e.g.*, *id.* at 97);

- He expressed stupefaction as to how the counterparties to various transactions with Seven Arts entities were able to produce documents evidencing dealings and communications with those entities, when he and Defendants could not produce their copies of those same documents (*see, e.g.*, *id.* at 96-97, 158-60, 184-86);

- He conceded that he never asked outside counsel, nor did he direct that anyone at Seven Arts ask outside counsel, to produce responsive, non-privileged documents (*see, e.g.*, *id.* at 161-62);

- He blamed the discontinuation of Zed One's hosting services (*see, e.g.*, *id.* at 71-73);

- He blamed the "girls" working under his direction — one of whom, Ms. Hoffman, was an officer in several Seven Arts entities — for not reviewing materials properly or not preparing summaries of information in a timely fashion (*see, e.g.*, *id.* at 77, 79, 91, 98-100, 108, 125, 171-72); and

- Most egregiously, he suggested that Plaintiff's counsel's understandable persistence in seeking documents to which Plaintiff was entitled under the Federal Rules of Civil Procedure had prompted an emotional outburst in his administrative assistant that had somehow caused her to disregard Court orders (*see id.* at 192-94).[16]

---

[16]   Mr. Hoffman's testimony at the December 15 hearing conflicted at times with his testimony before the Special Referee in the State Court Proceeding. (*See, e.g.*, *Arrowhead Capital Fin. Ltd.* v. *Seven Arts Pictures PLC*, Index No. 601199/10 (Sup. Ct. N.Y. County), Transcript of March 11, 2015 Proceedings Before Special Referee). As but one example, Mr. Hoffman advised the Referee that numerous document that were arguably responsive to the document production requests in this litigation had been transferred to SAE pursuant to the Transfer Agreements. (*Id.* at 38-39, 58-59). However, before this Court, Mr. Hoffman testified that he "just can't tell if all of them" were transferred to SAE. (Goldin Decl., Ex. 10 at 74-75).

For all of these reasons, the Court hereby orders that Defendants shall pay the attorney's fees that Plaintiff incurred: (i) drafting the September 21 Letter; (ii) preparing for and participating in the October 6 conference; (iii) generating the October 8 List; (iv) writing the October 23 Letter; (v) preparing for and participating in the November 12 conference; (vi) preparing for and participating in the December 15 hearing; and (vii) preparing the February 20 Letter.  Plaintiff's counsel must submit a proposed fee calculation to the Court within 45 days of this Order. Furthermore, Defendants must retain a second outside counsel — other than Mr. Markovich — to do a thorough review of Defendants' files and determine whether Defendants possess additional discoverable information.  This second outside counsel must represent Defendants for any remaining discovery-related proceedings.

Finally, the Court finds that Mr. Hoffman is in contempt of Court.  *See* Fed. R. Civ. P. 37(b)(2)(vii) (explaining that it is permissible to "treat[] as contempt of court the failure to obey any [discovery] order except an order to submit to a physical or mental examination").  The numerous letters that the parties have submitted disclose that Mr. Hoffman has been intimately involved in the discovery process.  (*See, e.g.*, Dkt. #77, Ex. 2 (memo from Mr. Hoffman to defense counsel outlining Defendants' position in the discovery dispute and explaining why particular documents did not need to be produced)).  Thus, the Court does not believe that the misconduct described above could have occurred without Mr. Hoffman's knowledge and consent.

50

Indeed, Mr. Hoffman seemed to anticipate that the Court would reach this conclusion, which is why he advised the Court, under oath, of his limited involvement in the production of responsive documents. (Goldin Decl., Ex. 10 at 191-92). This Court fully believes that, when Mr. Hoffman learned that there would be contempt proceedings in this case, he attempted to minimize his involvement in the discovery process. But the Court highly doubts that Mr. Hoffman took the requisite steps to ensure that, without his involvement, all responsive materials would be produced. To the contrary, Mr. Hoffman seemed to expect that staff would make "judgment[s]" — as distinguished from "mistakes" — not to produce responsive materials. (Goldin Decl., Ex. 10 at 192). Mr. Hoffman's purported efforts to limit his first-hand knowledge of the discovery process, so that he could minimize the scope of his involvement during the contempt proceedings and thereby attempt to shield himself from liability, show a flagrant disregard for this Court's discovery orders. Thus, because he (i) willfully impeded the discovery process; (ii) improperly attempted to minimize his responsibility for the obvious deficiencies in that process; and (iii) deliberately took steps to make his testimony less useful to the Court in its review of those deficiencies, Mr. Hoffman is now in contempt of Court.

### 4.    A Modest Sanction for Defense Counsel Is Also Warranted

The Court has "inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman* v. *Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995); *see also* 28 U.S.C. § 1927 ("Any attorney ... who so multiplies the proceedings in any case

unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Here, the Court believes that defense counsel Markovich acted in bad faith and in a manner that improperly lengthened the proceedings in this litigation on at least two occasions. First, the Court believes that Mr. Markovich acted in bad faith when he represented to the Court that the CEO and CFO of Defendant SAE "lacked any information or knowledge related to the subject matter of this dispute." (Dkt. #56). No attorney with knowledge of the allegations in this case could believe this representation, yet it was the cornerstone of Mr. Markovich's argument that the CEO and the CFO should not be deposed. (*See id.*).

Second, the Court believes that Mr. Markovich acted in bad faith when he raised cursory evidentiary objections to every paragraph in Plaintiff's Rule 56.1 statement, most of which had no basis in fact or law. For example, Mr. Markovich raised "Best Evidence" objections to several paragraphs in Plaintiff's Rule 56.1 statement, but many of these paragraphs cited actual written contracts at issue in this case (or at least photocopies of actual written contracts). (*See, e.g.*, Def. 56.1 Opp. ¶¶ 1-6). These written contracts clearly satisfy the best evidence rule. *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."); Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is

raised about the original's authenticity or the circumstances make it unfair to admit the duplicate.").

Similarly, Mr. Markovich raised specious relevance objections to several of the most relevant paragraphs in Plaintiff's 56.1 statement.  For example, paragraph 24 states that, in October of 2012, "the New York Supreme Court filed and entered Judgment in … Arrowhead's favor for $2,496,195[.]"  (Pl. 56.1 ¶ 24).  Mr. Markovich lodged a relevance objection to this statement — but this entire case turns on whether the October 2012 judgment binds Defendants. (*See* Def. 56.1 Opp. ¶ 24; *see also, e.g.*, Def. 56.1 Opp. ¶ 28 (lodging a relevance objection to key passages in the First Transfer Agreement)).  Thus, the Court cannot conclude that Mr. Markovich raised all of his evidentiary objections in good faith.

In light of Mr. Markovich's conduct — which was plainly in bad faith but limited in scope and effect — the Court will impose a modest sanction on him, and order him to cover some portion of the costs Plaintiff incurred in preparing the reply brief to its summary judgment motion.  Plaintiff's counsel must submit a proposed fee schedule to the Court within 45 days of this Order, and must explain to the Court in that submission the degree to which the drafting of the reply brief was complicated by the improprieties outlined in this section.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Defendants' motion is DENIED in its entirety.  The Clerk of Court is directed to terminate docket entries 98

and 110.  The Court also ORDERS sanctions in accordance with pages 39-40, 50, and 53 of this Opinion.

In addition, the parties are ORDERED to appear for a conference on **Thursday, October 20, 2016, at 10:00 a.m.**, in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, at which time a trial will be scheduled in this matter.

SO ORDERED.

Dated:      September 16, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge